1  JONATHAN H. BLAVIN (State Bar No. 230269)
   jonathan.blavin@mto.com
2  ELLEN M. RICHMOND (State Bar No. 277266)
   ellen.richmond@mto.com
3  JOSHUA PATASHNIK (State Bar No. 295120)
   josh.patashnik@mto.com
4  MUNGER, TOLLES & OLSON LLP
   560 Mission Street, Twenty-Seventh Floor
5  San Francisco, CA  94105-4000
   Telephone:      (415) 512-4000
6  Facsimile:      (415) 512-4077

7  JOHN W. SPIEGEL (State Bar No. 78935)
   john.spiegel@mto.com
8  MUNGER, TOLLES & OLSON LLP
   355 South Grand Avenue, Thirty-Fifth Floor
9  Los Angeles, California 90071-1560
   Telephone:      (213) 683-9100
10 Facsimile:      (213) 687-3702

11 Attorneys for Plaintiff Airbnb, Inc.

12                    UNITED STATES DISTRICT COURT

13                   NORTHERN DISTRICT OF CALIFORNIA

14                       SAN FRANCISCO DIVISION

15

16

17  AIRBNB, INC.,                         Case No. 16-cv-03615

                                          **NOTICE OF MOTION AND MOTION**
18          Plaintiff,                    **FOR PRELIMINARY INJUNCTION;**
                                          **MEMORANDUM OF POINTS AND**
19      vs.                               **AUTHORITIES IN SUPPORT**
                                          **THEREOF**
20  CITY AND COUNTY OF SAN
    FRANCISCO,                            Time:      August 1, 2016 at 9:00 am
21
            Defendant.
22

23

24

25

26

27

28

# TABLE OF CONTENTS

Page

NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION.............................. 1

I.      INTRODUCTION............................................................................... 1

II.     BACKGROUND.................................................................................. 4

        A.      Airbnb................................................................................. 4

        B.      San Francisco's Regulatory Scheme Governing Short-Term Rentals and the
                Ordinance's Amendments to It .................................................... 6

III.    ARGUMENT ...................................................................................... 9

        A.      Standard for Preliminary Injunction............................................. 9

        B.      Airbnb is Likely To Succeed on the Merits of its Claims ..................... 9

                1.      The City's Enforcement of the Ordinance Against Airbnb Violates
                        and Is Preempted By Section 230 of the CDA ............................ 9

                        (a)     Hosting Platforms Are "Interactive Computer Service"
                                Providers........................................................ 11

                        (b)     The Ordinance Treats Hosting Platforms as "Publishers" ........ 11

                                (i)      The Ordinance Imposes Liability on Hosting Platforms
                                         for Publishing Certain Third-Party Content ............. 11

                                (ii)     The Ordinance Imposes Liability on Hosting Platforms
                                         for Failing to Verify and Screen Third-Party Content ........ 13

                                (iii)    The Substance and Purpose of The Ordinance to Target
                                         Third-Party Content Confirm the CDA's Applicability........ 15

                        (c)     Listings Without Verified Registration Numbers Are Provided
                                By "Another Information Content Provider" ...................... 16

                2.      The Disclosure Provisions Conflict With and Are Preempted by the
                        SCA ................................................................... 17

                3.      The Ordinance Violates the First Amendment Because It Is a Content-
                        Based Restriction on Speech that Is Not Narrowly Tailored to Serve a
                        Substantial Government Interest and Is Overbroad ...................... 18

        C.      Airbnb Faces Irreparable Harm Unless the Ordinance is Enjoined ........... 23

        D.      The Balance of Equities and Public Interest Favor Airbnb................... 25

IV.     CONCLUSION ................................................................................ 25

**FEDERAL CASES**

*Aeroground, Inc. v. City & Cnty. of San Francisco,*
170 F. Supp. 2d 950 (N.D. Cal. 2001) ......................................................25

*Almeida v. Amazon.com, Inc.,*
456 F.3d 1316 (11th Cir. 2006) ................................................................14

*Am. Trucking Ass'ns, Inc. v. City of Los Angeles,*
559 F.3d 1046 (9th Cir. 2009) ...............................................................4, 25

*Ashcroft v. ACLU,*
542 U.S. 656 (2004) .................................................................................19

*Backpage.com, LLC v. Cooper,*
939 F. Supp. 2d 805 (M.D. Tenn. 2013) ...............................13, 15, 21, 24

*Backpage.com, LLC v. Hoffman,*
2013 WL 4502097 (D.N.J. Aug. 30, 2013) ........................................13, 23

*Backpage.com, LLC v. McKenna,*
881 F. Supp. 2d 1262 (W.D. Wash. 2012) ................................... passim

*Bank One, Utah v. Guttau,*
190 F.3d 844 (8th Cir. 1999) ....................................................................25

*Barnes v. Yahoo!, Inc.,*
570 F.3d 1096 (9th Cir. 2009) ............................................................2, 11, 13

*Bartnicki v. Vopper,*
532 U.S. 514 (2001) ..............................................................................3, 20

*Batzel v. Smith,*
333 F.3d 1018 (9th Cir. 2003) ..................................................................12

*Black v. Google Inc.,*
2010 WL 3222147 (N.D. Cal. Aug. 13, 2010) ..........................................17

*Brown v. Entm't Merchants Ass'n,*
564 U.S. 786 (2011) .............................................................................19, 20

*Carafano v. Metrosplash.com, Inc.,*
339 F.3d 1119 (9th Cir. 2003) .........................................................10, 12, 17

*Central Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n,*
447 U.S. 557 (1980) .................................................................................19

*Chicago Lawyers' Comm. for Civil Rights Under Law, Inc. v. Craigslist, Inc.,*
   519 F.3d 666 (7th Cir. 2008) ..................................................................................10

*City of Cincinnati v. Discovery Network, Inc.,*
   507 U.S. 410 (1993) ..............................................................................................22

*Crispin v. Christian Audigier, Inc.,*
   717 F. Supp. 2d 965 (C.D. Cal. 2010) ..............................................................17, 18

*Dart v. Craigslist, Inc.,*
   665 F. Supp. 2d 961 (N.D. Ill. 2009) ......................................................................10

*Doe v. Friendfinder Network, Inc.,*
   540 F. Supp. 2d 288 (D.N.H. 2008) ........................................................................14

*Doe v. Harris,*
   772 F.3d 563 (9th Cir. 2014) ..................................................................................23

*Doe v. MySpace, Inc.,*
   474 F. Supp. 2d 843 (W.D. Tex. 2007), aff'd, 528 F.3d 413 (5th Cir. 2008) .................14, 16

*Edenfield v. Fane,*
   507 U.S. 761 (1993) ..........................................................................................20, 22

*Fair Hous. Council of San Fernando Valley v. Roommates.com, LLC,*
   521 F.3d 1157 (9th Cir. 2008) ..............................................................10, 11, 14, 17

*Farris v. Seabrook,*
   677 F.3d 858 (9th Cir. 2012) ..........................................................................4, 9, 23

*Florida Bar v. Went For It, Inc.,*
   515 U.S. 618 (1995) ..............................................................................................19

*Florida Star v. B.J.F.,*
   491 U.S. 524 (1989) ..............................................................................................20

*Forsyth Cnty. v. Nationalist Movement,*
   505 U.S. 123 (1992) ..............................................................................................19

*Foti v. City of Menlo Park,*
   146 F.3d 629 (9th Cir. 1998) ....................................................................................1

*Fourco Glass Co. v. Transmirra Prods. Corp.,*
   353 U.S. 222 (1957) ................................................................................................7

Page(s)

*Georgia Latino Alliance for Human Rights v. Governor of Georgia*,
    691 F.3d 1250 (11th Cir. 2012)..................................................................................23

*Goddard v. Google, Inc.*,
    2008 WL 5245490 (N.D. Cal. Dec. 17, 2008) ...............................................3, 16, 17

*Goddard v. Google, Inc.*,
    640 F. Supp. 2d 1193 (N.D. Cal. 2009) ...............................................................2, 17

*Inman v. Technicolor USA, Inc.*,
    2011 WL 5829024 (W.D. Pa. Nov. 18, 2011) ............................................................10

*Jane Doe No. 1 v. Backpage.com, LLC*,
    817 F.3d 12 (1st Cir. 2016) ............................................................................. passim

*Jones v. Dirty World Entm't Recordings LLC*,
    755 F.3d 398 (6th Cir. 2014)....................................................................................17

*Jurin v. Google, Inc.*,
    695 F. Supp. 2d 1117 (E.D. Cal. 2010) ....................................................................10

*Klein v. City of San Clemente*,
    584 F.3d 1196 (9th Cir. 2009)..................................................................................25

*Mahroom v. Best W. Int'l, Inc.*,
    2009 WL 248262 (N.D. Cal. Feb. 2, 2009)...............................................................25

*Mazur v. eBay Inc.*,
    2008 WL 618988 (N.D. Cal. Mar. 4, 2008) .......................................................10, 14

*Melendres v. Arpaio*,
    695 F.3d 990 (9th Cir. 2012)...............................................................................4, 25

*Memphis Publ'g Co. v. Leech*,
    539 F. Supp. 405 (W.D. Tenn. 1982)........................................................................23

*Morales v. Trans World Airlines, Inc.*,
    504 U.S. 374 (1992) ..................................................................................................23

*Newdow v. Rio Linda Union Sch. Dist.*,
    597 F.3d 1007 (9th Cir. 2010)..................................................................................12

*News & Sun Sentinel Co. v. Bd. of Cnty. Comm'rs*,
    693 F. Supp. 1066 (S.D. Fla. 1987)..........................................................................22

*Reed v. Town of Gilbert*,
    135 S. Ct. 2218 (2015) ................................................................................18

*Rubin v. Coors Brewing Co.*,
    514 U.S. 476 (1995) ....................................................................................18

*Satellite Television of N.Y. Assocs. v. Finneran*,
    579 F. Supp. 1546 (S.D.N.Y. 1984) ...........................................................24

*Sorrell v. IMS Health, Inc.*,
    564 U.S. 552 (2011) .........................................................................3, 18, 19

*Telecomms. Regulatory Bd. of Puerto Rico v. CTIA-Wireless Ass'n*,
    752 F.3d 60 (1st Cir. 2014) .....................................................................3, 18

*Thompson v. W. States Med. Ctr.*,
    535 U.S. 357 (2002) ....................................................................................22

*Toomer v. Witsell*,
    334 U.S. 385, 392 (1948) ............................................................................24

*Valle Del Sol Inc. v. Whiting*,
    709 F.3d 808 (9th Cir. 2013) ................................................................21, 22

*Valle del Sol Inc. v. Whiting*,
    732 F.3d 1006 (9th Cir. 2013) ...............................................................4, 23

*Village of Schaumburg v. Citizens for a Better Env't*,
    444 U.S. 620 (1980) ....................................................................................20

*Yniguez v. Arizonans for Official English*,
    42 F.3d 1217 (9th Cir. 1994) ......................................................................22

*Winter v. Natural Res. Def. Council*,
    555 U.S. 7 (2008) ..........................................................................................9

**STATE CASES**

*Gentry v. eBay, Inc.*,
    99 Cal. App. 4th 816 (2002).................................................................10, 16

*Hill v. StubHub, Inc.*,
    219 N.C. App. 227 (2012)......................................................................10, 17

*Milgram v. Orbitz Worldwide, Inc.*,
    419 N.J. Super. 305 (2010) ...........................................................................1

# TABLE OF AUTHORITIES
**(continued)**

**Page(s)**

**FEDERAL STATUTES AND RULES**

18 U.S.C. § 2510 ................................................................................................... 17

18 U.S.C. § 2701 ..................................................................................................... 1

18 U.S.C. § 2702 ................................................................................................... 18

47 U.S.C. § 230 ............................................................................................... passim

Federal Rule of Civil Procedure 65 ........................................................................ 1

**MUNICIPAL STATUTES**

S.F. Admin. Code § 41A.4 ............................................................................... passim

S.F. Admin. Code § 41A.5 ............................................................................... passim

S.F. Admin. Code § 41A.7 ............................................................................... passim

**OTHER AUTHORITIES**

U.S. Const., amend. I ....................................................................................... passim

**CONGRESSIONAL REPORTS**

S. Rep. No. 99-541 (1986) ..................................................................................... 17

AIRBNB'S MOTION FOR A PRELIMINARY INJUNCTION

CASE NO. 16-cv-03615

## NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION

PLEASE TAKE NOTICE that on August 1, 2016 at 9:00 a.m. or as soon thereafter as may be heard, Plaintiff Airbnb, Inc. ("Airbnb") will and hereby does move for a preliminary injunction.

Airbnb respectfully requests an order enjoining Defendant City and County of San Francisco ("City") from enforcing against Airbnb amended Sections 41A.5(e), 41A.5(g)(4)(C), and 41A.7(b) (1)–(3) of the San Francisco Administrative Code, effective on July 24, 2016 (the "Ordinance").[1]

## I.  INTRODUCTION

As designed and drafted by the Board of Supervisors, the Ordinance directly conflicts with, and is preempted by, Section 230 of the Communications Decency Act, 47 U.S.C. § 230 (the "CDA").  According to its own sponsors, the law holds "*hosting platforms accountable* for the hundreds of units (rented by) *unscrupulous individuals*" posting listings on their websites, and holds "*Airbnb Accountable for Listing Illegal Short Term Rentals*."  Declaration of Jonathan H. Blavin ("Blavin Decl."), Exs. A at 1; B; C at 1 (emphases added).  As such, the Ordinance unquestionably treats online platforms like Airbnb as the publisher or speaker of third-party content and is completely preempted by the CDA.  In addition, the law violates the Stored Communications Act, 18 U.S.C. §§ 2701 et seq. (the "SCA"), by requiring disclosure to the City of customer information without any legal process, and the First Amendment as an impermissible content-based regulation.[2]

The Ordinance fundamentally and impermissibly alters San Francisco's regulatory scheme for short-term rentals by holding "Hosting Platforms"—defined by the law as entities that provide "a means through which" residents "may offer" and "advertise" their units for rent "through a website" (S.F. Admin. Code § 41A.4)—criminally and civilly liable for their users' posting of listings without valid registration numbers.  Prior to the recent amendments (since February 2015), San Francisco law has permitted residents to rent out their homes on a short-term basis if they

---

[1] The Ordinance was passed by the Board of Supervisors on June 14, 2016.  The Mayor did not sign it, rendering it enacted on Friday, June 24.  *See* Ordinance, § 4.  The Ordinance becomes effective 30 days after enactment, or July 24.  *Id.*  A copy of the Ordinance is attached hereto as Appendix A.  The full version of Chapter 41A, before amendment by the Ordinance, is attached as Appendix B.

[2] This action is both an as-applied and a facial challenge.  It is an as-applied challenge in that it seeks only to prohibit the City from enforcing portions of the Ordinance against Airbnb, and it is a facial challenge in that such provisions, on their face, violate the law and cannot be enforced in any set of factual circumstances.  *See Foti v. City of Menlo Park*, 146 F.3d 629, 635 (9th Cir. 1998).

register and obtain registration numbers for their units from the City. Residents are required to include these numbers on any "listing" on a Hosting Platform, and face liability for failing to do so. *Id*. §§ 41A.5(g)(1)(F), (g)(2)(A). The only persons who can list their units and obtain registration numbers are the residents themselves. Hosting Platforms like Airbnb have no property interests in the units listed on their websites and no ability to obtain or create registration numbers.

The Ordinance punishes Hosting Platforms for third-party content by (a) requiring them to verify that each active and future listing on their websites has a valid registration number prior to publishing the listing, and (b) subjecting them to criminal and civil penalties for their publishing of listings without verifying the registration number, including up to six months in jail and fines of up to $1,000 per day for each unverified listing. *See id*. §§ 41A.5(e), (g)(4)(C)–(D); 41A.7(b)(1)–(3).

These provisions squarely violate the CDA, which prohibits "treat[ing]" websites who host or distribute third-party content, like the Hosting Platforms at issue here, "as the publisher or speaker of any information provided by another information content provider," and immunizes them from liability under any "inconsistent" state or local law. 47 U.S.C. §§ 230(c)(1), (e)(3); *Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1102 (9th Cir. 2009). A fundamental purpose of Congress in passing the CDA was to shield website operators from compulsory obligations to screen user content upon pain of liability, and instead to provide them with the incentive to build innovative platforms while having the flexibility to experiment with and develop tools to address undesirable content without fear of legal retribution. 47 U.S.C. §§ 230(b)(1), (2), (4). The scope of this immunity is broad, and applies regardless of whether a website may know that third parties are using its services to create or post unlawful content. *Goddard v. Google, Inc*., 640 F. Supp. 2d 1193, 1196 (N.D. Cal. 2009). Since its passage in 1996, the CDA has functioned as the bedrock upon which online services of all kinds and sizes have founded and built their operations. By punishing platforms for failing to verify and screen third-party listings, and for publishing unverified listings, the Ordinance directly conflicts with the CDA and is barred under settled law.

The City was not blind to the fact that the Ordinance might run afoul of the CDA and other laws. Following its passage, the Mayor's office said that the "mayor remains concerned that this law will not withstand a near-certain legal challenge and will in practice do nothing to aid the city's

registration and enforcement of our short-term rental laws." Blavin Decl., Ex. D at 1. The City

Attorney's Office acknowledged that the Ordinance could raise "issues under the Communications

Decency Act" but claimed that it had been drafted "in a way that minimizes" those issues by

regulating "business activities" instead of "content." Blavin Decl., Ex. E at 3. Despite the City's

best efforts to tiptoe around the CDA through such semantic devices, the problem for the City is

that the *substance* of what the Ordinance seeks to do violates the CDA. No amount of creative

drafting can change that reality. *See*, *e.g.*, *Jane Doe No. 1 v. Backpage.com, LLC*, 817 F.3d 12, 21

(1st Cir. 2016) (rejecting claim that site's "lack of phone number verification" for listings and other

"activities" did "not involve traditional publishing" functions, as they fell within site's protected

"decisions about how to treat postings" under CDA); *Goddard v. Google, Inc*., 2008 WL 5245490,

at *4-5 (N.D. Cal. Dec. 17, 2008) (rejecting plaintiffs' "recharacterization" of claim to avoid CDA).

The verification provisions of the Ordinance separately are barred by the SCA. In a futile

effort to sidestep the CDA, the Ordinance requires Hosting Platforms to verify listings by disclosing

to the City host names and addresses "prior to posting" a listing—and without a subpoena. S.F.

Admin. Code §§ 41A.5(g)(4)(C)(ii); 41A.7(b)(2)-(3). But in this failed endeavor to avoid Section

230, the Ordinance runs smack into the SCA, which bars state laws that compel online services like

Airbnb to release customer information to governmental entities without legal process. *See*

*Telecomms. Regulatory Bd. of Puerto Rico v. CTIA-Wireless Ass'n*, 752 F.3d 60, 68 (1st Cir. 2014).

The Ordinance also violates Hosting Platforms' First Amendment rights. The prohibition on

the publication of certain rental advertisements—i.e., those listings without verified registration

numbers—is a content-based speech restriction subject to "heightened judicial scrutiny" under the

First Amendment. *Sorrell v. IMS Health, Inc.*, 564 U.S. 552, 565 (2011). The City cannot meet its

burden of demonstrating that this speech restriction directly advances a substantial state interest and

does so in a narrowly tailored way. Even assuming the Ordinance actually advances a substantial

state interest (which is questionable), it places a far greater burden on speech than is necessary to

achieve that end. The "normal method of deterring unlawful conduct" is to punish the conduct,

rather than prohibit speech or advertising regarding it. *Bartnicki v. Vopper*, 532 U.S. 514, 529

(2001). The City cannot show that the obvious alternative of enforcing its existing laws against

third-party residents who rent properties in violation of the law, rather than against Hosting Platforms, would be ineffective or inadequate. Just the opposite: it is clear the City *could* enforce its laws directly against hosts who violate them—as it already has begun to do with increasing effectiveness and success—rather than indirectly against Hosting Platforms that publish listings. Further, the law is unconstitutionally overbroad as it punishes platforms for publishing *any* listing without complying with its "verification" procedures—including those listings that may be lawful.

Absent the intervention of this Court, the Ordinance threatens irreparable harm to Airbnb in several ways. First, Airbnb faces the threat of prosecution and significant criminal and civil penalties under a preempted state law, which constitutes irreparable harm. *See, e.g.*, *Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1029 (9th Cir. 2013). The Ordinance impermissibly coerces Airbnb to comply with its unlawful terms and to screen third-party listings from its site, or face the threat of imprisonment and staggering monetary liability. Further, the imminent violations of Airbnb's constitutional rights "'unquestionably constitute[] irreparable injury.'" *Farris v. Seabrook*, 677 F.3d 858, 868 (9th Cir. 2012). Airbnb also faces the risk of substantial disruption to its business, and an erosion of customer goodwill, if it is forced to remove immediately thousands of listings from its website, including ones that otherwise may be registered and lawful, to comply with the Ordinance. *See Am. Trucking Ass'ns, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1058 (9th Cir. 2009).

Given this palpable threat of irreparable harm, the equities tip sharply in Airbnb's favor. Moreover, the public interest is served by enforcing the "Constitution's declaration that federal law is to be supreme," *id.* at 1059-60, and preventing the "violation of" Airbnb's "constitutional rights,'" *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012). By contrast, an injunction would not prevent the City from continuing to enforce its laws directly against those hosts who violate them. For these reasons and those discussed below, the Court should enjoin enforcement of the Ordinance.

## II.    BACKGROUND

### A.    Airbnb

Founded in 2008, Airbnb provides an Internet platform through which persons desiring to book accommodations ("guests"), and persons listing unique accommodations available for rental ("hosts"), can locate each other and enter into direct agreements to reserve and book travel

accommodations on a short and long-term basis.  Declaration of David Owen ("Owen Decl."), ¶ 2.

Airbnb does not manage, operate, lease or own hosts' accommodations, and it is not a party to the direct agreements between guests and hosts for the booking of accommodations offered by hosts.  *Id.* ¶ 4.  Airbnb's platform provides a means by which hosts can choose to list their rentals; guests can locate those rentals; and hosts and guests can message each other directly on the platform to determine the terms for their bookings. *Id.* ¶ 3.  The platform also provides, through third-party payment processors, a secure payment-processing service to permit hosts to receive payments electronically.  *Id.*  In consideration for use of its platform, Airbnb receives a service fee from both the guest and host, determined as a percentage of the accommodation fee set solely by the host.  *Id.*

Hosts, and not Airbnb, decide whether to list their properties and with whom and when to transact, provide the descriptions of their rentals, set their own lengths of stay, and determine the prices of their rentals.  *Id.*  ¶ 6-7.  As Airbnb's Terms of Service state, hosts "alone are responsible for any and all Listings and Member Content [they] post."  *Id.*, Ex. 1 at 6.

Chapter 41A acknowledges that Airbnb hosts, not Airbnb, create their listings, stating that a "Residential Unit is offered for Tourist or Transient Use [i.e., short-term use] *by the Permanent Resident* of the Residential Unit."  S.F. Admin. Code § 41A.4 (emphases added).  By contrast, a Hosting Platform like Airbnb is a "means through which" an individual "may offer a Residential Unit" for a short-term rental, providing an "online platform" that "allows *an Owner to advertise the Residential Unit* through a website provided by the Hosting Platform."  *Id.* (emphases added).

Airbnb advises its hosts and guests to be aware of and comply with local laws in listing and renting units listed on Airbnb.  The Airbnb Terms of Service reference at their outset parties' "OBLIGATIONS TO COMPLY WITH APPLICABLE LAWS AND REGULATIONS," and that

> IN PARTICULAR, HOSTS SHOULD UNDERSTAND HOW THE LAWS WORK IN THEIR RESPECTIVE CITIES.  SOME CITIES HAVE LAWS THAT RESTRICT THEIR ABILITY TO HOST PAYING GUESTS FOR SHORT PERIODS…. IN MANY CITIES, HOSTS MUST REGISTER, GET A PERMIT, OR OBTAIN A LICENSE BEFORE LISTING A PROPERTY OR ACCEPTING GUESTS.  CERTAIN TYPES OF SHORT-TERM BOOKINGS MAY BE PROHIBITED ALTOGETHER.

Owen Decl., Ex. 1 at 1.  Similarly, the Airbnb "Responsible Hosting" page for San Francisco informs hosts that "it's important for you to understand the laws in your city," provides links to the City's website describing applicable laws, and notes with respect to "Short-Term Rental

Registration," that "San Francisco requires hosts to register by scheduling an appointment with the Planning Department and paying a fee of $50." *Id.*, Ex. 3 at 1. Airbnb further informs hosts that "You may include your short-term rental permit number on your listing" in the "'Other Things to Note' field" by "typ[ing] in your permit number following the acceptable permit format for San Francisco. The format is: STR-xxxxxxx. An example would be: STR-1234567." *Id.*

As part of the Airbnb Community Compact, the company is committed to helping provide solutions tailored to the needs of cities like San Francisco with historic housing challenges. *See id.* ¶ 12. For example, Airbnb discretionarily removes listings that it believes may be offered by hosts with multiple "entire home" listings or by unwelcome commercial operators. *See id.* ¶¶ 12-13. If Airbnb is alerted to shared spaces or private rooms that appear to be operated by unwelcome commercial operators or that do not reflect the community vision, it generally will remove such listings. *See id.* ¶ 13. Within the last year, Airbnb has removed numerous San Francisco listings from its platform as part of its Community Compact efforts. *See id.*

### B. San Francisco's Regulatory Scheme Governing Short-Term Rentals and the Ordinance's Amendments to It

The Ordinance amends Chapter 41A of the San Francisco Administrative Code, which governs short-term rentals in the City. As discussed below, a main feature of the Ordinance is that, unlike prior San Francisco law, it holds Hosting Platforms liable, on threat of both criminal and civil penalties, for publishing listings without complying with certain verification procedures.

In October 2014, the Board of Supervisors enacted a set of amendments to Chapter 41A that made short-term rentals generally lawful in San Francisco, subject to certain limitations and requirements. "Permanent Residents" who have occupied their units for at least 60 days may offer their homes for "Short-Term Rental." S.F. Admin. Code §§ 41A.4; 41A.5(g).[3] Before offering such a rental, residents must apply for and register the unit with the Planning Department, which assigns the unit a registration number and lists it on a registry. *Id.* §§ 41A.5(g)(1)(E), (g)(3)(A). Residents also are required to "include[] the Department-issued registration number on any Hosting Platform

---

[3] There is no limit on the number of days per year a unit may be rented if it is "hosted"; if the host is not on site, the unit cannot be rented more than 90 days a year. S.F. Admin. Code § 41A.5(g)(1)(A).

listing," and face liability for failing to do so. *Id.* §§ 41A.5(g)(1)(F), (g)(2)(A).

As part of the October 2014 amendments, the Board also imposed certain duties and obligations on Hosting Platforms, which must notify users of the City's regulations regarding short-term rentals and must collect and remit Transient Occupancy Taxes required under the Business and Tax Regulations Code. *Id.* § 41A.5(g)(4)(A)-(B). But the amendments did not impose liability on Hosting Platforms based on the content of listings they publish, nor did it require them to verify the contents of any listings. These amendments went into effect in February 2015. The City created the Office of Short-Term Rentals ("OSTR") in July 2015 to enforce them.

At the direction of Supervisor David Campos, one of the Ordinance's co-sponsors, the City's Budget and Legislative Analyst's Office prepared a report in April of this year regarding the state of short-term rentals in the City. The report stated that the OSTR "continues to levy fines against hosts found to be non-compliant" with the law, and while "there still remains a sizeable gap between the number of registered hosts and the number of hosts advertising short-term rentals on online platforms," the "OSTR may be able to further close that gap in coming months as OSTR became fully staffed in December 2015." Blavin Decl., Ex. F at 21. The report further noted that OSTR saw "a wave of compliant behavior towards the end of 2015" and has developed "new strategies to pro-actively identify non-compliant hosts." *Id.* at 3, 18. The report proposed four "options" that the Board of Supervisors could consider to "improve compliance with the City's short-term rental laws." *Id.* at 25. One of those options—to "[s]implify the short-term rental registration process as the existing system might deter otherwise compliant short-term rental hosts," *id.* at 4—has been implemented by the Ordinance, S.F. Admin. Code § 41A.7(a). Another option—requiring "that online hosting platforms prohibit hosts from advertising on their websites if they have not registered with the City"—formed the basis of the law's verification requirement. Blavin Decl., Ex. F at 25.

The Ordinance provides that "[p]rior to providing reservation and payment services[4] for a listing of a Residential Unit within the City to be rented for Tourist or Transient Use, a Hosting

---

[4] The phrase "reservation and payment services" is not defined. The Ordinance, however, sets forth two exclusive and specific articulations of what a site must do to comply with § 41A.5(g)(4)(C). *See Fourco Glass Co. v. Transmirra Prods. Corp.*, 353 U.S. 222, 228-29 (1957) ("Specific terms prevail over the general in the same or another statute which otherwise might be controlling.").

Platform shall verify with the Office of Short-Term Residential Rental Administration and Enforcement that the Residential Unit is listed on the Registry and has a valid registration number." S.F. Admin. Code § 41A.5(g)(4)(C). The Ordinance specifies two exclusive ways that platforms "shall comply with this subsection." *Id*. Hosting Platforms must:

> (i) *Provid[e] the verified registration number on each listing* in the area of the listing dedicated to information verified or compiled by the Hosting Platform about the host[;] or
>
> (ii) Send[] the verified registration number, Residential Unit street address, … and host name to the Office of Short-Term Residential Rental Administration and Enforcement by electronic mail *prior to posting the listing on the platform*.

*Id*. (emphases added). The Ordinance thus imposes criminal and civil liability on Hosting Platforms that do not verify the registration number prior to publishing a listing—either by including the number on each listing or sending the number to the City prior to posting the listing. *See also* Ordinance Preface (law "require[s] Hosting Platforms verify" that a unit "is on the City Registry *prior to listing*" (emphasis added)). It provides that "any Hosting Platform that provides a listing … in violation of" Chapter 41A is subject to criminal liability, including imprisonment up to six months, fines up to $1,000, or both. *Id*. § 41A.5(e). Hosting Platforms that fail to comply also are subject to civil and administrative penalties of up to $1,000 a day. *Id*. §§ 41A.5(g)(4)(D); 41A.6(d)(1)-(2). All of these penalties apply to any Hosting Platform that posts a listing without adhering to the verification procedure described in the statute, *even if* the listing at issue advertises a rental that is fully in compliance with San Francisco law.

The Ordinance also sets forth a monitoring regime. It requires the OSTR to "actively monitor Hosting Platform listings to ensure that Hosting Platforms are only listing Residential Units that are listed on the Registry." *Id*. § 41A.7(b). The agency must undertake this monitoring effort "on at least a monthly basis," *id.*, and each time it does so, it must "immediately provide notice to Hosting Platforms by electronic mail of all listings that do not have valid registration numbers or are otherwise not in compliance with this Chapter 41A." *Id*. § 41A.7(b)(1). Upon receiving such notice, Hosting Platforms must, "within one City business day," "respond" by "confirming, for each listing identified in the notice, that the listing has a valid registration number and providing that number and any other requested information," including "unit address and host information." *Id*.

§ 41A.7(b)(2)-(3). "For each listing that a Hosting Platform fails to provide the requested information" within one day, the platform shall be subject to penalties of up to $1,000 per day. *Id.*

Supervisors David Campos and Aaron Peskin proposed the law. Supervisor Peskin has stated that its purpose is to "hold[] the *hosting platforms accountable* for the hundreds of units (rented by) *unscrupulous individuals* who have taken multiple units of affordable housing off the rental market." Blavin Decl., Exs. A at 1; B (emphases added). Similarly, a press release from the office of Supervisor Campos states that the "Legislation *Hold[s] Airbnb Accountable for Listing Illegal Short Term Rentals*," and in a Facebook post, Supervisor Campos described it as "hold[ing] *Airbnb and other hosting platforms accountable for advertising illegal short term rentals*." *Id.*, Exs. C at 1; G (emphases added). Supervisor Peskin also has stated that the law is intended to target the listings of "unscrupulous speculators" and not "mom and pop" hosts. *Id.*, Ex. H at 1.

## III. ARGUMENT

### A. Standard for Preliminary Injunction

"A plaintiff seeking a preliminary injunction must show that: (1) she is likely to succeed on the merits, (2) she is likely to suffer irreparable harm in the absence of preliminary relief, (3) the balance of equities tips in her favor, and (4) an injunction is in the public interest." *Farris*, 677 F.3d at 864. Alternatively, "'serious questions going to the merits' and a balance of hardships that tips sharply towards the plaintiff can support issuance of a preliminary injunction, so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." *Id.* Airbnb satisfies both standards. It is overwhelmingly likely to succeed on its CDA, SCA, and constitutional claims, and it is threatened with irreparable harm in light of the substantial penalties it faces under a preempted law, as well as the infringement of its constitutional rights and erosion of goodwill. The balance of equities and public interest also favor an injunction.

### B. Airbnb is Likely To Succeed on the Merits of its Claims

#### 1. The City's Enforcement of the Ordinance Against Airbnb Violates and Is Preempted By Section 230 of the CDA

The CDA unequivocally bars states and localities from imposing liability on Internet websites premised on their role as a publisher of third-party content. Because this is precisely what the Ordinance does, it violates the CDA and is preempted by federal law.

9

Under Section 230, "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." 47 U.S.C. § 230(c)(1). It bars liability "under any State or local law that is inconsistent with this section." *Id*. § 230(e)(3). In providing a "broad grant of webhost immunity," the CDA "gives effect to Congress's stated goals" of "'promot[ing] the continued development of the Internet and other interactive computer services,'" and "'preserv[ing] the vibrant and competitive free market that presently exists for the Internet and other interactive computer services,'" *Fair Hous. Council of San Fernando Valley v. Roommates.com, LLC*, 521 F.3d 1157, 1174-75, 1180 (9th Cir. 2008) (en banc) (quoting § 230(b)(1), (2)). And by eliminating the threat of liability based on websites' efforts to screen user content, the CDA incentivizes the development of innovative platforms while "encourag[ing] voluntary monitoring." *Carafano v. Metrosplash.com, Inc.*, 339 F.3d 1119, 1122-23 (9th Cir. 2003). As courts have held, the "purpose of the CDA is to encourage open, robust, and creative use of the internet." *Jurin v. Google, Inc.*, 695 F. Supp. 2d 1117, 1123 (E.D. Cal. 2010).

This "broad construction accorded to section 230 as a whole has resulted in a capacious conception of what it means to treat a website operator as the publisher or speaker of information provided by a third party." *Backpage.com*, 817 F.3d at 19. Consistent with this, a long line of cases have held that Section 230 provides immunity for online marketplaces, classifieds, and other sites similar to Hosting Platforms from any liability stemming from their role as a publisher of third-party listings and advertisements.[5] As the Ninth Circuit has instructed, "close cases … must be resolved in favor of immunity, lest we cut the heart out of section 230 by forcing websites to face death by ten thousand duck-bites …." *Roommates.com*, 521 F.3d at 1174.

---

[5] *See, e.g.*, *Gentry v. eBay, Inc.*, 99 Cal. App. 4th 816 (2002) (eBay immune from liability for fake sports memorabilia listings); *Dart v. Craigslist, Inc.*, 665 F. Supp. 2d 961, 967 (N.D. Ill. 2009) (claim that Craigslist adult section listings were public nuisance barred by CDA); *Mazur v. eBay Inc.*, 2008 WL 618988, at *9 (N.D. Cal. Mar. 4, 2008) (eBay immune from claim it failed to screen listings); *Hill v. StubHub, Inc.*, 219 N.C. App. 227, 247-48 (2012) (claim that StubHub hosting of event ticket sales violated law barred by CDA); *Milgram v. Orbitz Worldwide, Inc.*, 419 N.J. Super. 305, 324 (2010) (CDA barred claim of "misleading ticket listings"); *Inman v. Technicolor USA, Inc.*, 2011 WL 5829024, at *7 (W.D. Pa. Nov. 18, 2011) ("eBay may not be held liable under the CDA" for "facilitat[ing]" sale); *Chicago Lawyers' Comm. for Civil Rights Under Law, Inc. v. Craigslist, Inc.*, 519 F.3d 666, 672 (7th Cir. 2008) (Craigslist immune under CDA; plaintiff "cannot sue the messenger just because the message reveals a third party's plan to engage in unlawful [conduct]").

In applying the CDA, courts look to "whether the duty" the law imposes "derives from the defendant's status or conduct as a 'publisher or speaker.'  If it does, section 230(c)(1) precludes liability."  *Barnes,* 570 F.3d at 1101-02.  There can be no question that the duty and liabilities the Ordinance imposes on Hosting Platforms here derive from their status as publishers of third-party content.  The law requires Hosting Platforms—who have no property and thus no legal or practical ability to obtain or create registration numbers—to verify third-party listings' registration numbers and, upon penalty of criminal and civil sanctions, to screen such listings prior to publishing them.  In short, if platforms do not engage in government-mandated screening of allegedly illegal (unverified) listings, they face penalties.  No semantic device or interpretative gymnastics can avoid the fact that the City has directly imposed liability on Hosting Platforms for their role as publishers or speakers of third-party content.  It is well settled that the CDA prohibits such efforts.

Section 230 protects (1) a "provider or user of an interactive computer service" from (2) any "state law" that "seeks to treat" it "as a publisher or speaker" (3) "of information provided by another information content provider."  *Barnes,* 570 F.3d at 1100-01.  Each of these elements is met.

### (a)  Hosting Platforms Are "Interactive Computer Service" Providers

Hosting Platforms like Airbnb provide information to "multiple users" by giving them "computer access . . . to a computer server" (47 U.S.C. § 230(f)(2)), and therefore are interactive computer service providers under the CDA.  *Roommates.com*, 521 F.3d at 1162 n.6.  Indeed, the "most common interactive computer services are websites."  *Id*.; *see* S.F. Admin. Code § 41A.4.

### (b)  The Ordinance Treats Hosting Platforms as "Publishers"

Under the CDA "[w]hat matters is not the name of the cause of action," but whether the law "inherently requires the court to treat the defendant as the 'publisher or speaker' of content provided by another."  *Barnes*, 570 F. 3d at 1101-02.  Here, the obligations and liability imposed by several provisions of the Ordinance plainly derive from Hosting Platforms' status as publishers or speakers of third-party content on the Internet, and are therefore barred by the CDA.

#### (i)  The Ordinance Imposes Liability on Hosting Platforms for Publishing Certain Third-Party Content

The Ordinance violates the CDA by imposing criminal and civil liability for Hosting Platforms' publishing of unverified third-party listings.

The Ordinance imposes liability based upon platforms' publishing conduct in the following ways:  (1) it imposes criminal liability—including imprisonment of up to six months and/or fines of up to $1,000—on "any Hosting Platform that *provides a listing* … in violation" of the Ordinance, S.F. Admin. Code § 41A.5(e) (emphasis added); (2) it imposes civil penalties of up to $1,000 per day where a Hosting Platform publishes a listing without first verifying a registration number, through either failing to "*provid[e]* the verified registration number *on each listing*" or by failing to "[s]end[] the verified registration number" to the City "*prior to posting the listing* on the platform," *id*. § 41A.5(g)(4)(C)(i)-(ii), (D) (emphases added); and (3) it similarly imposes administrative penalties of up to $1,000 per day for "each listing" where the platform has "fail[ed]" to provide the registration number and other information in response to the City's request, *id.* § 41A.7(b)(3).

In all of these instances, the penalties are imposed for the Hosting Platform's *publication* of the unverified listing—either by posting the listing without the registration number on it, or by posting the listing without first sending the number to the City.[6]  Indeed, if such "listings" were not published, they would not be "listed" at all and there would be no basis to impose any liability. This is further confirmed by the law's prefatory language stating that it "require[s] Hosting Platforms verify" that a unit "is on the City Registry *prior to listing*," (emphasis added), and by the press release from Supervisor Campos's office describing the law as "*Holding Airbnb Accountable for Listing* Illegal Short Term Rentals."  Blavin Decl., Ex. C at 1(emphasis added); *see id.*, Ex. G.[7]

These provisions are squarely barred by the CDA.  Section 230 "provides broad immunity for publishing content provided primarily by third parties."  *Carafano*, 339 F.3d at 1123.  Courts thus repeatedly have enjoined the enforcement of statutes like the Ordinance that impose liability for websites' publishing of third-party listings and ads.  In *Backpage.com, LLC v. McKenna*, 881 F. Supp. 2d 1262 (W.D. Wash. 2012), for example, the court preliminarily enjoined a Washington state statute on the basis that it was likely "inconsistent with and therefore expressly preempted by

---

[6] Separately, requiring *Hosting Platforms to publish hosts'* registration numbers in listings is itself barred by the CDA.  "[D]eciding *not* to publish" content is just as protected as the decision to publish content.  *Batzel v. Smith*, 333 F.3d 1018, 1032 (9th Cir. 2003) (emphasis in original).

[7] *See, e.g., Newdow v. Rio Linda Union Sch. Dist.*, 597 F.3d 1007, 1014 (9th Cir. 2010) ("plain text of the preamble to" statute "sets forth that Congress had two primary purposes" in law).

Section 230" because it "impos[ed] liability" on websites for knowingly "publishing" or "causing to

be published" certain prohibited "ads for commercial sex acts" and therefore "treat[ed]" websites as

"the publisher or speaker of information created by third parties." *Id.* at 1273-74 (citing, *e.g.*,

*Barnes,* 570 F.3d at 1101-02). Several other courts similarly have enjoined statutes that impose

liability based on the publication of third-party ads. *See Backpage.com, LLC v. Hoffman*, 2013 WL

4502097, at *6 (D.N.J. Aug. 30, 2013) (enjoining statute that "runs afoul of Section 230 by

imposing liability" for "publishing" third-party ads); *Backpage.com, LLC v. Cooper*, 939 F. Supp.

2d 805, 824 (M.D. Tenn. 2013) (enjoining statute where "sale of online advertisements regulated by

[statute] derives from a website's status and conduct as an online publisher" and "thus the

protection of section 230 is triggered"). No different here, because the Ordinance imposes liability

based on platforms' publication of unverified third-party listings, it is preempted by the CDA.

**(ii)**      **The Ordinance Imposes Liability on Hosting Platforms for Failing to Verify and Screen Third-Party Content**

The CDA not only immunizes Hosting Platforms against any claims based on their

publication of host listings, but also provides immunity from any liability for their alleged failure to

"verify" listings prior to posting them. S.F. Admin. Code § 41A.5(g)(4)(C); *id.* § 41A.7(b)(2).

During a committee hearing on the Ordinance, a Deputy City Attorney claimed that the

verification requirement did not violate the CDA because it "regulates the business activities" of

Hosting Platforms, instead of the "content of the website." Blavin Decl., Ex. E at 3. These

"activities," however, are exactly the type of publishing or editorial functions that the CDA protects.

In *Jane Doe No. 1 v. Backpage.com*, the plaintiffs challenged several "choices that Backpage has

made about the posting standards for advertisements" that they claimed were "designed to

encourage sex trafficking," including most relevant here, the lack of "phone number verification"

for numbers in ads, as well as the "option to anonymize e-mail addresses," the "stripping of

metadata from photographs uploaded to the website," and the site's "acceptance of anonymous

payments." 817 F.3d at 16, 20-21. The First Circuit rejected the plaintiffs' argument, similar to the

City's here, that such conduct was "distinguishable from publisher functions," holding that "section

230(c)(1) extends to the formulation of precisely the sort of website policies and practices that the

13

[plaintiffs] assail." *Id*. at 20. The court emphasized that the plaintiffs' claims "address the structure and operation of the Backpage website, that is, Backpage's decisions about how to treat postings," and "challenge features that are part and parcel of the overall design and operation of the website." *Id*. at 21. "Features such" as the "lack of phone number verification" reflect "choices about what content can appear on the website and in what form," and are "editorial choices that fall within the purview of traditional publisher functions" protected by the CDA. *Id*.

Numerous other courts similarly have held that any alleged obligation to verify information associated with third-party content prior to publishing it, including, for example, an individual's identity or age, or a posting's accuracy, regulates publisher activity that is protected by the CDA. *See, e.g., Doe v. Friendfinder Network, Inc*., 540 F. Supp. 2d 288, 294-95 (D.N.H. 2008) ("§ 230 bars the plaintiff's claims that the defendants acted wrongfully" by "failing to verify that a profile corresponded to the submitter's true identity"); *Doe v. MySpace, Inc*., 474 F. Supp. 2d 843, 850 (W.D. Tex. 2007), *aff'd*, 528 F.3d 413 (5th Cir. 2008) (claims that "MySpace liable for ineffective … policies relating to age verification" were "barred under" the CDA); *Roommates*, 521 F.3d at 1180 ("web[sites] are immune" for any "efforts to verify the truth of" statements).

No different here, the Ordinance by its plain terms holds Hosting Platforms liable for failing to verify information associated with a third-party listing—its registration number, which *hosts* are required to include on their listings. Indeed, the Ordinance effectively requires platforms to screen listings prior to publishing them. Before posting, Hosting Platforms must determine whether hosts have provided a registration number, whether it is valid, and if no number is provided, whether the listing has a number and what it may be. It is well settled that "[s]creening" a listing "is akin to deciding whether to publish" and thus a website "is immune under section 230 for its screening decisions." *Mazur*, 2008 WL 618988, at *9 (eBay immune for alleged failure to screen listings); *see Almeida v. Amazon.com, Inc.*, 456 F.3d 1316, 1322 n.3 (11th Cir. 2006) (CDA "clearly inconsistent with state law that makes" sites "liable based on their efforts to screen" third-party content).

These types of screening and verification requirements violate the CDA and undermine its core policies. In *Cooper*, for example, a Tennessee law required a website to show, as a defense to a claim that it published third-party sex ads depicting a minor, that "prior to publication" of the ad, it

14

obtained the minor's "driver license" or "other governmental" identification, which the court found amounted to "in-person identification verification." 939 F. Supp. 2d at 824-25. In holding that the law violated the CDA and enjoining its enforcement, the court emphasized that to avoid "significant penalties for certain ads," websites would need to "screen[] millions of advertisements" which "would likely undermine" the "goals supporting CDA immunity," as sites would "likely be forced to eliminate user postings" rather "than face possible liability," and would "relax their current self-policing." *Id.* Similarly, in enjoining a near-identical provision under Washington law, the *McKenna* court held that the "statute conflicts with Congressional intent" under the CDA "because, by imposing liability on online service providers who do not pre-screen content," the "statute drastically shifts the unique balance that Congress created with respect to the liability of online service providers that host third party content." 881 F. Supp. 2d at 1274. Likewise here, the requirement that platforms verify and screen listings prior to publication is barred by the CDA.

### (iii) The Substance and Purpose of The Ordinance to Target Third-Party Content Confirm the CDA's Applicability

Notwithstanding the City's efforts to tiptoe around the CDA in drafting the Ordinance, its preemptive effect is further cemented by the fact that the substance and purpose of the law indisputably is to impose liability based upon the content of certain third-party listings. As Supervisor Peskin put it, the Ordinance seeks to hold the "*hosting platforms accountable for the hundreds of units* (rented by) *unscrupulous individuals*" posting listings on their sites. Blavin Decl., Exs. A at 1; B (emphases added). Similarly, a press release from the office of Supervisor Campos describes the law as "Holding *Airbnb Accountable for Listing Illegal Short Term Rentals.*" *Id.*, Ex. C at 1 (emphasis added); *id.*, Ex. G (same). Indeed, the law provides for enforcement through a City "review of active Hosting Platform listings" posted by third parties. S.F. Admin. Code § 41A.7(b).

Courts repeatedly have applied CDA immunity where the clear substance of the claim is to impose liability on websites based on third-party content. In *Goddard*, the plaintiff similarly argued that her claim was "independent" of any publishing role by Google because it "stem[med] from Google's acceptance of tainted funds from fraudulent mobile content providers." 2008 WL 5245490, at *4. The court rejected this as an "impermissible recharacterization" as the plaintiff "claim[ed] in essence that she was harmed because Google hosted certain online content," in

15

"contravention of § 230." *Id.* at \*4-5; *see also Gentry*, 99 Cal. App. 4th at 831 ("substance" of "allegations reveal [plaintiffs] ultimately seek to hold eBay responsible for conduct falling" within CDA and rejecting claim they were "seek[ing] to enforce eBay's independent duty" to "furnish a warranty," not "as a publisher"); *MySpace, Inc.*, 528 F.3d at 418-19 (rejecting as "artful pleadings" that claim "predicated" on "failure to implement" safety measures, not "publisher" role). The CDA applies here as the Ordinance plainly seeks to hold platforms "accountable" for third-party content.

### (c) Listings Without Verified Registration Numbers Are Provided By "Another Information Content Provider"

Section 230 encompasses "*any information* provided by another information content provider." 47 U.S.C. § 230(c)(1) (emphasis added). Here, listings without verified registration numbers are content provided by "another information content provider"—third-party hosts.

Third parties, not Hosting Platforms, create and provide the relevant information for their listings. As the Ordinance acknowledges, Hosting Platforms like Airbnb are "*a means through which*" residents "may *offer* a" rental, providing an "online platform" that "allows *an Owner to advertise the Residential Unit* through a website." S.F. Admin. Code § 41A.4 (emphases added). Third-party hosts create and provide descriptions of their listings, set the lengths of any particular rental, decide how many listings to place on Airbnb, and as most relevant here, are responsible for registering their short-term rentals, obtaining a registration number from the City, and including their registration numbers "on any Hosting Platform listing." *Id.* §§ 41A.5(g)(1)(F), (g)(2)(A). As noted, Airbnb also expressly tells hosts that they are required to register their units with the City and obtain registration numbers, and provides instructions as to how they may include their numbers in their listings. *See supra* at 5. Hosting Platforms like Airbnb have no property interests in the units listed on their sites and no ability to obtain or create registration numbers, which can only come from the host. Imposing liability on platforms for failing to verify registration numbers and publishing unverified listings thus treats them as the publisher of content provided by others.

That a website provides third parties with "neutral tools to create web content, even if the website knows" they "are using such tools to create illegal content," does not render the site a "content provider." *Goddard*, 640 F. Supp. 2d at 1198 ("Keyword Tool" that "does nothing more

MOTION FOR PRELIMINARY INJUNCTION

CASE NO. 16-cv-03615

than provide options" protected); *Carafano*, 339 F.3d at 1124-25 ("menu" of "pre-prepared responses" protected). Nor does a site lose immunity if it "fails to take action despite notice of the problematic content." *Black v. Google Inc.*, 2010 WL 3222147, at *3 (N.D. Cal. Aug. 13, 2010). Further, that sites like Airbnb may enable the processing of transactions, impose fees for their services, and offer additional functionality does not affect the CDA's applicability. *Backpage.com*, 817 F.3d at 16-17, 21.[8] Finally, although not relevant to Airbnb here, the law is clear that "features" of a website that are purportedly "designed to encourage" or "facilitate" unlawful content are also protected by the CDA. *Id.*; *see also Jones v. Dirty World Entm't Recordings LLC*, 755 F.3d 398, 414-15 (6th Cir. 2014) (websites that "not only allow but also actively invite and encourage users to post particular types of content" immune under CDA); *Roommates.com*, 521 F.3d at 1174 (CDA applies where sites allegedly "promoted or encouraged … illegality of third parties").

### 2. The Disclosure Provisions Conflict With and Are Preempted by the SCA

In a futile attempt to avoid the CDA, the Ordinance requires, as one method of verification, that Hosting Platforms "[s]end[] the verified registration number, Residential Unit street address," and "host name" to the City "prior to posting the listing." S.F. Admin. Code § 41A.5(g)(4)(C)(ii). Similarly, in response to a notice from the City that a listing does not have a registration number, platforms must verify the listing by providing to the City the number and "any other requested information," including "unit address and host information." *Id.* § 41A.7(b)(2)-(3). Not only do such provisions violate the CDA, but they also conflict with and are preempted by the SCA.

The SCA was enacted "to update and clarify Federal privacy protections and standards in light of dramatic changes in new computer and telecommunications technologies." S. Rep. No. 99–541, at 1–2 (1986). It restricts the ability of "electronic communication service" providers, which include online services like Airbnb that allow users to connect and communicate with one another,[9]

---

[8] *See StubHub*, 219 N.C. App. at 245-46 (that StubHub "'controlled' the transaction by acting as an intermediary between buyer and seller" and offered "certain guarantees and assumed responsibility for handling the mechanics required to complete the transaction," irrelevant under CDA).

[9] An ECS provider is "any service which provides to users thereof the ability to send or receive wire or electronic communications." 18 U.S.C. § 2510(15). Websites that "provide private messaging or email" or bulletin board-type services to users, such as Airbnb, constitute ECS providers. *Crispin v. Christian Audigier, Inc.*, 717 F. Supp. 2d 965, 980, 982 (C.D. Cal. 2010) (Facebook and

17

to divulge certain information to governmental entities about their users. Most relevant, the "SCA clearly prohibits communications providers from disclosing to the government basic subscriber information—including a customer's name [and] address …—without a subpoena." *Telecomms. Regulatory*, 752 F.3d at 68; *see* 18 U.S.C. § 2702(a)(3) (ECS "shall not … divulge a record or other information pertaining to a subscriber to or customer of such service ... to any governmental entity" without legal process). Indeed, "[t]hat Congress intended [the SCA] to restrict the ability of a service provider to turn over even a list of customers to a governmental entity" is "abundantly clear." *Telecomms. Regulatory*, 752 F.3d at 67. Because the Ordinance "requires" Airbnb to "disclose" its "customers' names" and "addresses" to a "governmental entity without a subpoena—or any process whatsoever," it "directly conflict[s]" with and is "thus preempted by the SCA." *Id*. at 68 (holding that SCA preempted similar disclosure provisions under Puerto Rico "Registry Act"; law enjoined).

### 3. The Ordinance Violates the First Amendment Because It Is a Content-Based Restriction on Speech that Is Not Narrowly Tailored to Serve a Substantial Government Interest and Is Overbroad

Airbnb is likely to succeed in demonstrating that the Ordinance violates the First Amendment. The Ordinance seeks to proscribe and punish speech, in the form of advertisements and online rental listings, based on the content of that speech: whether the listings advertise short-term residential rentals without a verified registration number and in a manner contrary to the Ordinance. The City cannot justify that restriction under the First Amendment.

There is no question that the Ordinance seeks to punish speech. It imposes "[c]riminal [p]enalties" on "any Hosting Platform that *provides a listing ...* in violation" of the Ordinance. S.F. Admin. Code § 41A.5(e) (emphasis added); *see id.* § 41A.5(g)(4)(C)-(D); § 41A.7(b)(3) (penalties of up to $1,000 per day for "each listing" not in compliance). Publishing or posting listings advertising products or services constitutes protected speech. *See, e.g.*, *Rubin v. Coors Brewing Co.*, 514 U.S. 476, 481-82 (1995). There also is no question that the Ordinance imposes a "content- and speaker-based" restriction, which "requires heightened judicial scrutiny." *Sorrell*, 564 U.S. at 570; *see Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2227 (2015). A restriction is content-based if, to

---

MySpace are ECS providers). Airbnb also is a remote computing service ("RCS") provider as it maintains on its systems communications in "electronic storage." *Id*. at 989-90.

enforce it, the government "must necessarily examine the content of the message that is conveyed." *Forsyth Cnty. v. Nationalist Movement*, 505 U.S. 123, 134 (1992). Obviously, to enforce the law, the City must examine the content of Hosting Platform listings, as the Ordinance itself recognizes by ordering a City agency to undertake a "comprehensive review of active Hosting Platform listings" to identify potentially unverified listings. S.F. Admin. Code § 41A.7(b). Similarly, the restriction is speaker-based because it applies only to a certain category of speakers, "singl[ing] out" Hosting Platforms "for disfavored treatment." *Brown v. Entm't Merchants Ass'n*, 564 U.S. 786, 802 (2011).

The verification provision similarly regulates speech. As *McKenna* held with respect to the Washington law's requirement that websites "check identification before publishing an escort ad," while "[a]t first blush," this "seems as commonsensical as requiring bar owners to check identification before allowing patrons to enter the door," because it "is an identification requirement—imposed by the government and punishable by imprisonment—related to speech," the court must consider that such a "pre-screening mechanism … would limit the amount of content available" to that which "publishers had the time and money to screen." 881 F. Supp. 2d at 1277-78.

"In the ordinary case, it is all but dispositive to conclude that a law is content-based." *Sorrell*, 564 U.S. at 571. Such laws are "presumed invalid" under the First Amendment, and "the Government bear[s] the burden of showing their constitutionality." *Ashcroft v. ACLU*, 542 U.S. 656, 660 (2004). This presumption of invalidity applies even in the context of commercial speech.[10] "Under a commercial speech inquiry, it is the State's burden to justify its content-based law as consistent with the First Amendment." *Sorrell*, 564 U.S. at 571-72. The government must show "that the statute directly advances a substantial government interest" and that there is a "'fit between the legislature's ends and the means chosen to accomplish those ends.'" *Id.* at 572; *see also, e.g., Florida Bar v. Went For It, Inc.*, 515 U.S. 618, 632 (1995) (in commercial speech context, a regulation must be "'narrowly tailored to achieve the desired objective'"); *Central Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n*, 447 U.S. 557, 566 (1980) (government must show that regulation

---

[10] Airbnb does not concede that "all speech hampered by [the law] is commercial," but proceeds under a commercial-speech analysis because "the outcome is the same whether a special commercial speech inquiry or a stricter form of judicial scrutiny is applied." *Sorrell*, 564 U.S. at 571.

is "not more extensive than is necessary" to serve interest at stake).  There also is an efficacy component to the test:  the government must establish that the challenged restriction advances the asserted interest "in 'a direct and effective way.'"  *Edenfield v. Fane*, 507 U.S. 761, 773 (1993).  "[M]ere speculation or conjecture" will not suffice to carry the government's burden.  *Id.* at 770.

The City is highly unlikely to be able to demonstrate either that the Ordinance is a narrowly tailored means of achieving any substantial government interest or that the Ordinance is a direct and effective way of doing so.  With respect to narrow tailoring, even assuming that punishing the publication of listings without a verified registration number serves a substantial government interest (which is far from clear),[11] the City cannot show that a *restriction on speech* is necessary to achieve that interest.  "The normal method of deterring unlawful conduct is to impose an appropriate punishment on the person who engages in it," not to punish those who engage in speech regarding the conduct.  *Bartnicki*, 532 U.S. at 529; *see also, e.g.*, *Village of Schaumburg v. Citizens for a Better Env't*, 444 U.S. 620, 637 (1980) (invaliding restriction on commercial solicitation because unlawful conduct "can be prohibited and the penal laws used to punish such conduct directly").

That principle is especially relevant here, where the City has acknowledged that it could directly target hosts who fail to comply with the law rather than punishing Hosting Platforms that publish listings.  The Ordinance requires the OSTR to "actively monitor Hosting Platform listings … on at least a monthly basis" to identify "potentially non-compliant listings."  S.F. Admin. Code § 41A.7(b).  And existing San Francisco law requires hosts to include their registration numbers on their listings.  *Id.* § 41A.5(g)(1)(F).  Having identified allegedly unlawful rentals in this manner, the City could initiate enforcement proceedings directly against those hosts for those rentals.

Indeed, the City *already has begun doing so*:  The OSTR has assessed nearly $700,000 in

---

[11] The sponsors of the Ordinance have articulated a variety of rationales for it, many of which do not constitute substantial government interests.  For instance, the sponsors have stated that the law's approach of imposing liability on Hosting Platforms rather than hosts themselves is justified because of the need for "corporate accountability."  Blavin Decl., Ex. C at 1.  But the government cannot justify its decision to proscribe *speech* on the ground that certain speakers are less popular than other actors.  Such targeting of unpopular speakers is exactly what the First Amendment is meant to prevent.  *See, e.g.*, *Brown*, 564 U.S. at 802; *Florida Star v. B.J.F.*, 491 U.S. 524, 540 (1989) (state "must demonstrate its commitment to advancing [its] interest by applying its prohibition [against speech] evenhandedly, to the smalltime disseminator as well as the media giant.").

penalties against hosts, and as the Budget and Legislative Analyst's Office report noted, may be able to "further close" the "gap" between the number of registered hosts and hosts "advertising short-term rentals on online platforms" in "coming months as OSTR became fully staffed in December 2015." Blavin Decl., Ex. F at 21.  The report further stated that the City can "simplify the short-term rental registration process as the existing system might deter otherwise compliant short-term rental hosts," *id*. at 4, and the Ordinance requires the OSTR to promulgate rules accomplishing that goal, S.F. Admin. Code § 41A.7(a).  Supervisor Wiener also recently observed that there has been an "acceleration in the number of hosts registering," and the City is "moving in a positive direction" in enforcing the law.  Blavin Decl., Ex. I at 3; *see also id*., Ex. F at 18 (City report noting "wave of compliant behavior towards the end of 2015").  The City has not even attempted to demonstrate that this obvious alternative of enforcing existing law directly against hosts who violate it is insufficient to accomplish the City's purpose.  This dooms the Ordinance under the First Amendment.  *See, e.g.*, *Valle Del Sol Inc. v. Whiting*, 709 F.3d 808, 826-27 (9th Cir. 2013) (enjoining anti-solicitation law where state did not show ineffectiveness of directly enforcing "preexisting" laws to "address legitimate traffic safety concerns" instead of speech); *McKenna*, 881 F. Supp. 2d at 1284 (invaliding law banning publication of ads for sexual encounters because state had "fail[ed] to demonstrate why a law targeting only the individuals who post ads would not be effective, rather than seeking to impose felony liability on online service providers"); *Cooper*, 939 F. Supp. 2d at 840 (similar).

The proponents of the Ordinance have suggested that imposing liability on Hosting Platforms for publishing listings will make the City's regulatory scheme more effective and efficient in preventing unlawful conduct.  *See* Blavin Decl., Ex. A at 1.  That contention is both wrong on its own terms and insufficient to sustain the Ordinance under the First Amendment.  In reality, not only is direct enforcement of the Ordinance against hosts technically feasible, *see supra* at 7, but it would also be *more effective* in achieving the sponsors' stated goal of punishing "unscrupulous speculators" who list multiple properties in violation of the law, rather than "mom and pop" hosts.  *Id*., Ex. H at 1.  The law's punishing of Hosting Platforms for publishing listings, by contrast, will affect *all* hosts where the platform cannot verify the registration numbers, including "mom and pop" hosts the City professes to want to protect.  This disconnect between the City's asserted aims and the

speech-restrictive means chosen also dooms the Ordinance. *See City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 424-25 (1993) (invalidating law restricting newspaper racks as it was not tailored to achieving city's asserted aesthetic interest); *Valle Del Sol*, 709 F.3d at 827 (similar).

Moreover, even if it were true that the Ordinance would be a more efficient or effective way of preventing unlawful short-term rentals than direct enforcement against hosts who violate the law, that would not be an adequate basis for upholding the Ordinance. The First Amendment precludes the government from restricting advertising and speech simply because it may be more politically or administratively convenient than a direct regulation of conduct. *See Thompson v. W. States Med. Ctr.*, 535 U.S. 357, 373 (2002) (speech restrictions must be "a necessary as opposed to merely convenient means of achieving [the government's] interests"); *Yniguez v. Arizonans for Official English*, 42 F.3d 1217, 1234 (9th Cir. 1994) ("The government cannot restrict the speech of the public … just in the name of *efficiency*."). The City seeks to place the burden of verifying each host's compliance with the law on Hosting Platforms—a burden that is likely to be substantial, given the effort needed to verify all of the thousands of San Francisco rental listings on Airbnb. Owen Decl., ¶¶ 16-17. But the government may not seek to "shift[] the burden of enforcing the law from the taxpayer" to speakers or publishers of information simply because it is easier to do so. *See News & Sun Sentinel Co. v. Bd. of Cnty. Comm'rs*, 693 F. Supp. 1066, 1072 (S.D. Fla. 1987).

For similar reasons, the City will be unable to establish that the Ordinance achieves the City's interests in "'a direct and effective way.'" *Edenfield*, 507 U.S. at 773. By its own terms, the Ordinance operates in an *indirect* way: it targets the behavior of "unscrupulous speculators" and other third-party hosts by imposing liability on Hosting Platforms. Blavin Decl., Ex. H at 1. Further, the City has not put forward any evidence showing that the Ordinance will achieve its purported goal of bringing units back to the long-term rental market. Indeed, a recent study by the city planning and research organization SPUR states that "[d]ata from Airbnb suggests that the vast majority of properties listed in San Francisco are not being removed from the long-term residential market." Blavin Decl., Ex. J at 9; *see also* Owen Decl., Ex. 5 at 4 (rentals by Airbnb hosts who may list more than one home for short term rental are 0.18% of all units in City). Courts have invalidated restrictions on commercial speech where, as here, the argument that a restriction will serve a

MOTION FOR PRELIMINARY INJUNCTION

CASE NO. 16-cv-03615

substantial government interest is "speculati[ve]" at best. *Edenfield*, 507 U.S. at 770-71 (restriction invalidated where state presented no "studies" or other "evidence" that law would achieve aims); *Memphis Publ'g Co. v. Leech*, 539 F. Supp. 405, 411 (W.D. Tenn. 1982) (same).

Finally, the Ordinance is unconstitutionally overbroad as it punishes Hosting Platforms for publishing *any* listing without complying with its "verification" measures—even those listings that may be registered and lawful. *See McKenna*, 881 F. Supp. 2d at 1280 (law overbroad where it "encompasses [ads] that are not illegal"). Indeed, the "Constitution gives significant protection from overbroad laws that chill speech," and that concern "is especially strong where" the "statute imposes criminal sanctions." *Doe v. Harris*, 772 F.3d 563, 577-78 (9th Cir. 2014). Here, in the face of substantial criminal and civil penalties for non-compliance, and a burdensome verification process, platforms likely would over-remove or not publish lawful listings. *See* Owen Decl. ¶¶ 18-20.

### C. <u>Airbnb Faces Irreparable Harm Unless the Ordinance is Enjoined</u>

For several reasons, Airbnb is likely to suffer irreparable harm absent an injunction.

*First*, Airbnb faces the threat of prosecution and significant penalties under a preempted law, which the Ninth Circuit and other courts have recognized constitutes irreparable harm. *See Valle del Sol*, 732 F.3d at 1029 ("irreparable harm" exists where plaintiff "demonstrated a credible threat of prosecution" under preempted law); *Georgia Latino Alliance for Human Rights v. Governor of Georgia*, 691 F.3d 1250, 1269 (11th Cir. 2012) (irreparable harm exists where "Plaintiffs are under the threat of state prosecution for crimes that conflict with federal law"); *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 381 (1992) ("irreparable injury" exists where "attorneys general … made clear that they would seek to enforce" preempted law and plaintiffs face "Hobson's choice" of "expos[ing] themselves to potentially huge liability" or "suffer[ing] the injury of obeying" the law).

*Second*, Airbnb's loss of First Amendment freedoms, even for minimal periods of time, "'unquestionably constitutes irreparable injury.'" *Farris*, 677 F.3d at 868.

*Third*, the risk of criminal penalties, including possible jail time, if the City is permitted to enforce the Ordinance additionally constitutes irreparable harm. *See Hoffman*, 2013 WL 4502097, at *12 (irreparable harm where, "[a]bsent injunctive relief, Plaintiffs may face serious criminal liability"); *Toomer v. Witsell*, 334 U.S. 385, 392 (1948) (where "defiance would have carried with it

23

the risk of heavy fines and long imprisonment," "imminence of irreparable injury" shown).

*Fourth*, the risk of fines reaching into the millions of dollars or more per day constitutes irreparable harm. The Ordinance authorizes fines of up to $1,000 per day for *each* violation, and the proponents of the Ordinance have claimed that there are approximately 6,000 unregistered Airbnb listings in San Francisco, Blavin Decl., Ex. K at 1—amounting to fines of *$6,000,000* per day. Courts have found irreparable harm based on fines of this magnitude. *See, e.g.*, *Satellite Television of N.Y. Assocs. v. Finneran*, 579 F. Supp. 1546, 1551 (S.D.N.Y. 1984) (irreparable harm "readily" shown where plaintiff "faced with a choice of" complying or incurring "fine of $2,000 a day").

The prospect of Airbnb facing criminal and civil penalties, moreover, is not just speculative or hypothetical. The Ordinance squarely takes aim at Airbnb's business operations, and indeed its proponents explicitly labeled and promoted it as a measure targeted at Airbnb. Blavin Decl., Exs. C; K. In these circumstances, courts have not hesitated to find irreparable harm based on the high likelihood of enforcement. *See Cooper*, 939 F. Supp. 2d at 819 (high likelihood of enforcement where Backpage.com was "direct target" of law); *McKenna*, 881 F. Supp. 2d at 1270 (same).

*Fifth*, the Ordinance also gives rise to irreparable injury by being highly disruptive to Airbnb's operations and threatening a loss of consumer goodwill. There are approximately 9,600 listings presently on Airbnb in San Francisco, and listings are continuously being added to (and removed) from the site. Owen Decl., ¶ 15. For each listing, Airbnb would need to verify the existence of a valid registration number, but the Ordinance does not provide any specific procedures for Airbnb to accomplish that. Airbnb likely would need to create a dedicated team of employees devoted full time to verifying listings manually, and would need to re-design its website. *Id.* ¶¶ 16-17. Implementing such procedures likely would take a significant period of time. *Id.* As such, the only way Airbnb could avoid the law's substantial criminal and civil penalties would be to remove thousands of listings from its site. *Id.* ¶ 18. This would include the removal of listings that may otherwise be in compliance with the law as Airbnb will not have the ability to confirm the validity of their registration numbers prior to the effective date. *Id.* ¶¶ 19-20. As a result of this significant disruption to its business and a loss of consumers who may never return to the platform even if the law is ultimately overturned, Airbnb faces the serious risk of an erosion in consumer trust and

goodwill. *Id.* ¶ 20. This constitutes irreparable harm. *Am. Trucking*, 559 F.3d at 1058 (irreparable harm exists where enforcement of preempted law will cause "part of" plaintiff's "business" and "goodwill" to "evaporate"); *Mahroom v. Best W. Int'l, Inc.*, 2009 WL 248262, at *3 (N.D. Cal. Feb. 2, 2009) ("[m]ajor disruption of a business" threatening "goodwill" is "irreparable harm").

Additionally, when unlawful regulations create the perception that a company's activities are illegal, the resulting loss in customer goodwill is irreparable. *See Aeroground, Inc. v. City & Cnty. of San Francisco*, 170 F. Supp. 2d 950, 959 (N.D. Cal. 2001) (irreparable harm to goodwill where party "is refusing to comply with a rule that it believes is preempted by federal law"). Here, the Ordinance engenders the inaccurate perception that Airbnb's activities may be illegal, creating confusion among potential hosts and guests alike, and driving consumers away from the platform.

### D.   The Balance of Equities and Public Interest Favor Airbnb

The balance of equities tips decidedly in favor of Airbnb. Airbnb faces deprivation of its constitutional rights, which far outweighs any harm the City might claim. *Klein v. City of San Clemente*, 584 F.3d 1196, 1208 (9th Cir. 2009). Harms to Airbnb in the form of impending criminal penalties and fines, as well as lost goodwill, also weigh in its favor. The City can claim little harm to outweigh these significant injuries: The Ordinance does not become effective until July 24, so the City does not face disruption of established practices. *McKenna*, 881 F. Supp. 2d at 1286 ("harm to the government [is not] great" where "'[n]o prosecutions have yet been []taken'").

The public interest also strongly favors Airbnb. The public interest is served by "the Constitution's declaration that federal law is to be supreme." *Am. Trucking*, 559 F.3d at 1059-60; *see Bank One, Utah v. Guttau*, 190 F.3d 844, 847-48 (8th Cir. 1999) ("public interest will perforce be served by enjoining the enforcement of [preempted] state law"). In addition, "'it is always in the public interest to prevent the violation of a party's constitutional rights.'" *Melendres*, 695 F.3d at 1002. It also is in the public interest to protect Airbnb from criminal liability and lost consumer goodwill resulting from unlawful regulation. By contrast, an injunction would not prevent the City from enforcing its laws against those non-compliant hosts who directly violate them.

### IV.   CONCLUSION

For the foregoing reasons, the Court should grant the motion for a preliminary injunction.

DATED:  June 27, 2016                    MUNGER, TOLLES & OLSON LLP
                                         JOHN W. SPIEGEL
                                         JONATHAN H. BLAVIN
                                         ELLEN M. RICHMOND
                                         JOSHUA PATASHNIK


                                 By:    */s/ Jonathan H. Blavin*
                                        JONATHAN H. BLAVIN
                                 Attorneys for Plaintiff Airbnb, Inc.