JONATHAN H. BLAVIN (State Bar No. 230269)
jonathan.blavin@mto.com
ELLEN M. RICHMOND (State Bar No. 277266)
ellen.richmond@mto.com
JOSHUA PATASHNIK (State Bar No. 295120)
josh.patashnik@mto.com
MUNGER, TOLLES & OLSON LLP
560 Mission Street, Twenty-Seventh Floor
San Francisco, CA  94105-4000
Telephone:      (415) 512-4000
Facsimile:      (415) 512-4077

JOHN W. SPIEGEL (State Bar No. 78935)
john.spiegel@mto.com
MUNGER, TOLLES & OLSON LLP
355 South Grand Avenue, Thirty-Fifth Floor
Los Angeles, California 90071-1560
Telephone:      (213) 683-9100
Facsimile:      (213) 687-3702

Attorneys for Plaintiff Airbnb, Inc.

*[Additional counsel listed on next page]*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| AIRBNB, INC. and HOMEAWAY.COM, INC., <br><br> Plaintiffs, <br><br> vs. <br><br> CITY AND COUNTY OF SAN FRANCISCO, <br><br> Defendant. | Case No. 3:16-cv-03615-JD <br><br> **PLAINTIFFS' JOINT NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF** <br><br> Judge:        Hon. James Donato <br> Courtroom:  11 <br> Time:         Oct. 6, 2016 at 10:00 am |

1 | *Additional counsel:*

2 | THOMAS R. BURKE (CA State Bar No. 141930)
thomasburke@dwt.com

3 | SANJAY M. NANGIA (CA State Bar No. 264986)
sanjaynangia@dwt.com

4 | DAVIS WRIGHT TREMAINE LLP
505 Montgomery Street, Suite 800

5 | San Francisco, California 94111
Telephone:    (415) 276-6500

6 | Facsimile:    (415) 276-6599

7 |

8 | JAMES C. GRANT (*pro hac vice*)
jamesgrant@dwt.com

9 | AMBIKA K. DORAN (*pro hac vice*)
ambikadoran@dwt.com

10 | DAVIS WRIGHT TREMAINE LLP
1201 Third Avenue, Suite 2200

11 | Seattle, Washington 98101
Telephone: (206) 757-8136

12 | Facsimile: (206) 757-7136

13 | Attorneys for HomeAway.com, Inc.

14 |

15 |

16 |

17 |

18 |

19 |

20 |

21 |

22 |

23 |

24 |

25 |

26 |

27 |

28 |

# TABLE OF CONTENTS

**Page**

NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION.................................. 1

I.     INTRODUCTION.......................................................................................................... 1

II.    BACKGROUND ............................................................................................................ 3

     A.     Airbnb and HomeAway ..................................................................................... 3

     B.     San Francisco's Regulatory Scheme Governing Short-Term Rentals ........................ 5

         1.     Background Regarding Short-Term Rental Regulation in the City ................ 5

         2.     The Original Ordinance Imposing Liability on Hosting Platforms.................. 6

         3.     The City's Withdrawal of the Original Ordinance After Airbnb and HomeAway Sued................................................................................. 7

         4.     The Amended Ordinance Imposing Liability on Hosting Platforms .............. 7

III.   ARGUMENT ................................................................................................................ 9

     A.     Standard for Preliminary Injunction................................................................. 9

     B.     Plaintiffs Are Likely To Succeed on the Merits of Their Claims ............................ 10

         1.     The Ordinance Violates and Is Preempted By the CDA ............................. 10

             (a)     The CDA Provides Broad Immunity to Websites for Third-Party Content........................................................................ 10

             (b)     Section 230 Provides a Straightforward Test for Website Immunity .......................................................................... 11

             (c)     The Ordinance Treats Hosting Platforms as the Publisher or Speaker of Third-Party Content, in Violation of Section 230........... 12

                 (i)     The Ordinance Imposes Liability On Hosting Platforms Stemming From Transactions On Their Sites ...................... 12

                 (ii)     The Ordinance Obligates Hosting Platforms to Monitor, Verify, and Screen Third-Party Listings ................ 16

         2.     The Ordinance Violates the First Amendment................................................ 20

             (a)     The Ordinance Is a Content-Based Restriction on Speech that Is Subject to Heightened Judicial Scrutiny ....................................... 20

             (b)     The Ordinance Cannot Survive Heightened Scrutiny Because It Is Not Narrowly Tailored to Serve a Substantial Government Interest ........................................................................ 22

             (c)     The Ordinance Impermissibly Imposes Strict Liability on Publishers Without Proof of Scienter................................................ 25

     C.     Plaintiffs Face Irreparable Harm Unless the Ordinance is Enjoined ...................... 27

     D.     The Balance of Equities and Public Interest Favor Plaintiffs .................................. 29

IV.   CONCLUSION ........................................................................................................... 30

# TABLE OF AUTHORITIES

**Page**

**FEDERAL CASES**

*Aeroground, Inc. v. City & Cnty. of San Francisco*,
    170 F. Supp. 2d 950 (N.D. Cal. 2001) ....................................................29

*Almeida v. Amazon.com, Inc.*,
    2004 WL 4910036 (S.D. Fla. July 30, 2004) ...............................................14

*Almeida v. Amazon.com, Inc.*,
    456 F.3d 1316 (11th Cir. 2006)..........................................................11, 14

*Am. Trucking Ass'ns, Inc. v. City of Los Angeles*,
    559 F.3d 1046 (9th Cir. 2009).........................................................29, 30

*Backpage.com, LLC v. Cooper*,
    939 F. Supp. 2d 805 (M.D. Tenn. 2013) .......................................... passim

*Backpage.com, LLC v. Dart*,
    807 F.3d 229 (7th Cir. 2015)...............................................................15

*Backpage.com, LLC v. Hoffman*,
    2013 WL 4502097 (D.N.J. Aug. 20, 2013) ...............................................28

*Backpage.com, LLC v. McKenna*,
    881 F. Supp. 2d 1262 (W.D. Wash. 2012) ........................................ passim

*Bank One, Utah v. Guttau*,
    190 F.3d 844 (8th Cir. 1999)................................................................30

*Barnes v. Yahoo!, Inc.*,
    570 F.3d 1096 (9th Cir. 2009)..........................................................11, 13

*Bartnicki v. Vopper*,
    532 U.S. 514 (2001) .........................................................................2, 22

*Batzel v. Smith*,
    333 F.3d 1018 (9th Cir. 2003)...................................................... passim

*Bigelow v. Virginia*,
    421 U.S. 809 (1975) ............................................................................21

*Brown v. Entm't Merchants Ass'n*,
    564 U.S. 786 (2011) .......................................................................24, 27

*Carafano v. Metrosplash.com, Inc.*,
    339 F.3d 1119 (9th Cir. 2003).........................................................11, 16

*Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n*,
    447 U.S. 557 (1980) ............................................................................22

## TABLE OF AUTHORITIES

*Chi. Lawyers' Comm. for Civil Rights Under Law, Inc. v. Craigslist, Inc.*,
   519 F.3d 666 (7th Cir. 2008) ...................................................................................11, 19

*City of Cincinnati v. Discovery Network, Inc.*,
   507 U.S. 410 (1993) ...............................................................................................24

*Corbis Corp. v. Amazon.com, Inc.*,
   351 F. Supp. 2d 1090 (W.D. Wash. 2004) ...............................................................14

*Doe v. Friendfinder Network, Inc.*,
   540 F. Supp. 2d 288 (D.N.H. 2008) .........................................................................17

*Doe v. MySpace, Inc.*,
   528 F.3d 413 (5th Cir. 2008) ...............................................................11, 12, 16

*Elrod v. Burns*,
   427 U.S. 347 (1976) .............................................................................................3, 27

*Fair Hous. Council of San Fernando Valley v. Roommates.com, LLC*,
   521 F.3d 1157 (9th Cir. 2008) ...........................................................................11, 16

*Farris v. Seabrook*,
   677 F.3d 858 (9th Cir. 2012) ...............................................................................9, 27

*Fields v. Twitter*,
   2016 WL 4205687 (N.D. Cal. Aug. 10, 2016) .....................................................18, 19

*Fla. Bar v. Went For It, Inc.*,
   515 U.S. 618 (1995) ...............................................................................................22

*Foti v. City of Menlo Park*,
   146 F.3d 629 (9th Cir. 1998) ...................................................................................1

*Free Speech Coal., Inc. v. Attorney General*,
   825 F.3d 149 (3d Cir. 2016) ....................................................................................21

*Gibson v. Craigslist, Inc.*,
   2009 WL 1704355 (S.D.N.Y. June 15, 2009) ...........................................................14

*Green v. Am. Online*,
   318 F.3d 465 (3d Cir. 2003) ...............................................................................11, 16

*Hinton v. Amazon.com.dedc, LLC*,
   72 F. Supp. 3d 685 (S.D. Miss. 2014) ................................................................12, 14

*Hustler Magazine, Inc. v. Falwell*,
   485 U.S. 46 (1988) .................................................................................................26

*Inman v. Technicolor USA, Inc.*,
   2011 WL 5829024 (W.D. Pa. Nov. 18, 2011) ...........................................................14

## TABLE OF AUTHORITIES

*Jane Doe No. 1 v. Backpage.com, LLC,*
    817 F.3d 12 (1st Cir. 2016) ..............................................................................11, 17, 19

*Johnson v. Arden,*
    614 F.3d 785 (8th Cir. 2010) ..................................................................................11

*Jones v. Dirty World Entm't Recordings LLC,*
    755 F.3d 398 (6th Cir. 2014) .............................................................................11, 17

*Klayman v. Zuckerberg,*
    753 F.3d 1354 (D.C. Cir. 2014) ..............................................................................11

*Klein v. City of San Clemente,*
    584 F.3d 1196 (9th Cir. 2009) ................................................................................29

*Mahroom v. Best W. Int'l, Inc.,*
    2009 WL 248262 (N.D. Cal. Feb. 2, 2009) ...........................................................29

*Melendres v. Arpaio,*
    695 F.3d 990 (9th Cir. 2012) ..................................................................................30

*Memphis Publ'g Co. v. Leech,*
    539 F. Supp. 405 (W.D. Tenn. 1982) .....................................................................24

*Morales v. Trans World Airlines, Inc.,*
    504 U.S. 374 (1992) ................................................................................................28

*Nemet Chevrolet, Ltd. v. Consumraffairs.com, Inc.,*
    591 F.3d 250 (4th Cir. 2009) ..................................................................................10

*New York v. Ferber,*
    458 U.S. 747 (1982) ................................................................................................25

*News & Sun Sentinel Co. v. Bd. of Cnty. Comm'rs,*
    693 F. Supp. 1066 (S.D. Fla. 1987) ........................................................................25

*Obado v. Magedson,*
    2014 WL 3778261 (D.N.J. July 31, 2014) .............................................................17

*Perfect 10, Inc. v. CCBill LLC,*
    488 F.3d 1102 (9th Cir. 2007) ...........................................................................10, 12

*Planned Parenthood of Idaho, Inc. v. Wasden,*
    376 F.3d 908 (9th Cir. 2004) ..................................................................................27

*Reed v. Town of Gilbert,*
    135 S. Ct. 2218 (2015) ......................................................................................21, 22

*Ricci v. Teamsters Union Local 456,*
    781 F.3d 25 (2d Cir. 2015) ......................................................................................11

## TABLE OF AUTHORITIES

*Rosetta Stone Ltd. v. Google Inc.*,
732 F. Supp. 2d 628 (E.D. Va. 2010), *aff'd*, 676 F.3d 144 (4th Cir. 2012) .................................15

*Satellite Television of N.Y. Assocs. v. Finneran*,
579 F. Supp. 1546 (S.D.N.Y. 1984) ...............................................................................................28

*Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.*,
502 U.S. 105 (1991) .........................................................................................................................22

*Smith v. California*,
361 U.S. 147 (1960) .........................................................................................................................25

*Sorrell v. IMS Health*,
564 U.S. 552 (2011) ...........................................................................................................2, 20, 21, 22

*Telecomms. Regulatory Bd. v. CTIA-Wireless Ass'n*,
752 F.3d 60 (1st Cir. 2014) .............................................................................................................26

*Thalheimer v. City of San Diego*,
645 F.3d 1109 (9th Cir. 2011) ...........................................................................................................9

*Thompson v. W. States Med. Ctr.*,
535 U.S. 357 (2002) .........................................................................................................................25

*Toomer v. Witsell*,
334 U.S. 385 (1948) .........................................................................................................................28

*United States v. Nat'l Treasury Emps. Union*,
513 U.S. 454 (1995) .........................................................................................................................22

*United States v. X-Citement Video, Inc.*,
513 U.S. 64 (1994) ...........................................................................................................................25

*Universal Commc'n Sys., Inc. v. Lycos, Inc.*,
478 F.3d 413 (1st Cir. 2007) ................................................................................................... passim

*Valle Del Sol Inc. v. Whiting*,
709 F.3d 808 (9th Cir. 2013).................................................................................................23, 24, 27

*Village of Schaumburg v. Citizens for a Better Env't*,
444 U.S. 620 (1980) .........................................................................................................................22

*Yniguez v. Arizonans for Official English*,
42 F.3d 1217 (9th Cir. 1994).............................................................................................................25

*Zeran v. America Online, Inc.*,
129 F.3d 327 (4th Cir. 1997).......................................................................................................11, 17

# TABLE OF AUTHORITIES

**STATE CASES**

*Gentry v. eBay, Inc.*,
  99 Cal. App. 4th 816 (2002)..................................................................................14

*Hill v. StubHub, Inc.*,
  727 S.E.2d 550 (N.C. App. 2012) .....................................................................13, 17

*Milgram v. Orbitz Worldwide, Inc.*,
  16 A.3d 1113 (N.J. Super. 2010)...........................................................................13

*Stoner v. eBay Inc.*,
  2000 WL 1705637 (Cal. Super. Ct. Nov. 1, 2000) .......................................13, 14, 18

**FEDERAL STATUTES AND LEGISLATIVE MATERIALS**

18 U.S.C. § 2702(a)(3) ...........................................................................................26

47 U.S.C. § 230 .......................................................................................... passim

47 U.S.C. § 230(b)(2)..............................................................................................10

47 U.S.C. § 230(c)(1)..........................................................................................10, 13

47 U.S.C. § 230(c)(2)..............................................................................................10

47 U.S.C. § 230(e)(3)................................................................................................2

47 U.S.C. § 230(f)(2)...............................................................................................11

141 Cong. Rec. H8469–72 (1995) ............................................................................11

**MUNICIPAL CODE PROVISIONS**

Anaheim Mun. Code § 4.05.120.030 .........................................................................7

S.F. Admin. Code § 41A.4 ................................................................................. passim

S.F. Admin. Code § 41A.5(e)...........................................................................1, 9, 21

S.F. Admin. Code § 41A.5(g)(1)(F)..................................................................1, 9, 22

S.F. Admin. Code § 41A.5(g)(2)(A).................................................................1, 9, 22

S.F. Admin. Code § 41A.5(g)(4)(C)..................................................................... passim

S.F. Admin. Code § 41A.5(g)(4)(D).....................................................................9, 22

S.F. Admin. Code § 41A.5(g)(4)(E)..................................................................1, 9, 22

S.F. Admin. Code § 41A.6(d) .................................................................................9

**TABLE OF AUTHORITIES**

S.F. Admin. Code § 41A.7(b) ...............................................................................9, 20, 21, 23

MOTION FOR PRELIMINARY INJUNCTION

## NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION

PLEASE TAKE NOTICE that on October 6, 2016 at 10:00 a.m. or as soon thereafter as they may be heard, Plaintiffs Airbnb, Inc. ("Airbnb") and HomeAway.com, Inc. ("HomeAway") will and hereby do move for a preliminary injunction.

Plaintiffs respectfully request an order enjoining Defendant City and County of San Francisco (the "City") from enforcing against them amended sections 41A.5(e) and 41A.5(g)(4)(C)-(E) of the San Francisco Administrative Code (the "Ordinance").[1]

## I.   INTRODUCTION

In June, the Board of Supervisors passed an ordinance (the "Original Ordinance") requiring Hosting Platforms to "verify" that short-term rental listings posted on their websites by third parties have valid registration numbers, or risk criminal and civil penalties for their users' listing of unregistered rentals.  Declaration of Jonathan H. Blavin ("Blavin Decl."), Ex. A at 3-5.  Plaintiffs filed this action, asserting the ordinance was preempted by Section 230 of the Communications Decency Act ("CDA"), 47 U.S.C. § 230, and violates the First Amendment.  As Supervisor David Campos (a sponsor of the law) said, the City "read [Airbnb's]" preliminary injunction motion, "said, you make a good point," and decided "we're going to modify."  Blavin Decl., Ex. B at 2.

The Board passed amendments in August.  Supervisor Campos has said the Board made "a very few set of modest revisions," and the "intent of" the Ordinance remains the same.  *Id.*, Ex. C at 1.  So does its effect.  The Ordinance, like the original law, imposes criminal and civil liability on Hosting Platforms for unregistered short-term rentals listings.  It also requires Hosting Platforms to verify that a rental is "lawfully registered … at the time [it] is rented."  § 41A.5(g)(4)(C).  The Ordinance suffers the same defects as the original law (and more) and violates Section 230 and the First Amendment.  The Court should therefore enjoin its enforcement.[2]

---

[1] A copy of the Ordinance as amended is attached as Appendix A.  The full version of Chapter 41A, before amendment by the Ordinance, is attached as Appendix B.  All citations to sections of Chapter 41A refer to the San Francisco Administrative Code as amended by the Ordinance.

[2] This action is both an as-applied and a facial challenge.  It is as-applied in that it seeks only to prohibit the City from enforcing the Ordinance against Plaintiffs; and it is a facial challenge in that the Ordinance, on its face, is invalid in certain respects. *See Foti v. City of Menlo Park*, 146 F.3d 629, 635 (9th Cir. 1998).

Section 230 prohibits "treat[ing]" websites "as the publisher or speaker of any information provided by another information content provider."  47 U.S.C. §§ 230(c)(1), (e)(3).  In other words, websites cannot be liable based on content provided by third parties.  Under settled law, this immunity extends to the processing of third-party transactions resulting from such content.  The Ordinance violates this proscription by imposing severe criminal and civil penalties on Hosting Platforms that collect a fee and provide "Booking Services," defined as reservation or payment services that "facilitate" short-term rental transactions, where the property at issue is not "lawfully registered."  §§ 41A.4, 41A.5(g)(4)(C).  The Ordinance thus requires Hosting Platforms to monitor, verify, and effectively block user listings, in violation of Section 230.  That platforms accept a fee or provide "reservation" or "payment services" does not mean the CDA does not apply.  Indeed, if parties could evade the law in this manner, this would leave a gaping hole in Section 230's protections and undermine its core objectives, including "the development of e-commerce."  *Batzel v. Smith*, 333 F.3d 1018, 1027 (9th Cir. 2003).

The Ordinance also violates the First Amendment.  It is a content-based restriction that burdens protected speech, i.e., third-party rental listings, published on Hosting Platforms, and is therefore subject to "heightened judicial scrutiny" under the First Amendment.  *Sorrell v. IMS Health*, 564 U.S. 552, 570 (2011).  To meet this standard, the City must show the Ordinance is narrowly tailored to further a substantial government interest.  But the "normal method of deterring unlawful conduct" is to punish the conduct, not prohibit speech about it.  *Bartnicki v. Vopper*, 532 U.S. 514, 529 (2001).  The City cannot show the obvious alternative of enforcing its laws against residents who rent properties in violation of the law would be ineffective or inadequate.  Just the opposite:  The City *can* (and does) enforce its laws against hosts who violate them.  The Ordinance also violates the First Amendment because it imposes criminal penalties on Hosting Platforms without requiring any showing of scienter.  The City has impermissibly created a strict-liability crime for providing Booking Services in connection with rentals that are not "lawfully registered," even if the platform has no knowledge of that fact.  But the Supreme Court has rejected efforts to impose strict criminal liability for the publication of allegedly unlawful third-party content because such restrictions chill protected, lawful speech.

Absent this Court's intervention, the Ordinance will cause Plaintiffs irreparable harm.  "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."  *Elrod v. Burns*, 427 U.S. 347, 373 (1976).  So, too, courts have found irreparable harm where, as here, a plaintiff faces a threat of prosecution, a substantial disruption to its business, and erosion of customer goodwill, under a preempted state law.   Given this palpable threat of irreparable harm, the equities tip sharply in Plaintiffs' favor, and the public interest is served by enforcing the Constitution and federal law.  At the same time, an injunction would not prevent the City from continuing to enforce its laws against residents who violate them.  The Court should enjoin enforcement of the Ordinance against Hosting Platforms such as Plaintiffs.

## II.      BACKGROUND

### A.      Airbnb and HomeAway

Airbnb and HomeAway provide Internet platforms through which persons desiring to book accommodations ("guests") and those listing accommodations available for rental ("hosts") can find each other, make arrangements, and enter into agreements for rentals.  Airbnb operates Airbnb.com, and HomeAway operates HomeAway.com, VRBO.com, and VacationRentals.com.[3]  *See* Declaration of David Owen ("Owen Decl."), ¶ 2; Declaration of Bill Furlong ("Furlong Decl."), ¶ 2.

Neither Airbnb nor HomeAway manages, operates, leases or owns the accommodations listed by third-party hosts, and neither is a party to the agreements between guests and hosts for the booking of rentals.  Owen Decl. ¶ 4; Furlong Decl. ¶ 3.  Plaintiffs' websites provide means by which hosts can list their accommodations and guests can locate and connect with hosts.  Owen Decl. ¶ 3; Furlong Decl. ¶ 2.  Hosts provide the content for listings, such as descriptions and rental prices, and the dates and lengths of stay their properties are available.  Owen Decl. ¶¶ 6-7; Furlong Decl. ¶ 6.  Plaintiffs' terms of service require hosts to agree they are solely responsible for the content of their listings.  *See* Owen Decl. ¶ 7 & Ex. 1 at 6 (hosts "alone are responsible for any and all Listings and Member Content [they] post."); Furlong Decl. ¶ 6 & Ex. B § 8 ("All property listings on the Site are the sole responsibility of the" owner).  Plaintiffs do not review all listings

---

[3] The three websites are referred to collectively as "HomeAway" or the "HomeAway websites."

1  before they appear on their websites.  Owen Decl. ¶¶ 17, 19; Furlong Decl. ¶ 6.

2       Plaintiffs also require hosts (and guests) to comply with local laws in listing and renting

3  units.  Airbnb's Terms of Service state: "HOSTS SHOULD UNDERSTAND HOW THE LAWS

4  WORK IN THEIR RESPECTIVE CITIES.  SOME CITIES HAVE LAWS THAT RESTRICT

5  THEIR ABILITY TO HOST PAYING GUESTS FOR SHORT PERIODS….  IN MANY CITIES,

6  HOSTS MUST REGISTER, GET A PERMIT, OR OBTAIN A LICENSE BEFORE LISTING A

7  PROPERTY OR ACCEPTING GUESTS.  CERTAIN TYPES OF SHORT-TERM BOOKINGS

8  MAY BE PROHIBITED ALTOGETHER."  Owen Decl., Ex. 1 at 1.  HomeAway's Terms and

9  Conditions state that hosts "are responsible for and agree to abide by all laws, rules, ordinances, or

10  regulations applicable to the listing of their rental property …, including but not limited to laws …

11  [and] requirements relating to taxes…."  Furlong Decl., Ex. B, § 1.  In addition, Plaintiffs

12  encourage hosts to be aware of the laws in their jurisdictions and provide information on their

13  websites about San Francisco's laws specifically.  *See* Owen Decl., Exs. 2-3 (Airbnb "Responsible

14  Hosting" pages, referencing and summarizing San Francisco laws, providing links, and informing

15  hosts about including registration numbers in listings); Furlong Decl. ¶ 8 (HomeAway information

16  about San Francisco laws and requirements).[4]

17       Airbnb and HomeAway have different models and provide different options for hosts and

18  guests to communicate and make arrangements with one another.  Airbnb allows guests to make

19  arrangements with hosts through online booking and enables the provision of payment processing

20  services to permit hosts to receive payments electronically.  Owen Decl. ¶ 3.  For use of its services,

21  including its publication and listing services, Airbnb receives a fee from both guests and hosts,

22  which is a percentage of the rental fee as set by the host.  *Id.* ¶ 8.

23       HomeAway hosts pay for services in one of two ways.  First, they may buy subscriptions to

---

[4] Also, as part of the Airbnb Community Compact, the company provides solutions tailored to the needs of cities like San Francisco with historic housing challenges.  *See* Owen Decl. ¶ 14 & Ex. 4. For example, Airbnb voluntarily removes listings that it believes may be offered by hosts with multiple "entire home" listings or by unwelcome commercial operators.  *See id.* ¶ 14.  If Airbnb is alerted to shared spaces or private rooms that appear to be operated by such operators or do not reflect the community vision, it generally removes such listings.  *See id.*  Within the last year, Airbnb has removed numerous San Francisco listings as part of its Community Compact.  *See id.* ¶¶ 14-15 & Ex. 5.

advertise their properties for a specified period of time, such as a year.  Furlong Decl. ¶ 4.  Second, they may choose a pay-per-booking option, paying for the services based on a percentage of the total cost of a confirmed booking.  *Id.*  Under this second arrangement, hosts and guests may make rental arrangements through online booking and online payment services using a third-party processor.  *Id.* ¶ 10.  Hosts and guests may also make arrangements by communicating through a messaging service on HomeAway's websites or by exchanging phone numbers or personal email addresses and communicating directly.  *Id.* ¶ 9.  In instances when hosts and guests arrange rentals and payments on their own, HomeAway may have no information about whether rentals occurred or only such information as is reflected in host-guest communications through the website.  *Id.*

**B.**   **San Francisco's Regulatory Scheme Governing Short-Term Rentals**

**1.**   **Background Regarding Short-Term Rental Regulation in the City**

In October 2014, the Board of Supervisors amended Chapter 41A (effective February 2015) to make short-term rentals lawful in San Francisco, subject to certain limitations and requirements. "Permanent Residents" who have occupied their units for at least 60 days may offer their homes for "Short-Term Rental."  §§ 41A.4; 41A.5(g).[5]  Residents must register their properties and "include[] the Department-issued registration number on any Hosting Platform listing."  §§ 41A.5(g)(1)(F), (g)(2)(A).  In addition, the amendments require Hosting Platforms to notify users of the City's short-term rental regulations and collect and remit Transient Occupancy Taxes ("TOT") required under the Business and Tax Regulations Code.  § 41A.5(g)(4)(A)-(B).

To register their properties, hosts must complete a two-step process.  First, they must obtain a Business Registration Certificate from the Treasurer & Tax Collector.  Blavin Decl., Ex. D at 4.  Second, they must schedule an in-person appointment with the Office of Short-Term Rentals ("OSTR") and provide an application, proof of residency, Business Registration Certificate, and proof of at least $500,000 in liability insurance and that the property does not violate any City code. *Id.*  Thereafter, they must submit quarterly reports of all stays.  *Id.* at 2.  Hosts, unless exempted, must also obtain a Certificate of Authority from the Treasurer & Tax Collector and file monthly

---

[5] There is no limit on the number of days per year a unit may be rented if it is "hosted"; if the host is not on site, the unit cannot be rented more than 90 days a year.  § 41A.5(g)(1)(A).

reports disclosing the rent received and TOT due.  *Id.*, Ex. E at 3-4.  In addition, earlier this year, the City's Assessor-Recorder announced that hosts must pay taxes on physical assets, meaning they must report the cost and acquisition year of "each piece of furniture, equipment, and supplies used in renting [their] residence, including furnishings from the kitchen, living room, dining room, and bedroom, such as televisions, computers, bed frames, mattresses, tables, chairs, stoves, fridges, appliances, dish washers, clothes washers and dryers, entertainment units, artwork, and any other property that [they] provide to [their] renters."  *Id.*, Ex. F at 1.

To administer and enforce its laws, the City created the OSTR.  An April 2016 report of the City's Budget and Legislative Analyst's Office (prepared at the request of Supervisor Campos) observed that the OSTR had been active in pursuing enforcement of the City's short-term rental laws by "levy[ing] fines against hosts found to be non-compliant," including nearly $700,000 as of February 2016.  *Id.*, Ex. G at 21.  The report also stated that the City expected to increase its efforts to promote compliance by hosts when the "OSTR became fully staffed in December 2015," and predicted this would "further close [the] gap" "between the number of registered hosts and the number of hosts advertising short-term rentals on online platforms."  *Id.*

## 2.      The Original Ordinance Imposing Liability on Hosting Platforms

In June 2016, the Board of Supervisors enacted the Original Ordinance, the City's first attempt to impose requirements on Hosting Platforms to monitor and block or remove listings allegedly in violation of City law.  The Original Ordinance required platforms to verify that all listings had a valid registration number.  Hosting Platforms could comply with the requirement by either "[p]roviding the verified registration number on each listing" or "[s]ending the verified registration number, Residential Unit street address (including any unit number), and host name" to the OSTR by email "prior to posting the listing."  Blavin Decl., Ex. A at 4.

Supervisor Campos explained the intent of the Original Ordinance was to "hold[] Airbnb and other hosting platforms accountable for advertising illegal short term rentals."  *Id.*, Ex. H at 1. He said it targeted the Hosting Platforms and "change[d] [the methods of] enforcement" for the City's short-term rental regulations.  *Id.*, Ex. I at 2.  Supervisor Aaron Peskin (who, with Supervisor Campos, co-sponsored the Original Ordinance) similarly said the City sought to "hold[] the hosting

1   platforms accountable" for listings provided by users.  *Id.*, Ex. J at 1.  The City Attorney's Office

2   acknowledged that the Original Ordinance could raise "issues under the Communications Decency

3   Act" but claimed it had been drafted "in a way that minimizes" those issues by regulating "business

4   activities" instead of "content."  *Id.*, Ex. K at 3.

### 3.   The City's Withdrawal of the Original Ordinance After Airbnb and HomeAway Sued

With the Original Ordinance scheduled to take effect July 24, 2016, Airbnb filed its

complaint and a preliminary injunction motion in this action on June 27, 2016.  (ECF Dkt. Nos. 1,

3.)  HomeAway filed a complaint in intervention five days later.  (ECF Dkt. No. 24.)  Plaintiffs

contended the ordinance violated, among other laws, the CDA and the First Amendment.  In a

telephonic conference on July 1, 2016, the Court set a briefing schedule for the preliminary

injunction motion, with a hearing date of September 7, 2016.  (ECF Dkt. No. 19.)  The City agreed

to stay enforcement of the Original Ordinance until the Court's ruling.

Faced with Plaintiffs' challenges, the Board of Supervisors decided to withdraw the Original

Ordinance and pursue an amended ordinance.  On July 12, 2016, Supervisor Campos introduced the

Ordinance to the Board.  He explained that he offered the Ordinance because the City "read

[Airbnb's] brief," "said, you make a good point," and decided "we're going to modify" the

ordinance.  Blavin Decl., Ex. B at 2.  On July 19, the Court granted the City's request for a stay of

proceedings to allow the Board to consider the proposed amendments.  (ECF Dkt. No. 36.)[6]

### 4.   The Amended Ordinance Imposing Liability on Hosting Platforms

The Ordinance passed the Board of Supervisors on August 2, 2016 and becomes effective on

---

[6] San Francisco is not the only city to conclude that imposing liability on Hosting Platforms for users' listings is impermissible.  In July, Airbnb and HomeAway filed suit challenging a similar ordinance passed by the City of Anaheim.  *See* Nos. 8:16-cv-1398, 8:16-cv-1402 (C.D. Cal.).  Unlike the law here, the Anaheim law contained a "savings clause," which stated the law "shall be interpreted in accordance with otherwise applicable state and federal law(s) and will not apply if determined by the city to be in violation of any such law(s)."  Anaheim Mun. Code § 4.05.120.030; *see id.* § 4.05.130.0103.  On August 10, 2016, Anaheim's City Attorney stated in a letter to Airbnb and HomeAway that, given "the current state of the law," the City had determined that its ordinance "does not and will not be applied to Airbnb, HomeAway or other hosting platforms," and "the City will not seek to enforce" the law "against hosting platforms."  Blavin Decl., Ex. L at 1.  As a spokesperson for Anaheim stated, "[a]fter considering federal communications law, we won't be enforcing parts of Anaheim's short-term rental rules covering online hosting sites."  *Id.*, Ex. M at 1.

September 11.  According to Supervisor Campos, the amendments made "a very few set of modest revisions," and the "intent of" the Ordinance remains the same.   Blavin Decl., Ex. C at 1.  The Ordinance, like the Original Ordinance, imposes criminal and civil liability on Hosting Platforms for short-term rental listings that are not "lawfully registered."  § 41A.5(g)(4)(C).  It states:

> A Hosting Platform may provide, and collect a fee for, Booking Services in connection with short-term rentals for Residential Units [in the City] only when those Residential Units are lawfully registered . . . at the time the Residential Unit is rented for short term rental.

*Id.*  A "Hosting Platform" is defined as any entity:

> that participates in the short-term rental business by providing, and collecting or receiving a fee for, Booking Services . . . usually . . . through an online platform that allows an Owner to advertise the Residential Unit through a website provided by the Hosting Platform.

§ 41A.4.  "Booking Services," in turn, are defined as:

> any reservation and/or payment service provided by a person or entity that facilitates a short-term rental transaction between an Owner or Business Entity and a prospective tourist or transient user and for which the person or entity collects or receives, directly or indirectly through an agent or intermediary, a fee in connection with the reservation and/or payment services provided for the short-term rental transaction.

*Id.*  In short, the Ordinance bars Hosting Platforms from providing Booking Services or collecting fees in relation to such services without first verifying that every property listed by hosts for rental is "lawfully registered" with the OSTR "at the time the Residential Unit is rented."  The Ordinance states that "any Hosting Platform that provides a Booking Service … in violation of the … obligations under this Chapter 41A shall be guilty of a misdemeanor," punishable by a fine of $1,000, six months in jail, or both.  § 41A.5(e).  In addition, it provides for "administrative penalties" up to $484 for initial violations and up to $968 for subsequent violations.  § 41A.6(d)(1).

    The Ordinance also imposes other obligations on Hosting Platforms that were not called for by the Original Ordinance.  It requires a monthly "affidavit to the [OSTR] verifying that the Hosting Platform has complied with subsection (g)(4)(C)" (*i.e.*, the obligations imposed on platforms) "in the immediately preceding month."  § 41A.5(g)(4)(D).  It also requires each platform to maintain records of all short-term bookings for a three-year period, § 41A.5(g)(4)(E), and creates new subpoena powers for the OSTR to obtain those records, § 41A.7(b)(2).

City officials have indicated that if Hosting Platforms charge "solely an advertisement fee," or do not charge any fees for rental listings (such as Craigslist), they are not covered by the Ordinance.  *See* Blavin Decl., Ex. N at 3 (Deputy City Attorney stating that if platforms charge "solely an advertisement fee," not subject to law); *id.* at 2 (Supervisor Campos stating if site "simply lists advertisements on its platforms and does not charge a fee, and we have the example of Craigslist," it is not subject to law); *id.*, Ex. O at 3 (Deputy City Attorney stating Craigslist not subject to law).  Supervisor Campos's office staff stated the Ordinance is intended to cover those sites where there is a "business transaction plus the advertising" of the listing.  *Id.*, Ex. O at 2.

According to Supervisor Campos, the Ordinance, like the Original Ordinance, is intended to "regulat[e] the business activity of hosting platforms, not website content," *id.*, Ex. N at 1, by requiring that they "do business with law-abiding hosts," rather than those who are "out of compliance with the law," *id.*, Ex. C at 1-2.  Supervisor Peskin has said the law aims to target "unscrupulous speculators," not "mom and pop" hosts.  *Id.*, Ex. P at 1; *see also id.*, Ex. O at 1-2 (similar statements of Supervisor Peskin).  In Supervisor Campos's view, "it is only fair that Airbnb and others help us enforce the law."  *Id.*, Ex. N at 2.

## III.   ARGUMENT

### A.   Standard for Preliminary Injunction

"A plaintiff seeking a preliminary injunction must show that: (1) she is likely to succeed on the merits, (2) she is likely to suffer irreparable harm in the absence of preliminary relief, (3) the balance of equities tips in her favor, and (4) an injunction is in the public interest."  *Farris v. Seabrook,* 677 F.3d 858, 864 (9th Cir. 2012).  Alternatively, "'serious questions going to the merits' and a balance of hardships that tips sharply towards the plaintiff can support issuance of a preliminary injunction, so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest."  *Id.*  "[I]n the First Amendment context, the moving party bears the initial burden of making a colorable claim that its First Amendment rights have been infringed, or are threatened with infringement, at which point the burden shifts to the government to justify the restriction."  *Thalheimer v. City of San Diego*, 645 F.3d 1109, 1115-16 (9th Cir. 2011).   For the following reasons, Plaintiffs have satisfied these standards.

9

**B.**     **Plaintiffs Are Likely To Succeed on the Merits of Their Claims**

**1.**     **The Ordinance Violates and Is Preempted By the CDA**

**(a)**     **The CDA Provides Broad Immunity to Websites for Third-Party Content**

The CDA bars the government from imposing liability on websites based on content provided by third parties.  It provides:  "No provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider."  47 U.S.C. § 230(c)(1).  The law prohibits liability "under any State or local law that is inconsistent with this section."  *Id*. § 230(e)(3).  Section 230 "establish[es] broad 'federal immunity to any cause of action that would make service providers liable for information originating with a third-party user of the service.'"  *Perfect 10, Inc. v. CCBill LLC*, 488 F.3d 1102, 1118 (9th Cir. 2007) (quoting *Zeran v. America Online, Inc.,* 129 F.3d 327, 331 (4th Cir. 1997)); *see also Nemet Chevrolet, Ltd. v. Consumraffairs.com, Inc.*, 591 F.3d 250, 254 (4th Cir. 2009) ("plaintiffs may hold liable the person who creates or develops unlawful content, but not the interactive computer service provider who merely enables that content to be posted online.").

Congress enacted Section 230 to achieve two goals.  First, it "wanted to encourage the unfettered and unregulated development of free speech on the Internet, and to promote the development of e-commerce."  *Batzel v. Smith*, 333 F.3d 1018, 1027 (9th Cir. 2003); 47 U.S.C. § 230(b)(2) (statute intended to "preserve the vibrant and competitive free market that presently exists for the Internet.").  Second, it sought to encourage online providers to "self-police" for potentially harmful or offensive material by providing immunity for such efforts.  *Batzel*, 333 F.3d at 1028; *see* 47 U.S.C. § 230(c)(2).  Congress recognized the Internet would not flourish if intermediaries could be liable for third-party content, "given the volume of material communicated through [it], the difficulty of separating lawful from unlawful speech, and the relative lack of incentives to protect lawful speech."  *Universal Commc'n Sys., Inc. v. Lycos, Inc.*, 478 F.3d 413, 418-19 (1st Cir. 2007); *see Batzel*, 333 F.3d at 1028 (Section 230 intended to eliminate the "obvious chilling effect" that imposing liability on online providers would cause).  The CDA thus "sought to prevent lawsuits from shutting down websites and other services on the Internet."  *Batzel*, 333 F.3d at 1027-28.

Courts have interpreted the CDA to establish broad immunity for online providers, as the Ninth Circuit and nine other circuit courts have held.  *See Fair Hous. Council of San Fernando Valley v. Roommates.com, LLC,* 521 F.3d 1157, 1174-75, 1180 (9th Cir. 2008) (en banc) (Section 230 provides a "broad grant of webhost immunity"); *Jane Doe No. 1 v. Backpage.com, LLC,* 817 F.3d 12, 19 (1st Cir. 2016) (courts have recognized "a capacious conception of what it means to treat a website operator as the publisher or speaker of information provided by a third party").[7]

### (b)       Section 230 Provides a Straightforward Test for Website Immunity

Section 230 sets forth a three-part test.  The law applies and provides immunity when (1) a party is a "provider or user of an interactive computer service," and a law (2) "seeks to treat" the party "as a publisher or speaker" (3) "of information provided by another information content provider."  *Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1100-01 (9th Cir. 2009).  Each of these elements is met here.

First, Airbnb and HomeAway unquestionably are "interactive computer service" providers. 47 U.S.C. § 230(f)(2).  And, as the Ninth Circuit has held, the "most common interactive computer services are websites."  *Roommates*, 521 F.3d at 1162 n.6.

Second, third parties (*i.e.*, hosts listing their properties) undisputedly create and provide the online content that the Ordinance targets.  Third-party hosts create and provide descriptions of their listings, set the lengths of any particular rental, decide how many listings to place on platforms, and are responsible for lawfully registering their short-term rentals, obtaining a registration number from the City, and including those numbers "on any Hosting Platform listing."  §§ 41A.5(g)(1)(F),

---

[7] *See Lycos,* 478 F.3d at 419 ("Section 230 immunity should be broadly construed"); *Almeida v. Amazon.com, Inc.*, 456 F.3d 1316, 1321 (11th Cir. 2006) ("federal circuits have interpreted [Section 230] to establish broad federal immunity"); *Carafano v. Metrosplash.com, Inc.*, 339 F.3d 1119, 1123-24 (9th Cir. 2003) (noting "consensus" that "§ 230(c) provides broad immunity for publishing content provided primarily by third parties"); *Doe v. MySpace, Inc.*, 528 F.3d 413, 418 (5th Cir. 2008) ("Courts have construed the immunity provisions in § 230 broadly"); *Ricci v. Teamsters Union Local 456*, 781 F.3d 25, 28 (2d Cir. 2015); *Jones v. Dirty World Entm't Recordings LLC*, 755 F.3d 398, 407 (6th Cir. 2014); *Klayman v. Zuckerberg*, 753 F.3d 1354, 1359 (D.C. Cir. 2014); *Johnson v. Arden*, 614 F.3d 785, 791 (8th Cir. 2010); *Chi. Lawyers' Comm. for Civil Rights Under Law, Inc. v. Craigslist, Inc.*, 519 F.3d 666, 672 (7th Cir. 2008); *Green v. Am. Online*, 318 F.3d 465, 471 (3d Cir. 2003); *Ben Ezra*, 206 F.3d at 985 n.3; *Zeran*, 129 F.3d at 330-31.

(g)(2)(A).  Airbnb and HomeAway are not the content providers but merely provide the forum for the listings.  Owen Decl. ¶¶ 6-7; Furlong Decl. ¶ 6.  The Ordinance acknowledges this, defining a "Hosting Platform" as "an online platform *that allows an Owner to advertise* the Residential Unit through a website."  § 41A.4 (emphasis added).

Third, as discussed below, the Ordinance imposes requirements and liability on Plaintiffs for being the "publisher or speaker" of third-party content.  Indeed, the express purpose of the Ordinance is to impose obligations on Hosting Platforms to monitor, review, and, in practice, block listings (under the threat of potential criminal and civil penalties) to alleviate work the City would otherwise have to do to administer and enforce its short-term rental laws.  These acts are integral to Plaintiffs' role as "publishers or speakers" of third-party content.

**(c)**   **The Ordinance Treats Hosting Platforms as the Publisher or Speaker of Third-Party Content, in Violation of Section 230**

**(i)**   **The Ordinance Imposes Liability On Hosting Platforms Stemming From Transactions On Their Sites**

The Ordinance imposes liability on Hosting Platforms for transactions among third parties through their websites—*i.e.*, prohibiting Booking Services for any property that is not "lawfully registered"—and therefore punishes them for their roles in publishing third-party content.  In effect, the Ordinance does the same thing as the Original Ordinance, just in a different guise—it imposes significant liability on Hosting Platforms if they "facilitate[] a short-term rental transaction," § 41A.4, for listings they publish allegedly in violation of the law (whether knowingly or not).

Section 230 immunizes online providers from all liability stemming from "information originating with a third-party user of the service."  *Perfect 10*, 488 F.3d at 1118 (quoting *Zeran*, 129 F.3d at 330).  The law precludes not only claims challenging third-party content on its face (such as for defamation), but "all claims stemming from their publication of information created by third parties."  *MySpace,* 528 F.3d at 418; *see also Lycos*, 478 F.3d at 422 (argument that CDA "only immunizes" websites for "deciding whether to publish, withdraw, postpone or alter" content "misapprehends the scope of Section 230 immunity," which also protects sites' "inherent decisions about how to treat postings generally"); *Hinton v. Amazon.com.dedc, LLC,* 72 F. Supp. 3d 685, 690 (S.D. Miss. 2014).  "[W]hat matters is not the name of the cause of action," but whether the law

1   "inherently requires the court to treat the defendant as the 'publisher or speaker' of content provided

2   by another. . . . If it does, Section 230(c)(1) precludes liability." *Barnes*, 570 F.3d at 1101-02.

3         Thus, as many cases have held, Section 230 immunity protects online providers for

4   transactions and sales of goods and services through their websites—not just their publication of

5   ads.  For example, in *Hill v. StubHub, Inc.*, 727 S.E.2d 550 (N.C. App. 2012), the court dismissed a

6   plaintiff's claims that StubHub violated state anti-scalping laws because users offered and sold

7   tickets at more than face value.  The court rejected the plaintiff's arguments that he only sought to

8   hold StubHub liable for its conduct, the transactions it facilitated, and the website's features and

9   "business model."  *Id*. at 561-62.  Section 230 barred these claims, as StubHub "simply functioned

10  as a broker, effectively putting a buyer and a seller into contact with each other in order to facilitate

11  a sale at a price established by the seller."  *Id*. at 563.  That StubHub allegedly "'controlled' the

12  transaction by acting as an intermediary between buyer and seller," "offered both buyers and sellers

13  certain guarantees and assumed responsibility for handling the mechanics required to complete the

14  transaction," and charged a "fee" for these services was "irrelevant" to "immunity" under the CDA.

15  *Id*. at 562; *see id.* at 563 ("that [StubHub] may have been on notice that its website could be used to

16  make unlawful sales … does not support a decision stripping … immunity under 47 U.S.C. § 230");

17  *see also Milgram v. Orbitz Worldwide, Inc.*, 16 A.3d 1113, 1121-22 (N.J. Super. 2010) (finding

18  website immune under Section 230 for online ticket sales, rejecting state officials' contention that

19  they were only challenging website's "commercial" activities and not its role as a "publisher or

20  speaker," and holding that the website's conduct "fits squarely within the CDA's purview," as the

21  "plain language of § 230 was designed to 'promote the development of e-commerce'").

22        Similarly, in *Stoner v. eBay Inc.*, 2000 WL 1705637 (Cal. Super. Ct. Nov. 1, 2000), the

23  court dismissed a plaintiff's claims seeking to hold eBay liable under the UCL and California

24  criminal statutes for sales of bootleg recordings.  The court rejected the plaintiff's argument that his

25  "suit [did] not seek to hold eBay responsible for the publication of information provided by others,

26  but for eBay's own participation in selling contraband musical recordings."  *Id*. at *2-3.  "Despite

27  plaintiff's attempt to characterize eBay as an active participant in the sale of products auctioned

28  over its service, plaintiff is seeking to hold eBay responsible for … information that originates with

13

the third party sellers who use the computer service." *Id.* at *2.  The fact that eBay offered a forum for third parties to buy and sell goods rather than a "bulletin board" for online postings, and "impos[ed] … a fee—including a fee based in part on the price at which an item is sold," was irrelevant, as a "principal objective of the immunity provision is to encourage commerce over the Internet by ensuring that interactive computer service providers are not held responsible for how third parties use their services." *Id*. at *2-3; *see also Gentry v. eBay, Inc.*, 99 Cal. App. 4th 816, 831-32 (2002) (barring claims against eBay for sale of fake sports memorabilia; "substance" of "allegations reveal [plaintiffs] ultimately seek to hold eBay responsible for conduct" within CDA).

　　　　*Inman v. Technicolor USA, Inc*., 2011 WL 5829024 (W.D. Pa. Nov. 18, 2011), also rejected a plaintiff's argument that the "CDA applies only to communications, while [he sought] to hold eBay responsible for its conduct, 'specifically, business transactions'" in facilitating the sale of an allegedly defective vacuum tube.  *Id*. at *6.  The court held that online sales transactions were part and parcel of eBay's forum and "sales made by a third party are considered information for purposes of the CDA," as "the alleged sale of vacuum tubes in this case was facilitated by communication for which eBay may not be held liable under the CDA."  *Id*. at *7.[8]

　　　　As in all of these cases, the Ordinance squarely violates Section 230 by imposing liability on Hosting Platforms for third-party transactions that directly result from their publication of third-party listings.  The Ordinance impermissibly treats Hosting Platforms as "publishers" or "speakers."

　　　　In addition, courts have rejected efforts to evade Section 230 by regulating a website's receipt of funds stemming from publisher functions.  In *Backpage.com, LLC v. Cooper*, 939 F. Supp. 2d 805 (M.D. Tenn. 2013), a challenged statute prohibited the sale of certain sex-related

---

[8] Several other cases have held that the CDA immunizes websites for liability based on transactions and not merely for the content of user posts. *See, e.g.*, *Hinton*, 72 F. Supp. 3d at 689 (Amazon immune for claims "concerning the sale of defective or illegal items" by third parties); *Almeida v. Amazon.com, Inc.*, 2004 WL 4910036, at *3-4 (S.D. Fla. July 30, 2004) (claim challenging "Amazon's sale of" book "preempted by" CDA as Amazon cannot be liable for "acts of non-parties" who "caused" book "to be sold on Amazon's website"), *aff'd*, 456 F.3d 1316 (11th Cir. 2006); *Corbis Corp. v. Amazon.com, Inc.*, 351 F. Supp. 2d 1090, 1118 (W.D. Wash. 2004) (Section 230 preempted state law claim against Amazon for plaintiff's images sold by a third-party through the Amazon website); *Gibson v. Craigslist, Inc.*, 2009 WL 1704355, at *4 (S.D.N.Y. June 15, 2009) (CDA precluded claim against Craigslist for allegedly "fail[ing] to monitor, regulate, properly maintain and police the merchandise being bought and sold on its ... website").

advertisements.  The government argued the law was "consistent with CDA Section 230 because the state law regulates conduct—the sale of advertisements—and not the speech itself, and therefore does not treat websites as 'publishers or speakers.'"  *Id.* at 823.  The court saw through this, holding the "sale of online advertisements regulated by [the statute] derives from a website's status and conduct as an online publisher of classified advertisements" as the "*transaction of the sale is inherent in the classified service's conduct as a publisher*," thus "trigger[ing]" the "protection of Section 230."  *Id.* at 824 (emphasis added); *cf. Backpage.com, LLC v. Dart*, 807 F.3d 229, 233-34 (7th Cir. 2015) (under CDA, website and credit card companies are protected "intermediaries" in transactions).  Likewise here, the act of receiving service fees is inherent in what Hosting Platforms do as publishers of third-party listings.  *See* Owen Decl. ¶ 8; *supra* at 4-5.

Similarly, in *Goddard v. Google, Inc.*, the plaintiff alleged she was injured as a result of clicking on ads posted on Google created by allegedly fraudulent providers of services for mobile devices.  2008 WL 5245490, at *1 (N.D. Cal. Dec. 17, 2008).  She sought to "avoid the application of § 230 by arguing that her UCL claim does not seek to treat Google as the publisher of third-party content," as it "'stems from Google's acceptance of tainted funds'" from the ads.  *Id.* at *4.  The court rejected this as "an impermissible recharacterization."  *Id.*  And in *Rosetta Stone Ltd. v. Google Inc.*, 732 F. Supp. 2d 628 (E.D. Va. 2010), *aff'd*, 676 F.3d 144 (4th Cir. 2012), the plaintiff argued that its unjust enrichment claim—based on money Google received when users clicked on allegedly infringing Sponsored Links—was independent of any publishing conduct.  Rejecting this, the court held that plaintiff's "claim *turns on Google's relationship with third party advertisers*. … The user's decision to click on a Sponsored Link—the act that triggers the third party advertiser's payment to Google—*is in fact driven by content provided by the advertiser*."  *Id.* at 633 (emphases added).  No different here, a guest's "decision to click" on a host's listing and book that listing—which may "trigger" a payment to the platform—is "driven by content provided by" a third party, i.e., the host's listing.

The City cannot parse the services Hosting Platforms offer, assert it is only imposing obligations (and liability) for transactions involving "Booking Services," and thereby contend it is not challenging or seeking to regulate Airbnb's and HomeAway's central roles of providing online

forums for third-party listings. "[C]ourts repeatedly have rejected attempts to recharacterize claims fundamentally based on the posting of online information in order to avoid § 230's prohibition on 'treat[ing] [the defendant] as a 'publisher' of information.'" *Goddard*, 2008 WL 5245490, at *4; *see also MySpace*, 528 F.3d at 419-20 (rejecting plaintiff's assertions that her claims did not treat Myspace as a publisher but instead concerned the site's conduct as "artful pleading," because the claims fundamentally were "directed toward MySpace in its publishing, editorial, and/or screening capacities"). If governments or plaintiffs could evade the CDA simply by asserting that they were challenging only websites' processing of transactions among third parties but not their publication of information that is the basis for the transactions, that would punch a vast hole in the protection offered by the CDA. Thousands of online retailers (from Amazon to eBay to Airbnb and HomeAway) and payment processors (such as PayPal) would risk liability that Section 230 expressly precludes, losing the protection for e-commerce that Congress sought to encourage. *See Batzel*, 333 F.3d at 1027. The Court should reject that result.

### (ii)   The Ordinance Obligates Hosting Platforms to Monitor, Verify, and Screen Third-Party Listings

The Ordinance also violates Section 230 by requiring Hosting Platforms to monitor, review, and verify third-party listings—and effectively block or remove such listings—to avoid liability. Congress expressly sought to prohibit states from chilling online speech in this way.

Again, one of the central purposes of Section 230 was to encourage online providers to voluntarily monitor third-party content by immunizing all such efforts. *See Carafano*, 339 F.3d at 1122-23. "[D]ecisions relating to the monitoring" of "content" are "actions quintessentially related to a publisher's role [and] Section 230 'specifically proscribes liability' in such circumstances." *Green*, 318 F.3d at 471; *accord MySpace*, 528 F.3d at 420. As the Ninth Circuit has said, "any activity that can be boiled down to deciding whether to exclude material that third parties seek to post online is perforce immune under Section 230." *Roommates.com*, 521 F.3d at 1170-71. And Section 230 immunity applies not only to an online provider's decision about whether to allow a given posting, but also decisions about the "construct and operation" of its website. *Lycos*, 478 F.3d at 422 (decisions about website policies and features are "as much an editorial decision … as a

1    decision not to delete a particular posting"); *accord Jane Doe No. 1*, 817 F.3d at 16, 20-21

2    (website's decision not to provide "phone number verification" for user ads "fall[s] within the

3    purview of traditional publisher functions" protected by Section 230).

4           Cases interpreting Section 230 make clear that an online provider cannot be subject to

5    liability for third-party content even if it receives notice that content is allegedly unlawful.  "It is, by

6    now, well established that notice of the unlawful nature of the information provided is not enough"

7    to strip a website of Section 230 immunity.  *Lycos*, 478 F.3d at 420; *accord Obado v. Magedson*,

8    2014 WL 3778261, at *7 (D.N.J. July 31, 2014); *Hill*, 727 S.E.2d at 559; *Goddard*, 2008 WL

9    5245490, at *3 (even if site has actual knowledge of alleged unlawful content, it is immune if it

10   fails or refuses to delete it).  This is because "[l]iability upon notice would defeat the dual purposes

11   advanced by § 230," *Zeran*, 129 F.3d at 333, and would subject providers to a "heckler's veto," as

12   anyone who objected could provide notice and thereby impose the grim choice of removing content

13   or facing litigation and liability, *Jones*, 755 F.3d at 407-08 (Section 230 "shields service providers

14   from this choice").

15          Thus, courts have uniformly held that states cannot impose requirements on websites to

16   verify advertisements provided by third-party users.  *See, e.g.*, *Backpage.com, LLC v. McKenna*, 881

17   F. Supp. 2d 1262, 1273-74, 1277 (W.D. Wash. 2012) (striking down state statute imposing criminal

18   liability on website operators if they failed to verify ages of individuals depicted in sexually related

19   ads; "by imposing liability on online service providers who do not pre-screen content … the statute

20   drastically shifts the unique balance that Congress created with respect to the liability of online

21   service providers that host third party content"); *see also Cooper*, 939 F. Supp. 2d at 825 (similar

22   law that would have required websites to screen ads to assure compliance with state law violated

23   CDA where "rather than encouraging unfettered speech," the state law "impose[d] significant

24   penalties," and "preventing liability could amount to screening millions of advertisements"); *Doe v.*

25   *Friendfinder Network, Inc.*, 540 F. Supp. 2d 288, 294-95 (D.N.H. 2008) ("§ 230 bars" claim that

26   defendant "fail[ed] to verify that a profile corresponded to the submitter's true identity").

27          The Ordinance seeks to do what Section 230 forbids, by requiring Hosting Platforms to

28   monitor and verify listings to determine if they are "lawfully registered on the Short-Term

17

1   Residential Rental Registry at the time the Residential Unit is rented for short term rental."

2   § 41A.5(g)(4)(C); *see also* App. A, *infra*, at 1 (preface to Ordinance stating that it "require[s]

3   Hosting Platforms *to verify* that a Residential Unit is on the City Registry" (emphasis added)).  That

4   could require platforms not only to determine if there is a registration number associated with a

5   listing, but also whether the rental is "lawfully registered," i.e., whether it complies with other laws

6   governing short-term rentals (for instance, regarding insurance and taxation).  The Ordinance does

7   this not only once, but at least twice, as it also requires Hosting Platforms to attest under penalty of

8   perjury they have not provided Booking Services to a host whose property is not "lawfully

9   registered at the time [it] is rented."  *See* §§ 41A.5(g)(4)(C)-(D).[9]

10          For purposes of CDA immunity, it makes no difference whether the City imposes penalties

11   against Hosting Platforms if they fail to verify that user listings are "lawfully registered" before

12   publishing them (as the Original Ordinance provided) or instead if users make reservations for

13   rentals (as in the Ordinance). The requirement to monitor third-party content triggers the CDA,

14   even if it is not tied to publication.  In *Stoner*, for example, the court noted that "[a]t bottom,

15   plaintiff's contention" was "that eBay should be held responsible *for failing to monitor the*

16   *products* auctioned over its service."  2000 WL 1705637, at *3 (emphasis added).  In rejecting this

17   claim, the court held that even if "it might be possible" for eBay "identify" unlawful products,

18   "*Congress intended to remove any legal obligation of interactive computer service providers to*

19   *attempt to identify or monitor the sale of such products*."  *Id.* (emphasis added); *see also Fields v.*

20   *Twitter*, 2016 WL 4205687, at *5, 8 (N.D. Cal. Aug. 10, 2016) (dismissing claims Twitter

21   provided material support to terrorists because it allowed ISIS to obtain accounts; though plaintiffs

22   argued claims "not based on 'the contents of tweets, the issuing of tweets, or the failure to remove

23   tweets," but rather "'provision of Twitter accounts to ISIS," CDA barred suit because it "would

24   significantly affect Twitter's monitoring and publication of third-party content by effectively

25   requiring Twitter to police and restrict its provision of Twitter accounts").

26   ---

27   [9] Also, given that the Ordinance imposes liability absent "lawful[] registration *at the time the Residential Unit is rented* for short term rental," § 41A.5(g)(4)(C) (emphasis added), this could require Plaintiffs to verify "lawful registration" a third time—when occupancy takes place, which in

28   most instances will be weeks or months after online bookings.  Furlong Decl. ¶ 14.

In any event, the practical effect of the Ordinance is the same as the Original Ordinance. Hosting Platforms such as Airbnb and HomeAway (whom the City has admitted were the targets of the law) risk liability if they do not verify "lawful registration" of all listings at the time hosts seek to post them.  Assuming the Ordinance reaches HomeAway's subscription model, the Ordinance might require verification from the point hosts sign up, because this is when HomeAway charges and collects a fee for "Booking Services" (whether or not the property is ever booked or rented).  More generally, under the Ordinance, both HomeAway and Airbnb would be at risk if they do not verify listings at the outset, because once a host and guest decide to enter into a transaction, Booking Services and payment services are provided immediately.  Owen Decl. ¶ 19; Furlong Decl. ¶ 6.

In this manner, the Ordinance also impermissibly attempts to regulate the "overall design and operation" of Hosting Platforms' websites.  *See Jane Doe No. 1*, 817 F.3d at 16, 20-21 (choice by Backpage allegedly "designed to encourage sex trafficking," such as allowing anonymous payments and failing to verify phone numbers, were protected editorial decisions as to the "overall design and operation of the website"); *Fields*, 2016 WL 4205687, at *7 (CDA protects Twitter's "decisions to structure and operate itself as a 'platform … allow[ing] for the freedom of expression'").  Requiring Hosting Platforms to verify whether a listing is "lawfully registered" would require them to make significant modifications to their sites and expend substantial financial and technical resources, introducing substantial delays in the booking process.  Owen Decl. ¶¶ 17, 19-20; Furlong Decl. ¶¶ 13, 15; *see Chi. Lawyers' Comm.*, 519 F.3d at 668-69 (website "could hire a staff to vet the postings, but that would be expensive and may well be futile: if postings had to be reviewed before being put online, long delay could make the service much less useful").   Alternatively, such platforms very likely will screen listings from appearing at all on their sites, Owen Decl. ¶ 19, 23-25; Furlong Decl. ¶¶ 13, 15—which is what the Original Ordinance sought to do, and what the City apparently determined was indefensible.[10]

---

[10] The Ordinance also attacks websites' decisions about their structure and operation by penalizing some models, but not others.  For example, the City has suggested that platforms that charge upfront fees *solely* for advertising, or sites that do not charge for rental listings at all but earn income through other channels (e.g., Craigslist), are *not* subject to the law.  *See supra* at 9; Blavin Decl., Ex. O at 2-3.  If this is right, then HomeAway's subscription model may not be covered by the Ordinance.

Congress's intent in passing the CDA was to permit online providers to make decisions on their own about monitoring, screening or blocking third-party content.  Here, and exactly contrary to that intent, the City seeks to impose liability on Hosting Platforms if they do not monitor, identify and effectively block or remove third-party listings the City deems to be unlawful.  The Ordinance therefore violates and is preempted by Section 230.

### 2. The Ordinance Violates the First Amendment

The Ordinance also violates the First Amendment.  Because it imposes liability on Hosting Platforms, the Ordinance is a content-based restriction on speech subject to "heightened judicial scrutiny" under the First Amendment.  *Sorrell*, 564 U.S. at 570.  For at least two reasons, the Ordinance cannot survive this scrutiny.  First, the City cannot show that the Ordinance is narrowly tailored to achieve a substantial governmental objective, *id.* at 572, given the obvious alternative of enforcing its short-term rentals laws directly against hosts who may violate them.  Second, the Ordinance imposes civil and criminal penalties on Hosting Platforms that publish listings for properties that are not "lawfully registered," without any requirement that a Hosting Platform first have knowledge of the property's status.  *See* §§ 41A.5(e), (g)(4)(C)-(D), 41A.7(b)(3).   The Court should enjoin enforcement of the Ordinance for these independently sufficient reasons.

### (a) The Ordinance Is a Content-Based Restriction on Speech that Is Subject to Heightened Judicial Scrutiny

The Ordinance seeks to proscribe speech, in the form of rental listings, based on the content of that speech:  whether the listings advertise "lawfully registered" short-term rentals in a manner contrary to the Ordinance.  Such "content-based" restrictions on speech are subject to "heightened judicial scrutiny" under the First Amendment.  *Sorrell*, 564 U.S. at 570.

"Government regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed."  *Reed v. Town of Gilbert*, 135 S.

---

More importantly, these distinctions attack the decisions platforms have made as to the best manner to structure their websites to allow third-party content to flourish.  Instead of charging hosts an upfront-fee for advertising their listings, which could deter some hosts from publishing listings, Airbnb and HomeAway's pay-per-book model charge users a service fee at the time of booking.  Owen Decl. ¶¶ 8-9; Furlong Decl. ¶ 4.  By basing a platform's obligations and liability on this particular model, the Ordinance impermissibly targets these decisions.

Ct. 2218, 2227 (2015).  The Ordinance is content-based because it seeks to impose liability based on certain short-term rental listings on Hosting Platforms, which, by definition, allow hosts "to *advertise*" their properties "through a website" provided by the Hosting Platform.  § 41A.5(e) (emphasis added).  Publishing "paid commercial advertisements" constitutes protected commercial speech.  *Bigelow v. Virginia*, 421 U.S. 809, 818 (1975).[11]  That the Ordinance constitutes a content-based restriction on speech is also obvious given the law's requirement that the City, "on at least a monthly basis," undertake a "comprehensive review of active Hosting Platform listings" to identify "*potentially non-compliant listings*."  § 41A.7(b) (emphasis added).

First Amendment scrutiny is also triggered by the Ordinance's requirements that Hosting Platforms verify in an affidavit their ongoing compliance with the law and its onerous recordkeeping provisions, which require Hosting Platforms to collect and maintain certain information for three years.  *See* §§ 41A.5(g)(4)(D)-(E).  In *McKenna*, for instance, the court invalidated a requirement that websites "check identification before publishing an escort ad."  881 F. Supp. 2d at 1277.  The court reasoned that even though "at first blush," the requirement "seems as commonsensical as requiring bar owners to check identification before allowing patrons to enter the door," an "identification requirement—imposed by the government and punishable by imprisonment—related to speech" still must survive First Amendment scrutiny.  *Id.* at 1277-78; *see also Free Speech Coal., Inc. v. Attorney General*, 825 F.3d 149, 164 (3d Cir. 2016) (applying heightened scrutiny to statute requiring adult entertainment producers to verify age of performers and keep records).

The City may argue the Ordinance does not restrict speech but conduct, i.e., the acceptance of money in exchange for what the City nebulously defines as "Booking Services."  § 41A.4.  The City is not the first governmental entity to disguise a restriction on speech as a regulation of conduct, and courts reject such transparent attempts to avoid the First Amendment.  *See, e.g.*, *Sorrell*, 564 U.S. at 566-67, 570 (rejecting Vermont's effort to defend law as a restriction on "nonexpressive [commercial] conduct" where "[b]oth on its face and in its practical operation,

---

[11] Plaintiffs do not concede that the Ordinance regulates only commercial speech but analyze it as though it does because "the outcome is the same" under the commercial speech or strict scrutiny tests.  *Sorrell*, 564 U.S. at 571.

Vermont's law imposes a burden based on the content of speech and the identity of the speaker"). In any event, the Supreme Court has made clear that restrictions on accepting monetary compensation for speech trigger First Amendment scrutiny because they create a "financial disincentive" to "publish … particular content." *Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.*, 502 U.S. 105, 118 (1991).  For example, the First Amendment prohibits the government from seizing the revenue of works of art published by criminals depicting their crimes. *Id.* at 123.  Nor can the government prohibit its employees from receiving payment for speaking appearances.  *United States v. Nat'l Treasury Emps. Union*, 513 U.S. 454, 468-69 (1995).  The City cannot evade the First Amendment merely by attaching liability to payment rather than publication.

**(b)** **The Ordinance Cannot Survive Heightened Scrutiny Because It Is Not Narrowly Tailored to Serve a Substantial Government Interest**

"In the ordinary case, it is all but dispositive to conclude that a law is content-based." *Sorrell*, 564 U.S. at 571.  Such laws are "presumptively unconstitutional," *Reed*, 135 S. Ct. at 2226, even when they pertain to commercial speech.  "Under a commercial speech inquiry, it is the State's burden to justify its content-based law as consistent with the First Amendment." *Sorrell*, 564 U.S. at 571-72; *see Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n*, 447 U.S. 557, 564 (1980).  The government must show "the statute directly advances a substantial government interest" and there is a "'fit between the legislature's ends and the means chosen to accomplish those ends.'" *Sorrell*, 564 U.S. at 572; *see also Fla. Bar v. Went For It, Inc.*, 515 U.S. 618, 632 (1995) (law must be "'narrowly tailored to achieve the desired objective'"); *Cent. Hudson*, 447 U.S. at 564-66.

The City cannot demonstrate that the Ordinance is narrowly tailored to achieve a substantial interest.  By its own terms, rather than operate "directly," *Sorrell*, 564 U.S. at 572, the Ordinance operates *indirectly*:  it aims to regulate the conduct of hosts by targeting the activities of Hosting Platforms.  This approach overlooks the Supreme Court's admonition that "[t]he normal method for deterring unlawful conduct is to impose an appropriate punishment on the person who engages in it"; speech cannot "be suppressed in order to deter conduct by a non-law-abiding third party." *Bartnicki*, 532 U.S. at 529-30; *see also, e.g.*, *Village of Schaumburg v. Citizens for a Better Env't*, 444 U.S. 620, 637 (1980) (invaliding speech restriction where conduct "can be prohibited and

1   the penal laws used to punish such conduct directly").

2          That principle is especially relevant here, where the City has acknowledged that it can—and

3   does—pursue hosts who fail to comply with the law rather than punish Hosting Platforms that

4   publish listings.  The Ordinance requires the OSTR to "actively monitor Hosting Platform listings

5   … on at least a monthly basis" to identify "potentially non-compliant listings."  § 41A.7(b).  As of

6   February 2016, the OSTR had assessed nearly $700,000 in penalties—equaling almost the entire

7   annual OSTR budget.  Blavin Decl., Ex. G at 16, 21.  A report noted that the OSTR may be able to

8   "further close" the "gap between the number of registered hosts and . . . hosts advertising short-term

9   rentals on online platforms" after the OSTR became fully staffed in December 2015.  *Id.* at 21.  The

10  same report acknowledged the City's own role in frustrating compliance with short-term rental laws,

11  noting that the complicated registration process—which forced residents to obtain certifications

12  from both the OSTR *and* the Treasurer & Tax Collector *in person*—"might deter or confuse

13  otherwise compliant short-term rental hosts."  *Id.* at 26.  Supervisor Wiener also recently observed

14  that there has been an "acceleration in the number of hosts registering," and the City is "moving in a

15  positive direction" in enforcing the law.  *Id.*, Ex. Q at 3; *see also id.*, Ex. G at 18 (City report noting

16  "wave of compliant behavior towards the end of 2015").

17         The City has not even attempted to show that this obvious alternative of enforcing existing

18  law directly against the hosts who violate it (and simplifying the law) cannot accomplish the City's

19  goals.  This shortfall alone invalidates the Ordinance's provisions that restrict the speech of Hosting

20  Platforms.  *See Valle Del Sol Inc. v. Whiting*, 709 F.3d 808, 826-27 (9th Cir. 2013) (enjoining anti-

21  solicitation law where state did not show ineffectiveness of directly enforcing "preexisting" laws to

22  "address legitimate traffic safety concerns" instead of speech); *McKenna*, 881 F. Supp. 2d at 1284

23  (invalidating law banning publication of ads for commercial sex acts because state had "fail[ed] to

24  demonstrate why a law targeting only the individuals who post ads would not be effective, rather

25  than seeking to impose felony liability on online service providers").

26         Proponents of the Ordinance have suggested that imposing liability on Hosting Platforms for

27  publishing listings will make the City's regulatory scheme more effective and efficient in preventing

28  unlawful conduct.  *See* Blavin Decl., Ex. J at 1.  That contention is both wrong and insufficient

1   under the First Amendment.  Enforcement against hosts would more directly advance the City's

2   stated goal of punishing "unscrupulous speculators" who list multiple properties in violation of the

3   law, rather than "mom and pop" hosts.  *Id.*, Ex. P at 1.  Penalties on Hosting Platforms, by contrast,

4   will affect *all* hosts.  This disconnect between the City's asserted aims and the speech-restrictive

5   means chosen dooms the Ordinance.  *See Valle Del Sol*, 709 F.3d at 827 (ban on roadside

6   solicitation not narrowly tailored means of achieving interest in traffic safety).[12]

7          In addition to being overinclusive (*i.e.*, restricting more speech than necessary), the

8   Ordinance is underinclusive, underscoring that it is not tailored to the City's asserted interest.

9   Under the City's interpretation, the Ordinance would apply to Hosting Platforms that receive a fee

10  for every booking (such as Airbnb and HomeAway's pay-per-booking model) but not those with no

11  fees at all (like Craigslist).  Thus, platforms with different business models could still help hosts and

12  guests find each other (even if hosts' properties are not "lawfully registered").  This is not only a

13  problem under the CDA, *supra* at 19-20 & n.10, but the First Amendment.  As the Supreme Court

14  has held, "[u]nder-inclusiveness raises serious doubts about whether the government is in fact

15  pursuing the interest it invokes, rather than disfavoring a particular speaker[.]"  *Brown v. Entm't*

16  *Merchants Ass'n*, 564 U.S. 786, 802 (2011); *see Valle Del Sol*, 709 F.3d at 827-28; *City of*

17  *Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 424-25 (1993) (invalidating law restricting

18  commercial publications' newspaper racks where "[t]he city has asserted an interest in esthetics, but

19  respondent publishers' newsracks are no greater an eyesore than the newsracks permitted to remain

20  on Cincinnati's sidewalks").

21          Moreover, even if the Ordinance *would* more efficiently prevent unlawful rentals and help

22  the City enforce its short-term rental laws, this would be insufficient.  The First Amendment

---

[12] The disconnect between the stated goals of the Ordinance and the speech-restrictive means chosen is further highlighted by the City's failure to put forward evidence showing that the Ordinance will achieve its purported goal of bringing units back to the long-term rental market.  On the contrary, a recent study by the city planning and research organization SPUR states that "[d]ata from Airbnb suggests that the vast majority of properties listed in San Francisco are not being removed from the long-term residential market."  Blavin Decl., Ex. R at 9; *see also* Owen Decl., Ex. 5 at 4 (rentals by Airbnb hosts who may list more than one home for short term rental are 0.18% of all units in City); *Memphis Publ'g Co. v. Leech*, 539 F. Supp. 405, 411 (W.D. Tenn. 1982) (invalidating commercial speech restriction where it was "speculative" restriction would have its intended effect).

precludes the government from restricting advertising and speech simply because it may be more politically or administratively convenient. *See Thompson v. W. States Med. Ctr.*, 535 U.S. 357, 373 (2002) (speech restrictions must be "a necessary as opposed to merely convenient means of achieving [the government's] interests"); *Yniguez v. Arizonans for Official English*, 42 F.3d 1217, 1234 (9th Cir. 1994) ("'The government cannot restrict the speech of the public … just in the name of *efficiency*.'").  The City seeks to place the burden of verifying hosts' compliance with the law on Hosting Platforms—a burden that is likely to be substantial, given the effort needed to verify each of thousands of San Francisco rental listings, and the onerous burdens placed on hosts, and one which could result in the suppression of vast amounts of protected speech.  Owen Decl. ¶¶ 23-25; Furlong Decl. ¶¶ 13-15.  The government may not seek to "shift[] the burden of enforcing the law from the taxpayer" to speakers or publishers of information simply because it is easier to do so.  *News & Sun Sentinel Co. v. Bd. of Cnty. Comm'rs*, 693 F. Supp. 1066, 1072-73 (S.D. Fla. 1987) (invalidating law requiring newspaper to include contractors' license numbers in all ads published for contractors).

**(c)      The Ordinance Impermissibly Imposes Strict Liability on Publishers Without Proof of Scienter**

The Ordinance also violates the First Amendment because it imposes criminal penalties on publishers without requiring a showing they know the listings at issue are not "lawfully registered." § 41A.5(g)(4)(C).  The Supreme Court has long rejected the imposition of strict criminal liability for the dissemination of information, even where the content itself lacks First Amendment protection.  In *Smith v. California*, 361 U.S. 147 (1960), the Court struck down an ordinance making it a crime for booksellers to possess obscene books, noting the law would require booksellers to review every book or face strict criminal liability, which "would tend to restrict the public's access to forms of the printed word which the State could not constitutionally suppress directly."  *Id.* at 153-54.  The Court has said the same in later cases—the First Amendment bars imposing liability on publishers absent proof of *mens rea* that speech is in fact unlawful.  *See New York v. Ferber*, 458 U.S. 747, 765 (1982) ("[C]riminal responsibility may not be imposed without some element of scienter on the part of the defendant"); *cf. United States v. X-Citement Video, Inc.*, 513 U.S. 64, 78 (1994).  The Court has made clear that similar principles apply in the civil

context.  *See, e.g.*, *Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46, 52 (1988) ("[A] rule that would impose strict liability on a publisher for [unprotected speech] would have an undoubted 'chilling' effect.")

The Ordinance violates this well-established principle.  It imposes severe criminal and civil penalties on publishers without any *mens rea* requirement.  For example, the Ordinance makes it unlawful for any Hosting Platform to provide "Booking Services" for a short-term rental unless the property is "lawfully registered" on the City's registry.  § 41A.5(g)(4)(C).  It does not matter whether the platform *knows* the property is unregistered or not.  Similarly, the law requires Hosting Platforms to verify after-the-fact that they provided Booking Services to only properties that were "lawfully registered," even if, at the time they provided Booking Services, the platform reasonably but mistakenly believed the property *was* "lawfully registered."  § 41A.5(g)(4)(C)-(D).   That is precisely the approach the First Amendment forbids.  *See, e.g.*, *Cooper*, 939 F. Supp. 2d at 829-30 (invalidating statute that imposed liability for sale of ads for commercial sex acts depicting minor where law "requires no actual knowledge of the age of anyone featured in the advertisement").

The constitutional defect posed by the lack of a scienter requirement in the Ordinance is compounded by the law's multiple ambiguities, which make it even more difficult for Hosting Platforms to know whether they are complying with the law.  For instance, the Ordinance requires Hosting Platforms to verify that each rental is "lawfully registered" on the City's registry. § 41A.5(g)(4)(C).  Verifying a rental is "registered" for each of thousands of listings is highly burdensome.  *Supra* at 19.[13]   But verifying that the rental is otherwise "lawful" would be impossible, as this would penalize Hosting Platforms if they publish a listing for which the rental is registered, but for which the registration is unlawful—whether because the host does not have insurance, has not filed monthly tax reports, or has not accurately reported and paid taxes on "each piece of furniture, equipment, and supplies used in renting [the] residence," such as "appliances,"

---

[13] Indeed, it is unclear *how* a Hosting Platform would even do so, as the City must "redact [from the Registry] any Permanent Resident names and street and unit numbers from the records available for public review," *id.* § 41A.4, and the federal Stored Communications Act prohibits Airbnb and HomeAway from divulging to the City for verification purposes any "information pertaining to" its users, including names and addresses, 18 U.S.C. § 2702(a)(3); *see Telecomms. Regulatory Bd. v. CTIA-Wireless Ass'n*, 752 F.3d 60, 68 (1st Cir. 2014).

1  "computers," and "artwork."  Blavin Decl, Ex. F at 1.  A Hosting Platform cannot possibly know

2  whether a host has complied with the multitude of laws governing short-term rentals.  *See* Owen

3  Decl. ¶ 18; Furlong Decl. ¶ 15.  The First Amendment prohibits the imposition of liability on this

4  basis.  *See Planned Parenthood of Idaho, Inc. v. Wasden*, 376 F.3d 908, 933 (9th Cir. 2004) ("A

5  scienter requirement of knowledge as applied to an unknowable element cannot save a provision

6  from constitutional invalidity.").

7        The Ordinance's requirement that Hosting Platforms verify that each rental is "lawfully

8  registered … *at the time it is rented*," § 41A.5(g)(4)(C) (emphasis added), further exacerbates this

9  constitutional infirmity.  This language suggests that a Hosting Platform may be liable even if a

10 rental is lawfully registered at the time of the reservation, but not at the time of the occupancy.  A

11 Hosting Platform can never know when it provides "Booking Services," i.e., when it publishes the

12 listing and enables a reservation and/or accepts a fee, whether a property will be "lawfully

13 registered" at the time of occupancy.  The Ordinance thus would seem to impermissibly impose

14 criminal liability on Hosting Platforms even if they have no way of knowing the listings are not

15 lawfully registered.  *See Wasden*, 376 F.3d at 933.

16       These ambiguities, while problematic standing alone, are constitutionally intolerable in an

17 Ordinance that seeks to impose strict criminal liability in connection with the publication of

18 information.  *See Brown*, 564 U.S. at 807 (ambiguity "in a law that regulates expression 'raises

19 special First Amendment concerns because of its obvious chilling effect on free speech'").

20            **C.**     **Plaintiffs Face Irreparable Harm Unless the Ordinance is Enjoined**

21       For several reasons, Plaintiffs are likely to suffer irreparable harm absent an injunction.

22       *First*, "[t]he loss of First Amendment freedoms, for even minimal periods of time,

23 unquestionably constitutes irreparable injury."  *Elrod*, 427 U.S. at 373; *see also Farris*, 677 F.3d at

24 868.  Such harm to free speech is relevant both under the First Amendment and the CDA, which as

25 the Ninth Circuit has held, "sought to further First Amendment … interests on the Internet."  *Batzel*,

26 333 F.3d at 1028 (citing 141 Cong. Rec. H8469–72 (1995)).

27       *Second*, Plaintiffs face the threat of prosecution under a preempted law, which constitutes

28 irreparable harm.  *See Valle del Sol*, 732 F.3d at 1029 ("irreparable harm" where plaintiff

1   "demonstrated a credible threat of prosecution" under preempted law); *Morales v. Trans World*

2   *Airlines, Inc.*, 504 U.S. 374, 381 (1992) ("irreparable injury" where "attorneys general … made clear

3   that they would seek to enforce" preempted law and plaintiffs faced "Hobson's choice" between

4   "expos[ing] themselves to potentially huge liability" or "suffer[ing] the injury of obeying" law).

5          *Third*, the risk of criminal penalties, including jail time, also constitutes irreparable harm.

6   See *Backpage.com, LLC v. Hoffman*, 2013 WL 4502097, at *12 (D.N.J. Aug. 20, 2013) (irreparable

7   harm where, "[a]bsent injunctive relief, Plaintiffs may face serious criminal liability"); *Toomer v.*

8   *Witsell*, 334 U.S. 385, 391-92 (1948) (where "defiance would have carried with it the risk of heavy

9   fines and long imprisonment," "imminence of irreparable injury" shown).

10          *Fourth*, the risk of hefty fines constitutes irreparable harm.  The Ordinance authorizes fines

11   of up to $1,000 for *each* violation, i.e., each time Plaintiffs provide Booking Services for a short-

12   term rental without a "lawful" registration.  Given that Airbnb and HomeAway publish thousands

13   of listings in the City, Owen Decl. ¶ 23; Furlong Decl. ¶ 2, this could result in fines in the millions

14   of dollars if even a fraction are not "lawfully registered."  Courts have found irreparable harm based

15   on fines of this magnitude.  *See, e.g.*, *Satellite Television of N.Y. Assocs. v. Finneran*, 579 F. Supp.

16   1546, 1551 (S.D.N.Y. 1984) (irreparable harm "readily" shown where plaintiff "faced with a choice

17   of" complying or incurring "fine of $2,000 a day").

18          The prospect of criminal and civil penalties is not hypothetical.  The Ordinance squarely

19   takes aim at both Airbnb's and HomeAway's operations, as evidenced by the public statements by

20   the proponents of the Ordinance.  Blavin Decl., Ex. N at 2 (Supervisor Campos: "it is only fair that

21   Airbnb and others help us enforce the law"); *see id.* (Supervisor Wiener noting desire for law to

22   apply to "VRBO or HomeAway"); *id.*, Ex. B at 4; Ex. H at 1.  In these circumstances, courts have

23   found irreparable harm.  *See Cooper*, 939 F. Supp. 2d at 819 (high likelihood of enforcement where

24   Backpage.com was "direct target" of law); *McKenna*, 881 F. Supp. 2d at 1270 (same).

25          *Fifth*, the Ordinance gives rise to irreparable injury by disrupting Plaintiffs' operations and

26   threatening a loss of consumer goodwill.  Again, the law would force Airbnb and HomeAway to

27   verify each property in a listing is "lawfully registered" before providing Booking Services.

28   § 41A.5(g)(4)(C).  Given the volume of listings on Plaintiffs' websites and the continual addition

1   and modification of listings, this would require Plaintiffs to change their platforms, expend

2   significant resources, and delay the availability of booking and reservation services.  Owen Decl.

3   ¶¶ 17-24; Furlong Decl. ¶ 11.  Verifying that each listing is associated with a registration number—

4   not to mention determining whether the rental is "*lawfully* registered" and otherwise complies with

5   the law—would require dedicated teams of employees manually obtaining and reviewing

6   information from users and the City for each listing, requiring substantial financial and personnel

7   resources.  Owen Decl. ¶ 17; Furlong Decl. ¶¶ 13, 15.  These changes themselves likely would repel

8   users and cause a loss of goodwill.  Owen Decl. ¶¶ 20-22; Furlong Decl. ¶¶ 13-15.

9   Given this, Plaintiffs likely would have no choice but to screen and remove listings from

10  their platforms altogether, including lawful ones.  Owen Decl. ¶¶ 19, 23-25; Furlong Decl. ¶ 19.

11  The resulting loss of consumer trust and goodwill constitutes irreparable harm.  *Am. Trucking*

12  *Ass'ns, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1058 (9th Cir. 2009) (irreparable harm exists

13  where preempted law will cause "part of" plaintiff's "business" and "goodwill" to "evaporate");

14  *Mahroom v. Best W. Int'l, Inc.*, 2009 WL 248262, at *3 (N.D. Cal. Feb. 2, 2009) ("[m]ajor

15  disruption of a business" threatening "goodwill" is "irreparable harm").

16  Finally, when unlawful regulations create the perception that a company's activities are

17  illegal, the resulting loss in goodwill is irreparable.  *See Aeroground, Inc. v. City & Cnty. of San*

18  *Francisco*, 170 F. Supp. 2d 950, 959 (N.D. Cal. 2001) (irreparable harm where party "is refusing to

19  comply with a rule that it believes is preempted by federal law").  Here, the Ordinance engenders

20  the inaccurate perception that Plaintiffs' activities may be illegal, creating confusion among

21  potential hosts and guests alike, and driving consumers away from their platforms.

22  **D.     The Balance of Equities and Public Interest Favor Plaintiffs**

23  The balance of equities tips decidedly in favor of Plaintiffs.  They face deprivation of their

24  constitutional rights, which far outweighs any harm the City might claim.  *Klein v. City of San*

25  *Clemente*, 584 F.3d 1196, 1208 (9th Cir. 2009).  Harms to Plaintiffs in the form of impending

26  criminal penalties and fines, as well as lost goodwill, also weigh in their favor.  The City can claim

27  little harm to outweigh these significant injuries.  Indeed, the City does not face disruption of

28  established practices.  *McKenna*, 881 F. Supp. 2d at 1286 ("harm to the government [is not] great"

29

1   where "'[n]o prosecutions have yet been []taken'").

2       The public interest also strongly favors Plaintiffs.  The public interest is served by "the

3   Constitution's declaration that federal law is to be supreme."  *Am. Trucking*, 559 F.3d at 1059-60;

4   *see Bank One, Utah v. Guttau*, 190 F.3d 844, 847-48 (8th Cir. 1999) ("public interest will perforce

5   be served by enjoining the enforcement of [preempted] state law").  In addition, "'it is always in the

6   public interest to prevent the violation of a party's constitutional rights.'"  *Melendres v. Arpaio*, 695

7   F.3d 990, 1002 (9th Cir. 2012).  It also is in the public interest to protect Plaintiffs from criminal

8   liability and lost consumer goodwill resulting from unlawful regulation.  By contrast, an injunction

9   would not prevent the City from enforcing its laws against those non-compliant hosts who directly

10  violate them.

11  **IV.    CONCLUSION**

12      For these reasons, Plaintiffs respectfully request that the Court grant their motion for a

13  preliminary injunction.

14

15  DATED:  September 6, 2016                MUNGER, TOLLES & OLSON LLP
                                             JOHN W. SPIEGEL
16                                           JONATHAN H. BLAVIN
                                             ELLEN M. RICHMOND
17                                           JOSHUA PATASHNIK

18

19                                     By:   */s/ Jonathan H. Blavin*
                                             JONATHAN H. BLAVIN
20                                           Attorneys for Plaintiff Airbnb, Inc.

21

22  DATED:  September 6, 2016                DAVIS WRIGHT TREMAINE LLP
                                             JAMES C. GRANT
23                                           AMBIKA K. DORAN

24

25                                     By:   */s/ James C. Grant*
                                             JAMES C. GRANT
26                                           Attorneys for Plaintiff-Intervenor HomeAway.com, Inc.

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## **FILER'S ATTESTATION**

I, Jonathan H. Blavin, am the ECF user whose identification and password are being used to file this Joint Notice of Motion and Motion for Preliminary Injunction.  Pursuant to Civil Local Rule 5-1(i)(3), I hereby attest that the other above-named signatory concurs in this filing.

MOTION FOR PRELIMINARY INJUNCTION

CASE NO. 3:16-cv-03615-JD