# EXHIBIT A

ANDREW P. BRIDGES (CSB No. 122761)
abridges@fenwick.com
GUINEVERE L. JOBSON (CSB No. 251907)
gjobson@fenwick.com
MATTHEW B. BECKER (CSB No. 291865)
mbecker@fenwick.com
FENWICK & WEST LLP
555 California Street, 12th Floor
San Francisco, CA 94104
Tel: (415) 875-2300
Fax: (415) 281-1350

ARMEN N. NERCESSIAN (CSB No. 284906)
anercessian@fenwick.com
FENWICK & WEST LLP
801 California Street
Mountain View, CA 94041
Tel: (650) 988-8500
Fax: (650) 938-5200

Attorneys for *Amici Curiae*
The Internet Association and CALinnovates

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

AIRBNB, INC. and HOMEAWAY.COM, INC.,

Plaintiffs,

vs.

CITY AND COUNTY OF SAN FRANCISCO,

Defendant.

Case No. 3:16-cv-03615-JD

**[PROPOSED] BRIEF OF *AMICI CURIAE* THE INTERNET ASSOCIATION AND CALINNOVATES IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

Judge: Hon. James Donato
Crtm: 11, 19th Floor
Time: Oct. 6, 2016 at 10:00 a.m.

**TABLE OF CONTENTS**

**Page**

INTERESTS OF *AMICI CURIAE* .......... 1

INTRODUCTION .......... 1

ARGUMENT .......... 3

I. BY DESIGN, THE CDA IMMUNIZES ONLINE PLATFORMS FROM LIABILITY FOR THE CONDUCT OF THIRD PARTIES. .......... 3

II. THE CDA'S BROAD PROTECTION HAS FUELED EXTRAORDINARY ENTREPRENEURIAL AND MARKETPLACE INNOVATION. .......... 6

III. THE CDA PROHIBITS SCHEMES TO TURN INTERACTIVE SERVICE PROVIDERS INTO POLICE OR REGULATORS OF THE MARKETPLACES THEY FACILITATE. .......... 9

IV. SUBTERFUGES AND STRATAGEMS, LIKE THE CITY OF SAN FRANCISCO'S EFFORT TO DISGUISE ITS ATTACK ON PLAINTIFFS' CDA IMMUNITY, HAVE NO PLACE UNDER THE STATUTE .......... 11

CONCLUSION .......... 12

## TABLE OF AUTHORITIES

**CASES** **PAGE(S)**

*Barnes v. Yahoo!, Inc.*,
570 F.3d 1096 (9th Cir. 2009)....................3, 4, 9

*Batzel v. Smith*,
333 F.3d 1018 (9th Cir. 2003)....................4

*Blumenthal v. Drudge*,
992 F. Supp. 44 (D.D.C. 1998)....................7, 8

*Caraccioli v. Facebook, Inc.*,
No. 5:15-CV-04145-EJD, 2016 WL 859863 (N.D. Cal. Mar. 7, 2016)....................10

*Chicago Lawyers' Comm. for Civil Rights Under Law, Inc. v. Craigslist, Inc.*,
519 F.3d 666 (7th Cir. 2008), *as amended* (May 2, 2008)....................5, 10

*Corbis Corp. v. Amazon.com, Inc.*,
351 F.Supp. 2d 1090 (2004)....................9

*Cubby, Inc. v. CompuServe, Inc.*,
776 F. Supp. 135 (S.D.N.Y. 1991)....................4, 8

*Delfino v. Agilent Techs., Inc.*,
145 Cal. App. 4th 790 (2006)....................9

*Fair Hous. Council of San Fernando Valley v. Roommates.Com, LLC*,
521 F.3d 1157 (9th Cir. 2008)....................3

*Fields v. Twitter, Inc.*,
No. 16-CV-00213-WHO, 2016 WL 4205687 (N.D. Cal. Aug. 10, 2016)....................10

*Gentry v. eBay, Inc.*,
99 Cal. App. 4th 816 (2002)....................10

*Goddard v. Google, Inc.*,
No. C 08-2738JF(PVT), 2008 WL 5245490 (N.D. Cal. Dec. 17, 2008)....................5, 10

*Hill v. StubHub, Inc.*,
219 N.C. App. 227 (2012)....................5

*Inman v. Technicolor USA, Inc.*,
No. CIV.A. 11-666, 2011 WL 5829024 (W.D. Pa. Nov. 18, 2011)....................10

*Jane Doe No. 1 v. Backpage.com, LLC*,
817 F.3d 12 (1st Cir. 2016)....................10

# TABLE OF AUTHORITIES (CONTINUED)

**CASES** **PAGE(S)**

*Jurin v. Google Inc.*,
695 F. Supp. 2d 1117 (E.D. Cal. 2010)....................7, 10

*Perfect 10, Inc. v. CCBill LLC*,
488 F.3d 1102 (9th Cir. 2007)....................5

*Schneider v. Amazon.com, Inc.*,
108 Wash. App. 454 (2001)....................9

*Stratton Oakmont, Inc. v. Prodigy Servs. Co.*,
No. 31063/94, 1995 WL 323710 (N.Y. Sup. Ct. May 24, 1995)....................4, 8

*Zeran v. Am. Online, Inc.*,
129 F.3d 327 (4th Cir. 1997)....................7, 9

**STATUTES**

The Communications Decency Act, 47 U.S.C. § 230.................... *passim*

47 U.S.C. § 230(c)(1)....................1, 3

47 U.S.C. § 230(c)(2)....................3, 4

47 U.S.C. § 230(e)....................5

**OTHER AUTHORITIES**

Barack Obama, Remarks by the President in State of the Union Address (Jan. 20, 2015), *available at* https://www.whitehouse.gov/the-press-office/2015/01/20/remarks-president-state-union-address-january-20-2015....................6

Benenson Strategy Group, *The Driver Roadmap: Where Uber Driver-Partners Have Been And Where They're Going* (2015), https://2q72xc49mze8bkcog2f01nlh-wpengine.netdna-ssl.com/wp-content/uploads/2015/01/BSG_Uber_Report.pdf....................6, 7

David Post, Editorial, *A bit of Internet history, or how two members of Congress helped create a trillion or so dollars of value*, Wash. Post, Aug. 27, 2015, *available at* https://www.washingtonpost.com/news/volokh-conspiracy/wp/2015/08/27/a-bit-of-internet-history-or-how-two-members-of-congress-helped-create-a-trillion-or-so-dollars-of-value....................1, 2

**TABLE OF AUTHORITIES**
**(CONTINUED)**

**OTHER AUTHORITIES** **PAGE(S)**

Fifth Era LLC, *The Impact of Internet Regulation on Early Stage Investment* (2014), http://static1.squarespace.com/static/ 571681753c44d835a440c8b5/t/572a35e0b6aa60fe011dec28/1462384101881/EngineFifthEraCopyrightReport.pdf ....11

Interactive Advertising Bureau, *Economic Value of the Advertising-Supported Internet Ecosystem* (June 10, 2009), http://www.iab.com/wp-content/uploads/2015/07/iab_Report_September-24-2012_4clr_v1.pdf ....6

Internet Association, *Measuring the U.S. Internet Sector* (2015), http://internetassociation.org/wp-content/uploads/2015/12/Internet-Association-Measuring-the-US-Internet-Sector-12-10-15.pdf ....7

Jonathan Hall & Alan Krueger, *An Analysis of the Labor Market for Uber's Driver-Partners in the United States* (2015), https://s3.amazonaws.com/uber-static/comms/PDF/Uber_Driver-Partners_Hall_Kreuger_2015.pdf ....6

Organization for Economic Co-operation and Development, *The Economic and Social Role of Internet Intermediaries* (2010), http://www.oecd.org/dataoecd/49/4/44949023.pdf ....6

Pew Research Center, *Shared, Collaborative, and On Demand: The New Digital Economy* (2016), http://www.pewinternet.org/files/2016/05/ PI_2016.05.19_Sharing-Economy_FINAL.pdf ....7

PricewaterhouseCoopers, *The sharing economy – sizing the revenue opportunity* (2015), http://www.pwc.co.uk/issues/megatrends/collisions/sharingeconomy/ the-sharing-economy-sizing-the-revenue-opportunity.html ....7

Senator Ron Wyden, Address at the Santa Clara University School of Law: 47 U.S.C. § 230: A 15-Year Retrospective (Mar. 4, 2011), *available at* https://www.wyden.senate.gov/download/?id=8e194261-aeb7-47f2-b3db-4697a7c6c17d&download=1 ....8

## INTERESTS OF *AMICI CURIAE*

The Internet Association and CALinnovates are membership organizations representing technology and entrepreneur communities that share an interest in advocating the proper application of the Communications Decency Act ("CDA"), 47 U.S.C. § 230, to Internet intermediaries, hosting platforms and other online service providers. ***The Internet Association*** represents roughly forty leading technology companies. Its membership includes a broad range of Internet intermediaries, from travel sites and online marketplaces to social networking services and search engines. The Internet Association advances public policy solutions that strengthen and protect Internet freedoms, foster innovation and economic growth, and empower small businesses and the public. ***CALinnovates*** is a coalition of technology leaders, start-ups, and entrepreneurs that champions the rise of innovation in the United States and its unmistakably beneficial impact for consumers of all socio-economic strata, states and localities' tax bases, and the economy. CALinnovates advocates the development of a modern, Internet-enabled economy, and supports policies that increase investment, technology infrastructure, competition and consumer choice in the marketplace. Congress enacted Section 230 of the CDA to promote the growth and development of the Internet, and both the Internet Association and CALinnovates have a substantial interest in this proceeding and its potential effect on the application of the Section 230 immunities to platform-based marketplaces more broadly.

## INTRODUCTION

The CDA's core immunity provision is unequivocal: "No provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." 47 U.S.C. § 230(c)(1). Since the enactment of Section 230 in 1996, this simple directive has allowed Internet-based businesses to flourish by barring claims against intermediaries based on third-party conduct except in intellectual property cases. Indeed, as one prominent legal scholar recently put it, "No other sentence in the U.S. Code, I would assert, has been responsible for the creation of more value than that one . . . ." David Post, Editorial, *A bit of Internet history, or how two members of Congress helped create a*

*trillion or so dollars of value*, Wash. Post, Aug. 27, 2015, *available at* https://www.washingtonpost.com/news/volokh-conspiracy/wp/2015/08/27/a-bit-of-internet-history-or-how-two-members-of-congress-helped-create-a-trillion-or-so-dollars-of-value.

The Internet Association and CALinnovates file this brief in support of Plaintiffs' challenge to San Francisco's Amended Ordinance, *see* Dkt. No. 50, because the success and vitality of many different marketplaces – hardly just Airbnb and HomeAway – depend upon a consistent and principled application of the CDA. Unlike brick-and-mortar businesses and online storefronts, platform-based marketplaces often only facilitate transactions between third parties. They furnish platforms that connect customers with other providers of goods, services and information. In the overwhelming majority of cases, a platform does not have any relationship with providers that would give rise to liability under traditional principles: there is no employment or agency contract; the platform is not itself a party to any particular transaction; it does not control the actions of parties to a transaction and lacks any practical ability to do so.

Platforms work in a binary fashion. Either they allow access or they do not. And, as an intermediary, a platform itself usually has no information about the internal operations of individual providers. Nor is the platform competent to evaluate an individual provider's or customer's compliance with specific state and local regulations that may apply to the provider or customer, to the information they choose to exchange, or to their transactions.

For budding enterprises, those who form the core of the supporters of CALinnovates, launching a new online platform is already fraught with uncertainty. A start-up has no reliable way to tell how individuals and entities will use a platform. It cannot predict how many users a platform will have. It does not even know whether anyone will actually use the platform. The Amended Ordinance and other measures like it would cause more uncertainty and may dissuade investment in new platforms. After all, if a new business were forced to bear, at the outset, the costs of ensuring that each transient use of a nascent platform by third-party actors complied with every local, state, and federal regulation that could conceivably apply (and face civil or even criminal liability for any putative failures in such compliance), the next wave of path-breaking

technology companies may decide that the whole game is not worth the candle and walk away.

That is precisely why Section 230 shields intermediaries from liability for any claims based on the information exchanges of third parties that they facilitate. The CDA is broad, for a reason: no one can predict the effects new platforms might have or the new business models that might emerge in their wake. These protections benefit both intermediaries and the public alike. Their breadth provides room for entrepreneurial imagination and innovation, without fear that online platforms must themselves become vigilantes over the markets they develop. Meanwhile, any uncertainty over the scope of the immunities, or anxiety that governments might succeed in stratagems that undermine the CDA's protections and subject businesses to open-ended liability, damages confidence among those who invest in technology. That may forestall future innovation.

San Francisco's Amended Ordinance aims to pierce the bedrock immunities of the CDA. The members of Internet Association and CALinnovates care deeply about the Court's decision in this case because, if it erodes the CDA's protections, the investments and legitimate expectations of Internet Association's and CALinnovate's members and countless smaller enterprises that are now trying to get off the ground will suffer grave harm.

## ARGUMENT

### I. BY DESIGN, THE CDA IMMUNIZES ONLINE PLATFORMS FROM LIABILITY FOR THE CONDUCT OF THIRD PARTIES.

The CDA contains two separate but related immunities. First, it shields providers or users of an "interactive computer service" (or "ICS") from liability under any law that treats them as the "publisher or speaker" of information provided by "another information content provider." 47 U.S.C. § 230(c)(1). This subsection bars any claims arising from "publication decisions" that pertain to "content generated entirely by third parties." *Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1101 (9th Cir. 2009). And it reaches "any activity that can be boiled down to deciding whether to exclude material that third parties seek to post online." *Id.* at 1103 (quoting *Fair Hous. Council of San Fernando Valley v. Roommates.Com, LLC*, 521 F.3d 1157, 1170-71 (9th Cir. 2008)).

Additionally, Section 230 also forecloses liability for "any action" a provider or user may

take "voluntarily" and "in good faith" to limit access to objectionable materials. 47 U.S.C. § 230(c)(2). This second immunity does not just apply to third-party materials. Rather, "even those who cannot take advantage of subsection (c)(1), perhaps because they developed, even in part, the content at issue can take advantage of subsection (c)(2) if they act to restrict access to the content because they consider it obscene or otherwise objectionable." *Barnes*, 570 F.3d at 1101.

In enacting these twin protections, Congress sought to correct a serious problem facing online platforms under then-existing law. Without the CDA, "users and providers of interactive computer services who review material could be found liable for the statements of third parties, yet providers and users that disavow any responsibility" would not. *Batzel v. Smith*, 333 F.3d 1018, 1027 (9th Cir. 2003). *Compare Stratton Oakmont, Inc. v. Prodigy Servs. Co.*, No. 31063/94, 1995 WL 323710 (N.Y. Sup. Ct. May 24, 1995) (holding access provider strictly liable for defamatory statements posted by anonymous user, because provider moderated message boards), *with Cubby, Inc. v. CompuServe, Inc.*, 776 F. Supp. 135 (S.D.N.Y. 1991) (holding that access provider was not liable for posted speech because it merely acted as a conduit).

The CDA fixed the problem under the earlier case law, and today Section 230's two immunities, taken together, are critical to the development of healthy platform-based marketplaces. The latter immunity gives an ICS the authority to control the quality of materials on a platform without fear of liability; the former one affords an ICS the flexibility to develop the platform at its own pace, without having to police third-party information and exchanges over which the ICS itself has little control. Internet intermediaries lack competence to adjudicate myriad regulatory issues that may affect the variety of uses of their platforms, and imposing responsibility on them to police activities for the potential violation of a wide range of government regulations would pose intractable problems.

Intermediaries already have powerful business incentives to weed troublesome providers from their platforms. Platform-based marketplaces are built on trust: it is critical to the reputation and success of a platform that providers honestly represent the goods or services they offer and that providers comply with applicable local, state and federal laws. No responsible

Internet company sets out to create a platform that encourages providers to harm others. But intermediaries lack the practical means to guarantee or enforce compliance, and they are in no position to investigate the compliance of individual providers.

The broad scope of these immunities is apparent on the face of the statute. Section 230 expressly preempts all inconsistent State and local law: "No cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section." 47 U.S.C. § 230(e)(3). And it excludes only intellectual property law and federal criminal law from the scope of its protections. 47 U.S.C. § 230(e)(1)-(2).

Indeed, a "majority of federal circuits" have held that the CDA establishes "broad federal immunity to any cause of action that would make service providers liable for information originating with a third-party user . . . ." *Perfect 10, Inc. v. CCBill LLC*, 488 F.3d 1102, 1118 (9th Cir. 2007) (internal citation and quotations omitted). And courts must resolve "all doubts . . . in favor of immunity." *Goddard v. Google, Inc.*, No. C 08-2738JF(PVT), 2008 WL 5245490, at *2 (N.D. Cal. Dec. 17, 2008) (internal citation and quotation omitted). We need not delve much into the details of each case here. Suffice to say: out of the "approximately 300 reported decisions" on the issue, "[a]ll but a handful . . . find that the website is entitled to immunity from liability." *Hill v. StubHub, Inc.*, 219 N.C. App. 227, 239 (2012).

With its focus on third-party conduct, Section 230 strikes an appropriate balance. It prohibits claims based on the mere failure to monitor material posted by third parties, but it allows lawsuits based on a platform's *own* culpable conduct. Under Section 230, one "cannot sue the messenger just because the message reveals a third party's plan to engage in unlawful" activities. *See Chicago Lawyers' Comm. for Civil Rights Under Law, Inc. v. Craigslist, Inc.*, 519 F.3d 666, 672 (7th Cir. 2008), *as amended* (May 2, 2008). And in the vast majority of cases, as in this one, that immunity is absolute.

\\

\\

\\

## II. THE CDA'S BROAD PROTECTION HAS FUELED EXTRAORDINARY ENTREPRENEURIAL AND MARKETPLACE INNOVATION.

Since the enactment of the CDA, Internet intermediaries have transformed how we live, work, and do business. They offer platforms that allow citizens to connect in new ways, using new business models that provide the public with new marketplace choices. Today, "millions of Americans [w]ork in jobs that didn't even exist 10 or 20 years ago." President Barack Obama, Remarks by the President in State of the Union Address (Jan. 20, 2015), *available at* https://www.whitehouse.gov/the-press-office/2015/01/20/remarks-president-state-union-address-january-20-2015. Many intermediaries are themselves large employers: "In 2008 in the United States, the overall information sector represented 47.6 million in jobs." Organization for Economic Co-operation and Development, *The Economic and Social Role of Internet Intermediaries*, 39 (2010), http://www.oecd.org/dataoecd/49/4/44949023.pdf. But beyond their contributions as direct employers, intermediaries have encouraged the growth of small businesses by "decreasing transaction costs such as the cost of searching for a buyer or a seller." *See id.* at 37-40. Indeed, one report by the Interactive Advertising Bureau (IAB) estimated that, in 2009, platform-based marketplaces allowed over one million persons to run one-person businesses. *See id.* at 40; IAB, *Economic Value of the Advertising-Supported Internet Ecosystem*, 55-57 (2009), http://www.iab.com/wp-content/uploads/2015/07/iab_Report_September-24-2012_4clr_v1.pdf.

These platforms have also spurred broad participation in the economy by persons previously shut out. They have allowed many who require greater job flexibility and are unable to participate in a more traditional fashion, such as single parents or students, to market their skills on a freelance basis or to make productive use of their personal assets. *See* Jonathan Hall & Alan Krueger, *An Analysis of the Labor Market for Uber's Driver-Partners in the United States*, 2 (2015), https://s3.amazonaws.com/uber-static/comms/PDF/Uber_Driver-Partners_Hall_Kreuger_2015.pdf. For part-time service providers, platforms have offered supplemental income and greater financial security. *See generally* Benenson Strategy Group, *The Driver Roadmap: Where Uber Driver-Partners Have Been and Where They're Going* (2015), https://2q72xc49mze



FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

8bkcog 2f01nlh-wpengine.netdna-ssl.com/wp-content/uploads/2015/01/BSG_Uber_Report.pdf. Meanwhile, crowdfunding platforms like Indiegogo and Kickstarter have connected investors with entrepreneurs here and around the world, launching hundreds of thousands of new projects.

The benefits both to the marketplace and to the public have been enormous. Platforms now offer purchasers access to a dazzling array of new service options by individual providers, including handyman services, such as TaskRabbit; third-party vendor services, such as eBay and Amazon; short-term rental services, such as Airbnb and HomeAway; and dog-walking services, such as Rover and Wag!, to name a few. A recent report by the Pew Research Center found that 72% of American adults had used at least one platform-enabled service; in fact, ten percent of 18- to 29-year-olds living in urban areas reported that they used some services, such as ride-sharing apps, on a daily or weekly basis. Pew Research Center, *Shared, Collaborative, and On Demand: The New Digital Economy*, 3, 14 (2016), http://www.pewinternet.org/files/2016/05/PI_2016.05.19_Sharing-Economy_FINAL.pdf. According to a 2014 study by PricewaterhouseCoopers LLP, platform-based markets generated an estimated $15 billion in global revenues in 2013, and could grow to up to $335 billion by 2025. PricewaterhouseCoopers, *The sharing economy – sizing the revenue opportunity* (2015), http://www.pwc.co.uk/issues/megatrends/collisions/sharingeconomy/the-sharing-economy-sizing-the-revenue-opportunity.html. And a recent report by Amicus Internet Association found that, overall, the American Internet sector was "responsible for six percent ($966.2B) of real GDP in 2014." *See* Internet Association, *Measuring the U.S. Internet Sector*, 5 (2015), http://internetassociation.org/wp-content/uploads/2015/12/Internet-Association-Measuring-the-US-Internet-Sector-12-10-15.pdf.

The CDA immunity has been critical to the growth of these new markets. "The purpose of the CDA is to encourage open, robust, and creative use of the internet." *Jurin v. Google Inc.*, 695 F. Supp. 2d 1117, 1123 (E.D. Cal. 2010). "Congress recognized the threat that tort-based lawsuits pose to freedom of speech in the new and burgeoning Internet medium." *Zeran v. Am. Online, Inc.*, 129 F.3d 327, 330 (4th Cir. 1997). And it "decided not to treat providers of

interactive computer services like other information providers such as newspapers, magazines or television and radio stations, all of which may be held liable for publishing or distributing" materials prepared by others. *Blumenthal v. Drudge*, 992 F. Supp. 44, 49 (D.D.C. 1998). Indeed, at a forum featuring a retrospective analysis of the CDA immunity at Santa Clara University School of Law, one of the legislators who originally proposed Section 230 noted that it "has become such a central part of the way we operate online, that I bet few could conceive of what operating a web business, a forum or a news site or a blog would be like without it." Senator Ron Wyden, Address at the Santa Clara University School of Law: 47 U.S.C. § 230: A 15-Year Retrospective (Mar. 4, 2011), *available at* https://www.wyden.senate.gov/download/?id=8e194261-aeb7-47f2-b3db-4697a7c6c17d&download=1.

The CDA established that, in these new markets, responsibility must fall on persons or entities for their own speech, not on the platforms for the conduct of those who use them. The persons or entities using the platforms decide which goods or services to offer, when to provide them, and which intermediaries to use to publicize their services or sell their goods. An intermediary's relationship to any individual provider is usually tenuous. In the typical case, the intermediary merely prescribes minimal formal standards for the information that a provider seeks to publish and offers some additional services to facilitate transactions generally, such as payment processing. After all, as the pre-CDA precedents of *Stratton Oakmont* and *Cubby* vividly illustrated, attempting to address the challenges that these new markets present by using outmoded regulatory tools leads to perverse results.

The emergence of the Internet in the 1990's forced society to grapple with the questions that follow in the wake of many significant innovations: Must our future only look like the past, or can it perhaps be something else entirely? Twenty years ago, sensing the untold promise of the Internet, Congress enacted the CDA. And we do not know what the next twenty years of technological innovation will bring. We can only imagine how they may transform the ways we live, work, and do business. But the true wisdom of the CDA is that it does not let the present failures of our imagination blind us from realizing the potentials of tomorrow.

That is not to say that there is no role for government oversight of platform-based marketplaces. It is merely a recognition that the traditional modalities of command-and-control regulation break down when governments try to apply them against Internet intermediaries. After all, a blog site is not a newspaper. An auction site is not a department store. One cannot hope to address the challenges of the future with only the tools of the past. Platform-based marketplaces are fundamentally different from earlier business models, and the CDA ensures that they are free from interference arising from their use by others to transmit and exchange information, including transactions that depend upon the platform to do so.

## III. THE CDA PROHIBITS SCHEMES TO TURN INTERACTIVE SERVICE PROVIDERS INTO POLICE OR REGULATORS OF THE MARKETPLACES THEY FACILITATE.

Intermediaries face a significant business reality: "It would be impossible for service providers to screen each of their millions of postings for possible problems." *Zeran*, 129 F.3d at 331. If "[f]aced with potential liability for each message republished by their services, interactive computer service providers might choose to severely restrict the number and type of messages posted." *Id.* Thus, in enacting the CDA, Congress sought to "avoid the chilling effect" on Internet markets and speech that would result if state and local government imposed liability on "companies that do not create potentially harmful messages but are simply intermediaries for their delivery." *Delfino v. Agilent Techs., Inc.*, 145 Cal. App. 4th 790, 802-03 (2006).

While the "cause of action most frequently associated with the cases on section 230 is defamation," the actual protections of the CDA sweep much further. *Barnes*, 570 F. 3d at 1101. Some of the Internet's most visited sites and valuable companies, including many of the Internet Association's constituents, have depended on the CDA for their growth and success. Without its immunities barring suits based on third-party conduct, the following services could not exist as we know them:

- Amazon's product review functionality, *see Schneider v. Amazon.com, Inc.*, 108 Wash. App. 454 (2001), or its third-party vendor marketplace, *see Corbis Corp. v. Amazon.com, Inc.*, 351 F.Supp. 2d 1090 (2004);

- eBay's marketplace platform for third-party buyers and sellers, *see Inman v. Technicolor USA, Inc.*, No. CIV.A. 11-666, 2011 WL 5829024 (W.D. Pa. Nov. 18, 2011) and *Gentry v. eBay, Inc.*, 99 Cal. App. 4th 816 (2002);
- Craigslist's forum for classified advertisements, *see Chicago Lawyers*, 519 F.3d 666;
- Twitter's provision of accounts and its direct messaging capability, *see Fields v. Twitter, Inc.*, No. 16-CV-00213-WHO, 2016 WL 4205687 (N.D. Cal. Aug. 10, 2016);
- Google's Adwords, *see Goddard*, 2008 WL 5245490, and Sponsored Link programs, *see Jurin*, 695 F. Supp. 2d; and
- Facebook's social networking services, *see Caraccioli v. Facebook, Inc.*, No. 5:15-CV-04145-EJD, 2016 WL 859863 (N.D. Cal. Mar. 7, 2016), among many others.

But this case is not just about established companies like Airbnb, Google, and Amazon. Future platforms that the next generation of technology leaders will develop are the ones for whom the protections of the CDA are most important. "[W]ebsites that display third-party content may have an infinite number of users generating an enormous amount of potentially harmful content." *See Jane Doe No. 1 v. Backpage.com, LLC*, 817 F.3d 12, 18-19 (1st Cir. 2016). For start-ups, having to satisfy a multiplicity of potentially conflicting state and local compliance obligations based on third-party conduct would effectively shackle new Internet companies with liability from the beginning, before these businesses can realize their potentials.

It is also wholly inappropriate for municipalities like San Francisco to attempt to outsource their policing of third-party conduct to technology platforms. Nothing prevents San Francisco from pursuing claims against non-compliant hosts directly. Rather than expending its own resources on enforcement efforts, however, San Francisco would just off-load the costs onto someone else. But intermediaries are not enforcers, and the CDA does not allow state and local governments to treat technology companies as extensions of their own police forces.

To the contrary, Section 230 ensures that online intermediaries remain subject to a consistent body of law. Any change in the ability of intermediaries to rely on these protections would jeopardize investment in new enterprises and impede the development of new business

models, products and services. Investors are uncomfortable investing in "digital content intermediaries" who operate in fields fraught with high legal ambiguity. *See* Fifth Era LLC, *The Impact of Internet Regulation on Early Stage Investment*, 20-22 (2014), http://static1.squarespace.com/static/571681753c44d835a440c8b5/t/572a35e0b6aa60fe011dec28/1462384101881/EngineFifthEraCopyrightReport.pdf. Attempts by governments like San Francisco to force intermediaries into policing these new markets create uncertainty and reduce investment in small businesses, hindering competition, innovation and perhaps even overall economic growth.

## IV. SUBTERFUGES AND STRATAGEMS, LIKE THE CITY OF SAN FRANCISCO'S EFFORT TO DISGUISE ITS ATTACK ON PLAINTIFFS' CDA IMMUNITY, HAVE NO PLACE UNDER THE STATUTE.

San Francisco's recasting of its ordinance in the face of this lawsuit was a transparent effort to thwart the intent of the CDA. Legislatures and litigants alike have consistently tried to circumvent the protections of Section 230 by recasting their claims against ICS providers as regulation of commercial actors rather than "publishers or speakers." That is what the City of San Francisco seeks to do here. Recognizing the attenuated relationship between platforms and third-party providers, the Amended Ordinance now seeks to implicate hosting platforms in the potential non-compliance of individual rental providers by focusing on the intermediaries' general provision of "Booking Services." *See* Dkt. No 50-2 [Amended Ordinance] at § 41A.4. The Amended Ordinance requires "Hosting Platforms" providing "Booking Services" to verify a third-party listing before processing any related transaction. *Id.* at § 41A.5(g)(4)(C). It demands that each platform submit a monthly affidavit of compliance, *see id.* at § 41A.5(g)(4)(D), and it even threatens criminal penalties for any failure to police the platform as mandated, *see id.* at § 41A.5(e).

In short, the same problems that plagued the San Francisco's earlier proposal doom this new one. Despite its refocusing on "Booking Services," the Amended Ordinance still seeks to hold ICS providers responsible for the activities of their third-party users. Indeed, though San Francisco purports to seek regulation only of platforms such as Airbnb and HomeAway, the

actual language of the Amended Ordinance may apply much more broadly. It defines "Booking Service" as "any reservation and/or payment service provided by a person or entity" that "facilitates a short-term rental transaction" and "for which the person or entity collects or receives, *directly or indirectly through an agent or intermediary*, a fee in connection with the reservation and/or payment services." Dkt. No 50-2 [Amended Ordinance] at § 41A.4 (emphasis added). This language could easily apply against untold number of other intermediaries, including passive payment processors like PayPal, Visa, and MasterCard. The CDA leaves no room for such tactics, and it prohibits state and local regulators from playing such games.

**CONCLUSION**

For these reasons, the Court should hold that the Amended Ordinance conflicts with the CDA immunities and thus that Section 230 preempts the Amended Ordinance in its entirety.

Dated: September 8, 2016

FENWICK & WEST LLP

By: */s/ Andrew P. Bridges*
Andrew P. Bridges

Andrew P. Bridges
Guinevere L. Jobson
Matthew B. Becker
FENWICK & WEST LLP
555 California Street, 12th Floor
San Francisco, CA 94104
Telephone: 415.875.2300
Facsimile: 415.281.1350
abridges@fenwick.com
gjobson@fenwick.com
mbecker@fenwick.com

Armen N. Nercessian
FENWICK & WEST LLP
801 California Street
Mountain View, CA 94041
Telephone: 650.988.8500
Facsimile: 650.938.5200
anercessian@fenwick.com

Attorneys for *Amici Curiae*
The Internet Association, CALinnovates