DAVID GREENE (SBN 160107)
davidg@eff.org
LEE TIEN (SBN 148216)
tien@eff.org
CORYNNE MCSHERRY (SBN 221504)
corynne@eff.org
ELECTRONIC FRONTIER FOUNDATION
815 Eddy Street
San Francisco, CA 94109
Telephone: (415) 436-9333
Facsimile: (415) 436-9993

Attorneys for *Amici Curiae*
Electronic Frontier Foundation,
Center For Democracy and Technology,
Daphne Keller, Eric Goldman and
Eugene Volokh

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| AIRBNB, INC. and HOMEAWAY.COM, INC., <br><br> Plaintiffs, <br><br> vs. <br><br> CITY AND COUNTY OF SAN FRANCISCO, <br><br> Defendant. | Case No. 3:16-cv-03615-JD <br><br> ***AMICUS CURIAE* BRIEF OF ELECTRONIC FRONTIER FOUNDATION, CENTER FOR DEMOCRACY AND TECHNOLOGY, DAPHNE KELLER, ERIC GOLDMAN AND EUGENE VOLOKH IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** <br><br> Judge: Hon. James Donato <br> Crtm: 11, 19th Floor <br> Time: October 6, 2016 at 10:00 a.m. |

**TABLE OF CONTENTS**

STATEMENT OF INTERESTS ................................................................................................1

INTRODUCTION .........................................................................................................................2

ARGUMENT..................................................................................................................................4

    I.    In enacting Section 230, congress recognized the important role intermediaries play in facilitating online freedom of expression. ..........................................................................4

    II.   Section 230 has proven effective in promoting freedom of speech. .................................6

    III.  Section 23 prevents intermediaries from being forced to serve as enforcement arms of local governments. ............................................................................................................7

    IV.  The public's interest is not diminished when a law restricts only the commercial aspects of an intermediary. ........................................................................................................8

CONCLUSION ..............................................................................................................................9

- i -

Case No. 16-cv-03615    *AMICUS CURIAE* BRIEF OF ELECTRONIC FRONTIER FOUNDATION ET AL.
IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

# TABLE OF AUTHORITIES

## Cases

*44 Liquormart v. Rhode Island*,
   517 U.S. 484 (1996) ..................................................................................................9

*Batzel v. Smith*,
   333 F.3d 1018 (9th Cir. 2003) ....................................................................................2

*Ben Ezra, Weinstein, & Co., Inc. v. Am. Online Inc.*,
   206 F.3d 980 (10th Cir. 2000) ....................................................................................4

*Delfi AS v. Estonia* [GC],
   App. No. 64569/09 (Eur. Ct. H.R. Jun. 16, 2015) ......................................................7

*Doe v. Backpage.com*,
   817 F.3d 12 (1st Cir. 2016).........................................................................................3

*Doe v. MySpace, Inc.*,
   528 F.3d 413 (5th Cir. 2008) ......................................................................................4

*Perfect 10, Inc. v. CCBILL, LLC*,
   488 F.3d 1102 (9th Cir. 2007) ....................................................................................2

*Reno v. ACLU*,
   521 U.S. 844 (1997) ...................................................................................................4

Supreme Court en banc Decision 2008Da53812 (Apr. 16, 2009)......................................6

*Zeran v. Am. Online, Inc.*,
   129 F.3d 327 (4th Cir. 1997). ........................................................................1, 4, 5, 6

## Statutes

47 U.S.C. § 230 ..........................................................................................................*passim*

47 U.S.C. § 230(b)(1) .........................................................................................................5

47 U.S.C. § 230(b)(2) .........................................................................................................6

47 U.S.C. § 230(b)(3) .........................................................................................................6

47 U.S.C. § 230(b)(5) .........................................................................................................6

47 U.S.C. § 230(c)(1) .........................................................................................................1

## Other Authorities

"Charitable authors brandish literary license, auction off rights to name book
   characters, places," *San Francisco Chronicle* (Sept. 22, 2005) .................................8

Anupam Chander & Uyên P. Lê, *Free Speech*, 100 Iowa L. Rev. (2015) .........................5

Anupam Chander, *How Law Made Silicon Valley*, 63 Emory L.J. (2014) ........................7

Article 19, *European Court strikes serious blow to free speech online* (Oct. 14, 2013) .................. 7

Broadband Comm'n for Digital Dev. [UN agency for information and communications technology], *The State of Broadband 2015: Broadband for All* (Oct. 2015) ........................... 4

Byron F. Marchant, *On-Line on the Internet: First Amendment and Intellectual Property Uncertainties in the On-Line World*, 39 How. L.J. (1996) .......................................................... 5

Glyn Moody, *Shock European court decision: Websites are liable for users' comments* (Jun. 16, 2015) ................................................................................................................................ 7

Jennifer Garnett, *European Court Finds Liability for Defamatory Comments by Anonymous Users*, HARV. J.L. & TECH. DIG. (Oct. 19, 2013), ............................................. 7

Kyung-Sin Park, Korea University Law School, *Intermediary Liability - Not Just Backward but Going Back* ....................................................................................................... 6

Philip N. Howard, *et al.*, *Opening Closed Regimes: What Was the Role of Social Media During the Arab Spring?* (Sep. 1, 2011) ........................................................... 4

## Legislative Authorities

141 Cong. Rec. H8471 (daily ed. Aug. 4, 1995) (statement of Rep. Zoe Lofgren) ....................... 5

Article 10, European Convention on Human Rights ..................................................................... 7

- iii -

Case No. 16-cv-03615   *Amicus Curiae* Brief of Electronic Frontier Foundation et al.
in Support of Plaintiffs' Motion for Preliminary Injunction

# STATEMENT OF INTERESTS

*Amici curiae* are nonprofit, public interest organizations that promote freedom of speech and innovation on the Internet and academics who have extensively studied the intermediary immunity created by 47 U.S.C. § 230 ("Section 230")[1] and its resulting benefits to the public interest. Each *amicus* has a strong interest in ensuring that Section 230 immunity remains a potent protection for Internet intermediaries and as a result continues to foster the availability of the Internet as a platform for diverse voices.

Electronic Frontier Foundation (EFF) is a member-supported civil liberties organization working to protect free speech and privacy rights in the online world. With more than 28,000 dues-paying members, EFF represents the interests of technology users in both court cases and in broader policy debates surrounding the application of law in the digital age. EFF actively encourages and challenges industry and government to support free expression, privacy, and openness in the information society. EFF has frequently represented public interest plaintiffs, and assisted courts as *amicus curiae*, in cases presenting difficult issues arising from Section 230. In many such cases, the intermediary that is the intended object of liability is unpopular and a sympathetic target for governmental regulation. EFF finds it especially important in such cases to help courts understand the broader public interests served by a robust and inclusive interpretation of Section 230.

The Center for Democracy & Technology (CDT) is a non-profit, public interest, Internet policy organization. CDT represents the public's interest in an open, innovative, and decentralized Internet, reflecting constitutional and democratic values of free expression, privacy, and individual liberty. CDT has litigated or otherwise participated in a broad range of Internet free expression and intermediary liability cases.

---

[1] The statute—which was originally Section 509 of the Communications Decency Act (part of the Telecommunications Act of 1996, Pub. L. 104-104) and is sometimes colloquially referred to as "CDA 230" or "Section 230 of the Communications Decency Act"—provides: "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." 47 U.S.C. § 230(c)(1). "By its plain language, [Section] 230 creates a federal immunity to any cause of action that would make service providers liable for information originating with a third-party user of the service." *Zeran v. Am. Online, Inc.*, 129 F.3d 327, 330 (4th Cir. 1997).

- 1 -

Case No. 16-cv-03615    AMICUS CURIAE BRIEF OF ELECTRONIC FRONTIER FOUNDATION ET AL.
IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

Daphne Keller is Director of Intermediary Liability at The Center for Internet and Society (CIS), a public interest technology law and policy program at Stanford Law School. CIS studies the interaction of new technologies and the law, examining ways in which the two can either promote or harm public goods like free speech, innovation, privacy, public commons, diversity, and scientific inquiry.

Prof. Eric Goldman is a Professor of Law at Santa Clara University School of Law. He has taught and written about Internet Law for over 20 years, and he has blogged virtually every Section 230 ruling since 2005. He is interested in the advancement of Internet law generally, and Section 230 specifically, as a foundation to enable the growth of innovative new services, such as those that create more efficient matches between consumers and vendors.

Prof. Eugene Volokh is Gary T. Schwartz Professor of Law at UCLA School of Law, where he specializes in free speech law and Internet law.

No one, except for *amici*, has authored this brief in whole or in part, or contributed money toward the preparation of this brief.

## INTRODUCTION

Section 230 immunity is an essential part of the architecture of the Internet that serves the public interest by promoting speech by a diverse array of voices. *Batzel v. Smith*, 333 F.3d 1018, 1027 (9th Cir. 2003) (explaining that Section 230 was intended to encourage "the unfettered and unregulated development of free speech on the Internet[.]") The overarching goal of Section 230 was not to give Internet intermediaries like Airbnb, HomeAway and TripAdvisor an advantage in the courtroom or the legislatures for their own sake. It was to ensure that the Internet flourished as a platform for broad use by the public, both to disseminate and receive information, thus preserving the Internet as the most democratic forum for communication that has ever existed. This intermediary-based structure is especially important to those without the financial or technological means to post content directly.

Congress chose categorical immunity to accomplish this goal.[2] Congress did not impose a

---

[2] Congress did exempt certain acts from Section 230 immunity, but none of those exemptions are relevant here. *See, e.g., Perfect 10, Inc. v. CCBILL, LLC*, 488 F.3d 1102 (9th Cir. 2007) (en

- 2 -

Case No. 16-cv-03615   AMICUS CURIAE BRIEF OF ELECTRONIC FRONTIER FOUNDATION ET AL.
IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

balancing test in which the free speech interests and regulatory interests were balanced case-by-case. Such a system would have burdened intermediaries with uncertainty. Congress also declined to create a notice-based system that imposed liability once a platform became aware of harmful third-party content. Such a system would have disincentivized intermediaries from patrolling their platforms for harmful content while at the same time creating an impetus for intermediaries to adopt restrictions on speech.

Congress's choice was a good one, and has proved successful for ensuring that the Internet is a vibrant and diverse medium.

As with any immunity, some nobly purposed and good faith regulations will be barred. But that is the choice Congress made.[3]

*Amici* agree with Plaintiffs that the San Francisco ordinance punishes certain Internet intermediaries precisely because they are serving as content intermediaries and is thus barred by Section 230. There is no way to interpret Section 230 whereby it would only permit this ordinance targeting hosting platforms. The reading of Section 230 urged by San Francisco would expose numerous other intermediaries to liability and uncertainty, thus defeating Congress's intent.

*Amici* write to emphasize the public interests that are furthered by the application of Section 230 immunity here and a broad reading of Section 230 generally.

///
///
///
///
///

---

banc) (construing Section 230's exemption for federal intellectual property claims).
[3] "But Congress did not sound an uncertain trumpet when it enacted the CDA, and it chose to grant broad protections to internet publishers. Showing that a website operates through a meretricious business model is not enough to strip away those protections. If the evils that the appellants have identified are deemed to outweigh the First Amendment values that drive the CDA, the remedy is through legislation, not through litigation." *Doe v. Backpage.com*, 817 F.3d 12, 29 (1st Cir. 2016)

**ARGUMENT**

**I.   IN ENACTING SECTION 230, CONGRESS RECOGNIZED THE IMPORTANT ROLE INTERMEDIARIES PLAY IN FACILITATING ONLINE FREEDOM OF EXPRESSION.**

Today's Internet hosts third-party contributions from a broad array of voices, facilitating the speech of billions. At the end of 2015, approximately 3.2 billion people, or 43.4 percent of the world's population, were online, up from 2.9 billion people in 2014.[4] Many of these individuals use U.S.-based services to access and distribute all manner of content, from organizing in opposition to oppressive regimes[5] to sharing pictures of children with grandparents.

Such worldwide Internet use was not inevitable or guaranteed. In the early to mid-1990s, the risk of potentially burdensome regulation and litigation presented a concrete threat to the proliferation of speech on the Internet. As it became clear that intermediary platforms had the potential to provide a forum for substantially all citizens of the world,[6] it also became clear the imposition of common law publisher liability on service providers would be a brake on such growth and development.

Section 230 was Congress's solution to this problem of "national and international dimension." *Zeran v. Am. Online*, 129 F.3d 327, 330 (4th Cir. 1997). Congress granted interactive computer service providers "broad immunity" from liability for content originally published by third parties. *Doe v. MySpace, Inc.*, 528 F.3d 413, 418 (5th Cir. 2008). S*ee also Ben Ezra, Weinstein, & Co., Inc. v. Am. Online Inc.*, 206 F.3d 980, 985 n.3 (10th Cir. 2000). Congress intended such immunity "to promote the continued development of the Internet and other interactive computer services" and "to preserve the vibrant and competitive free market"

---

[4] *See* Broadband Comm'n for Digital Dev. [UN agency for information and communications technology], *The State of Broadband 2015: Broadband for All*, 42 (Oct. 2015), http://www.broadbandcommission.org/documents/reports/bb-annualreport2015.pdf.

[5] *See*, *e.g.*, Philip N. Howard, *et al.*, *Opening Closed Regimes: What Was the Role of Social Media During the Arab Spring?* (Sep. 1, 2011), *available at* http://philhoward.org/opening-closed-regimes-what-was-the-role-of-social-media-during-the-arab-spring/.

[6] The Supreme Court underscored the Internet's global potential in *Reno v. ACLU*, finding that the Internet allows "tens of millions of people to communicate with one another and to access vast amounts of information from around the world. [It] is 'a unique and wholly new medium of worldwide human communication.'" *Reno v. ACLU*, 521 U.S. 844, 850 (1997).

- 4 -

Case No. 16-cv-03615   *AMICUS CURIAE* BRIEF OF ELECTRONIC FRONTIER FOUNDATION ET AL.
IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

online. *See* 47 U.S.C. § 230(b)(1)–(2). "[Section] 230 recognized the special role of intermediaries, who serve as a vehicle for the speech of others." Anupam Chander & Uyên P. Lê, *Free Speech*, 100 Iowa L. Rev. 501, 514 (2015). Congress sought to dispense with the broad range of legal uncertainty that enveloped online service providers in the early stages of the popular Internet.[7] Congress thus made the policy choice that fostering the Internet as a forum for unrestrained, robust communication was more important than deterring potentially harmful online speech by imposing liability on intermediaries "for other parties' potentially injurious messages." *Zeran*, 129 F.3d at 330–31.

Congress recognized that the Internet would be a far more limited forum if Internet service providers were forced to second-guess decisions about managing and presenting content authored by third parties.[8] And given the volume of information being published online, it would be impossible for most intermediaries to review every single bit of information published through their platforms prior to publication. "Faced with potential liability for each message republished by their services, interactive computer service providers might choose to severely restrict the number and type of messages posted." *Zeran v. AOL*, 129 F.3d 327, 331 (4th Cir. 1997).

It would be similarly impossible for intermediaries to comply with the enormous variety of international, state and local laws. This point is especially evident here where the law at issue is a local ordinance, and that hundreds of other laws with differing provisions may be adopted across the country.

Courts broadly interpret Section 230 immunity, "recogniz[ing] as critical in applying the

---

[7] *See generally* Byron F. Marchant, *On-Line on the Internet: First Amendment and Intellectual Property Uncertainties in the On-Line World*, 39 How. L.J. 477, 478, 493 (1996) ("[I]nteractions on the Internet span a new world of legal issues involving nearly every aspect of the law[,]" including "when an Internet system provider or party sponsoring a site on the Internet should be liable for the content of a message posted on that service or that Website.").

[8] "It immunized Internet intermediaries for the actions of their users. On the House floor, Representative Zoe Lofgren embraced the speech freedoms enshrined in § 230, which she believed would 'preserve the [F]irst [A]mendment and open systems on the Net.'" Anupam Chander & Uyên P. Lê, *Free Speech*, 100 Iowa L. Rev. 501, 511-12 (2015) (quoting 141 Cong. Rec. H8471 (daily ed. Aug. 4, 1995) (statement of Rep. Zoe Lofgren)).

statute the concern that lawsuits could threaten the 'freedom of speech in the new and burgeoning Internet medium.'" *Batzel*, 333 F.3d at 1027 (quoting *Zeran*, 129 F.3d at 330).

## II. SECTION 230 HAS PROVEN EFFECTIVE IN PROMOTING FREEDOM OF SPEECH.

Congress acted in the public interest by "preserv[ing] the vibrant and competitive free market that presently exists for the Internet and other interactive computer services[,]" finding that "[t]he Internet and other interactive computer services offer a forum for a true diversity of political discourse, unique opportunities for cultural development, and myriad avenues for intellectual activity[,]" and recognizing that "[t]he specter of tort liability in an area of such prolific speech would have an obvious chilling effect." 47 U.S.C. § 230(b)(2), (3), (5). "Congress considered the weight of the speech interests implicated and chose to immunize service providers to avoid any . . . restrictive effect [on online speech]." *Zeran*, 129 F.3d at 331.

Indeed, in countries without the protection provided by Section 230, intermediaries have been held liable for speech posted by others, resulting in the strict monitoring and censoring of user content. For example, in 2009, the South Korea Supreme Court issued a decision holding various online intermediaries, including Yahoo! Korea, liable for defamation when user postings on those sites accused the plaintiff of deserting a pregnant girlfriend.[9] The court found that intermediaries could be held liable not only when a plaintiff specifically requested the takedown of specific content, but even without any notification if "it was apparently clear that the provider could have been aware of that content." *See* Kyung-Sin Park, Korea University Law School, *Intermediary Liability - Not Just Backward but Going Back*.[10] The decision set up a strict intermediary liability regime that imposed liability for "unknown but could-have-known" content, incentivizing intermediaries to monitor their sites and delete or block offending posts, even without a request from the post's subject—"a general monitoring obligation that kills the

---

[9] Supreme Court en banc Decision 2008Da53812 (Apr. 16, 2009), *available at* https://cyberlaw.stanford.edu/page/wilmap-south-korea.

[10] *Available at* http://opennetkorea.org/en/wp/main-free-speech/intermediary-liability-korea-2014?ckattempt=1This paper has been made part of Harvard University Berkman Center's publication, "Governance of Online Intermediaries: Observations from a Series of National Case Studies."

- 6 -

Case No. 16-cv-03615   *AMICUS CURIAE* BRIEF OF ELECTRONIC FRONTIER FOUNDATION ET AL.
IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

power of the Internet." *Id. See also* Anupam Chander, *How Law Made Silicon Valley*, 63 Emory L.J. 639, 674 (2014) ("Critics worried that the decision would chill speech, causing websites to delete user posts to preclude liability").

Similarly, in 2015, the European Court of Human Rights upheld a judgment holding an Estonian Internet news website liable for offensive comments posted online by its readers, even when the comments were removed upon request, finding that imposing such liability did not violate Article 10 of the European Convention on Human Rights' freedom of speech guarantee.[11] In addition to encouraging Estonian news portals to shut down their comments sections[12]—thereby closing off a platform for user speech—the decision has also raised concerns of potential consequences on freedom of speech across the European Union.[13]

### III. SECTION 23 PREVENTS INTERMEDIARIES FROM BEING FORCED TO SERVE AS ENFORCEMENT ARMS OF LOCAL GOVERNMENTS.

When Section 230 is applied against governmental regulation, as opposed to a private plaintiff's cause of action, another objective of the statute is apparent: Section 230 immunity empowers intermediaries to resist being enlisted as extensions of local law enforcement for the purpose of regulating online content.[14] Section 230 thus provides assurances to speakers that speech on those platforms is not being monitored at the behest of the government. Without such assurances, the speakers perhaps most in need of the communications platform the Internet provides, such as those in disadvantaged communities espousing unpopular views, would be

---

[11] *Delfi AS v. Estonia* [GC], App. No. 64569/09 (Eur. Ct. H.R. Jun. 16, 2015), *available at* http://hudoc.echr.coe.int/eng?i=001-155105. *See also* Colombia University, Global Freedom of Expression, *Delfi AS v.* Estonia, https://globalfreedomofexpression.columbia.edu/cases/delfi-as-v-estonia/.
[12] Article 19, *European Court strikes serious blow to free speech online* (Oct. 14, 2013) https://www.article19.org/resources.php/resource/37287/en/european-court-strikes-serious-blow-to-free-speech-online.
[13] *See, e.g.*, Jennifer Garnett, *European Court Finds Liability for Defamatory Comments by Anonymous Users*, HARV. J.L. & TECH. DIG. (Oct. 19, 2013), http://jolt.law.harvard.edu/digest/jurisdiction/international-decisions/european-court-finds-liability-for-defamatory-comments-by-anonymous-users; Glyn Moody, *Shock European court decision: Websites are liable for users' comments* (Jun. 16, 2015), http://arstechnica.co.uk/tech-policy/2015/06/shock-european-court-decision-websites-are-liable-for-users-comments/.
[14] Indeed, this seems to be exactly what San Francisco is trying to accomplish. As Supervisor David Campos stated: "it is only fair that Airbnb and others help us enforce the law." ECF No. 51-14 at 2.

- 7 -

Case No. 16-cv-03615    *AMICUS CURIAE* BRIEF OF ELECTRONIC FRONTIER FOUNDATION ET AL.
IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

chilled from speaking.

And by providing intermediaries with a shield from governmental regulation, Section 230 also provides the public with assurances that the government has not manipulated the content they view on Internet platforms. Governments too are thus denied a heckler's veto and cannot demand that platforms take down content they deem offensive.

## IV. THE PUBLIC'S INTEREST IS NOT DIMINISHED WHEN A LAW RESTRICTS ONLY THE COMMERCIAL ASPECTS OF AN INTERMEDIARY.

The fact that the intermediary activity that is regulated has a commercial purpose (either for the content creator or the intermediary or both) does not diminish the public interest concerns.

Nonprofit organizations and grassroots campaigns frequently use the Internet to raise funds for their causes and have a strong interest in ensuring that platforms that allow them to do so remain widely available and not subject to burdensome regulation. These may include platforms dedicated to nonprofit fundraising, such as GoFundMe.com or Crowdrise.com, or general purpose sales platforms such as eBay.[15] Indeed, an interpretation of Section 230 that separated payment processing-related features from the publication features of an intermediary platform would provide state and local governments with an easy path for choking off fundraising by the very grassroots watchdogs that routinely criticize those same governments.

Public interest organizations also use intermediaries, such as Shopify.com, for direct sales of their own products or services.

And the public interest is certainly benefitted from the existence of sales platforms that allow for self-publishing and the continued dissemination of out-of-print or disfavored writings that do not fit within conventional publishing models.

Lastly, as the Supreme Court has repeatedly acknowledged, speech intertwined within commercial transactions plays an important role in informing public debate. Indeed, it is "error to

---

[15] *See, e.g.,* "Charitable authors brandish literary license, auction off rights to name book characters, places," *San Francisco Chronicle* (Sept. 22, 2005) <*available at* http://www.sfgate.com/news/article/Charitable-authors-brandish-literary-license-2567928.php> (nonprofit uses eBay to conduct character name auction fundraiser).

1 | assume that commercial speech . . . was without value to the marketplace of ideas." *44*
2 | *Liquormart v. Rhode Island*, 517 U.S. 484, 495-96 (1996).

### CONCLUSION

For the above-stated reasons, this Court should find that Section 230 prohibits the restrictions imposed on the intermediaries by the San Francisco ordinance.

DATED:  September 9, 2016          Respectfully submitted,

By:  ___/s/ David Greene_____

David Greene
ELECTRONIC FRONTIER FOUNDATION
815 Eddy Street
San Francisco, CA  94109
Telephone: (415) 436-9333
Facsimile: (415) 436-9993

*Attorneys for Amici Curiae*
Electronic Frontier Foundation, Center For Democracy and Technology, Daphne Keller, Eric Goldman and Eugene Volokh

- 9 -

Case No. 16-cv-03615    *Amicus Curiae* Brief of Electronic Frontier Foundation et al.
in Support of Plaintiffs' Motion for Preliminary Injunction