1  DENNIS J. HERRERA, State Bar #139669
   City Attorney
2  JAMES M. EMERY, State Bar #153630
   ROBB W. KAPLA, State Bar #238896
3  SARA J. EISENBERG, State Bar #269303
   Deputy City Attorneys
4  City Hall, Room 234
   1 Dr. Carlton B. Goodlett Place
5  San Francisco, California 94102-4602
   Telephone:     (415) 554-4628
6  Facsimile:      (415) 554-4757
   E-Mail:        jim.emery @sfgov.org
7
8  Attorneys for Defendant
   CITY AND COUNTY OF SAN FRANCISCO
9

10                    UNITED STATES DISTRICT COURT

11                  NORTHERN DISTRICT OF CALIFORNIA

12

13  AIRBNB, INC.,                        Case No. 3:16-cv-03615-JD

14         Plaintiff,                    **SAN FRANCISCO'S MEMORANDUM OF
                                         POINTS AND AUTHORITIES IN**
15  HOMEAWAY.COM, INC.,                  **OPPOSITION TO PLAINTIFFS' MOTION
                                         FOR PRELIMINARY INJUNCTION**
16         Plaintiff-Intervenor,
                                         Hearing Date:    October 6, 2016
17               vs.                     Time:            10:00a.m.
                                         Place:           Courtroom 11
18  CITY AND COUNTY OF SAN
    FRANCISCO,                           Trial Date:      Not set
19
           Defendant.
20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................................ ii

INTRODUCTION .......................................................................................................................1

BACKGROUND ........................................................................................................................2

ARGUMENT ..............................................................................................................................5

I.      The Communications Decency Act Does Not Preempt San Francisco's
Ordinance. ..............................................................................................................5

        A.     Binding Ninth Circuit Precedent Establishes That the CDA Does Not
Preempt San Francisco's Ordinance, Since the Ordinance Does Not Seek
to Impose Liability on Websites as a "Publisher or Speaker" Of Third-
Party Content. ...............................................................................................6

        B.     Airbnb's and Homeaway's Contrary Arguments Fail. .............................11

              1.     The Ordinance Does Not Impose Liability On Hosting Platforms
For Third-Party Transactions. .......................................................12

              2.     The Ordinance Does Not Impose Liability On Hosting Platforms
For Revenue From Publishing Activities. ......................................14

              3.     The Ordinance Does Not Require Hosting Platforms To Monitor
The Content Of Listings. ...............................................................14

II.     San Francisco's Ordinance Comports with the First Amendment. .......................16

        A.     The First Amendment Does Not Apply, Because San Francisco's
Ordinance is Directed to Conduct, not Speech. .........................................16

        B.     Any Speech That The Ordinance May Burden Is Only Illegal and
Misleading Speech, Which Does Not Receive First Amendment
Protection. ...................................................................................................18

        C.     In Any Event, San Francisco's Ordinance Is Narrowly Tailored to Serve
a Substantial Government Interest. ............................................................20

        D.     The Ordinance Does Not Impose Strict Liability On Hosting Platforms
For Speech. ..................................................................................................24

III.    Airbnb and Homeaway Have Failed To Demonstrate Irreparable Harm, and the
Balance of Hardships Favors Enforcement of the Ordinance. ..............................26

IV.    The Court Should Require A Bond As A Condition For Any Injunction. ............28

CONCLUSION .........................................................................................................................29

## <u>TABLE OF AUTHORITIES</u>

**Federal Cases**

*800-JR Cigar, Inc. v. GoTo.com, Inc.*
  437 F. Supp. 2d 273 (D.N.J. 2006) ........................................................................................11

*Almeida v. Amazon.com, Inc.*
  2004 WL 49100036 (S.D. Fla. July 30, 2004)........................................................................14

*Anthony v. Yahoo! Inc.*
  421 F. Supp. 2d 1257 (N.D. Cal. 2006) .............................................................................9, 11

*Backpage.com, LLC v. Cooper*
   939 F. Supp. 2d 805 (M. D. Tenn. 2013)...........................................................11, 14, 15, 24

*Backpage.com, LLC v. McKenna*
  881 F. Supp. 2d 1262 (W.D. Wash. 2012) ......................................................................15, 18

*Bar v. Went For It, Inc.*
  515 U.S. 618, 632 (1995)........................................................................................................20

*Barnes v. Yahoo!, Inc.*
  570 F.3d 1096 (9th Cir. 2009) .........................................................................6, 7, 8, 10, 11

*Bartnicki v. Vopper*
  532 U.S. 514 (2001)................................................................................................................22

*Board of Trustees of the State Univ. of N.Y. v. Fox*
  492 U.S. 469 (1989)................................................................................................................20

*Boelter v. Hearst Comm., Inc.*
  __ F. Supp. 3d __, 2016 WL 3369541 (S.D.N.Y. June 17, 2016) .................................21

*California Outdoor Equity Partners v. City of Corona*
  2015 WL 4163346 (C.D. Cal. July 9, 2015) ..........................................................................21

*Central Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n*
   447 U.S. 557 (1980)..................................................................................................19, 20, 21

*Citizens for Free Speech, L.L.C. v. Cnty. of Alameda*
  114 F.Supp.3d 952 (N.D. Cal. 2015) .....................................................................................21

*City of Chicago, Illinois v. Stubhub!, Inc.*
  624 F.3d 363 (7th Cir. 2010) ...........................................................................................10, 11

*Contest Promotions, LLC v. City & Cty. of San Francisco*
  2015 WL 4571564 (N.D. Cal. July 28, 2015) ........................................................................21

*Corbis Corp. v. Amazon.com, Inc.*
  351 F. Supp. 2d 1090 (W.D. Wash. 2004)..............................................................................14

*CTIA-The Wireless Ass'n v. City of Berkeley*
   2015 WL 5569072 (N.D.Cal. Sept. 21, 2015) ................................................21

*Dana's R.R. Supply v. Attorney Gen., Florida*
   807 F.3d 1235 (11th Cir. 2015) ................................................20

*DISH Network Corp. v. FCC*
   653 F.3d 771 (9th Cir.2011) ................................................5

*Doe v. Factfinder Network, Inc.*
   540 F. Supp. 2d 288 (D.N.H. 2008)................................................15

*Doe v. Internet Brands, Inc.*
   824 F.3d 846 (9th Cir. 2016) ................................................6, 8, 11, 15

*Fair Hous. Council of San Fernando Valley v. Roommates.Com, LLC*
   521 F.3d 1157 (9th Cir. 2008) ................................................6, 7, 8, 10, 11

*Fields v. Twitter*, Inc.
   2016 WL 4205687 (N.D. Cal. Aug. 10, 2016) ................................................15

*Flytenow, Inc. v. FAA*
    808 F.3d 882 (D.C. Cir. 2015) ................................................19

*Free Speech Coalition, Inc. v. Attorney General*
   825 F.3d 149 (3d Cir. 2016) ................................................18

*Gametech Int'l, Inc. v. Trend Gaming Sys., L.L.C*
   2005 WL 1473982 (D. Ariz. June 21, 2005) ................................................29

*Geft Outdoor LLC v. Consolidated City of Indianapolis and County of Marion, Ind.*
   __ F. Supp. 3d __, 2016 WL 2941329 at *10 (S.D. Ind. May 20, 2016)................................................21

*Gibson v. Craigslist, Inc.*
   2009 WL 1704355 (S.D.N.Y. June 15, 2009) ................................................14

*Goddard v. Google, Inc.*
   2008 WL 5245490 (N.D. Cal. Dec. 17, 2008) ................................................14

*Greater New Orleans Broadcasting Ass'n, Inc. v. United States*
   527 U.S. 173 (1999)................................................20

*Hinton v. Amazon.com.dedc, LLC*
    72 F.Supp. 3d 685 (S.D. Miss. 2014) ................................................14

*Hoffman Estates v. Flipside, Hoffman Estates, Inc.*
   455 U.S. 489 (1982)................................................26

*Holder v. Humanitarian Law Project*
   561 U.S. 1 (2010)................................................26

*Hunt v. City of Los Angeles*
  638 F.3d 703 (9th Cir. 2011) ...........................................................................26

*Hustler Magazine, Inc. v. Falwell*
  485 U.S. 46 (1988)...........................................................................................24

*Inman v. Technicolor USA, Inc.*
  2011 WL 5829024 (W.D. Pa. Nov. 18, 2011) ................................................13

*Klein v. City of San Clemente*
  584 F.3d 1196 (9th Cir.2009) ............................................................................5

*Lone Star Security & Video, Inc. v. City of Los Angeles*
  __ F.3d __, 2016 WL 3632375 (9th Cir. July 7, 2016).................................20

*Metro Lights, L.L.C. v. City of Los Angeles*,
  551 F.3d 898 (9th Cir. 2009).....................................................................20, 23

*New York v. Ferber*
  458 U.S. 747 (1982)..........................................................................................24

*Nunes v. Twitter*
  __ F. Supp. 3d __, 2016 WL 3660526  (N.D. Cal. July 1, 2016) ............10, 11

*Peterson v. Village of Downers Grove*
  150 F.Supp.3d 910 (N.D. Ill. 2015) ................................................................20

*Pittsburgh Press Co. v. Pittsburgh Comm'n on Human Relations*
  413 U.S. 376 (1973)..........................................................................................19

*RCP Publ'ns, Inc. v. City of Chicago*
  __ F. Supp. 3d __, 2016 WL 4593830 (N.D. Ill. Sept. 2, 2016).....................21

*Reed v. Town of Gilbert*
  135 S.Ct. 2218 (2015).......................................................................................20

*Retail Digital Network, LLC v. Appelsmith*
  810 F.3d 638 (9th Cir. 2016) ...........................................................................19

*Rosetta Stone Ltd. v. Google Inc.*
  732 F. Supp. 2d 628 (E.D. Va. 2010) ....................................................7, 8, 14

*San Francisco Apt. Ass'n v. City & Cty. of San Francisco*
  142 F.Supp.3d 910 (N.D. Cal. 2015)...............................................................21

*Senate Permanent Subcomm. v. Ferrer*
  __ F. Supp. 3d __, 2016 WL 4179289 (D.D.C. Aug. 5, 2016)........................19

*Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.*
  502 U.S. 105 (1991)....................................................................................16, 17

*Smith v. California*
361 U.S. 147 (1959) ..................................................................................................24

*Sorrell v. IMS Health*
564 U.S. 552 (2011) ................................................................................16, 17, 19, 21

*Stormans, Inc. v. Selecky*
586 F.3d 1109 (9th Cir.2009) ...................................................................................5

*Thalheimer v. City of San Diego*
645 F.3d 1109 (9th Cir. 2011) ..................................................................................5

*Thompson v. Western States Medical Center*
535 U.S. 357 (2002) ..................................................................................................24

*U.S. v. Ford*
821 F.3d 63 (1st Cir. 2016) .......................................................................................25

*United States v. Nat'l Treasury Emps. Union*
513 U.S. 454 (1995) ............................................................................................16, 17

*United States v. Williams*
553 U.S. 285 (2008) ..................................................................................................19

*United States v. X-Citement Video, Inc.*
513 U.S. 64 (1994) ....................................................................................................24

*Valle Del Sol Inc. v. Whiting*
709 F.3d 808 (9th Cir. 2013) ..............................................................................22, 23

*Village of Schaumburg v. Citizens for a Better Env't*
444 U.S. 620 (1980) ..................................................................................................22

*Vivid Entm't, LLC v. Fielding*
774 F.3d 566 (9th Cir. 2014) .....................................................................................5

*Yniguez v. Arizonans for Official English*
42 F.3d 1217 (9th Cir. 1994) ....................................................................................24

**State Cases**

*Gentry v. eBay, Inc.*
99 Cal. App. 4th 816 (2002) .....................................................................................13

*Hill v. StubHub, Inc.*
727 S.E.2d 550 (N.C. App. 2012) ............................................................................12

*J.S. v. Village Voice*
184 Wash. 2d 95 (2005) ............................................................................................11

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*Lamar Central Outdoor, LLC v. City of Los Angeles*
   245 Cal.App.4th 610 (2016) ................................................................19

*Stoner v. eBay*
   2000 WL 1705637 (Cal. Super. Ct. Nov. 1, 2000)...........................12, 15

**Federal Statutes**

47 United States Code
   Section 230(c)(1) ...........................................................................6, 11

Federal Rule of Civil Procedure
   Section 65(c) ......................................................................................28

**San Francisco Codes**

San Francisco Administrative Code
   Section 41A...............................................................................2, 4, 21
   Section 41A.5(g)(4)(C) .......................................................................5, 16

**Other References**

*Fair Housing Council of San Fernando Valley v. Roommates.com.*"); Patricia Spiccia,
   *The Best Things in Life Are Not Free: Why Immunity Under Section 230 of the*
   *Communications Decency Act Should Be Earned and Not Freely Given,*
   48 Val. U. L. Rev. 369  (2013) ...........................................................6

Ryan Gerdes, *Scaling Back S 230 Immunity: Why the Communications Decency Act Should*
   *Take A Page from the Digital Millennium Copyright Act's Service Provider Immunity*
   *Playbook,* 60 Drake L. Rev. 653, 664 (2012 ......................................6

1

**INTRODUCTION**

2      Airbnb and Homeaway attempt to stretch both the Communications Decency Act (CDA) and

3   the First Amendment beyond all reasonable bounds. They assert, essentially, that because their

4   business is online, they are immune from any regulation of their commercial transactions.

5      The CDA protects online service providers from liability as publishers or speakers of content

6   provided by third parties. Under the CDA, Airbnb and Homeaway cannot be held liable for what

7   individual hosts upload to their websites. San Francisco's Short Term Residential Rental Ordinance

8   (the Ordinance) does not impose liability on a Hosting Platform based on content provided by third

9   party hosts. To the contrary, San Francisco holds a Hosting Platform responsible only if and when it

10  (1) provides booking services for an illegal short-term rental with an unregistered host; and (2)

11  receives a fee for those booking services. Since San Francisco's Ordinance does not impose liability

12  for third party content, the CDA does not apply.

13     For these same reasons, San Francisco's Ordinance does not implicate First Amendment

14  interests. Because the Ordinance prohibits a Hosting Platform from providing booking services and

15  receiving a fee for an illegal short-term rental, the Ordinance regulates only conduct (an unlawful

16  commercial transaction), not speech. The Ordinance imposes no burden on any protected speech or

17  expression.

18     The balance of hardships weighs further against an injunction. It is simple enough for Airbnb

19  and Homeaway to verify whether their San Francisco hosts have registered with the City. They could

20  simply require hosts to provide them an image of their City-issued registration certificate. Uber

21  requires every new driver to provide an image of his or her driver's licenses before Uber allows the

22  new driver to pick up any passengers. Airbnb's newly minted non-discrimination policy further

23  demonstrates it has the ability to require host verification, when it wants to. Preserving Airbnb's $30

24  billion business valuation, which is based on profits from illegal host transactions, is not a legitimate

25  interest when balanced against San Francisco's urgent need: (1) to preserve scarce housing stock, (2)

26  to reduce the incentive of landlords to evict existing tenants or hold apartments off the long-term

27  market, and (3) to preserve the quality of life and character of its residential neighborhoods.

28

For these reasons, set forth more fully below, the Court should deny Airbnb's and Homeaway's preliminary injunction motion.

## BACKGROUND

In 1981, San Francisco enacted Chapter 41A of its Administrative Code, which implemented a permanent ban on conversion of residential apartments to tourist or transient use. The legislative purpose of the 1981 ban on apartment conversions was "to benefit the general public by minimizing adverse impacts on the housing supply and on persons and households of all income levels resulting from the loss of apartment units through their conversion to tourist and transient use." Legislative findings supporting the 1981 ban included:

> (a) There is a severe shortage of decent, safe, sanitary and affordable rental housing in the City and County of San Francisco.
>
> * * *
>
> (d) As a result of the removal of apartment units from the rental housing market, a housing emergency exists within the City and County of San Francisco for its elderly, disabled and low-income households.
>
> * * *
>
> (g) It is in the public interest that conversion of apartment units be regulated and that remedies be provided when unlawful conversion has occurred, in order to protect the resident tenants and to conserve the limited housing resources.

Emery Decl., Exh. A.

This 1981 ban remained in effect until 2015.[1]  In 2015, Ordinance 218-14 went into effect, which "provide[d] an exception for permanent residents to the prohibition on short-term residential rentals under certain conditions." Specifically, Ordinance 218-14 authorized permanent residents of San Francisco to register their primary residence for short-term rentals. Short term rental hosts are required to actually occupy the short-term rental unit at least 275 days out of the year, thereby limiting "unhosted" short-term rentals to 90 days per year. In addition, short-term rental hosts whose primary residence is subject to rent control are prohibited from charging more for short-term rentals than the short-term rental host pays in rent to his or her landlord. Guy Decl., Exh. A. Legislative findings

---

[1]  Before 2015, the 1981 ban was amended once, in 2012, and strengthened. Emery Decl., Exh. B.

explained the careful balance between the need to preserve permanent housing, and to desire to accommodate the "sharing" economy.

> (1) The widespread conversion of residential housing to short-term rentals, commonly referred to as hotelization, was prohibited by this Board because, when taken to extremes, these conversions could result in the loss of housing for permanent residents. But, with the advent of new technology, the rise of the sharing economy, and the economic and social benefits to residents of sharing resources, short-term rental activity continued to proliferate. This has not only led the City to strengthen enforcement of short-term rental laws, but also prompted an examination of parameters to regulate short-term rentals and create a pathway to legalize this activity. The goal of regulation is to ensure compliance with all requirements of the Municipal Code, including but not limited to the Business and Tax Regulations Code and the Residential Rent Stabilization and Arbitration Ordinance, and accountability for neighborhood quality of life.

> (2) The exception created here for permanent residents would allow for reasonable flexibility in renting residential spaces on an occasional basis; however, this exception is only intended for residents who meet the definition of permanent resident so that these units remain truly residential in use. Thus, the exception is only for primary residences in which permanent residents are present for a significant majority of the calendar year.

*Id.*

San Francisco's cautious approach to short-term rentals is well founded. San Francisco's continuing housing affordability crisis is "among the worst in the nation." Guy Decl., Exh. B, at p. 4. Any decrease in the available housing stock "puts an upward pressure on price." *Id.* at pp. 4-5. The higher rates available through short-term rentals inflate both rents and housing prices, and create an incentive for landlords to evict rent controlled residential tenants. *Id.* at p. 5. San Francisco's Budget Analyst estimated that commercial short-term rentals remove about 15% of the total rental housing available for rent across San Francisco, "and private and shared rooms that might otherwise be occupied by roommates take even more units off the rental market." Guy Decl., Exh. C, at p. 11; see also *id.* at pp. 24-25. Short-term rentals also have a negative impact on quality of life in residential neighborhoods, increasing late night noise, parking problems, and introducing safety and security concerns. Guy Decl., Exh. B, at pp. 5-6 & Exh. C, at p. 11.

Later in 2015, San Francisco enacted further amendments to Chapter 41A, creating the Office of Short-Term Residential Rental Administration and Enforcement (OSTR), and requiring notice of

short-term rental registration applications to be mailed to all occupants and owners within 300 feet of the proposed short-term rental.  Guy Decl., Exh. D.

Compliance levels with San Francisco's short-term rental ordinance have been disappointing. As of November 2015, OSTR had received only 1,082 registration applications from short-term rental hosts.  The applicants represent only 20% of the 5,378 unique Airbnb hosts listed in San Francisco as of November 2015.  By March 2016, OSTR had received 1,647 applications, representing less than 25% of the 7,046 unique Airbnb hosts in San Francisco on that date.  Blavin Decl., Exh. G, at p. 14.[2] More than 25% of unhosted short-term rentals exceed the 90-day cap.  *Id.* at p. 15.  Enforcement of San Francisco's short-term rental laws is "hampered by the City's lack of information about the location and number of bookings for each short-term rental listing."  *Id.* at p. 7.  "Airbnb previously included a field for entering a short-term rental registration number on each listing.  However, that field is no longer available on the Airbnb website for hosts to include this pertinent information."  *Id.* at p. 16.  The Budget Analyst concluded that enforcement of San Francisco's short-term rental regulations would lead many commercial hosts to return their short-term rentals to the long-term residential market.  Guy Decl., Exh C, at p. 33.

In June 2016, faced with the adverse consequences of large-scale noncompliance with its short-term rental ordinance, San Francisco enacted Ordinance 104-16.  Blavin Decl., Exh. A.  Among other amendments to Chapter 41A, Ordinance 104-16 imposed duties on Hosting Platforms before they were allowed to post a short-term rental listing, required Hosting Platforms to ensure that all rental listings included the host's short-term rental registration number, and imposed periodic affirmative reporting requirements on Hosting Platforms.  *Id.*

After Airbnb and Homeaway commenced this action, San Francisco reviewed the challenged legislation, and made further amendments.  Ordinance 178-16, enacted in August 2016, removed all

---

[2]  Since Airbnb is only one of several Hosting Platforms operating in San Francisco, the calculated compliance rates are overstated.

The City's Budget Analyst attributed the uptick in registration applications between November 2015 and March 2016 to several factors.  In late 2015, the Treasurer & Tax Collector sent notifications to short-term rental hosts advising hosts they must obtain a business registration certificate. Proposition F, on the November 2015 ballot, may have spurred increased compliance.  New hosts may have listed in anticipation of the Super Bowl.  OSTR undertook several public awareness initiatives. Blavin Decl., Exh. G, at pp. 17-18.

requirements for Hosting Platforms before they publish a host listing, removed any liability for

Hosting Platforms based on the content of any host listings, and eliminated the requirement that

Hosting Platforms periodically provide host information to the City.  Emery Decl. Exh. C.  As

amended, SF Admin. Code § 41A.5(g)(4)(C) now provides:

> Hosting Platform may provide, and collect a fee for, Booking Services in
> connection with short-term rentals for Residential Units located in the City and
> County of San Francisco only when those Residential Units are lawfully
> registered on the Short Term Residential Rental Registry at the time the
> Residential Unit is rented for short-term rental.

*Id.*  Instead of requiring Hosting Platforms to provide to the City information about individual hosts,

the Ordinance now requires Hosting Platforms to verify monthly their compliance with subsection

(g)(4)(C), and to maintain records sufficient to demonstrate compliance.  *Id.*

    With their preliminary injunction motion, Airbnb and Homeaway now seek to enjoin

enforcement of San Francisco's requirement that they refrain from providing booking services and

collecting fees for illegal short-term rentals with unregistered hosts.

### ARGUMENT

    San Francisco largely agrees with Airbnb's and Homeaway's statement of the standards for a

preliminary injunction, with one addendum.  (See Ps' MPA, at p. 9 [Dkt # 50].)  "But even if the

plaintiff demonstrates likely success on the merits [of a First Amendment claim], the plaintiff still

must demonstrate irreparable injury, a favorable balance of equities, and the tipping of the public

interest in favor of an injunction."  *Vivid Entm't, LLC v. Fielding*, 774 F.3d 566, 577 (9th Cir. 2014)

(citing *Thalheimer v. City of San Diego*, 645 F.3d 1109, 1128 (9th Cir. 2011)).  Accord *DISH Network

Corp. v. FCC*, 653 F.3d 771, 776 (9th Cir.2011); *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1138 (9th

Cir.2009); *Klein v. City of San Clemente*, 584 F.3d 1196, 1207 (9th Cir.2009).

### I.   The Communications Decency Act Does Not Preempt San Francisco's Ordinance.

    Airbnb and Homeaway first argue the Ordinance violates the CDA.  (Ps' MPA, at pp. 10-20.)

Not so.  Contrary to Airbnb's and Homeaway's assertions, the Ordinance is quite modest in scope and

does not make Hosting Platforms responsible for the content of any short-term rental listings or for

any third-party content at all.  Hosting Platforms can post whatever listings they choose – whether or

not the unit is registered with the City – without any risk of liability.  The ***only*** thing the Ordinance

prevents Hosting Platforms from doing is engaging in a direct transaction in which the Hosting Platform provides booking services for an illegal short-term rental with an unregistered host and receives a fee for booking that illegal transaction.  Under binding Ninth Circuit case law, the Ordinance is entirely consistent with the CDA.

**A.  Binding Ninth Circuit Precedent Establishes That the CDA Does Not Preempt San Francisco's Ordinance, Since the Ordinance Does Not Seek to Impose Liability on Websites as a "Publisher or Speaker" Of Third-Party Content.**

The parties agree that under Section 230 of the CDA, (1) an "interactive computer service" provider is not liable (2) as a "publisher or speaker" of information (3) if the information is "provided by another information content provider." 47 U.S.C. § 230(c)(1); *see also Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1100-01 (9th Cir. 2009).  The City does not dispute that some courts have construed this provision quite broadly.  But the Ninth Circuit (and other courts) has interpreted and applied the CDA significantly more narrowly.  *See generally Doe v. Internet Brands, Inc.*, 824 F.3d 846, 853 (9th Cir. 2016) (noting the CDA's "narrow language," and explaining that "we must be careful not to exceed the scope of the immunity provided by Congress.  Congress could have written the statute more broadly, but it did not.") (internal quotation marks and citations omitted).[3]

Recognizing that "[t]he Communications Decency Act was not meant to create a lawless no-man's-land on the Internet," *Fair Hous. Council of San Fernando Valley v. Roommates.Com, LLC*, 521 F.3d 1157, 1164 (9th Cir. 2008), the Ninth Circuit has imposed clear common-sense boundaries on the scope of CDA protection.  As relevant here, the Ninth Circuit has interpreted and applied the second prong of the above-noted test narrowly – carefully circumscribing when a website will be considered to be acting as a "publisher," and allowing websites to be held liable for actions undertaken

---

[3] Numerous commentators have noted that the Ninth Circuit interprets section 230 more narrowly than some other courts. *See, e.g.*, Ryan Gerdes, *Scaling Back § 230 Immunity: Why the Communications Decency Act Should Take A Page from the Digital Millennium Copyright Act's Service Provider Immunity Playbook*, 60 Drake L. Rev. 653, 664 (2012) ("[S]everal courts have recently applied § 230 immunity more narrowly. . . . One such court was the Ninth Circuit in *Fair Housing Council of San Fernando Valley v. Roommates.com*."); Patricia Spiccia, *The Best Things in Life Are Not Free: Why Immunity Under Section 230 of the Communications Decency Act Should Be Earned and Not Freely Given*, 48 Val. U. L. Rev. 369, 393 (2013) (stating that "[a]lthough most courts have construed section 230 of the CDA very broadly, there have been some cases in which courts have raised concerns and attempted to rein in section 230's immunity" and citing, *inter alia*, *Roommates.com*).

outside of that role.

In *Roommates.com*, the Ninth Circuit analyzed a discrimination claim against a website whose purpose was to assist apartment dwellers to find prospective occupants for a spare room. *Roommates.com*, 521 F.3d at 1161.  Subscribers were required to create a profile before using the service, and the profiles required subscribers to divulge—by selecting a response from a list of answers provided by the website—their "sex, sexual orientation, and whether [they] would bring children to a household."  *Id.*  Fair housing councils alleged the website violated the federal Fair Housing Act.  In an *en banc* decision, the Ninth Circuit held Roommates.com could ***not*** claim a defense under the CDA, and also made clear that a website may be held liable for its direct violation of the law.  As the court succinctly explained, "a real estate broker may not inquire as to the race of a prospective buyer, and an employer may not inquire as to the religion of a prospective employee.  If such questions are unlawful when posed face-to-face or by telephone, they don't magically become lawful when asked electronically online."  *Id.* at 1164.

A year later in *Barnes v. Yahoo!*, the Ninth Circuit fleshed out the "publisher or speaker" requirement in further detail.  In *Barnes,* the plaintiff's former boyfriend posted nude photographs of the plaintiff on Yahoo's social media website without her permission, along with open solicitations to engage in sexual intercourse.  570 F.3d at 1098.  Barnes received numerous advances from unknown men in response to this profile and contacted Yahoo to have the profile removed.  *Id.*  Yahoo did not remove the profile, and Barnes sued, alleging both the tort of negligent undertaking for Yahoo's failure to remove the photographs and promissory estoppel for breach of its promise to do so.  *Id.* at 1099.  Barnes could state a viable claim under the CDA if her theory of liability did not "treat defendant as a publisher or speaker of third-party content."  *Id.* at 1101.  The court concluded that "a publisher reviews material submitted for publication, perhaps edits it for style or technical fluency, and then decides whether to publish it."  *Id.* at 1102; *see also id.* ("[P]ublication involves reviewing, editing, and deciding whether to publish or to withdraw from publication third-party content.") (citing *Roommates.com*, 521 F.3d at 1170-71).  Applying this test to Barnes's claims, the court affirmed dismissal of her tort claim, finding that "the duty that Barnes claims Yahoo violated derives from Yahoo's conduct as a publisher—the steps it allegedly took, but later supposedly abandoned, to de-

publish the offensive profiles." *Id.* at 1103.  But the court reinstated her promissory estoppel claim because "liability [on that claim] would not come from Yahoo's publishing conduct," but from its breach of a promise. *Id.* at 1107.  Even though the promise breached was a promise to remove material from its website, the court concluded this was sufficiently distinct from the website's publishing activities to fall outside the scope of the CDA.

Just this year, the Ninth Circuit once again confirmed that a website operator cannot invoke the CDA when it engages in non-publishing conduct.  *Doe v. Internet Brands, Inc.*, 824 F.3d 846 (9th Cir. 2016).  The plaintiff in *Internet Brands* alleged the owner of a networking website for people in the modeling industry knew that two of the site's users had been engaging in a scheme to lure, drug, and rape women by responding to postings on the site, and that the owner had tortiously failed to warn her about the risk of being victimized. *Id.* at 848.  Once again, the Ninth Circuit explained that the essential question was whether the claim sought to treat the defendant as a speaker or publisher of third-party content.  The court held that it did not because "[t]he duty to warn allegedly imposed by California law would not require Internet Brands to remove any user content or otherwise affect how it publishes or monitors such content." *Id.* at 851.[4]

As these cases makes clear, the CDA does not provide blanket immunity to websites.  Acts that would otherwise be illegal do not "magically become lawful" simply because they occur online. *Roommates.com*, 521 F.3d at 1164.  A company acts as a publisher when it reviews and edits material and decides whether to publish it.  *Barnes*, 570 F.3d at 1102.  And if a company – even one that primarily acts as a publisher and speaker of third-party content – engages in illegal conduct outside of its role as a publisher, it cannot hold the CDA up as a shield.  Such is the case here.

Hosting Platforms often perform two distinct functions.  They post listings for rental units, and they provide booking services in connection with the rental of those units.  The City does not dispute that Hosting Platforms act as publishers of third-party content when they post listings created by the Owner of a residential unit.  Accordingly, the CDA would protect Hosting Platforms from liability based on publishing third-party content describing short-term rentals for hosts who have not registered

---

[4] Counsel for Airbnb in this case was counsel for Internet Brands.  *Internet Brands*, 824 F.3d at 847 (listing counsel).

with San Francisco's Short Term Rental Registry.  But the Ordinance does not do this.  The Ordinance does not impose liability for Hosting Platforms' decisions about what to post or for the substance of listings contained on their websites.  Compliance with the law would not require them to review or vet or remove any user content.  To the contrary, a Hosting Platform can publish whatever listings it wants without violating the Ordinance, and faces potential liability *only* if and when it steps outside its role as a publisher by providing specified booking services to an unregistered host in return for a fee.  Providing payment and reservation services is not a publication function.  Thus, the Ordinance does not seek to impose liability on hosting platforms as the "publisher or speaker" of third-party content, as the Ninth Circuit has interpreted and applied that element of the CDA.

By way of analogy, assume that San Francisco were to pass a law prohibiting travel agents from receiving a fee for booking clients into a hotel that lacked a proper certificate of occupancy.[5]  There is no argument that such a law would treat travel agents as publishers.  The mere fact that Hosting Platforms, which also publish third party listings, provide this booking service online does not render their booking service "publication" and does not make it "magically" lawful.  The CDA is equally inapplicable to both the hypothetical travel agent regulation and the Ordinance at issue here.

This conclusion is bolstered by CDA opinions from other courts, including the Seventh Circuit Court of Appeals and this Court.

In *Anthony v. Yahoo! Inc.*, 421 F. Supp. 2d 1257 (N.D. Cal. 2006), a user of the defendant's online dating service sued the service provider for breach of contract, fraud, negligent misrepresentation, and unfair trade practices.  *Id.* at 1259.  He alleged, among other things, that Yahoo circulated the profiles of "actual" former subscribers whose subscriptions had expired to give the misleading impression that these individuals were still available for dates.  *Id.* at 1260.  Yahoo moved to dismiss, arguing that the CDA barred the fraud, negligent misrepresentation, and unfair trade practice claims.  *Id.* at 1262.  The court found that Yahoo was not immune under the CDA from claims that it fraudulently or negligently circulated the profiles of unavailable former subscribers because the

---

[5] This type of restriction on who an individual or company can do business with is common. For example, states often require the use of licensed contractors or electricians.

source of liability was not the content of the profiles, but Yahoo's manner of distribution.  *Id.* at 1263. The court observed that while the profiles of former members were created by third parties, the CDA "only entitles Yahoo not to be the 'publisher or speaker' of the profiles.  It does not absolve Yahoo from liability for any accompanying misrepresentations."  *Id.*  Because the user's claim was that Yahoo!'s manner of presenting the profiles – as opposed to the underlying profiles themselves – constituted fraud, the CDA did not apply.  *Id.*

In *Nunes v. Twitter*, __ F. Supp. 3d __, 2016 WL 3660526 (N.D. Cal. July 1, 2016), a consumer sued Twitter, alleging the social networking platform violated the Telephone Consumer Protection Act by sending unwanted "tweets" via text message to her cell phone.  The plaintiff's "recycled" cell phone number had previously belonged to a person who had authorized the tweets.  *Id.* at *1-*2.  Twitter argued the claim was barred by the CDA because the lawsuit sought to treat it as the "publisher" of information provided by a third party.  *Id.* at *7.  The court disagreed, providing the following helpful analysis:

> To analogize to a more traditional publishing platform, if someone delivers newspapers containing false gossip, and the person who is the subject of the gossip sues the delivery person for defamation, that lawsuit seeks to treat the delivery person as a publisher.  But if the delivery person throws an unwanted newspaper noisily at a door early in the morning, and the homeowner sues the delivery person for nuisance, that suit doesn't seek to treat the delivery person as a publisher.  The suit doesn't care whether the delivery person is throwing a newspaper or a rock, and the suit certainly doesn't care about the content of the newspaper.  It does not involve the delivery person's "reviewing, editing, and deciding whether to publish or to withdraw from publication third-party content."  *Barnes*, 570 F.3d at 1102.  Nor is the lawsuit asking a court to impose "liability arising from content."  *Roommate.com*, 521 F.3d at 1162.  It merely seeks to stop the nuisance.  The same is true of this lawsuit regarding unwanted tweets sent by text to the owners of recycled numbers.

*Id.* at *8.

And in *City of Chicago, Illinois v. Stubhub!, Inc.*, 624 F.3d 363 (7th Cir. 2010), the City of Chicago brought an action against an Internet auction site that resold tickets to entertainment events, asserting that the Internet site was responsible for the city's amusement tax on tickets.  *Id.* at 365.  The defendant argued that it was immune under the CDA, but the Seventh Circuit disagreed.  *Id.* at 366.  The court held that the CDA does not create an "immunity" of any kind but rather limits who may be called the publisher of information that appears online.  The court explained that while such

information might matter to liability for defamation, obscenity, or copyright infringement, "Chicago's amusement tax does not depend on who 'publishes' any information or is a 'speaker.'" *Id.* Accordingly, the court concluded that the CDA was "irrelevant." *Id.*; *see also Backpage.com, LLC v. Cooper*, 939 F. Supp. 2d 805, 824 n.3 (M.D. Tenn. 2013) ("In essence, the tax ordinance in [*City of Chicago v. Stubhub!*] applied to the website not for its conduct as a publisher of ticket-sale advertisements, but for its conduct as a sales agent processing ticket transactions.").

Here, as in these analogous and persuasive cases,[6] San Francisco's Ordinance does not seek to treat an interactive computer service as a publisher. As in *Anthony v. Yahoo*, the source of potential liability is not the content of any listings, but Hosting Platforms' affirmative acts outside their role as publisher. *See Anthony*, 421 F. Supp. 2d at 1263. As in *Nunes v. Twitter*, the Ordinance "does not involve the [Hosting Platform's] 'reviewing, editing, and deciding whether to publish or to withdraw from publication third-party content.' Nor is the [Ordinance seeking] to impose 'liability arising from content.'" *Nunez*, 2016 WL 3660526, at *8. And as in *City of Chicago v. StubHub*, the Ordinance applies to Hosting Platforms not for their conduct as publishers of rental listings, but for their conduct as agents or brokers in short-term rental transactions. *See City of Chicago*, 624 F.3d at 366. Accordingly, the CDA is irrelevant.

**B.  Airbnb's and Homeaway's Contrary Arguments Fail.**

Airbnb and Homeaway essentially ignore the cases discussed above. They include only passing references to *Barnes* and to *Roommates.com*, without addressing their holdings, and fail even to mention *Internet Brands* or the other pertinent cases. Instead, Airbnb and Homeaway rely primarily on (often unpublished) state court and out-of-circuit district court opinions in an attempt to support their arguments that CDA preempts the Ordinance. For the reasons explained below, these cases do not apply and cannot overcome the controlling Ninth Circuit cases of *Barnes*, *Roommates.com* and *Internet Brands*.

---

[6] *See also, e.g.*, *800-JR Cigar, Inc. v. GoTo.com, Inc.*, 437 F. Supp. 2d 273, 295 (D.N.J. 2006) ("It is not the purpose of the Act to shield entities from claims of fraud and abuse arising from their own pay-for-priority advertising business, rather than from the actions of third parties."); *J.S. v. Village Voice*, 184 Wash. 2d 95, 104-15 (2005) (en banc) (Wiggins, J., concurring).

**1.  The Ordinance Does Not Impose Liability On Hosting Platforms For Third-Party Transactions.**

Airbnb and Homeaway first argue that the Ordinance is preempted because the CDA prohibits the imposition of liability on a website for transactions among third parties.  (Ps' MPA, at pp. 12-14.) They cite several cases in which courts concluded that the CDA immunized websites for "third-party transactions that directly result[ed] from their publication of third-party listings."  (Ps' MPA, at p. 14.) But Airbnb and Homeaway duel with a strawman.  The Ordinance does not impose liability for *third-party* transactions that occur on Hosting Platforms' websites, but for the illegal transactions in which the Hosting Platforms themselves directly engage.  Accordingly, the cases Airbnb and Homeaway cite are distinguishable and their attempt to circumvent binding Ninth Circuit law fails.

Airbnb and Homeaway cite first to *Hill v. StubHub, Inc.*, 727 S.E.2d 550 (N.C. App. 2012) a North Carolina Court of Appeals case concerning online ticket scalping.  Individuals who purchased tickets from a third party using StubHub (for more than three times the face value) filed a complaint against the website alleging violations of North Carolina's anti-scalping law.  *Id.* at 552 & n.1.  There was no issue in the case or discussion in the opinion about whether the claim sought to treat StubHub as a "publisher or speaker."  Rather, to determine whether StubHub was entitled to protection under the CDA, the court analyzed whether the website "effectively control[led]" the ticket price rendering it an information content provider of the unlawful material.  The court concluded that acting as an intermediary, handling the mechanics necessary to complete the sale and charging a fee for these services did not give StubHub control over the ticket price or make the website liable for the content of the ticket listing or the third-party sale that resulted.  *Id.* at 556-563.  This conclusion – that you cannot hold a website liable *for the underlying third-party transaction* because it provides some broker services – says nothing about whether a law prohibiting StubHub from providing these services to illegal sellers would be valid.

Airbnb's and Homeaway's reliance on the California superior court's unpublished opinion in *Stoner v. eBay*, 2000 WL 1705637 (Cal. Super. Ct. Nov. 1, 2000), is similarly misplaced.  In that case, the plaintiff brought claims against eBay under California's Unfair Competition Law alleging, *inter alia*, that eBay "sells, or at a minimum, advertises and offers for sale, and causes the sale of" "bootleg

sounds recordings" and "actively promotes and enables those auctions and takes a commission on each sale." *Id.* at *1.  The court held that advertising its auction services and charging a fee for each transaction did not "transform" eBay into a seller responsible for items sold by a third party.  *Id.* at *2; *see also id.* ("Neither the escrow service nor the [payment service], however, renders eBay a seller.").  Concluding that the provision of services to a seller does not render a website the seller for purposes of imposing liability under state law is not the same as holding that the state could not—consistent with the CDA—pass a law prohibiting the website from offering those services in connection with illegal sales.

*Inman v. Technicolor USA, Inc.*, 2011 WL 5829024 (W.D. Pa. Nov. 18, 2011), is even less relevant.  In *Inman*, the plaintiff purchased vacuum tubes from Tube Zone on eBay.  *Id.* at *1.  He subsequently filed a complaint alleging that the tubes contained mercury, which gave him "acute mercury poisoning and/or toxicity."  *Id.*  Among numerous other defendants, the plaintiff sued eBay under various tort theories including breach of warranty of merchantability and negligence.  *Id.*  Although the plaintiff argued that he was attempting to hold eBay liable for its "'business transactions and the shipping and packaging of goods,'" he did "not set forth any facts demonstrating that eBay acts as anything more than an online forum where sellers such as Tube Zone may peddle their wares."  *Id.* at *6.  In short, the plaintiff was trying to impose liability on the website for simply publishing the advertisements and allowing the third party transactions to occur – not for any direct transaction by eBay.  The court's conclusion that the CDA precluded liability in those circumstances has no bearing on this case.

Not one of these cases involved a government entity's regulation of websites' direct transactions.  Not one of them meaningfully addresses the CDA's "publisher" requirement.  And not one of them alters or trumps the Ninth Circuit precedent discussed above establishing that where, as here, a law seeks to regulate an interactive computer service provider only in its role as a direct market participant, the CDA does not apply.[7]

---

[7] The remaining string-cited cases that Airbnb and Homeaway rely on are similarly inapposite in that, as Plaintiffs acknowledge (Ps' MPA, at p. 14 & n.8), they involve attempts to impose liability based on posting third-party content or allowing third-party transactions to be made on the defendant websites – not for direct transactions in which the defendants engaged.  *See Gentry v. eBay, Inc.*, 99 Cal. App. 4th 816, 831 (2002) (rejecting an attempt to hold eBay liable for violating the Autographed

**2.   The Ordinance Does Not Impose Liability On Hosting Platforms For Revenue From Publishing Activities.**

Airbnb and Homeaway next assert that the CDA prohibits regulation or imposition of liability based on a website's receipt of funds for its publishing activities, e.g., for selling online advertisements.  (Ps' MPA, at pp. 14-16.)  This is true, but irrelevant.  San Francisco's Ordinance does not regulate the receipt of funds stemming from publishing functions.  Under the Ordinance, Hosting Platforms are free to charge a fee for posting a listing (even a listing for an unregistered unit) on their websites.  What they cannot do – and *all* that they cannot do – is collect a fee for providing booking services for an unregistered unit.  Accordingly, the cases cited by Airbnb and Homeaway are inapposite.  *See Backpage.com, LLC v. Cooper*, 939 F. Supp. 2d 805 (M. D. Tenn. 2013) (concerning law prohibiting the sale of certain advertisements); *Goddard v. Google, Inc.*, 2008 WL 5245490 (N.D. Cal. Dec. 17, 2008) (unpublished) (rejecting imposition of liability based on Google's acceptance of funds from ads created by allegedly fraudulent providers of services for mobile devices); *Rosetta Stone Ltd. v. Google Inc.*, 732 F. Supp. 2d 628 (E.D. Va. 2010) (rejecting imposition of liability based on Google's acceptance of funds from the sale of "sponsored link" advertisements).

**3.   The Ordinance Does Not Require Hosting Platforms To Monitor The Content Of Listings.**

Finally, Airbnb and Homeaway contend that "states cannot impose requirements on websites to verify advertisements provided by third party users."  (Ps' MPA, at pp. 16-20.)  Once again, the Ordinance simply does not require Hosting Platforms to do this.  It is true that Hosting Platforms may, at some point, have to determine if a unit is lawfully registered – but only if and when the Hosting Platform wants to provide booking services in connection with a short-term rental of the unit.  No

---

Sports Memorabilia statute based on its "dissemination of representations made by individual [seller] defendants, or the posting of compilations of information generated by those defendants and other third parties"); *Hinton v. Amazon.com.dedc, LLC*, 72 F.Supp. 3d 685 (S.D. Miss. 2014) (rejecting a claim that sought to hold defendant liable for "permitting" a third party to advertise and sell a recalled product on its auction website); *Almeida v. Amazon.com, Inc.*, 2004 WL 49100036 (S.D. Fla. July 30, 2004) (unpublished) (plaintiff sought to hold Amazon liable for unauthorized publication of her image, which appeared on the cover of a book compiled and edited by third parties); *Corbis Corp. v. Amazon.com, Inc.*, 351 F. Supp. 2d 1090, 1117-18 (W.D. Wash. 2004) (rejecting an attempt to hold Amazon liable for copyright infringement based on allegedly infringing photographs sold by third parties on Amazon's vendor platform); *Gibson v. Craigslist, Inc.*, 2009 WL 1704355, at *4 (S.D.N.Y. June 15, 2009) (unreported) ("Plaintiff seeks to hold Defendant liable for its alleged failure to block, screen, or otherwise prevent the dissemination of a third-party's content, *i.e.*, the gun advertisement in question.").

monitoring or screening is required before an account is created or a listing is posted.  Indeed, even if a Hosting Platform determines that a listed unit is not registered, it is under no obligation to remove or alter the listing in any way.  Simply put, Hosting Platforms do not need to monitor, verify or screen third-party content.  They only need to ensure that they themselves do not engage in an illegal booking transaction with an unregistered host.  Accordingly, the cases Airbnb and Homeaway cite are inapplicable.  *See Backpage.com, LLC v. McKenna*, 881 F. Supp. 2d 1262 (W.D. Wash. 2012) (invalidating a law that sought to require websites to verify the *content of ads* posted thereon); *Cooper*, 939 F. Supp. 2d at 825 (same); *Doe v. Factfinder Network, Inc.*, 540 F. Supp. 2d 288 (D.N.H. 2008) (rejecting a claim that sought to impose liability for failure to verify the content of user profiles); *Stoner*, 2000 WL 1705637 (statement referenced by Plaintiffs that "Congress intended to remove any legal obligation of [websites] to identify or monitor the sale of [illegal] products" irrelevant since the Ordinance does not impose an obligation on Hosting Platforms to prevent or even monitor illegal short-term rentals that occur through the site); *Fields v. Twitter*, Inc., 2016 WL 4205687 (N.D. Cal. Aug. 10, 2016) (rejecting a claim that would have required Twitter to monitor and "police" who can obtain an account to post messages based on the third-party created content).

In sum, none of the arguments raised or cases cited by Airbnb and Homeaway enable them to avoid the binding Ninth Circuit precedent establishing that, because the Ordinance does not seek to treat Hosting Platforms as publishers of third-party content, the CDA simply does not apply here.[8]

---

[8]  Amici add nothing new to the CDA argument because, like Airbnb and Homeaway, they start with the incorrect assumption that the Ordinance regulates content.  (See Dkt ## 54-1, 55-1.)  In addition, amici make broad policy arguments about the importance of the CDA.  (See, e.g, Dkt #54-1 at 6-9; Dkt #55-1 at 4-7.)  But the Ninth Circuit recently rejected the notion that these arguments justify an over-broad application of the CDA:

> It may be true that imposing any tort liability on [a website] for its role as an interactive computer service could be said to have a "chilling effect" on the internet, if only because such liability would make operating an internet business marginally more expensive. But such a broad policy argument does not persuade us that the CDA should bar [all claims]. . . . Congress has not provided an all purpose get-out-of-jail-free card for businesses that publish user content on the internet, though any claims might have a marginal chilling effect on internet publishing businesses.

*Internet Brands*, 824 F.3d at 852-53.

**II. San Francisco's Ordinance Comports with the First Amendment.**

For the same reasons that the CDA does not apply, San Francisco's Ordinance does not burden First Amendment interests. As explained above, the Ordinance regulates illegal booking transactions for unregistered short-term rentals – conduct, not speech. If the Court perceives any burden on speech, then the burden is only on unlawful and/or misleading speech, which is not entitled to First Amendment protection. In any event, the Ordinance is narrowly drawn to advance the significant government interests in preserving long-term housing, reducing evictions, and preserving the character and quality of life in San Francisco's residential neighborhoods.

**A. The First Amendment Does Not Apply, Because San Francisco's Ordinance is Directed to Conduct, not Speech.**

Contrary to Airbnb's and Homeaway's mischaracterization of the Ordinance in their brief, the Ordinance does *not* impose "penalties on Hosting Platforms that publish listings for properties that are not 'lawfully registered.'" (Ps' MPA, at p. 20.) Rather, the Ordinance imposes liability only if a Hosting Platform provides booking services for an illegal transaction with an unregistered host *and* collects a fee for that illegal transaction. S.F. Planning Code § 41A.5(g)(4)(C). Booking a reservation and receiving a fee for that transaction is conduct, not speech.

Airbnb and Homeaway argue that the Ordinance "disguise[s] a restriction on speech . . . to avoid the First Amendment." (Ps' MPA, at p. 21.) Airbnb and Homeaway rely on *Sorrell v. IMS Health*, 564 U.S. 552, 566-67 (2011); *Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.*, 502 U.S. 105, 118 (1991); and *United States v. Nat'l Treasury Emps. Union*, 513 U.S. 454, 468-69 (1995). (See Ps' MPA, at pp. 21-22.) These cases demonstrate, to the contrary, that San Francisco's Ordinance regulates conduct, not speech. And because San Francisco's Ordinance regulates conduct, not speech, the First Amendment does not apply.

In *Sorrell*, the Supreme Court recognized "that the First Amendment does not prevent restrictions directed at commerce or conduct from imposing incidental burdens on speech." 564 U.S. at 567. The Supreme Court invalidated a Vermont law restricting "the sale, disclosure, and use of pharmacy records that reveal the prescribing practices of individual doctors," and prohibiting, with certain exceptions, pharmacies from selling or disclosing the information for marketing purposes, and

prohibiting pharmaceutical manufacturers from using the information for marketing.  564 U.S. at 557.

"Heightened judicial scrutiny" applied, because the challenged law "disfavors marketing, that is,

speech with a particular content," and "disfavors specific speakers, namely pharmaceutical

manufacturers."  *Id.* at 564.

In *Simon & Schuster*, the publishing company challenged New York's "Son of Sam" law,

which required royalties from books describing the author's crimes to be held in escrow.  The "Son of

Sam" law imposed an impermissible burden on expression, because it was not narrowly tailored to

advance New York's interest in compensating crime victims.  502 U.S. at 118.

The principle of *National Treasury Employees Union* is similar to the *Simon & Schuster* case.

The statutory ban prohibiting low-level executive branch employees from receiving honoraria for

speeches on matters of public interest imposed an unlawful burden on speech because it lacked an

adequate nexus to the government's vital interest in promoting efficiency of public service.  513 U.S.

at 468-69.

In stark contrast to these three cases on which Airbnb and Homeaway rely, San Francisco's

Ordinance imposes no restriction on any speech or expression by the Hosting Platforms or individual

hosts.  Unlike *Sorrell*, San Francisco's Ordinance does not impose even an incidental burden on

protected expression.  San Francisco does not prohibit or punish publication of an advertisement for an

unlawful short-term rental.  Unlike *Simon & Schuster* and *National Treasury Employees Union*, San

Francisco's Ordinance does not burden expression by restricting income that can be earned through

speech.  San Francisco's Ordinance does not restrict or burden advertising or speech at all, it merely

prohibits Hosting Platforms from engaging in, and profiting from, illegal short-term rental bookings

with unregistered hosts.

Airbnb and Homeaway also contend that the Ordinance's verification requirement and its

record-keeping requirement trigger First Amendment scrutiny.  (Ps' MPA, at p. 21.)  The Ordinance

requires Hosting Platforms to verify monthly with an affidavit to the City that the Platform has

provided booking services and received a fee for those services only for lawfully registered hosts, and

it requires Hosting Platforms to maintain records of their booking transactions for three years.  The

Ordinance's verification and record-keeping requirements are neither triggered by speech (in which

case the requirements could burden speech), nor do they regulate speech.  These verification and record-keeping requirements relate solely to a Platform's commercial short-term rental booking transactions.

The cases that Airbnb and Homeaway cite, by contrast, challenged verification and record-keeping requirements that directly burden speech and expression.  In *Backpage.com, LLC v. McKenna*, 881 F.Supp.2d 1262, 1277 (W.D. Wash. 2012), for example, the challenged statute requiring a website to check identification before publishing an escort ad impermissibly burdened First Amendment rights.  Similarly, in *Free Speech Coalition, Inc. v. Attorney General*, 825 F.3d 149, 164 (3d Cir. 2016), requiring adult entertainment venues to verify performers' ages and to keep copies of the verifying documents triggered strict scrutiny.

The District Court in *McKenna* explained the difference between a verification requirement related solely to conduct (like San Francisco's Ordinance) and a verification requirement that burdens speech.  The former is allowed.  The latter is not.

> At first blush, requiring publishers to check identification before publishing an escort ad seems as commonsensical as requiring bar owners to check identification before allowing patrons to enter the door.  There is, however, a key difference between these two scenarios.  The latter is an identification requirement related to conduct – drinking alcohol in a bar.  The former is an identification requirement – imposed by the government and punishable by imprisonment – related to speech.  Since there is no constitutional right to drink alcohol, courts tasked with upholding the Constitution care little if a bar's identification verification process results in a line forming outside the door, or causes some restaurants to stop serving liquor.  However, because there is a constitutional right to free speech, the Constitution cannot permit similar collateral consequences in the First Amendment context.

*McKenna*, 881 F. Supp. 2d at1277.  San Francisco's Ordinance, requiring a Hosting Platform to verify a host's registration before providing booking services, is just like requiring a bar owner to verify a patron's identification before serving alcohol.  There is no more a constitutional right to book short-term rentals than there is a constitutional right to drink alcohol.  Accordingly, San Francisco's verification and record-keeping requirements do not trigger First Amendment scrutiny.

**B.  Any Speech That The Ordinance May Burden Is Only Illegal and Misleading Speech, Which Does Not Receive First Amendment Protection.**

As San Francisco explains above, its Ordinance regulates conduct, not speech.  If this Court disagrees and determines that the Ordinance in some way burdens commercial speech, then *Central*

*Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n*, 447 U.S. 557 (1980), articulates the applicable test for evaluating the Ordinance.  (See Ps' MPA, at p. 22.)  *Central Hudson* establishes a four-part test for commercial speech cases.

> At the outset, we must determine whether the expression is protected by the First Amendment.  For commercial speech to come within that provision, it at least must concern lawful activity and not be misleading.  Next, we ask whether the asserted governmental interest is substantial.  If both inquiries yield positive answers, we must determine whether the regulation directly advances the governmental interest asserted, and whether it is not more extensive than is necessary to serve that interest.

*Central Hudson*, 447 U.S. at 566; see also *Retail Digital Network, LLC v. Appelsmith*, 810 F.3d 638 (9th Cir. 2016) (following *Sorrell*, court applied heightened scrutiny to non-misleading restrictions on commercial speech).[9]

In this case, Airbnb's and Homeaway's challenge fails at the very first step of the four-part test.  San Francisco's Ordinance addresses only unlawful and misleading activity.  San Francisco's Ordinance prohibits Hosting Platforms from providing booking services and collecting a fee for unlawful, unregistered short-term rentals.  Airbnb and Homeaway acknowledge the Ordinance distinguishes between "lawfully registered" and illegal short-term rentals.  (Ps' MPA, at p. 20.) Because the Ordinance concerns only unlawful activity, it satisfies *Central Hudson*'s test for restraints on commercial speech even without considering *Central Hudson*'s final three elements.

Even outside the context of commercial speech, the Supreme Court has held, and other courts have recently reiterated, that "'[o]ffers to engage in illegal transactions are categorically excluded from First Amendment protection.'"  *Senate Permanent Subcomm. v. Ferrer*, __ F. Supp. 3d __, 2016 WL 4179289 at *11 (D.D.C. Aug. 5, 2016) (quoting *United States v. Williams*, 553 U.S. 285, 297 (2008) and citing *Pittsburgh Press Co. v. Pittsburgh Comm'n on Human Relations*, 413 U.S. 376, 388 (1973) and *Flytenow, Inc. v. FAA*, 808 F.3d 882, 894 (D.C. Cir. 2015)).  Even if the Ordinance

---

[9] Neither *Sorrell* nor *Applesmith* describes the contours of "heightened scrutiny" that may apply to a content-based commercial speech restriction.  In the end, *Sorrell* invalidated the Vermont statute under *Central Hudson*'s intermediate scrutiny test because the Vermont statute failed to directly advance any of the state's asserted interests.  *See Lamar Central Outdoor, LLC v. City of Los Angeles*, 245 Cal.App.4th 610, 623-24 (2016).  And the *Applesmith* court remanded the case with instructions to the district court to apply heightened scrutiny.

implicates non-commercial speech, a Hosting Platform's offer to provide booking services for illegal transactions is not protected speech and not entitled to any First Amendment protection.

**C.  In Any Event, San Francisco's Ordinance Is Narrowly Tailored to Serve a Substantial Government Interest.**

Airbnb and Homeaway assert that San Francisco has the burden to demonstrate that its Ordinance "directly advances a substantial government interest" and is "narrowly tailored to achieve the desired objective."  (Ps' MPA, at p. 22, citing *Sorrell*, *Central Hudson*, and *Florida Bar v. Went For It, Inc.*, 515 U.S. 618, 632 (1995).)  While the "fit" between the government's objective and the means chosen to accomplish those ends should be "reasonable," it need not be perfect.  *Greater New Orleans Broadcasting Ass'n, Inc. v. United States*, 527 U.S. 173, 188 (1999); *Board of Trustees of the State Univ. of N.Y. v. Fox*, 492 U.S. 469, 480 (1989).  The "fit" should be determined based on the Ordinance's general application, not specifically with respect to just the plaintiffs.  *Metro Lights, L.L.C. v. City of Los Angeles*, 551 F.3d 898, 904 (9th Cir. 2009).

Airbnb and Homeaway cite *Reed v. Town of Gilbert*, 135 S.Ct. 2218 (2015), to suggest a content-based restriction is "presumptively unconstitutional" and that First Amendment review of the Ordinance should be fatal.  (See Ps' MPA, at pp. 20-22.)  *Reed* does not apply because it dealt only with non-commercial speech.  Both the Ninth and Eleventh Circuit Courts of Appeal agree that *Central Hudson* continues to control commercial speech cases after *Reed*.  *See Lone Star Security & Video, Inc. v. City of Los Angeles*, __ F.3d __, 2016 WL 3632375 at *4 n. 3 (9th Cir. July 7, 2016) ("although laws that restrict only commercial speech are content based," citing *Reed*, "such restrictions need only withstand intermediate scrutiny" under *Central Hudson*); *Dana's R.R. Supply v. Attorney Gen., Florida*, 807 F.3d 1235, 1246 (11th Cir. 2015) (the general strict scrutiny rule for content-based distinctions is "not absolute," and *Central Hudson* continues to govern commercial speech distinctions after *Reed*).  In *Peterson v. Village of Downers Grove*, 150 F.Supp.3d 910 (N.D. Ill. 2015), the court explained this rationale:

> the majority never specifically addressed commercial speech in *Reed*, which is not surprising, because the Supreme Court did not need to address that issue: all of the restrictions at issue in *Reed* applied only to non-commercial speech. What is important for this case is that, absent an express overruling of *Central Hudson*, which most certainly did not happen in *Reed*, lower courts must

1   consider *Central Hudson* and its progeny—which are directly applicable to the commercial-based distinctions at issue in this case—binding.

2   *Id.* at 927-28.[10]

3       The Ordinance easily satisfies the applicable intermediate review of *Central Hudson*,[11] since it

4   directly advances San Francisco's interests in preserving its housing stock, reducing evictions and

5   landlord's incentives to keep housing off the long-term market, and preserving the character of

6   residential neighborhoods, and is narrowly tailored to achieve those goals.  In 2015, San Francisco

7   lifted its 34-year absolute ban on conversion of residential units to tourist and transient use.  To

8   preserve the important interests that had originally animated Chapter 41A in 1981, San Francisco

9   tightly regulated and strictly limited short-term rentals.  In 2016, a high degree of non-compliance

10   persisted in the short-term rental market.  This continuing noncompliance undermines San Francisco's

11   interests in preserving housing, reducing evictions and maintaining neighborhood character, and it

12   persists notwithstanding the regulations and requirements that San Francisco already enacted for

13   individual hosts.  San Francisco cannot ascertain, from the public information available on an

14   individual host's advertisement, the name, address or registration status of the individual listing, much

15   less the number of nights each rental is booked.  San Francisco determined that it could not rely

16   exclusively on its enforcement efforts against non-compliant hosts to ensure effective enforcement of

17   its short-term rental Ordinance.

18       Hosting Platforms profit every time they collect a booking fee for an illegal short-term rental

19   from an unregistered host.  Hosting Platforms have an economic incentive to allow noncompliant hosts

---

20, 21   [10]  Accord, e.g., *Contest Promotions, LLC v. City & Cty. of San Francisco*, 2015 WL 4571564, at *4 (N.D. Cal. July 28, 2015) ("*Reed* does not concern commercial speech, and therefore does not

22   disturb the framework which holds that commercial speech is subject only to intermediate scrutiny as defined by the *Central Hudson* test."); *San Francisco Apt. Ass'n v. City & Cty. of San Francisco*, 142

23   F.Supp.3d 910 (N.D. Cal. 2015); *CTIA-The Wireless Ass'n v. City of Berkeley*, 2015 WL 5569072, at *10 (N.D.Cal. Sept. 21, 2015); *California Outdoor Equity Partners v. City of Corona*, 2015 WL

24   4163346 at *10 (C.D. Cal. July 9, 2015); *Citizens for Free Speech, L.L.C. v. Cnty. of Alameda*, 114 F.Supp.3d 952, 968-69 (N.D. Cal. 2015); *RCP Publ'ns, Inc. v. City of Chicago*, __ F. Supp. 3d __,

25   2016 WL 4593830 at *4 (N.D. Ill. Sept. 2, 2016); *Geft Outdoor LLC v. Consolidated City of Indianapolis and County of Marion, Ind.*, __ F. Supp. 3d __, 2016 WL 2941329 at *10 (S.D. Ind. May

26   20, 2016); *Boelter v. Hearst Comm., Inc.*, __ F. Supp. 3d __, 2016 WL 3369541 at *9 n. 10 (S.D.N.Y. June 17, 2016).

27   [11]  Likewise, the Ordinance satisfies *Sorrell*'s "heightened scrutiny," if *Sorrell*'s "heightened scrutiny" is in substance any different from *Central Hudson*'s intermediate scrutiny, itself a form of

28   heightened scrutiny.

to continue renting.  Indeed, Airbnb's $30 billion business valuation is based in part on these illegal bookings in San Francisco and New York.  Emery Decl., Exh. C.  In February 2016, Airbnb affirmatively frustrated San Francisco's enforcement efforts against individual hosts by eliminating the field allowing hosts to post their registration numbers.  Guy Decl., ¶ 10.  In the absence of this dedicated field, hosts have had difficulty complying with San Francisco's requirement that they include their registration numbers in their online listings.  Emery Decl., Exhs. G, H.

Faced with rampant scofflaws and inadequate information to support effective enforcement, San Francisco enacted the challenged Ordinance.  The Ordinance avoids any regulation of speech, or the content or management of the websites.  The Ordinance simply requires a Hosting Platform to verify a San Francisco host's registration status before the Hosting Platform provides booking services for that hosts *and receives a fee for those booking services*.  By regulating only commercial transactions, not speech, and by prescribing only illegal transactions, the Ordinance directly advances San Francisco's substantial government interests, and is narrowly tailored to achieve those goals.

Airbnb and Homeaway argue that the Ordinance is not narrowly tailored because it seeks to deter hosts' conduct indirectly by regulating Hosting Platforms' speech.  (Ps' MPA, at pp. 22-23.)  To the contrary, the Ordinance zeroes in directly on prohibited conduct by deterring Hosting Platforms from engaging in, and profiting from, illegal commercial booking transactions.  Because the Ordinance does not burden protected speech in order to deter prohibited conduct indirectly, *Bartnicki v. Vopper*, 532 U.S. 514 (2001); and *Village of Schaumburg v. Citizens for a Better Env't*, 444 U.S. 620 (1980), on which Airbnb and Homeaway rely, are not relevant to this case.

Likewise, Airbnb's and Homeaway's reliance on *Valle Del Sol Inc. v. Whiting*, 709 F.3d 808 (9th Cir. 2013), is misplaced.  (See Ps' MPA, at 23-24.)  In *Valle Del Sol*, the Ninth Circuit upheld a preliminary injunction against provisions in Arizona's immigration reform bill that "made it a crime for an occupant of a motor vehicle to solicit or hire a day laborer if the motor vehicle blocks or impedes traffic," and "for a day laborer to enter a motor vehicle to work at a different location if the motor vehicle blocks or impedes traffic."  *Id.* at 815.  These day labor provisions imposed much more severe penalties than the preexisting content-neutral laws addressing similar traffic violations.  *Id.* at 820.  The Ninth Circuit held that these day labor provisions were content-based restrictions on

commercial speech, and that the plaintiffs had established a substantial likelihood of success on the merits, because the day labor provisions were not narrowly tailored to advance Arizona's legitimate interest in traffic safety.  *Id.* at 818-28.  The day labor provisions were "designed to suppress the economic activity of undocumented immigrants."  *Id*. at 828.  Arizona's substantial government interest was in traffic flow and safety, not in curbing in-street employment solicitation.  *Id*. at 827.  But Arizona had failed to present any evidence that it was unable to address the legitimate traffic problems effectively with content-neutral traffic regulations, without reference to speech.  *Id.* at 827-29.  San Francisco's Ordinance does not run afoul of *Del Valle* for the simple reason that San Francisco's Ordinance makes no reference to speech and directly regulates the conduct that San Francisco seeks to deter, i.e., illegal bookings with unregistered hosts.[12]

Airbnb and Homeaway next assert that the Ordinance is underinclusive.  They complain that the Ordinance fails to reach platforms (such as Craigslist) that do not charge for booking services, but may nevertheless facilitate illegal short-term rentals with unregistered hosts.  (Ps' MPA, at p. 24.)  This complaint is disingenuous.  As Airbnb and Homeaway established in their original complaints and original preliminary injunction motion in this case (Dkt ## 1, 3, 24), they contend that any effort by San Francisco to regulate online ads would violate both the CDA and the First Amendment.  It is entirely reasonable for San Francisco to enhance its enforcement tools incrementally.  See *Metro Lights*, 551 F.3d at 910-11.  Indeed, by focusing on Hosting Platforms' booking services instead of advertising, San Francisco is simply following the Ninth Circuit's directive to "consider pursuing its interests through conduct-based regulations before enacting speech-based regulations."  *Valle Del Sol*, 709 F.3d at 827 (citing *Comite de Jornaleros de Redondo Beach v. City of Redondo Beach*, 657 F.3d 936, 949-50 (9th Cir. 2011)).

Airbnb's and Homeaway's final argument on First Amendment scrutiny invokes the principle that mere convenience is insufficient to justify restrictions on speech.  (Ps' MPA, at pp. 24-25.)  San

---

[12] Airbnb and Homeaway also rely on *Backpage.com LLC v. McKenna* to argue that the Ordinance is overinclusive.  (Ps' MPA, at p. 23.)  San Francisco has already explained, see Part II.A., *supra*, that *McKenna* affirmatively supports the Ordinance's compliance with the First Amendment.  For the same reasons, *McKenna* undermines Airbnb's and Homeaway's argument that the Ordinance is overinclusive.

1  Francisco, as explained above, is not cutting corners by regulating speech instead of underlying

2  conduct.  The Ordinance directly regulates the conduct of Hosting Platforms when they provide

3  booking services and profit directly from illegal short-term rental transactions with unregistered hosts.

4  Accordingly, *Thompson v. Western States Medical Center*, 535 U.S. 357 (2002); *Yniguez v. Arizonans*

5  *for Official English*, 42 F.3d 1217 (9th Cir. 1994); and *News & Sun Sentinel Co. v. Board of County*

6  *Commissioners*, 693 F.Supp. 1066 (S.D. Fla. 1987), on which Airbnb and Homeaway rely, are not

7  relevant to this case.[13]

8  **D.  The Ordinance Does Not Impose Strict Liability On Hosting Platforms For Speech.**

9       Airbnb and Homeaway complain that San Francisco's Ordinance imposes strict liability on

10  Hosting Platforms for publishing listings and selling ads for unregistered short-term rentals.  Airbnb

11  and Homeaway rely on case law recognizing that imposing strict liability for publishing unprotected

12  speech or selling the opportunity to engage in unprotected speech may chill First Amendment rights.

13  (Ps' MPA, at pp. 25-27, citing *United States v. X-Citement Video, Inc.*, 513 U.S. 64 (1994); *Hustler*

14  *Magazine, Inc. v. Falwell*, 485 U.S. 46 (1988); *New York v. Ferber*, 458 U.S. 747 (1982); *Smith v.*

15  *California*, 361 U.S. 147 (1959).)

16       This argument fails for three separate reasons.  ***First***, this challenge is premature.  Neither

17  Airbnb nor Homeaway has demonstrated, or even alleged, that it faces a reasonable risk of prosecution

18  for booking an illegal short-term rental with an unregistered host without actual knowledge of the

19  host's booking status.  Whether the Ordinance should be interpreted to impose strict liability on a

20  Hosting Platform, and whether the City ever attempts to pursue enforcement on such a theory, should

21  await a more developed record and an actual enforcement action.

22       ***Second***, as explained above, San Francisco's Ordinance imposes zero liability for selling ads or

23  publishing content.  Instead, San Francisco's Ordinance imposes liability on a Hosting Platform only

24  when the Hosting Platform engages in an unlawful short-term rental booking transaction with an

25  unregistered host and collects a fee for that unlawful transaction.  *Backpage.com, LLC v. Cooper*, 939

26

27       [13]  Airbnb and Homeaway do not acknowledge *Yniguez*'s extensive subsequent history.  The
     Ninth Circuit reheard the cited decision en banc, 69 F.3d 920 (1995), and the Supreme Court vacated

28  judgment.  520 U.S. 43 (1997).

F.Supp.2d 805, 829-30 (M.D. Tenn. 2013), on which Airbnb and Homeaway rely, highlights the difference between the permissible scope of San Francisco's Ordinance, and the Tennessee law that prohibited the sale of "an advertisement that would appear to a reasonable person to be for the purpose of engaging in what would be a commercial sex act . . . with a minor." *Id.* at 816.  If the Tennessee statute were analogous to San Francisco's Ordinance, the Tennessee statute would have imposed liability on Backpage.com only when the website booked a meeting between a john and an underage victim of sex trafficking, and then took a percentage cut of the sex payment for doing so.  The rule of decision that Airbnb and Homeaway advocate here would prohibit Tennessee from criminalizing online pimping of underage sex trafficking.  With its Ordinance, San Francisco has done exactly what the *Cooper* court admonished lawmakers to do.  "[T]he state may not use a butcher knife on a problem that requires a scalpel to fix." *Id.* at 813.  Consistent with this admonition, San Francisco has surgically removed any protected speech from the reach of its Ordinance.  Because the Ordinance regulates only a non-expressive commercial transaction, *Smith*, *Ferber*, *X-Citement Video, Inc.*, and *Hustler v. Falwell*, on which Airbnb and Homeaway rely, do not support plaintiffs' challenge to the Ordinance.

  *Third*, if for any reason imposition of strict liability were constitutionally suspect, the court should impute a scienter requirement to the Ordinance.  Because scienter is commonly understood to be an element of criminal liability, a court should assume a scienter requirement in a criminal statute, unless lawmakers affirmatively indicated they intended to dispense with mens rea as an element of the violation.  *X-Citement Video, Inc.*, 513 U.S. at 70-72; *U.S. v. Ford*, 821 F.3d 63, 68 (1st Cir. 2016).

  Thus in *X-Citement Video*, the Supreme Court reviewed a conviction under the federal Protection of Children Against Sexual Exploitation Act of 1977.  The Act prohibits "knowingly" transporting, shipping, receiving, distributing, or reproducing a visual depiction, if such depiction "involves the use of a minor engaging in sexually explicit conduct."  513 U.S. at 67-68.  The Supreme Court interpreted the Act to require knowledge of the performer's age.  *Id.* at 78.  And in *Ford*, the First Circuit interpreted the federal aiding and abetting statute (18 U.S.C. § 2) to require proof "that the putative aider and abettor knew the facts that make the principal's conduct criminal," even though the aiding and abetting statute is silent as to mens rea.  821 F.3d at 74.  Accordingly, if it is necessary

1    to save the Ordinance, the court should impute a scienter requirement.  Airbnb and Homeaway cannot

2    strike down the Ordinance because of the absence of an explicit scienter requirement.

3         Lastly, Airbnb and Homeaway complain that the Ordinance is ambiguous.  (Ps' MPA, at 26-

4    27.)  The Ordinance is not ambiguous.  The phrase "lawfully registered" in the Ordinance simply

5    means that the host has a registration certificate.  Guy Decl., ¶ 12.  And "at the time it is rented" means

6    when the booking transaction occurs.  *Id.* ¶ 13.  In any event, Airbnb's and Homeaway's vagueness

7    concerns are premature, and should await an actual enforcement action.[14]

8    **III. Airbnb and Homeaway Have Failed To Demonstrate Irreparable Harm, and the Balance of Hardships Favors Enforcement of the Ordinance.**

9         Airbnb's and Homeaway's hardship and burden arguments depend on their contention that the

10   Ordinance burdens constitutionally protected expression, and on their assertion that verification of

11   hosts' registration status before completing booking transactions is unreasonably difficult.  (Ps' MPA,

12   at pp. 27-30.)  The Ordinance however, neither burdens protected speech, nor runs afoul of the CDA.

13   See Parts I, II, *supra*.  The assertion that Airbnb and Homeaway are unable to verify host registration

14   status lacks credibility.

15        Neither Airbnb nor Homeaway reveal how many new San Francisco hosts register each week

16   or each month.  See Owen Decl.; Furlong Decl.  It is therefore impossible to assess the scope of the

17   ongoing verification task.  In any event, it would be a simple matter for a Hosting Platform to require

18   hosts to upload their San Francisco registration certificate before completing a booking.  Uber already

19   has the analogous requirement for its drivers.  Uber does not let a driver pick up a passenger until Uber

20   has verified a valid driver's license.  Emery Decl., Exh. E.

21        An effective program to verify the registration status of San Francisco hosts would be much

22   simpler than Airbnb's new Nondiscrimination Policy, which Airbnb announced on September 8, 2016.

---

24   [14]  Vagueness is a due process claim, not a First Amendment claim.  *Holder v. Humanitarian

25   Law Project*, 561 U.S. 1, 19 (2010); *Hunt v. City of Los Angeles*, 638 F.3d 703, 710 (9th Cir. 2011).
     "A plaintiff who engages in some conduct that is clearly proscribed cannot complain of the vagueness

26   of the law as applied to the conduct of others."  *Humanitarian Law Project*, 561 U.S. at 3 (quoting
     *Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 495 (1982)).  Accordingly, to

27   adjudicate a Hosting Platform's standing to pursue a vagueness challenge to the Ordinance, a court
     would have to know what conduct is charged, and whether the Ordinance "clearly proscribed" the

28   charged conduct.

Emery Decl., Exh. F.  To ensure that hosts comply with its Nondiscrimination Policy "Airbnb has committed to make a series of product and policy changes."  *Id.* at p. 10.  "Airbnb has assembled a permanent team of engineers, data scientists, researchers, and designers whose sole purpose is to advance belonging and inclusion and to root out bias." *Id.* at p. 11.  "The Airbnb team developed new tools to quickly and reliably route concerns regarding discrimination to a group of trained specialists who are dedicated to both identifying and combatting discrimination." *Id.*  All hosts, "before they book" a rental, "will see a message asking them to affirmatively certify that they agree with [Airbnb's Community Commitment]." *Id.* at p. 19.  Airbnb will "[r]emind hosts of the Airbnb nondiscrimination policy at key points during the hosting and booking process." *Id.* at p. 20.  "If a host rejects a guest by stating that their space is not available, Airbnb will automatically block the calendar for subsequent reservation requests for that same trip." *Id.*  "If a guest or host believes they have been discriminated against, Airbnb will investigate their complaint and take action if the policy has been violated." *Id.*

With this nondiscrimination policy, Airbnb has demonstrated: (1) it can require San Francisco hosts to certify they have a valid registration; (2) it can remind San Francisco hosts repeatedly "during the hosting and booking process" of the host's obligation to obtain a registration; and (3) it can "automatically block the calendar" if a host does not comply with San Francisco's registration requirement.  But instead of implementing these or other easy, convenient and common-sense measures to verify host compliance with San Francisco's registration requirement, Airbnb has affirmatively frustrated San Francisco's enforcement efforts, eliminating the field for hosts to provide their registration number, making it difficulat for hosts to comply with their obligation to include their registration numbers on their online listings.  Guy Decl., ¶ 10; Emery Decl., Exhs. G, H.

It is natural that Airbnb and Homeaway seek to preserve the revenue they receive from rental transactions with unregistered hosts.  Indeed, Airbnb's $30 billion business valuation depends in part on this income stream from illegal transactions.  Emery Decl., Exh. D.  Hosting Platforms' desire to preserve this income stream from illegal transactions, however, is not a legitimate interest to consider when balancing hardships and equities.

San Francisco, on the other hand, has a crucial interest in preserving its housing stock for permanent residents, reducing evictions, and preserving neighborhood character.  To advance these

interests, San Francisco in 1981 entirely banned conversion of apartments to tourist or transient use. Then, to accommodate the "new economy," San Francisco in 2015 permitted a limited and highly regulated exception to the overall ban on short-term rentals.  The key to San Francisco's regulatory scheme is the requirement that short-term rental hosts register with the City.  In order to register, a prospective short-term rental host must demonstrate he or she is a permanent resident of San Francisco, actually resides in the unit to be rented at least 275 days each year, and if a tenant in a rent controlled apartment, does not earn more in short-term rentals than he or she pays in rent to the landlord.  San Francisco crafted the registration requirements to limit the type, number and frequency of short-term rentals.  But by 2016, when Airbnb alone had 4 times more San Francisco hosts than had registered with the City, it was clear that San Francisco's existing enforcement tools were ineffective, and that unauthorized short-term rentals imperiled both the permanent housing stock and the quality of life in residential neighborhoods.  A preliminary injunction, prohibiting San Francisco from implemented necessary incentives on Hosting Platforms to avoid unlawful transactions with unregistered hosts, will further encourage noncompliance, to the detriment of San Francisco's permanent housing stock and the quality of life in residential neighborhoods.

For these reasons, the irreparable harm analysis and balance of hardships weigh against the preliminary injunction.

**IV. The Court Should Require A Bond As A Condition For Any Injunction.**

For all the reasons set forth above, Airbnb and Homeaway are not entitled to a preliminary injunction.  Airbnb and Homeaway do not address the requirement for plaintiffs to post a bond as a condition for issuing a preliminary injunction.  If the Court nevertheless contemplates granting the motion, the Court must order appropriate security to San Francisco.  "The court may issue a preliminary injunction . . . only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."  Fed. R. Civ. P. 65(c).  This bond requirement serves several important purposes.

> First, a preliminary injunction bond provides a fund for the compensation of an incorrectly enjoined defendant who may suffer from the effects of an incorrect interlocutory order.  As a rule, courts presume damages against the bond if the preliminary injunction is wrongful.  Secondly, the bond provides the plaintiff with notice of the maximum extent of its potential liability since the amount of

1

2

3

4

the bond is the limit of the damages the defendant can obtain for a wrongful injunction, . . . provided the plaintiff was acting in good faith.  Another purpose of the bond requirement is to deter rash applications on tenuous grounds for interlocutory orders because the financial obligation encourages action with a cooler head and careful thought beforehand.  Perhaps most importantly, however, absent a different legal theory like malicious prosecution or unjust enrichment, a wrongfully enjoined party has no recourse for damages in the absence of a bond.

5

6

*Gametech Int'l, Inc. v. Trend Gaming Sys., L.L.C*, 2005 WL 1473982, at *2 (D. Ariz. June 21, 2005) (citations and internal quotations omitted).

7

8

9

10

11

12

13

14

15

If this Court issues a preliminary injunction, it should require Airbnb and Homeaway to place in escrow with the Court all booking fees from San Francisco transactions, from September 10, 2016, until the injunction is dissolved.  Since approximately 75% of current host postings in San Francisco are for illegal unregistered short-term rentals, the value of San Francisco booking fees is a conservative estimate of the amount of penalties due from Airbnb and Homeaway for violating the Ordinance.  When the Ordinance is upheld, San Francisco will look first to the escrowed funds to recover penalties for illegal booking transactions that occurred while this case remained pending, which undermined the City's need to preserve housing, reduce evictions and preserve the character of its residential neighborhoods.

16

## CONCLUSION

17

18

For the foregoing reasons, the Court should deny the preliminary injunction motion and dismiss the First Amended Complaint without leave to amend.

19

Dated:  September 19, 2016

20

21

22

23

DENNIS J. HERRERA
City Attorney
JAMES M. EMERY
ROBB W. KAPLA
SARA J. EISENBERG
Deputy City Attorneys

24

25

By:  */s/James M. Emery*
JAMES M. EMERY

26

27

Attorneys for Defendant
CITY AND COUNTY OF SAN FRANCISCO

28