**EXHIBIT A**

San Francisco Administrative Code

Section 41A.1

# CHAPTER 41A

## APARTMENT UNIT CONVERSION ORDINANCE

Sec. 41A.1.    Title.
Sec. 41A.2.    Purpose.
Sec. 41A.3.    Findings.
Sec. 41A.4.    Definitions.
Sec. 41A.5.    Unlawful Conversion; Remedies.
Sec. 41A.6.    Report on Apartment Conversion.
Sec. 41A.7.    Construction.

**SEC. 41A.1.    TITLE.** This chapter shall be known as the Apartment Unit Conversion Ordinance. (Added by Ord. 331-81, App. 6/26/81)

**SEC. 41A.2.    PURPOSE.** It is the purpose of this ordinance to benefit the general public by minimizing adverse impacts on the housing supply and on persons and households of all income levels resulting from the loss of apartment units through their conversion to tourist and transient use. This is to be accomplished by regulating the conversion of apartment units to tourist and transient use, and through appropriate administrative and judicial remedies. (Added by Ord. 331-81, App. 6/26/81)

**SEC. 41A.3.    FINDINGS.** The Board of Supervisors finds that:

(a) There is a severe shortage of decent, safe, sanitary and affordable rental housing in the City and County of San Francisco.

(b) The people of the City and County of San Francisco, cognizant of the housing shortage in San Francisco, on November 4, 1980, adopted a declaration of policy to increase the City and County's housing supply by 20,000 units.

(c) Many of the City and County's elderly, disabled and low-income persons and households reside in apartment units.

(d) As a result of the removal of apartment units from the rental housing market, a housing emergency exists within the City and County of San Francisco for its elderly, disabled and low-income households.

(e) The Board of Supervisors and the Mayor of the City and County of San Francisco recognized this housing emergency and enacted an ordinance which established a moratorium on the conversion of apartment units to tourist and transient use.

(f) The conversion of apartment units to tourist and transient use impacts especially on persons seeking housing in the low to moderate price range.

(g) It is in the public interest that conversion of apartment units be regulated and that remedies be provided when unlawful conversion has occurred, in order to protect the resident tenants and to conserve the limited housing resources. (Added by Ord. 331-81, App. 6/26/81)

**SEC. 41A.4.    DEFINITIONS.** (a) **Apartment Unit.** Room or rooms in any building, or portion thereof, which is designed, built, rented, leased, let or hired out to be occupied, or which is occupied as the home or residence of four or more

(6-89)

households living independently of each other in dwelling units as defined in the San Francisco Housing Code, provided that the apartment was occupied by a permanent resident on or after February 8, 1981.

(b) **Residential Use.** Any use for occupancy as a dwelling unit by a permanent resident.

(c) **Tourist or Transient Use.** Use of an apartment unit for occupancy on a daily term of tenancy; or occupancy of a unit leased by a business entity, whether on short-term or long-term basis, for temporary use of its employees or guests.

(d) **Permanent Resident.** A person who occupies an apartment unit for at least 60 consecutive days with intent to establish that unit as his or her principal place or residence.

(e) **Conversion or Convert.** The change of the use or to rent an apartment unit from residential use to tourist and transient use.

(f) **Owner.** Owner includes any person who is the owner of record of the real property. (Added by Ord. 331-81, App. 6/26/81)

**SEC. 41A.5.   UNLAWFUL CONVERSION; REMEDIES.** (a) **Unlawful Actions.** It shall be unlawful for any owner to offer an apartment unit for rent for tourist use.

(b) **Civil Action by Tenant.** Any permanent resident injured by any action unlawful under this chapter shall be entitled to injunctive relief and to recover three times the actual damages in a civil action. (Added by Ord. 331-81, App. 6/26/81)

**SEC. 41A.6.   REPORT ON APARTMENT CONVERSION.** (a) The Department of City Planning shall report to the Board of Supervisors on the conversion of apartment units to tourist and commercial uses and shall formulate comprehensive legislation for the Board of Supervisors to consider within one year of the passage of this ordinance.

(b) The Department of City Planning shall specifically determine the following:

(1) The social, economic and physical impact of such conversion upon low and moderate-income households, which comprise a significant portion of the residents of apartment units. These groups shall include, but not be limited to, the elderly, the disabled, minorities, single heads of households with minor children, and other persons with limited economic resources,

(2) The impact that such conversions will have upon the total stock of low and moderate-income housing in the City and County of San Francisco as a whole, as well as the impact upon the areas in which the units in question are located;

(3) The effect of prohibition of the conversion of said apartment units to tourist or commercial uses unless replacement housing units are provided on a one-to-one basis. (Added by Ord. 331-81, App. 6/26/81)

**SEC. 41A.7.   CONSTRUCTION.** (a) Nothing in this Chapter may be construed to supersede any other lawfully enacted ordinance of the City and County of San Francisco.

(b) Clauses of this Chapter are declared to be severable and if any provision or clause of this chapter or the application thereof is held to be unconstitutional or to be otherwise invalid by any court of competent jurisdiction, such invalidity shall not affect other provisions of this Chapter. (Added by Ord. 331-81, App. 6/26/81)

**EXHIBIT B**

FILE NO. 120299

Substituted
9/25/2012

ORDINANCE NO. 224-12

1   [Administrative Code - Extending Restrictions of the Apartment Conversion Ordinance to
    Business-Sponsored Short Term Occupancies; Allowing Civil Actions by Certain Non-Profit
2   Entities; Revising Enforcement Procedures]

3

4   **Ordinance amending the San Francisco Administrative Code by amending Chapter 41A**

5   **to 1) extend the restrictions against converting apartment units to short-term**

6   **occupancies to tenants or guests of business entities that rent such apartments; (2)**

7   **allow civil actions to be brought by certain non-profit entities; (3) revise enforcement**

8   **procedures; and 4) making environmental findings.**

9   .

10              NOTE:         Additions are *single-underline italics Times New Roman*;
                              deletions are *strike-through italics Times New Roman*.
11                            Board amendment additions are double-underlined;
                              Board amendment deletions are strikethrough normal.
12

13

14          Be it ordained by the People of the City and County of San Francisco:

15          Section 1.  Findings.  The Planning Department has determined that the actions

16   contemplated in this ordinance comply with the California Environmental Quality Act

17   (California Public Resources Code Section 21000 et seq.).  Said determination is on file with

18   the Clerk of the Board of Supervisors in File No. 120299 and is incorporated herein by

19   reference.

20          Section 2.  The San Francisco Administrative Code is hereby amended by Chapter

21   41A, to read as follows:

22          **CHAPTER 41A: *APARTMENT* RESIDENTIAL UNIT CONVERSION AND**

23   **DEMOLITION**

24          Sec. 41A.1. Title.

25          Sec. 41A.2. Purpose.

Supervisors Chiu, Mar
**BOARD OF SUPERVISORS**

Page 1
9/25/2012

1    Sec. 41A.3. Findings.

2    Sec. 41A.4. Definitions.

3    Sec. 41A.5. Unlawful Conversion; Remedies.

4    ~~Sec. 41A.6. Report on Apartment Conversion.~~

5    ~~Sec. 41A.7. Construction.~~

6    Sec. 41A.8̲6̲. Procedures for Determining ~~and Appealing~~ Administrative Penalties.

7    *Sec. 41A.7.  Construction*

8    **SEC. 41A.1. TITLE.**

9    This chapter shall be known as the ~~Apartment~~ *Residential* Unit Conversion Ordinance.

10   **SEC. 41A.2. PURPOSE.**

11   It is the purpose of this ordinance to benefit the general public by minimizing adverse

12   impacts on the housing supply and on persons and households of all income levels resulting

13   from the loss of ~~apartment~~ *residential* units through their conversion to tourist and transient use.

14   This is to be accomplished by regulating the conversion of ~~apartment~~ *residential* units to tourist

15   and transient use, and through appropriate administrative and judicial remedies.

16   **SEC. 41A.3. FINDINGS.**

17   The Board of Supervisors finds that:

18   (a) There is a severe shortage of decent, safe, sanitary and affordable rental housing in

19   the City and County of San Francisco.

20   (b) The people of the City and County of San Francisco, cognizant of the housing

21   shortage in San Francisco, on November 4, 1980, adopted a declaration of policy to increase

22   the City and County's housing supply by 20,000 units.

23   (c) Many of the City and County's elderly, disabled and low-income persons and

24   households reside in ~~apartment~~ *affordable residential* units.

25

1    (d) As a result of the removal of ~~apartment~~ *residential* units from the ~~rental~~ housing

2    market, a housing emergency exists within the City and County of San Francisco for its

3    elderly, disabled and low-income households.

4    (e) The Board of Supervisors and the Mayor of the City and County of San Francisco

5    recognized this housing emergency and enacted an ordinance which established a

6    moratorium on the conversion of ~~apartment~~ *residential* units to tourist and transient use.

7    (f) The conversion of ~~apartment~~ *residential* units to tourist and transient use impacts

8    especially on persons seeking housing in the low to moderate price range.

9    (g) It is in the public interest that conversion of ~~apartment~~ *residential* units be regulated

10   and that remedies be provided when unlawful conversion has occurred, in order to protect the

11   resident*s* ~~tenants~~ and to conserve the limited housing resources.

12   **SEC. 41A.4. DEFINITIONS.**

13   (a) ~~Apartment~~ *Residential* Unit. Room or rooms, *including a condominium or a room or*

14   *dwelling unit that forms part of a tenancy-in-common arrangement,* in any building, or portion

15   thereof, which is designed, built, rented, leased, let or hired out to be occupied, or which is

16   occupied as the home or residence of four or more households living independently of each

17   other in dwelling units as defined in the San Francisco Housing Code, provided that the

18   ~~apartment~~ *residential* unit was occupied by a permanent resident on or after February 8, 1981.

19   It is presumed that a~~n~~ *residential* ~~apartment~~ unit was occupied by a permanent resident on or

20   after February 8, 1981, and the owner has the burden of proof to show that a~~n~~ ~~apartment~~

21   *residential* unit is not subject to this Chapter.

22   (b) Residential Use. Any use for occupancy ~~as~~ *of* a dwelling unit by a permanent

23   resident.

24   (c) Tourist or Transient Use. Use of a~~n~~ ~~apartment~~ *residential* unit for occupancy ~~on~~ *for*

25   less than a 30-day term of tenancy, *or occupancy for less than 30 days of a residential unit leased*

Supervisors Chiu, Mar
**BOARD OF SUPERVISORS**

Page 3
9/25/2012

1    *or owned by a business entity, whether on a short-term or long term basis, including any occupancy by*

2    *employees or guests for less than 30 days where payment for the residential unit is contracted for or*

3    *paid by the business entity.*

4    (d) Permanent Resident. A person who occupies a~~n apartment~~ *residential* unit for at least

5    60 consecutive days with intent to establish that unit as his or her principal place of residence.

6    (e) Conversion or Convert. The change of the use or to rent a~~n apartment~~ *residential* unit

7    from residential use to tourist or transient use.

8    (f) Owner. Owner includes any person who is the owner of record of the real property.

9    Owner includes a lessee where an interested party alleges that a lessee is offering a~~n~~

10   ~~apartment~~ *residential* unit for tourist or transient use.

11   (g) Interested Party. A permanent resident of the building in which the tourist or

12   transient use is alleged to occur, ~~or~~ the City and County of San Francisco, *or any non-profit*

13   *organization exempt from taxation pursuant to Title 26, Section 501 of the United States Code, which*

14   *has the preservation or improvement of housing as a stated purpose in its articles of incorporation or*

15   *bylaws.*

16   (h) Director. The Director of the Department of Building Inspection.

17   **SEC. 41A.5. UNLAWFUL CONVERSION; REMEDIES.**

18   (a) Unlawful Actions. It shall be unlawful for *(1)* any owner to offer a~~n apartment~~

19   *residential* unit for rent for tourist or transient use, *(2) any owner to offer a residential unit for rent*

20   *to a business entity that will allow the use of a residential unit for tourist or transient use, or (3) any*

21   *business entity to allow the use of a residential unit for tourist or transient use.*

22   *(b)  Records Required.  The owner and business entity shall retain and make available to the*

23   *Department of Building Inspection occupancy records to demonstrate compliance with this Chapter.*

24   (~~b~~*c*) Determination of Violation. Upon the filing of a complaint ~~by a permanent resident~~

25   that an unlawful conversion has occurred, the Director shall take reasonable steps necessary

Supervisors Chiu, Mar
**BOARD OF SUPERVISORS**

1   to determine the validity of the complaint. The Director may independently determine whether

2   an owner *or business entity* may be renting an ~~apartment~~ *residential* unit for tourist or transient

3   use as defined in this Chapter. To determine if there is a violation of this Chapter, the Director

4   may initiate an investigation of the subject property. This investigation may include, but is not

5   limited to, an inspection of the subject property and a request for any pertinent information

6   from the owner, such as leases or other documents. *The Director shall have discretion to*

7   *determine whether there is a potential violation of this Chapter 41A and whether to conduct an*

8   *administrative review hearing as set forth below.*

9        (~~e~~*d*) Civil Action. ~~Except as provided by Subsection (1) below,~~ *Following the filing of a*

10  *complaint and the determination of a violation by the Director through an administrative review*

11  *hearing as set forth in this Chapter 41A,* ~~A~~*a*ny interested party may institute proceedings for

12  injunctive and monetary relief~~for violation of this Chapter~~. In addition, the owner *or business entity*

13  may be liable for civil penalties of not more than $1,000 per day for the period of the unlawful

14  rental. If the *City or the* interested party is the prevailing party, ~~such~~ *the City or the interested*

15  party shall be entitled to the costs of enforcing this Chapter, including reasonable attorneys'

16  fees, *up to the amount of the monetary award,* pursuant to an order of the Court. ~~If the interested~~

17  ~~party is a permanent resident, then the interested party shall retain the entire monetary award.~~ Any

18  monetary award obtained by the City and County of San Francisco in such a civil action shall

19  be deposited in the Mayor's Office of Housing, Housing Affordability Fund less the reasonable

20  costs incurred by the City and County of San Francisco in pursuing the civil action.

21       ~~(1) If the interested party is a permanent resident, such resident, as a condition to initiating civil~~

22  ~~proceedings pursuant to Subsection (e), must satisfy the requirements set forth in Section 41A.8(b)(2).~~

23       (~~d~~*e*) Criminal Penalties. Any owner *or business entity* who rents an ~~apartment~~ *residential*

24  unit for tourist or transient use as defined in this Chapter shall be guilty of a misdemeanor.

25  Any person convicted of a misdemeanor hereunder shall be punishable by a fine of not more

1  than $1,000 or by imprisonment in the County Jail for a period of not more than six months, or

2  by both. Each ~~apartment~~ residential unit rented for tourist or transient use shall constitute a

3  separate offense.

4  (e~~f~~) Method of Enforcement, Director. The Director shall have the authority to enforce

5  this Chapter against violations thereof by any or all of the means provided for in this

6  ~~Section~~Chapter 41A.

7  ~~SEC. 41A.6. REPORT ON APARTMENT CONVERSION.~~

8  ~~(a) The Department of City Planning shall report to the Board of Supervisors on the conversion~~

9  ~~of apartment units to tourist and commercial uses and shall formulate comprehensive legislation for the~~

10  ~~Board of Supervisors to consider within one year of the passage of this ordinance.~~

11  ~~(b) The Department of City Planning shall specifically determine the following:~~

12  ~~(1) The social, economic and physical impact of such conversion upon low and moderate-~~

13  ~~income households, which comprise a significant portion of the residents of apartment units. These~~

14  ~~groups shall include, but not be limited to, the elderly, the disabled, minorities, single heads of~~

15  ~~households with minor children, and other persons with limited economic resources;~~

16  ~~(2) The impact that such conversions will have upon the total stock of low and moderate-income~~

17  ~~housing in the City and County of San Francisco as a whole, as well as the impact upon the areas in~~

18  ~~which the units in question are located;~~

19  ~~(3) The effect of prohibition of the conversion of said apartment units to tourist or commercial~~

20  ~~uses unless replacement housing units are provided on a one-to-one basis.~~

21  ~~SEC. 41A.7~~6. CONSTRUCTION.

22  ~~(a) Nothing in this Chapter may be construed to supersede any other lawfully enacted~~

23  ~~ordinance of the City and County of San Francisco.~~

24

25

1    (b) Clauses of this Chapter are declared to be severable and if any provision or clause of this

2    chapter or the application thereof is held to be unconstitutional or to be otherwise invalid by any court

3    of competent jurisdiction, such invalidity shall not affect other provisions of this Chapter.

4      **SEC. 41A.86. PROCEDURES FOR DETERMINING *AND APPEALING***

5    **ADMINISTRATIVE PENALTIES.**

6      (a) Notice of Complaint. Within ~~10~~*15* days of the filing of a complaint ~~or~~ *and* upon the

7    Director's independent finding that there may be a violation of this Chapter, the Director shall

8    notify the owner by certified mail that the owner's ~~apartment~~ *residential* unit is the subject of an

9    investigation for an unlawful *use* ~~rental~~ *and provide the date, time, and place of an administrative*

10    *review hearing in which the owner can respond to the complaint*.

11      (b) *Administrative Review Hearing; ~~Director's Determination of a Violation; Notice~~. In the*

12    *event the Director determines that an administrative review hearing shall be conducted, the Director's*

13    *appointed hearing officer will hold an administrative review hearing within 60 days of the filing of the*

14    *complaint to~~Upon~~* review~~ing the~~ *all* information ~~set forth in the complaint, if any, and any information~~

15    ~~obtained by the Director during his or her~~ *provided by the Interested Party, members of the public, City*

16    *staff and the Owner for the* investigation~~,~~ *and* the ~~Director~~ *hearing officer* shall *thereafter make a*

17    determin~~ation~~*e* whether *the* ~~an~~ owner has violated this Chapter. ~~The Director shall notify by~~

18    ~~certified mail the complainant and the owner of his or her determination.~~

19      *(1) Notice of the hearing shall be conspicuously posted on the building that is the subject of the*

20    *hearing. The owner shall state under oath at the hearing that the notice remained posted for at least 10*

21    *calendar days prior the hearing. The Director shall appoint a hearing officer to conduct the hearing.*

22      *(2) Pre-hearing Submission. No less than ten working days prior to the administrative review*

23    *hearing, parties to the hearing shall submit written information to the Director including, but not*

24    *limited to, the issues to be determined by the hearing officer and the evidence to be offered at the*

25

1    *hearing. Such information shall be forwarded to the hearing officer prior to the hearing along with any*

2    *information compiled by the Director.*

3    *(3) Hearing Procedure. If more than one hearing is requested for residential units located in the*

4    *same building at or about the same time, the Director shall consolidate all of the hearings into one*

5    *hearing. The hearing shall be tape recorded. Any party to the hearing may at his or her own expense*

6    *cause the hearing to be recorded by a certified court reporter. Parties may be represented by counsel*

7    *and shall have the right to cross-examine witnesses. All testimony shall be given under oath. Written*

8    *decisions and findings shall be rendered by the hearing officer within 20 working days of the hearing.*

9    *Copies of the findings and decision shall be served upon the parties by certified mail. A notice that a*

10   *copy of the findings and decision is available for inspection between the hours of 9:00 a.m. and 5:00*

11   *p.m. Monday through Friday shall be posted by the owner or the Director in the building in the same*

12   *location in which the notice of the administrative review hearing was posted.*

13   *(4)  Failure to Appear.  In the event the owner or an interested party fails to appear at the*

14   *hearing, the hearing officer may nevertheless make a determination based on the evidence in the record*

15   *and files at the time of the hearing, and issue a written decision and findings.*

16   *(5) Finality of the Hearing Officer's Decision and Judicial Review. The decision of the hearing*

17   *officer shall be final. Within 20 days after service of the hearing officer's decision, any party may seek*

18   *judicial review of the hearing officer's decision.*

19   *(6) Hearing Officer Decision and Collection of Penalties. If any imposed administrative*

20   *penalties and costs have not been deposited at the time of the Hearing Officer's decision, the Director*

21   *may proceed to collect the penalties and costs pursuant to the lien procedures set forth in Subsection*

22   *41A.6(e), consistent with the Hearing Officer's decision.*

23   *(1)*  **(7) Remedy of Violation.** If the *Hearing Officer* ~~*Director*~~ determines that a violation has

24   occurred, the ~~*Director's notice shall:*~~ *Hearing Officer's Decision should:*

25

1    (i4) Specify a reasonable period of time during which the owner must correct or

2    otherwise remedy the violation; and

3    (iiB) State that if the violation is not corrected or otherwise remedied within this

4    period, the owner may be required to pay the administrative penalties set forth in

5    Subsection *41A.6*(c).

6    (82) If the *Hearing Officer*~~Director~~ determines that no violation has occurred, ~~for purposes~~

7    ~~of filing a civil action authorized by Section 41A.5(c)(1),~~ the ~~Director's~~ determination is final.

8    (c) Imposition of Administrative Penalties for Unabated Violations and Enforcement

9    Costs.

10    (1) Administrative Penalties. If the ~~Director, upon further investigation, finds that the~~

11    violation has continued unabated beyond the time specified in the notice required by *the*

12    *Hearing Officer, ~~in Subsection (b)(1)(A), the Director may impose~~* an administrative penalty of not

13    more than ~~three~~ *four* times the *standard hourly administrative rate of $104.00* ~~rental rate~~ *shall be*

14    charged for each unlawfully converted unit from the day the unlawful ~~rental~~ *use* commenced

15    until such time as the unlawful *use* ~~rental~~ terminates. ~~The rental rate charged shall be the rent~~

16    ~~charged, whether daily, weekly, or otherwise calculated, for the apartment unit during the period of the~~

17    ~~unlawful use.~~

18    (2) Enforcement Costs. The ~~Director also may require the~~ owner ~~to~~ *shall* reimburse the

19    City for the costs of enforcement of this Chapter, which shall include, but not be limited to,

20    reasonable attorneys' fees.

21    (d) Notice of ~~Director's Determination of~~ Continuing Violation and Imposition of Penalties.

22    The Director shall notify the owner by certified mail that the violation has continued unabated

23    and that administrative penalties shall be imposed pursuant to ~~Subsection (c)~~*this Chapter 41A*.

24    The notice shall state the ~~basis~~ *time* of the ~~Director's determination regarding the~~ continued

25    existence of the violation and the resulting imposition of penalties. ~~The notice also shall inform~~

Supervisors Chiu, Mar
**BOARD OF SUPERVISORS**

1 ~~the owner of the right to request a hearing within 10 days of the notice date to contest the Director's~~

2 ~~determination on the continuation of the violation and the imposition of penalties. (e) Confirmation of~~

3 ~~Continuing Violation and Imposition of Penalties. If no request is timely filed for an administrative~~

4 ~~review hearing, the Director's determination regarding the continuation of the violation and the~~

5 ~~imposition of penalties shall be deemed confirmed. The Director may then request p~~Payment of the

6 administrative penalties and enforcement costs _shall be made_ within 30 days of the certified

7 mailed notice to the owner. If the administrative penalties and enforcement costs are not paid,

8 the Director ~~is authorized to~~ _shall_ initiate lien procedures to secure the amount of the penalties

9 and costs against the real property that is subject to this Chapter, _under Article XX of Chapter_

10 _10 of the San Francisco Administrative Code to make the penalty, plus accrued interest, a lien against_

11 _the real property regulated under this Chapter. Except for the release of the lien recording fee_

12 _authorized by Administrative Code Section 10.237, all sums collected by the Tax Collector pursuant to_

13 _this ordinance shall be held in trust by the Treasurer and distributed as provided in Section 41A.5(d) of_

14 _this Chapter._ ~~pursuant to the provisions of Section 41.20(d) of this Code; provided however, that the~~

15 ~~City Treasurer shall distribute all sums collected pursuant to Subsection (11) herein.~~

16 ~~(f) Notice of Administrative Review Hearing. Whenever an administrative review hearing is~~

17 ~~requested pursuant to Subsection (d), the Director, within 45 calendar days of the request, shall notify~~

18 ~~the owner of the date, time, and place of the hearing by certified mail. Notice of the hearing shall be~~

19 ~~conspicuously posted on the building that is the subject of the hearing. The owner shall state under~~

20 ~~oath at the hearing that the notice remained posted for at least 10 calendar days prior the hearing. The~~

21 ~~Director shall appoint a hearing officer to conduct the hearing.~~

22 ~~(g) Pre-hearing Submission. No less than three working days prior to the administrative review~~

23 ~~hearing, parties to the hearing shall submit written information to the Department of Building~~

24 ~~Inspection including, but not limited to, the following: the issues to be determined by the hearing officer~~

25

1     *and the evidence to be offered at the hearing. Such information shall be forwarded to the hearing*

2     *officer prior to the hearing along with any information compiled by the Director.*

3     *(h) Hearing Procedure. If more than one hearing is requested for apartment units located in the*

4     *same building at or about the same time, the Director shall consolidate all of the hearings into one*

5     *hearing. The hearing shall be tape recorded. Any party to the hearing may at his or her own expense,*

6     *cause the hearing to be recorded by a certified court reporter. Parties may be represented by counsel*

7     *and have the right to cross-examine witnesses. All testimony shall be given under oath. Written*

8     *decisions and findings shall be rendered by the hearing officer within 20 working days of the hearing.*

9     *Copies of the findings and decision shall be served upon the parties by certified mail. A notice that a*

10     *copy of the findings and decision is available for inspection between the hours of 9:00 a.m. and 5:00*

11     *p.m. Monday through Friday shall be posted by the owner in the building in the same location in which*

12     *the notice of the administrative review hearing was posted.*

13     *(i) Finality of the Hearing Officer's Decision and Appeal. The decision of the hearing officer*

14     *shall be final. Within 20 days after service of the hearing officer's decision, any party other than the*

15     *City and County of San Francisco, may seek review of the hearing officer's decision by the municipal*

16     *court, according to the procedures set forth in California Government Code Section 53069.4.*

17     *(j) Confirmation of Hearing Officer Decision. If no notice of appeal of the hearing officer's*

18     *decision is timely filed, the decision shall be deemed confirmed. If any imposed administrative penalties*

19     *and costs have not been deposited at this time, the Director may proceed to collect the penalties and*

20     *costs pursuant to the lien procedures set forth in Subsection (e).*

21     *(k) Collection of Penalties after Municipal Court Decision. If the court finds in favor of the*

22     *contestant, the amount of the municipal court filing fee shall be reimbursed to the contestant by the City*

23     *and County of San Francisco. If the administrative penalty has been deposited, the City and County of*

24     *San Francisco shall distribute the administrative penalty in accordance with the judgment of the court.*

25

1   ~~If the administrative penalties and enforcement costs have not been deposited and the decision of the~~
2   ~~municipal court is against the contestant, the Director may proceed to collect the penalties and costs.~~
3        (ge) Deposit of Penalties. Administrative penalties paid pursuant to this Chapter shall
4   be deposited in the Mayor's Office of Housing, Housing Affordability Fund less the reasonable
5   costs incurred by the City and County of San Francisco in pursuing *enforcement under this*
6   *Chapter 41A.* ~~the lien procedures set forth in Subsection (e), if such procedures were undertaken.~~ If
7   enforcement costs were imposed ~~pursuant to Subsection (e)~~, such funds shall be distributed
8   according to the purpose for which they were collected.
9        *SEC. 41A.7. CONSTRUCTION.*
10       *(a) Nothing in this Chapter may be construed to supersede any other lawfully enacted*
11  *ordinance of the City and County of San Francisco.*
12       *(b) Clauses of this Chapter are declared to be severable and if any provision or clause of this*
13  *chapter or the application thereof is held to be unconstitutional or to be otherwise invalid by any court*
14  *of competent jurisdiction, such invalidity shall not affect other provisions of this Chapter.*
15       Section 3. Effective Date. This ordinance shall become effective 30 days from the
16  date of passage.
17       Section 4. This section is uncodified. In enacting this Ordinance, the Board intends to
18  amend only those words, phrases, paragraphs, subsections, sections, articles, numbers,
19  punctuation, charts, diagrams, or any other constituent part of the Administrative Code that
20       //
21       //
22       //
23       //
24       //
25

1    are explicitly shown in this legislation as additions, deletions, Board amendment additions,

2    and Board amendment deletions in accordance with the "Note" that appears under the official

3    title of the legislation.

4

5    APPROVED AS TO FORM:
     DENNIS J. HERRERA, City Attorney

6

7    By: _____
     KATE HERRMANN STACY

8    Deputy City Attorney

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Supervisor Chiu
BOARD OF SUPERVISORS
                                                                        Page 13
                                                                        9/25/2012
                                  originated at : n:\legana\as2012\1200416\00798779.doc
                               revised on:  9/25/2012 – n:\legana\as2012\1200416\00798779.doc



| | | |
|---|---|---|
| | **City and County of San Francisco** | City Hall |
| | **Tails** | 1 Dr. Carlton B. Goodlett Place |
| | **Ordinance** | San Francisco, CA 94102-4689 |

---

**File Number:**   120299                           **Date Passed:**   October 23, 2012

Ordinance amending the San Francisco Administrative Code by amending Chapter 41A to 1) extend the restrictions against converting apartment units to short-term occupancies to tenants or guests of business entities that rent such apartments; (2) allow civil actions to be brought by certain non-profit entities; (3) revise enforcement procedures; and 4) making environmental findings.

October 01, 2012 Land Use and Economic Development Committee - RECOMMENDED

October 16, 2012 Board of Supervisors - PASSED, ON FIRST READING
    Ayes: 11 - Avalos, Campos, Chiu, Chu, Cohen, Elsbernd, Farrell, Kim, Mar, Olague and Wiener

October 23, 2012 Board of Supervisors - FINALLY PASSED
    Ayes: 10 - Avalos, Campos, Chiu, Cohen, Elsbernd, Farrell, Kim, Mar, Olague and Wiener
    Excused: 1 - Chu

File No. 120299

**I hereby certify that the foregoing Ordinance was FINALLY PASSED on 10/23/2012 by the Board of Supervisors of the City and County of San Francisco.**

_Angela Calvillo_
**Angela Calvillo**
**Clerk of the Board**

_Edwin M. Lee_
**Mayor**

_11/1/12_
**Date Approved**

---

**EXHIBIT C**

AMENDED IN BOARD
07/26/16

FILE NO. 160790                                ORDINANCE NO. 178–16

[Administrative Code - Short-Term Residential Rentals]

**Ordinance amending the Administrative Code to revise the Residential Unit Conversion**

**Ordinance to require Hosting Platforms to verify that a Residential Unit is on the City**

**Registry prior to accepting a fee for booking a short-term rental transaction, and to**

**provide an affidavit of compliance to the City and retain certain records; authorize the**

**Office of Short Term Rentals to issue an administrative subpoena to obtain records;**

**and provide for civil, administrative, and criminal penalties against Hosting Platforms**

**for violations of their obligations under the Residential Unit Conversion Ordinance; and**

**affirming the Planning Department's determination under the California Environmental**

**Quality Act.**

NOTE:    **Unchanged Code text and uncodified text** are in plain Arial font.
**Additions to Codes** are in *single-underline italics Times New Roman font*.
**Deletions to Codes** are in ~~*strikethrough italics Times New Roman font*~~.
**Board amendment additions** are in <u>double-underlined Arial font</u>.
**Board amendment deletions** are in ~~strikethrough Arial font~~.
**Asterisks (\* \* \* \*)** indicate the omission of unchanged Code
subsections or parts of tables.

Be it ordained by the People of the City and County of San Francisco:

Section 1. Environmental Findings. The Planning Department has determined that the

actions contemplated in this ordinance comply with the California Environmental Quality Act

(California Public Resources Code Sections 21000 et seq.).  Said determination is on file with

the Clerk of the Board of Supervisors in File No. 160790 and is incorporated herein by

reference. The Board affirms this determination.

Section 2.  The Administrative Code is hereby amended by revising Sections 41A.4,

41A.5, 41A.6, and 41A.7, to read as follows:

1     **SEC. 41A.4.  DEFINITIONS.**

2        Whenever used in this Chapter 41A, the following words and phrases shall have the

3 definitions provided in this Section:

4        *Booking Service. A Booking Service is any reservation and/or payment service provided by a*

5 *person or entity that facilitates a short-term rental transaction between an Owner or Business Entity*

6 *and a prospective tourist or transient user, and for which the person or entity collects* or receives,

7 directly or indirectly through an agent or intermediary, *a fee in connection with the reservation*

8 *and/*or *payment services provided for the short-term rental transaction.*

9          \*     \*     \*     \*

10     **Hosting Platform.** A person or entity that participates in *the* short-term rental business

11 by providing,~~ a means~~ *and collecting* or receiving *a fee for, Booking Services* through which an

12 Owner may offer a Residential Unit for Tourist or Transient Use. ~~This business service is~~*Hosting*

13 *Platforms* usually, though not necessarily, provide~~d~~ *Booking Services* through an online platform

14 that allows an Owner to advertise the Residential Unit through a website provided by the

15 Hosting Platform and ~~provides a means for~~ *the Hosting Platform conducts a transaction by which*

16 potential tourist or transient users ~~to~~ arrange Tourist or Transient Use and payment, whether

17 the tourist or transient pays rent directly to the Owner or to the Hosting Platform.

18          \*     \*     \*     \*

19     **SEC. 41A.5.  UNLAWFUL CONVERSION; REMEDIES.**

20          \*     \*     \*     \*

21     (e) **Criminal Penalties.** Any Owner or Business Entity who rents a Residential Unit for

22 Tourist or Transient Use in violation of this Chapter 41A, or any Hosting Platform that provides

23 *a Booking Service* ~~a listing~~ for a Residential Unit *to be used* for Tourist or Transient Use in

24 violation of *the Hosting Platform's obligations under* this Chapter 41A, ~~without correcting or~~

25 ~~remedying the violation as provided for in subsection 41A.6(c)(6),~~ shall be guilty of a misdemeanor.

1   Any person convicted of a misdemeanor hereunder shall be punishable by a fine of not more

2   than $1,000 or by imprisonment in the County Jail for a period of not more than six months, or

3   by both. Each Residential Unit rented for Tourist or Transient Use shall constitute a separate

4   offense.

5   *   *   *   *

6   (g)   **Exception for Short-Term Residential Rental.**

7   *   *   *   *

8   (4)   **Requirements for Hosting Platforms.**

9   (A)   ~~*Notice to Users of Hosting Platform.*~~ All Hosting Platforms shall

10   provide the following information in a notice to any user listing a Residential Unit located

11   within the City and County of San Francisco through the Hosting Platform's service. The

12   notice shall be provided prior to the user listing the Residential Unit and shall include the

13   following information: that Administrative Code Chapters 37 and 41A regulate Short-Term

14   Rental of Residential Units; the requirements for Permanent Residency and registration of the

15   unit with the Department; and the transient occupancy tax obligations to the City.

16   (B)   A Hosting Platform shall comply with the requirements of the

17   Business and Tax Regulations Code by, among any other applicable requirements, collecting

18   and remitting all required Transient Occupancy Taxes, and this provision shall not relieve a

19   Hosting Platform of liability related to an occupant's, resident's, Business Entity's, or Owner's

20   failure to comply with the requirements of the Business and Tax Regulations Code. A Hosting

21   Platform shall maintain a record demonstrating that the taxes have been remitted to the Tax

22   Collector. ~~and shall make this record available to the Tax Collector upon request.~~

23   (C)   *A Hosting Platform may provide, and collect a fee for, Booking Services in*

24   *connection with short-term rentals for Residential Units located in the City and County of San*

25   *Francisco only when those Residential Units are lawfully registered on the Short Term Residential*

1   *Rental Registry at the time the Residential Unit is rented for short term rental.  Prior to providing*

2   *reservation and payment services for a listing of a Residential Unit within the City to be rented for*

3   *Tourist or Transient Use, a Hosting Platform shall verify with the Office of Short-Term Residential*

4   *Rental Administration and Enforcement that the Residential Unit is listed on the Registry and has a*

5   *valid registration number.  For each listing active on the effective date of the ordinance in Board File*

6   *No. 160423 and thereafter, Hosting Platforms shall comply with this subsection (g)(4)(C) by:*

7   *(i) Providing the verified registration number on each listing in the area*

8   *of the listing dedicated to information verified or compiled by the Hosting Platform about the host, such*

9   *as host response rate, host ratings, and date of joining the platform prior to conducting any booking*

10  *service for such host; or*

11  *(ii) Sending the verified registration number, Residential Unit street*

12  *address (including any unit number), and host name to the Office of Short-Term Residential Rental*

13  *Administration and Enforcement by electronic mail prior to posting the listing on the platform.*

14  *Consistent with protections for Registry information, the Office of Short-Term Residential Rental*

15  *Administration and Enforcement, to the extent permitted by law, shall redact registered Permanent*

16  *Resident names and street and unit numbers from the records available for public review.*

17  *(D) Any violation of a Hosting Platform's responsibilities under subsections (g)(4)(A),*

18  *(B), or (C), or 41A.7(b) shall subject the Hosting Platform to the administrative penalties and*

19  *enforcement provisions of this Chapter 41A, including but not limited to payment of civil penalties of up*

20  *to $1,000 per day for the period of the failure to comply, with the exception that any violation related to*

21  *failure to comply with the requirements of the Business and Tax Regulations Code shall be enforced by*

22  *the Treasurer/Tax Collector under that Code.*

23  *(D) Commencing November 5, 2016, and on the fifth day of every month*

24  *thereafter, a Hosting Platform shall provide a signed affidavit to the Office of Short Term Rentals*

25

Supervisors Campos; Peskin, Avalos, Mar
**BOARD OF SUPERVISORS**                                    Page 4

1     *verifying that the Hosting Platform has complied with subsection (g)(4)(C) of this Section 41A.5 in the*

2     *immediately preceding month.*

3                 *(E)     For not less than three years following the end of the calendar year in*

4     *which the short-term rental transaction occurred, the Hosting Platform shall maintain and be able, in*

5     *response to a lawful request, to provide to the Office of Short Term Rentals for each short-term rental*

6     *transaction for which a Hosting Platform has provided a Booking Service:*

7                 *(i)     The name of the Owner or Business Entity who offered a*

8     *Residential Unit for Tourist or Transient Use,*

9                 *(ii)     The address of the Residential Unit,*

10                 *(iii)     The dates for which the tourist or transient user procured use of*

11     *the Residential Unit using the Booking Service provided by the Hosting Platform,*

12                 *(iv)     The registration number for the Residential Unit, and*

13                 *(v)     The affidavit required in subsection (g)(4)(D).*

14         (5)   The exception set forth in this subsection (g) provides an exception only to

15     the requirements of this Chapter 41A. It does not confer a right to lease, sublease, or

16     otherwise offer a residential unit for Short-Term Residential Use where such use is not

17     otherwise allowed by law, a homeowners association agreement or requirements, any

18     applicable covenant, condition, and restriction, a rental agreement, or any other restriction,

19     requirement, or enforceable agreement. All Owners and residents are required to comply with

20     the requirements of Administrative Code Chapter 37, the Residential Rent Stabilization and

21     Arbitration Ordinance, including but not limited to the requirements of Section 37.3(c).

22         (6)   ~~*Department Contact Person.*~~ The Department shall designate a contact

23     person for members of the public who wish to file Complaints under this Chapter 41A or who

24     otherwise seek information regarding this Chapter or Short-Term Residential Rentals. This

25     contact person shall also provide information to the public upon request regarding quality of

1    life issues, including, for example, noise violations, vandalism, or illegal dumping, and shall

2    direct the member of the public and/or forward any such Complaints to the appropriate City

3    department.

4              (7)   Notwithstanding any other provision of this Chapter 41A, nothing in this

5    Chapter shall relieve an individual, Business Entity, or Hosting Platform of the obligations

6    imposed by any and all applicable provisions of state law and the Municipal Code including

7    but not limited to those obligations imposed by the Business and Tax Regulations Code.

8    Further, nothing in this Chapter shall be construed to limit any remedies available under any

9    and all applicable provisions of state law and the Municipal Code including but not limited to

10   the Business and Tax Regulations Code.

11

12   **SEC. 41A.6.  ADMINISTRATIVE ENFORCEMENT PROCEDURES.**

13           *    *    *    *

14       (d)   **Administrative Penalties for Violations and Enforcement Costs.**

15              (1)   **Administrative Penalties.** Administrative penalties shall be assessed as

16   follows:

17                     (A)   For the initial violation *by an Owner or Business Entity*, not more than

18   four times the standard hourly administrative rate of $121 for:

19   _____(i)_____each unlawfully converted unit *per day from the notice of*

20   *violation until such time as the unlawful activity terminates*; or

21   _____(ii)      *the initial for each identified* failure of a Hosting Platform to

22   comply with *the requirements of its obligations under* subsections 41A.5(g)(4).*; (4), (B), (C), or*

23   *41A.7(b), per day from the notice of violation until such time as the unlawful activity terminates;*

24

25

1            (B)   For the second *and any subsequent* violation by the same Owner(s),

2    Business Entity, or Hosting Platform, not more than eight times the standard hourly

3    administrative rate of $121 for:

4            (i)    each unlawfully converted unit *per day from the notice of*

5    *violation until such time as the unlawful activity terminates;* or

6            (ii)   ~~for~~ the second and any subsequent~~each identified~~ failure of a

7    Hosting Platform to comply with *its obligations under* ~~the requirements of~~ subsection~~s~~

8    41A.5(g)(4)~~, (4), (B), (C), or 41A.7(b), per day from the day the unlawful activity commenced until~~

9    ~~such time as the unlawful activity terminates; and~~

10           ~~(C)   For the third and any subsequent violation by the same Owner(s), Business~~

11   ~~Entity, or Hosting Platform, not more than 12 times the standard hourly administrative rate of $121 for~~

12   ~~each unlawfully converted unit or for each identified failure of a Hosting Platform to comply with the~~

13   ~~requirements of subsections 41A.5(g)(4) (A), (B), (C), or 41A.7(b), per day from the day the unlawful~~

14   ~~activity commenced until such time as the unlawful activity terminates.~~

15       (2)   **Prohibition on Registration and Listing Unit(s) on Any Hosting**

16   **Platform.** In the event of multiple violations *of any Owner's or Business Entity's obligations under*

17   *this Chapter 41A*, the Department shall remove the Residential Unit(s) from the Registry for one

18   year and include the Residential Unit(s) on a list maintained by the Department of Residential

19   Units that may not be *offered for Tourist or Transient Use*~~listed on any Hosting Platform~~ until

20   compliance. Any Owner~~,~~ *or* Business Entity *or Hosting Platform* who continues to ~~list~~*offer for*

21   *rent* a Residential Unit in violation of this Section 41A.6 shall be liable for additional

22   administrative penalties and civil penalties of up to $1,000 per day of unlawful inclusion.

23

24       *   *   *   *

25

1  **SEC. 41A.7.  OFFICE OF SHORT-TERM RESIDENTIAL RENTAL ADMINISTRATION**

2  **AND ENFORCEMENT.**

3      (a)  The Mayor shall establish an Office of Short-Term Residential Rental

4  Administration and Enforcement, which shall provide a single location to receive and process

5  applications for the Registry and Complaints regarding violations of this Chapter 41A. This

6  office shall be staffed by the Department and other departments as appropriate, with

7  participation from the Department of Building Inspection, the Treasurer/Tax Collector's Office,

8  and other departments as needed, to process applications for the Registry and enforce the

9  requirements of this Chapter 41A in a timely and efficient manner. It is the intent of this Board

10  of Supervisors in directing the establishment of this office to streamline both the process of

11  administering the Registry and enforcing the requirements of this Chapter 41A to protect

12  residential housing from unlawful conversion to Tourist or Transient Use.  The Office of Short-

13  Term Residential Rental Administration and Enforcement shall promulgate rules and

14  regulations to simplify and streamline the application process and to minimize the time

15  between the filing of applications and their final approval.

16      (b)  **Monitor Hosting Platforms.**  In addition to the administrative enforcement

17  duties outlined in Section 41A.6, the Office of Short-Term Residential Rental Administration

18  and Enforcement shall actively monitor Hosting Platform listings ~~to ensure that Hosting Platforms~~

19  ~~are only listing Residential Units that are listed on the Registry~~.  Within 15 business days of the

20  effective date of ~~the ordinance in Board File No.160423~~ Ordinance No. 104-16, the Office of Short-

21  Term Residential Rental Administration and Enforcement shall complete a comprehensive

22  review of active Hosting Platform listings and produce an inventory of potentially non-

23  compliant listings discovered during the review.  Subsequent reviews of Hosting Platform

24  listings shall be performed on at least a monthly basis.

25

1          (1)  The Office of Short-Term Residential Rental Administration and

2    Enforcement shall, upon completion of a Hosting Platform review or discovery of a potentially

3    non-compliant listing, immediately provide notice to Hosting Platforms by electronic mail of all

4    listings that do not have valid registration numbers or are otherwise not in compliance with this

5    Chapter 41A.  These notices shall be provided to the City Attorney's Office.

6    ~~(2) Hosting Platforms shall respond to each notice sent pursuant to subsection (b)(1) by~~

7    ~~confirming, for each listing identified in the notice, that the listing has a valid registration number and~~

8    ~~providing that number and any other requested information relevant to determining whether the listing~~

9    ~~complies with the provisions of this Chapter 41A (including unit address and host information) to the~~

10    ~~Office of Short-Term Residential Rental Administration and Enforcement. Consistent with protections~~

11    ~~for Registry information, the Office of Short-Term Residential Rental Administration and Enforcement,~~

12    ~~to the extent permitted by law, shall redact registered Permanent Resident names and street and unit~~

13    ~~numbers from the records available for public review.~~

14    _(2)  The Office of Short-Term Residential Rental Administration and Enforcement shall_

15    _have the power to issue and serve administrative subpoenas as necessary to determine whether_

16    _Owners, Business Entities, and Hosting Platforms have complied with Administrative Code Chapter_

17    _41A.  The Office of Short-Term Residential Rental Administration and Enforcement shall issue and_

18    _serve subpoenas to the Hosting Platforms to obtain information necessary to determine whether_

19    _violations of Administrative Code Chapter 41A have occurred within a reasonable time not to exceed_

20    _30 days of discovering potential violations through a monthly review or other investigation effort._

21    _Owners, Business Entities, and Hosting Platforms shall have a reasonable opportunity to challenge the_

22    _administrative subpoena by seeking judicial review before suffering any penalties for refusing to_

23    _comply._

24    ~~(3)  For each listing that a Hosting Platform fails to provide the requested information~~

25    ~~within one City business day of the notice being sent by the Office of Short-Term Residential Rental~~

1   ~~Administration and Enforcement, the Hosting Platform shall be subject to the administrative penalties~~

2   ~~and enforcement provisions of this Chapter 41A, including but not limited to payment of civil penalties~~

3   ~~of up to $1,000 per day until the Hosting Platform complies with subsection (b)(2).~~

4         (c)     **Reporting to Board of Supervisors.**

5         (1)  **Annual Reports.** The Office of Short-Term Residential Rental

6   Administration and Enforcement shall provide a report to the Board of Supervisors regarding

7   the administration and enforcement of the Short-Term Residential Rental program on an

8   annual basis. The report shall make recommendations regarding proposed amendments to

9   this Chapter 41A necessary to reduce any adverse effects of the Short-Term Residential

10   Rental program.

11         (2)  **Quarterly Reports.** The Office of Short-Term Residential Rental

12   Administration and Enforcement shall provide quarterly reports to the Board of Supervisors

13   summarizing the Host Platform monitoring activities during the preceding quarter.  The

14   periods covered by the quarterly reports shall commence on January 1, April 1, July 1, and

15   October 1, respectively.  At a minimum, each report shall include the number of notices sent

16   to Hosting Platforms, the total number of listings included in those notices, the number *of any*

17   *administrative subpoenas issued upon discovery of potentially non-compliant listings,* ~~of listings that~~

18   ~~were confirmed as non-compliant or otherwise removed or modified by the Hosting Platforms in~~

19   ~~response to the notices,~~ and the number and amount of penalties imposed on *Owners, Business*

20   *Entities, or* Hosting Platforms for *violations of their respective obligations under this Chapter*

21   *41A.* ~~failing to respond to notices.~~  Each report shall break down information by zip code,

22   supervisorial district, and any other criteria as may be requested by the Board of Supervisors.

23        Section 3.  Effective Date.  This ordinance shall become effective 30 days after

24   enactment.  Enactment occurs when the Mayor signs the ordinance, the Mayor returns the

25

1  ordinance unsigned or does not sign the ordinance within ten days of receiving it, or the Board

2  of Supervisors overrides the Mayor's veto of the ordinance.

3

4       Section 4.  Scope of Ordinance.  In enacting this ordinance, the Board of Supervisors

5  intends to amend only those words, phrases, paragraphs, subsections, sections, articles,

6  numbers, punctuation marks, charts, diagrams, or any other constituent parts of the Municipal

7  Code that are explicitly shown in this ordinance as additions, deletions, Board amendment

8  additions, and Board amendment deletions in accordance with the "Note" that appears under

9  the official title of the ordinance.  This ordinance sets forth revisions to Administrative Code

10  Chapter 41A, with the amendments adopted in Ordinance No. 104-16 shown as existing text,

11  even though the effective date of Ordinance No. 104-16 is July 24, 2016, subsequent to

12  introduction of this ordinance.

13

14  APPROVED AS TO FORM:
    DENNIS J. HERRERA, City Attorney
15

16  By:

17      ROBB KAPLA
        Deputy City Attorney

18

19  n:\legana\as2016\1500663\01123988.docx

20

21

22

23

24

25



**City and County of San Francisco**

**Tails**

**Ordinance**

City Hall
1 Dr. Carlton B. Goodlett Place
San Francisco, CA  94102-4689

---

**File Number:**   160790                    **Date Passed:**   August 02, 2016

Ordinance amending the Administrative Code to revise the Residential Unit Conversion Ordinance to require Hosting Platforms to verify that a Residential Unit is on the City Registry prior to accepting a fee for booking a short-term rental transaction, and to provide an affidavit of compliance to the City and retain certain records; authorize the Office of Short Term Rentals to issue an administrative subpoena to obtain records; provide for civil, administrative, and criminal penalties against Hosting Platforms for violations of their obligations under the Residential Unit Conversion Ordinance; and affirming the Planning Department's determination under the California Environmental Quality Act.

July 25, 2016 Land Use and Transportation Committee - REFERRED WITHOUT RECOMMENDATION AS COMMITTEE REPORT

July 26, 2016 Board of Supervisors - AMENDED, AN AMENDMENT OF THE WHOLE BEARING SAME TITLE

    Ayes: 9 – Avalos, Breed, Campos, Cohen, Kim, Peskin, Tang, Wiener and Yee

    Excused: 1 – Farrell

    Absent: 1 - Mar

July 26, 2016 Board of Supervisors - PASSED ON FIRST READING AS AMENDED

    Ayes: 9 – Avalos, Breed, Campos, Cohen, Kim, Peskin, Tang, Wiener and Yee

    Excused: 1 – Farrell

    Absent: 1 - Mar

August 02, 2016 Board of Supervisors - FINALLY PASSED

    Ayes: 10 – Avalos, Breed, Campos, Cohen, Kim, Mar, Peskin, Tang, Wiener and Yee

    Excused: 1 – Farrell

---

File No. 160790

I hereby certify that the foregoing
Ordinance was FINALLY PASSED on
8/2/2016 by the Board of Supervisors of the
City and County of San Francisco.

*Peggy Nevin*

<u>for</u> Angela Calvillo
**Clerk of the Board**

<u>**Unsigned**</u>       <u>8/11/16</u>
**Mayor**           **Date Approved**

I hereby certify that the foregoing ordinance, not being signed by the Mayor within the time limit as
set forth in Section 3.103 of the Charter, or time waived pursuant to Board Rule 2.14.2, became
effective without his approval in accordance with the provision of said Section 3.103 of the Charter
or Board Rule 2.14.2.

*Peggy Nevin*

<u>for</u> Angela Calvillo
Clerk of the Board        <u>8/12/16</u>
              Date

**EXHIBIT D**

  

 PRO  WATCHLIST

*Dove*   Softer, smoother skin after **just one shower**    Save $1 ▶

## TECHNOLOGY

TECHNOLOGY | RECODE | MOBILE | SOCIAL MEDIA | ENTERPRISE | GAMING | CYBERSECURITY | THE PULSE o 1 MARKET

# Airbnb may not be worth $30 billion if illegal listings go away, said VC

Harriet Taylor | @HarriSt
Thursday, 30 Jun 2016 | 6:02 PM ET

🐦 f 🔴 in ✉ 🔗   **2**
SHARES

**13  COMMENTS**  Join the Discussion



SKYWORKS SOLUTIONS

CHARTS | APPLE: TOO FAR, TOO FAST?

🔺 CNBC

Airbnb's reportedly proposed $30 billion valuation may not hold up if illegal listings in New York and San Francisco are removed, said Bradley Tusk, a former aid to Mayor Michael Bloomberg who specializes in helping startups navigate regulatory environments.

Airbnb has continued to raise funding — enabling the home-sharing service to put off an eventual IPO — even as it remains locked in disputes with lawmakers, including in its hometown of San Francisco and in New York City.

(*The New York Times* first reported the details of Airbnb's most recent funding round on Tuesday.)

"They are raising now at a higher valuation, but if you were to say 'here is what the New York and San Francisco markets are really worth in full legal compliance' and then re-run the numbers — however they do it — I don't know that they are still that $30 billion company," said Tusk at a dinner with reporters in San Francisco on Wednesday.

Airbnb declined to comment for this report.

On Monday, Airbnb sued its home-town of San Francisco over a Board of Supervisors decision on June 7 to fine the company $1,000 per day for each listing that is not registered with the city.

This followed a decision earlier in the month by New York State Senate to make it illegal for hosts to advertise short-term rentals of less than

## think IBM Cloud

The IBM Cloud: Design...



Learn about IBM IoT solutions on the IBM Cloud
Find out more about Watson on the IBM Cloud
Shop the IBM Marketplace

Conversation

What might a retailer, oil company & tennis club have in common? How can #hybridcloud help? @JohnPBoston explains bit.ly/29YT7UG

Reply  Retweet  Like

Learn More

FROM THE WEB          Sponsored Links by Taboola

**Yes, Pay Off Your House At A Furious Pace If You Owe Less Than $300k**
Lower My Bills

**4 Times in 14 Years: Rare Stock Alert Released**
The Motley Fool

**Thinking About Going Solar? Read This First**
Home Solar Quotes

**How Rich He Got Doing "Gods Work" is Disgusting**
Your Daily Dish

30 days on Airbnb. If the bill passes into law, New Yorkers who violate the law will face fines starting at $1,000.

Tusk advises companies disrupting highly regulated industries, including Uber, Tesla and FanDuel, and said he now uses Airbnb as a cautionary tale. The key missteps CEO Brian Chesky made were not taking regulators seriously enough and moving too slowly, said Tusk. That enabled the opposition — hotel unions, hoteliers and affordable housing advocates — to build a coalition before Airbnb was able to cut deals with legislators, said Tusk.

"I get wanting to be super aggressive — I started doing this with [Uber CEO Travis Kalanick] five years ago and there is no-one more aggressive than Travis," he said. "But still there are times when you have got to recognize the political reality of what you are dealing with."

Knowing who you're up against is also important, said Tusk. If you're waging a fight against a sympathetic constituency, you're going to have a hard time.

"Affordable housing advocates are kind of likeable, so they are just harder to beat," he said.

When asked how he would advise Airbnb to move forward in New York and San Francisco, Tusk said he had nothing to offer.

"I don't see how they can overcome that in either city, which means they have got a really tough choice because they have got to operate in this very legal gray area, risk seeing lots of fines on their hosts and on the company too or, if they were to right-size the platform in both markets and only have legal inventory, you are wiping out a lot of their profits and a lot of their revenue in two critical markets, especially New York," said Tusk.

According to Beyond Pricing, New York City and San Francisco make up just 2.4 percent Airbnb's worldwide listings.


**Harriet Taylor**
CNBC Tech Reporter

## RELATED SECURITIES

| Symbol | Price | Change | %Change |
|--------|-------|--------|---------|
| TSLA | 205.40 ▲ | 4.98 | 2.48% |

## FROM THE WEB

Sponsored Links by Taboola

The Fastest Way To Pay Off $10,000 In Credit Card Debt
NerdWallet

Yes, Pay Off Your House At A Furious Pace If You Owe Less Than $300k
Lower My Bills

Thinking About Going Solar? Read This First
Home Solar Quotes

by Taboola

Mark Cuban makes $10 million pitch to Donald Trump

Here's how much the richest Americans have saved for retirement

Clinton's illness goes faint as Trump shows new lack of discipline

A correction is coming, and nothing can stop it, this economist says

Elizabeth Warren: 'There's a serious problem with senior management at Wells Fargo'

Apple shares are soaring, and here's why they're going higher: Trader

MOST POPULAR: TECH


The iPhone 7 just hit stores. Here's what people are saying.


Best Buy, Target announce $50 offers amid Apple Watch Series 2 delays


Samsung, safety regulators officially recall about 1 million Galaxy Note 7 phones


How to get a free iPhone 7 on your carrier


The iPhone 7 reviews are in. Here's what people are saying

BINGE ›

Morgan Freeman on how 'Shawshank' became a classic

How Rich He Got Doing "Gods Work" is Disgusting
Your Daily Dish

Prepare for a Doctor's Visit with These Questions on Eczema [Download]
WebMD

Longevity Scientists Explain What They Believe Is Key To Health Now and Later
Fast Company | Elysium Health

MORE FROM CNBC                                                          by Taboola

Mark Cuban makes $10 million pitch to Donald Trump

Here's how much the richest Americans have saved for retirement

Clinton's illness goes faint as Trump shows new lack of discipline

A correction is coming, and nothing can stop it, this economist says

Elizabeth Warren: 'There's a serious problem with senior management at Wells Fargo'

Apple shares are soaring, and here's why they're going higher: Trader

Sponsored

| | |
|---|---|
| Top Roth IRA Plans | Foreclosed Homes for Sale |
| Best Annuities for 2016 | Reverse Loan Calculator |
| 2016 Best Smartphones | Top 5 Oil Stocks to Buy |
| New Reverse Mortgage Rates | Best Luxury Car Lease Deals |
| 2016 Best SUVs | 10 Best IRA Plans |

Morgan Freeman on Shawshank, and why the title is wrong ⊙

Morgan Freeman: Movies should fear TV ⊙

Morgan Freeman: The big screen vs. the iPhone screen ⊙

What it was like to negotiate with Steve Jobs ⊙

Sponsored

1. 10 Best IRA Plans

2. Best Retirement Savings Plans

3. Reverse Loan Calculator

4. Retirement Planning Calculator

5. New Reverse Mortgage Rates

SHOW COMMENTS

f    🐦    📷    ▶    t    in    g+    📌    🎞    🔊

About    Site Map    Digital Products    Licensing & Reprints    Careers    Help    Contact

Corrections    Privacy Policy    AdChoices    Terms of Service - New    News Releases

Independent Programming    Switch to mobile view    Subscribe to CNBC PRO

Data is a real-time snapshot *Data is delayed at least 15 minutes
Global Business and Financial News. Stock Quotes and Market Data and Analysis

Data also provided by    THOMSON REUTERS

© 2016 CNBC LLC  All Rights Reserved  A Division of NBCUniversal

NEWSLETTERS

☑ Make It

☑ Breaking News

☑ Morning Squawk

☑ Evening Brief

More Free Newsletters

Email (Required)              SUBMIT

Get these newsletters delivered to your inbox, and more info about our products and service
Privacy Policy

Case 3:16-cv-03615-JD   Document 58-1   Filed 09/19/16   Page 37 of 81

**EXHIBIT E**



UBER

Ride   Drive

FIND A CITY     HELP     SIGN IN

BECOME A DRIVER

It's easy to get started

**1**

Sign up in minutes

Tell us a little about yourself and your car. Vehicle requirements vary by region, and we'll show you what's needed for your city.

BECOME A DRIVER  →

**2**

Share some documents

We'll need your license, registration, proof of insurance, and the necessary information to run a background check.

**3**

Get the app and go

Once you're approved to drive with Uber as an independent contractor, we'll provide everything you need to be a success on the road.

**EXHIBIT F**

# Airbnb's Work to Fight Discrimination and Build Inclusion

## A Report Submitted to Airbnb

By Laura W. Murphy,

President, Laura Murphy & Associates

September 8, 2016

About Airbnb / 2
A Message from Laura Murphy / 3
Summary / 10
Chapter One: Airbnb's Nondiscrimination Review / 13
Chapter Two: Key Findings and Lessons Learned / 16
Chapter Three: Policy Changes / 19
Conclusion / 26
Appendix One: The Airbnb Nondiscrimination Policy / 27



# About Airbnb

Founded in August 2008 and based in San Francisco, Airbnb is a trusted community marketplace for people to list, discover, and book unique accommodations around the world —online or from a mobile phone or tablet. Whether an apartment for a night, a castle for a week, or a villa for a month, Airbnb connects people to unique travel experiences, at any price point, in more than 34,000 cities and 191 countries. And with world-class customer service and a growing community of users, Airbnb is the easiest way for people to monetize their extra space and showcase it to an audience of millions.

Hosts create profiles for themselves and their property, choose their own price and availability, and set guidelines for guests. Hosts and guests learn about each other through past reviews and personal communication through the Airbnb platform. Guests and hosts use Airbnb to confirm travel dates and expectations, and make and receive payments. After the stay, both hosts and guests leave reviews for one another, which are public for all future hosts and guests to read.

# A Message from Laura Murphy

When I was approached by Airbnb and asked to lead their effort to fight discrimination and bias, I was skeptical. After spending decades devoting my career to fighting for the protection and advancement of civil rights and civil liberties in this nation, at the American Civil Liberties Union and other organizations, I've seen many companies merely pay lip service to addressing the problems of racism and discrimination.

I was also skeptical because I wondered what one company, especially such an upstart in the sharing economy, could do to have a deep impact on ending racial discrimination among its users. After all, the sad truth is that racial biases (as well as other forms of bias) are deeply embedded in the culture of our nation. No one company can create an alternative universe where they do not exist.

In the area of housing and public accommodations in particular, for the vast majority of this nation's history it was legal to discriminate based on race and other immutable characteristics. Only about 50 years ago, after great social tumult, federal laws were enacted to prevent discrimination in the real estate and lodging industry, the two most prominent being the Fair Housing Act of 1968 and Title II of the Civil Rights Act of 1964. As important as those laws are, they were unevenly enforced and lacked sufficient strength to be universally effective. Even with those federals laws supplemented by state and local prohibitions, evidence points to the sad fact that discrimination in lodging has been one of the most intractable civil rights problems in our nation.

Further, I once served as the District of Columbia's first Director of Tourism in the early 1990s. I became familiar with the many tactics long used by hotels, restaurants, and tour companies to facilitate or ignore racial discrimination. Before a sharing economy company like Airbnb was even imagined, there were established problems with discrimination in the travel and tourism industry. During my stint as a tourism leader in the nation's capital, one of my greatest challenges was getting that industry to employ and do business with members of the Asian American, Pacific Islander, Latino, and African American communities, and to help circulate the tourism dollar so that it helped communities and neighborhoods outside the small corridor of federal monuments and attractions.

3

Finally, as an African American woman, I grew up understanding the sting of bias. My mother, who was born in New England, was terrified of travel in the southern United States. Even outside of the South, my family, like most black families, often had difficulty booking hotel rooms when traveling in the United States, even when it was clear that we had the means to do so. We knew that we were being turned down at hotels—even those with vacancies—merely because they did not want black customers. My parents told me stories about the Green Book and how black families had to stay with other black families because Jim Crow laws permitted most hotels and motels to deny accommodations to black travelers.

We would like to think that decades after these forms of overt biases were in place and sanctioned by law, in 2016 a company like Airbnb would not have to deal with these problems. Unfortunately, that is not the case: Airbnb has seen how African Americans and other people of color have been discriminated against when trying to find a place to stay. It was clear that Airbnb needed a comprehensive, end-to-end review of all facets of the Airbnb community, with a focus on how the platform can be designed to prevent and address discrimination.

Given that context, I had to ask: was it realistic to expect Airbnb to do better than others in the travel and lodging business and be a leader in overcoming longstanding industry practices and widespread bias? After engaging with key stakeholders and officials at every level of the company, my skepticism was replaced by enthusiasm for the task. Here is what I have come to believe:

**Airbnb is engaging in frank and sustained conversations about bias on its platform. More noteworthily, however, Airbnb is putting in place powerful systemic changes to greatly reduce the opportunity for hosts and guests to engage in conscious or unconscious discriminatory conduct.**

What initially persuaded me that change is possible at Airbnb was a series of conversations with key stakeholders, starting with my first conversation with Airbnb's CEO, Brian Chesky. In the course of a very substantive meeting, Chesky said to me with great conviction, "Airbnb will never be able to fulfill its mission without seriously combating discrimination on its platform." I heard a level of determination and commitment in his words, words that were repeated by the members of the executive staff throughout the company.

4

Brian Chesky was also forthright in admitting that his company was slow to address these problems. He and his co-founders Joe Gebbia and Nathan Blecharczyk started Airbnb in 2008 with the best of intentions, but were not fully conscious of racial bias when they designed the platform. He agreed and was personally concerned that there was an unacceptable lack of urgency around Airbnb's previous attempts to address allegations of racial bias within the Airbnb community, and vowed that such unconsciousness would not happen again.

Other stakeholders take just as seriously the problems of discrimination on Airbnb's platform. Along with top management, these stakeholders and constituents, notwithstanding vigorous criticism, made me confident that greatly reducing bias on Airbnb's platform was achievable. Among the stakeholders I met with as we worked on this challenge were:

- **Hosts:** The vast majority of hosts we engaged believe that discrimination inhibits their ability to earn supplemental income, it is bad for business and their collective reputations, and they are invested in seeing it end. They also want freedom to determine who stays in their home. Airbnb sought to strike a balance between homeowners' rights and the need to have people on their platform who embrace the company's mission, i.e., not tolerating discrimination based on certain immutable characteristics.

- **Victims of discrimination:** After speaking with victims of discrimination, the majority wanted to use the site again, and felt that there were specific reforms that could be put into place to, if not eliminate, then at least greatly diminish bias.

- **Employees:** Airbnb employees are proud of where they work and don't want their employer to do anything to facilitate discrimination or let these kind of problems fester. Before this review started, a number of employees had formed internal working groups to come up with solutions. They showed up at town halls with thoughtful questions, and sought ways to be involved. They made it clear that they wanted to be part of the solution not just for African American travelers but for Latino, Asian American Pacific Islander, and LGBTQ, people with disabilities, and other travelers as well. My particular thanks go to Global Policy Director Sarah Bianchi, Director of Product Donna Boyer, and Director of Diversity and Belonging David King for their leadership and tireless work.

5

- **Civil rights organizations:** Civil rights leaders are rightly concerned about the advancement of civil rights in the sharing economy. A number of them have written very thoughtful articles, given speeches, and have written letters to Airbnb about the need to structure inclusion and eliminate bias. They have graciously offered their input on dozens of proposed solutions, and have agreed to work with Airbnb to hold the company accountable.

- **Federal and state regulatory agencies:** Regulators want to see good faith efforts on the part of businesses in the sharing economy. They encouraged Airbnb to be proactive and not wait on government before changes were put into place.

- **Elected and appointed officials:** When their constituents complain, public leaders jump into action. These officials act as an important barometer of consumer concerns. As part of this 90-day review process, a number of elected officials have engaged Airbnb in meaningful discussions about discrimination and government concerns related to bias.

- **Travel and tourism executives:** The Internet has led to the creation of a plethora of innovative services for travelers. Many potential Airbnb partners wanted to engage in cooperative travel enterprises, but only if they were sincerely addressing discrimination. Travel and tourism partners had a variety of useful and practical suggestions.

- **Leaders and expert consultants, including:**

  - **The Honorable Eric H. Holder, Jr.** Mr. Holder served as the 82nd U.S. Attorney General from 2009 to 2015, making him one of the longest-serving attorneys general in U.S. history. Serving as the nation's top law enforcement official, he oversaw the prosecution of hundreds of terrorists and white collar criminals, and instituted major reforms to criminal justice and policing practices. He also significantly reenergized the enforcement of federal civil rights laws. After leaving the U.S. Department of Justice, he returned as a partner to Covington & Burling, LLP.

O   **Margaret L. Richardson.** Ms. Richardson joined Airbnb's global policy development team in August. Prior to this, she was Of Counsel at Covington & Burling, LLP, where she served as an outside advisor and worked closely with the Airbnb team on this project. From 2009 until July 2015, she was a counselor to U.S. Attorney General Holder, serving as White House Liaison, Deputy Chief of Staff, and Chief of Staff, respectively. Prior to joining the Obama administration, she worked on the Obama Biden campaign and transition teams in a variety of capacities.

O   **John Relman.** Mr. Relman is a noted civil rights attorney in Washington, D.C. who has represented scores of plaintiffs and public interest organizations in individual and class action discrimination cases in federal court. Mr. Relman has written and lectured extensively in the areas of fair housing and fair lending law and practice, and has provided numerous training classes and seminars for plaintiffs' lawyers, fair housing organizations, the real estate industry, and lending institutions. He is the author of the *Housing Discrimination Practice Manual*, published by the West Group.

O   **Dr. Robert W. Livingston.** Dr. Livingston is a Lecturer of Public Policy at the Harvard Kennedy School of Government. Prior to joining Harvard, he held faculty positions at the University of Wisconsin-Madison, the Kellogg School of Management at Northwestern University, and the University of Sussex in England. Broadly speaking, Dr. Livingston's research focuses on diversity, leadership, and social justice. His work has been published in numerous top-tier academic journals.

O   **Dr. Daniel Effron.** Dr. Effron is an Assistant Professor of Organisational Behaviour at London Business School. Previously, he taught at the Kellogg School of Management at Northwestern University. He earned his Ph.D. from Stanford and his B.A. from Yale. His research examines the psychology of ethical decision-making, discrimination, and hypocrisy, and has appeared in such scholarly publications as the *Journal of Personality and Social Psychology, Organizational Behavior and Human Decision Processes*, the *Journal of Experimental Social Psychology*, and *Personality and Social Psychology Bulletin*.

7

○ **Dr. Peter Glick.** Dr. Glick is the Henry Merritt Wriston Professor in the Social Sciences at Lawrence University. His foundational work on benevolent sexism (with Susan Fiske) received the American Psychological Association's Allport Prize for best paper on intergroup relations. In addition to more than 80 articles and chapters, Dr. Glick has co-edited or co-authored three books, including the *SAGE Handbook of Prejudice* and *The Social Psychology of Gender*.

To these thoughtful stakeholders, I can only say thank you for working with me and working with the team at Airbnb to slog through these tough, emotionally charged issues. These problems did not materialize overnight, and Airbnb will not fully resolve them in the short term, but I strongly believe we are off to a very serious and productive start.

The advice of these stakeholders and consultants is the basis for my report, which outlines the policy and product changes Airbnb will make to help fight discrimination. While this issue garnered significant attention after some African Americans highlighted their negative experiences when using Airbnb, I am confident that the policies and proposals being implemented by the company will help everyone who has ever been discriminated against because of who they are, where they are from, what they look like, or whom they love.

These changes are merely a first step. Airbnb understands that no one company can eliminate racism and discrimination. Fighting bias is an ongoing task that requires constant vigilance from all of us. And there is no question that we will continue to see examples of bias and discrimination in society, the sharing economy, and Airbnb in the future. As certain product tools are built and implemented, they will need to be refined and updated. The task of fighting discrimination is difficult, but Airbnb is committed to continuing this work in the future, and I will personally hold them to their word. We all should.

As a former Director of Tourism, I also see enormous potential for Airbnb to bring tourism to communities that haven't benefitted from it in the past. Airbnb hosts are thriving in communities like Southeast Washington, D.C. and the South Side of Chicago. Tourism dollars are flowing into local businesses. And as Airbnb continues to tackle difficult issues, it must also seize the opportunity to help deliver economic benefits to these and other underserved communities.

Moving ahead, effectively fighting bias and discrimination also requires ongoing listening to thoughtful individuals and groups in the Airbnb community and outside of it. I welcome your continued input, ideas, and advice on the steps Airbnb can take to build a community where anyone can belong anywhere.

Airbnb was founded to bring people together. Fighting discrimination is fundamental to the company's mission, and I am confident that our work as advocates in concert with the company itself will help create a community that welcomes everyone.

# Summary

Airbnb is a company that has made home sharing easier and more popular, and it has shown how home sharing can both facilitate travel and bring people from disparate backgrounds together. Fighting discrimination is fundamental to the company's mission. While there are countless examples of Airbnb hosts and guests who have forged positive connections with people from different backgrounds, there have been too many unacceptable instances of people being discriminated against on the Airbnb platform because of who they are or what they look like.

A team representing executives from every Airbnb department conducted a comprehensive examination of how Airbnb has fought discrimination in the past, where these efforts fell short, and how they can be improved in the future. Based on that review, Airbnb has committed to make a series of product and policy changes that will help fight discrimination and bias. These changes include:

- **The Airbnb Community Commitment**
  Airbnb believes everyone in the Airbnb community should be held to a standard that goes above and beyond what is required by law. Beginning November 1, 2016, everyone who uses Airbnb around the world will be asked to affirmatively agree to uphold the following commitment before they book a listing or share their space on the Airbnb platform:

  > *"We believe that no matter who you are, where you are from, or where you travel, you should be able to belong in the Airbnb community. By joining this community, you commit to treat all fellow members of this community, regardless of race, religion, national origin, disability, sex, gender identity, sexual orientation or age, with respect, and without judgment or bias."*

- **A New Nondiscrimination Policy**
  Agreeing to the Airbnb Community Commitment also means agreeing to follow Airbnb's

strengthened and more detailed nondiscrimination policy. Like the Community
Commitment, these rules are stronger than what is required by law.

- **A Permanent, Full-Time Product Team to Fight Bias and Promote Diversity**
  Airbnb has assembled a permanent team of engineers, data scientists, researchers,
  and designers whose sole purpose is to advance belonging and inclusion and to root
  out bias.

- **Encouraging the Growth of Instant Book Listings**
  Airbnb wants to make booking a listing easy for everyone. Instant Book allows
  certain listings to be booked immediately—without prior host approval of a specific
  guest. Airbnb will accelerate the use of Instant Book with a goal of making one
  million listings bookable via Instant Book by January 2017.

- **Going Beyond Photos**
  Profile photos help hosts and guests get to know one another and can serve as an
  important security feature. At the same time, some have asked Airbnb to remove
  profile photos from the platform. Airbnb's new product team dedicated to fighting
  discrimination will experiment with reducing the prominence of guest photos in the
  booking process and enhancing other parts of host and guests profiles with
  objective information.

- **Enforcing the Rules, Supporting Our Community**
  To improve its response to discrimination complaints and better enforce its policies,
  Airbnb overhauled its enforcement protocols. The Airbnb team developed new tools
  to quickly and reliably route concerns regarding discrimination to a group of trained
  specialists who are dedicated to both identifying and combatting discrimination.

- **Open Doors**
  Airbnb is committed to implementing solutions that help ensure everyone can use
  the site to find a place to stay. If someone is discriminated against while using the
  platform, Airbnb wants to make it right. To achieve this goal, Airbnb is instituting
  Open Doors. Under Open Doors, if a guest is not able to book a listing because they
  have been discriminated against, Airbnb will ensure the guest finds a place to stay.

- **Welcome to Our Home: Addressing Unconscious Bias and Bringing People Together**

  In order to help create a world where anyone can belong anywhere, Airbnb will offer new training to help people learn how to fight bias. As the program develops, we will highlight hosts who have completed this training.

- **A Diverse Workforce, A Diverse Community**

  Airbnb realizes that becoming a more diverse company will make it a stronger company. Airbnb wants to ensure its workforce is more diverse and has work to do to achieve this goal. The company will implement the Diversity Rule, a new Airbnb policy that will mandate that all candidate pools for senior-level positions include women and candidates from underrepresented backgrounds. Airbnb will also expand efforts to bring economic opportunities to minority-owned business and encourage more people from underrepresented populations to use Airbnb.

These changes are only Airbnb's first steps. Fighting discrimination will require constant and ongoing work. The internal working group that produced this report will continue working to both implement these initiatives and evaluate additional steps Airbnb can take to ensure the Airbnb community is truly fair for all.

12

# Chapter One:

## Airbnb's Nondiscrimination Review

An increasing number of Airbnb hosts and guests have voiced their concerns about being discriminated against when trying to book a listing because of their race, sexual orientation, or gender identity. Discrimination flies in the face of the company's mission to build a world where anyone can belong anywhere.

This outcry from the community led Airbnb to closely examine their nondiscrimination policies and procedures. Airbnb has had nondiscrimination rules in place since the early days of the company and has removed hosts and guests from the platform who violate these rules. However, the examination quickly uncovered that this issue is complicated, and highlighted a range of deficiencies and areas ripe for improvement. It was clear that Airbnb needed a comprehensive, end-to-end review of all facets of the policy and the Airbnb community, with a focus on how the platform can be redesigned to prevent explicit and implicit discrimination.

In late May, I was approached by Airbnb and asked to lead this review. The review and my role were announced publicly on June 2, 2016. I immediately traveled to San Francisco to convene a team representing a range of departments across Airbnb and created a standing internal working group tasked with completing this review. The internal working group included senior representatives from the following Airbnb departments:

- Business Affairs
- Communications
- Customer Experience
- Data Science and Analytics
- Design
- Diversity and Belonging
- Engineering
- Executive Staff
- Financial Planning and Analysis

13

- Host and Community Operations
- Legal
- Marketing
- Procurement
- Product
- Public Policy
- Research
- Talent/Human Resources
- Trust and Safety

Together, this team worked tirelessly to examine every facet of Airbnb, and crafted a range of policies and initiatives that will help fight bias and discrimination. Specifically, the team evaluated:

### Hosting and Booking
We examined precisely how hosts share their space and how guests then interact with hosts, paying particular attention to the design of our platform and how it did or did not facilitate fair interactions between people who do not know one another.

### Policies
Airbnb has a wide range of rules and regulations governing host and guest conduct. We examined how these policies intersect and when, how, and why they were drafted.

### Enforcement and Response
Critically, we studied how these policies are enforced and how Airbnb's internal teams are trained to respond to instances of discrimination.

### The Airbnb Team
We studied the lack of diversity on the Airbnb team, and our efforts to reach out to hosts and guests in underserved communities.

### Partnerships
We looked at the organizations that collaborate with Airbnb and the need for Airbnb to build broader and enduring relationships with diverse travel, civil rights, grassroots, small business, social science, and educational institutions. If Airbnb

wants to be at the forefront of tackling discrimination, it will be mutually beneficial to be a part of a sustained dialogue with diverse individuals and organizations.

From day one, we recognized that we did not have all the answers and formally engaged a range of experts who provided guidance throughout this process, including former U.S. Attorney General Eric H. Holder, Jr., Dr. Robert W. Livingston of Harvard University, Dr. Peter Glick, Dr. Daniel Effron, and civil rights lawyer John Relman.

Additionally, Airbnb senior officials met with a range of experts and advocates, including:

- Color of Change
- The Leadership Conference on Civil and Human Rights
- The Mexican American Legal Defense and Education Fund
- The National Urban League
- The Rainbow/PUSH Coalition
- The National Women's Law Center
- The Congressional Black Caucus
- The ACLU Racial Justice Program
- The Equal Justice Society
- The National Council of Negro Women
- The National Association for Equal Opportunity in Higher Education
- The Lawyers Committee for Civil Rights Under Law
- The NAACP
- The Brennan Center for Justice
- The National Coalition for Black Civic Participation
- The Center for American Progress

We also held a series of individual calls and consultations with a range of other other organizations representing the disability, Latino, Muslim, South Asian, Asian American Pacific Islander, and LGBTQ communities.

15

# Chapter Two:

# Key Findings and Lessons Learned

Our comprehensive review process generated a series of key learnings that informed
changes to our platform and policies. Among these findings:

1. **There is No Single Solution**
   There is no one product change, policy, or modification that can eliminate bias and
   discrimination. Bias and discrimination have been regrettable parts of society for
   centuries, and combatting these odious and objectionable behaviors is not easy and
   cannot be accomplished with one modification or initiative. Indeed, the experts we
   consulted through our review identified a range of factors that contribute to bias
   and unfair treatment. Tackling these challenges requires a sustained and
   multifaceted approach.

2. **Discrimination Must Be Addressed**
   There have been over 100 million guest arrivals in Airbnb listings, and the
   overwhelming majority of Airbnb hosts are respectful and welcoming of all guests.
   Unfortunately, it is clear that discrimination is a problem and the company believes
   that one instance of discrimination is one too many. The company's analysis has
   found that, as interest in traveling on Airbnb has continued to grow, guests—
   regardless of race or other factors—can face difficulties booking a listing. Dynamics
   such as traveling during a peak time to a desired market during a major event can
   impact supply availability. But Airbnb's research also has generally confirmed public
   reports that minorities struggle more than others to book a listing.

3. **Workflows for Addressing Discrimination Must Be Improved**
   While Airbnb has long prohibited discrimination, the company's internal processes
   were unclear to the front-line customer service teams who receive calls from
   concerned guests and hosts. As a result, some members of the community did not
   receive the timely, compassionate response they expected and deserved when they
   reported instances of discrimination.

16

4. **Airbnb's Nondiscrimination Policy Must Be Stronger**

Airbnb's nondiscrimination policy was well-intentioned and required hosts and guests to do more than follow applicable federal, state, and local laws. Unfortunately, awareness of the policy was extremely limited, and the processes around enforcement were not designed to reflect the enormous growth the platform experienced. Additionally, the policy did not adequately address a range of practical situations faced by Airbnb hosts and guests.

5. **Airbnb's Platform Can Be Leveraged For Good**

Hosts and guests overwhelmingly share our commitment to diversity and belonging and are eager to open their homes. Airbnb has an opportunity to leverage that goodwill to educate more people about the steps they can take to fight discrimination and unconscious bias. Moreover, Airbnb provides an enormous opportunity for economic empowerment and entrepreneurship that should be fully developed and realized.

6. **Airbnb's Workforce is Not Sufficiently Diverse**

Airbnb may have been slow to address concerns about discrimination because the company's employees are not sufficiently diverse.

7. **Quality Bias Training Needs to Be Made More Accessible**

Airbnb recognized the importance and effectiveness of training to combat unconscious bias and offered these trainings to hosts at the Airbnb Open in November 2015. This event was attended by a small number of Airbnb's hosts and was not otherwise made accessible online or required for employees.

8. **Photos Are Useful, But Should Not Be as Prominent**

Airbnb believes profile photos are an important feature that help build relationships and allow host and guests to get to know one another before a booking begins. While important, photos capture only one dimension of a person's identity. The reviews a person receives, the number of reservations accepted and rejected, social media profiles, and other factors that can provide substantial information about a person are not always properly highlighted on the Airbnb platform. Photos are also an important security feature: hosts and guests want to know who they will be meeting when a stay begins.

17

9. **Guests Need Greater Support When Booking**

Many guests struggle to book a reservation when they begin using Airbnb. It is not easy to determine if these guests are discriminated against because of their race or because of other characteristics, such as not having any reviews, and are thus rejected by hosts who prefer guests with an established track record on Airbnb. As a business, Airbnb must work to improve this and address the very real problem that some guests have been discriminated against and need additional assistance.

10. **Airbnb Should Expand Host Opportunities in Communities of Color**

Airbnb's research and data show that Airbnb listings can bring new housing options and economic opportunities to neighborhoods that have been underserved by traditional hospitality companies. While many listings already exist in underserved communities, the company can do more to reach out to communities of color to encourage them to take advantage of this economic opportunity, and I hope community organizations will partner with the company on this effort.

# **Chapter Three:** Policy Changes

After evaluating these challenges and lessons learned, Airbnb has committed to a series of policy and product changes that will be implemented immediately. These changes are broadly assigned to eight categories:

1. The Airbnb Community Commitment
2. Enforcing the Rules, Supporting Our Community
3. Open Doors
4. Fighting Bias and Bringing People Together
5. One Million Instant Book Listings
6. Going Beyond Photos
7. A Permanent Full-Time Team of Engineers to Fight Bias and Promote Diversity
8. A Diverse Workforce, A Diverse Community

**The Airbnb Community Commitment**

Airbnb will require all users to explicitly acknowledge that they share the company's commitment to creating a world where anyone can belong anywhere. The company will also substantially improve its policies and the enforcement of rules that help prevent discrimination:

1. Beginning November 1, 2016, everyone who uses Airbnb around the world will be asked to affirm and uphold the Airbnb Community Commitment before they book or share their space on the Airbnb platform. All users will see a message asking them to affirmatively certify that they agree with the following commitment:

   "We believe that no matter who you are, where you are from, or where you travel, you should be able to belong in the Airbnb community. By joining this community, you commit to treat all fellow members of this community, regardless of race, religion, national origin, disability, sex, gender identity, sexual orientation or age, with respect, and without judgment or bias."

Users who do not certify that they agree with this commitment will be prohibited from using Airbnb.

2. Implement a new nondiscrimination policy. Under the guidance of former U.S. Attorney General Eric H. Holder, Jr. and noted civil rights attorney John Relman, Airbnb has rewritten its nondiscrimination policy to ensure there is no tolerance for discriminatory practices in the Airbnb community that violate our policy. The new policy requires Airbnb hosts and guests to do significantly more than merely follow applicable laws. It is available in Appendix One and will apply to everyone who uses Airbnb as of September 8, 2016. By agreeing to the Airbnb Commitment, users certify that they will also adhere to this new nondiscrimination policy. As noted above, users who do not agree to the Airbnb Commitment will be prohibited from using Airbnb.

3. Remind hosts of the Airbnb nondiscrimination policy at key points during the hosting and booking process. These reminders will be in place by the end of 2016.

4. Hold hosts accountable. Some guests have reported requesting a booking and being informed by the host that a listing that was advertised as vacant was not available. In some cases, it appears that these listings were then made available for the same trip to guests of a different race. Going forward, Airbnb will develop a feature to help prevent this from happening. If a host rejects a guest by stating that their space is not available, Airbnb will automatically block the calendar for subsequent reservation requests for that same trip. This feature will be implemented in the first half of 2017.

**Enforcing the Rules, Supporting Our Community**

To ensure Airbnb improves its response to discrimination complaints and better enforces its policies, the company significantly improved its enforcement and response protocols. As part of this, an array of teams worked to develop and implement technology that rapidly identifies cases of reported discrimination, and immediately routes those cases to a group of trained specialists. The teams also developed thoughtful enforcement procedures to ensure those cases are handled consistently and with the utmost care by a group of trained specialists. If a guest or a host believes they have been discriminated against, Airbnb will investigate their complaint and take action if the policy has been violated. Every customer service employee will receive robust training so they can better identify potential

discrimination and route any suspected or reported discrimination to a specially trained team focused on addressing and combating discrimination. All team members will receive this training by January 2017.

Any guest who believes they have been discriminated against will also have enhanced options to report their experience to the Airbnb team. Members of the Airbnb community will be able to:

1.  Flag an Airbnb message to quickly report discrimination or hate speech to Airbnb. These user flags are available now from the website, and Airbnb is working to expand and enhance this tool by January 2017.

2.  Visit the new Nondiscrimination section of the enhanced Help Center, which will have additional information regarding Airbnb's policies and a place for users to report their concerns.

3.  Quickly access more information about Airbnb's policies and how to report a concern. Every Airbnb guest who requests and is denied a reservation will receive an email with a link to information about Airbnb's community standards, which will include rules for hosts and information on how to report instances of discrimination. This will be implemented no later than November 1.

**Open Doors**

Ultimately, every guest who visits Airbnb is looking for a place to stay, but for a few, this has been made more difficult because they have been victims of discrimination. Airbnb is committed to implementing solutions that help ensure everyone can use the site to find a place to stay. and if someone is discriminated against while using the platform, Airbnb wants to make it right. To achieve this goal, Airbnb is instituting Open Doors.

Under Open Doors, if a guest is not able to book a listing because they have been discriminated against, Airbnb will ensure the guest finds a place to stay.

The Airbnb team will do this by providing timely, 24/7, personalized, hands-on support from a specially trained Airbnb employee who will help the guest find a place to stay on Airbnb. If there is not a similar Airbnb listing in the market, Airbnb will identify an alternative accommodation option.

**Welcome to Our Home: Addressing Bias and Bringing People Together**

As a company whose mission is to create a world where anyone can belong anywhere, Airbnb is committed to both fighting bias and encouraging people to open their homes to guests from different communities and cultures. Airbnb will pursue this goal by:

1. Launching anti-bias training. Not all discrimination is explicit, and we all have biases that we may not even be aware of. That is why Airbnb engaged with one of the country's preeminent experts in this field, Dr. Robert Livingston, to help develop trainings that will help reduce unconscious bias. This online training will be made available to every Airbnb host beginning November 1, 2016. As the program develops, we will work to highlight hosts who have completed the training.

2. Expanding anti-bias training for everyone who works for Airbnb. Airbnb currently has an anti-bias training program that has been completed by 25 percent of all employees. By January 31, 2017, all Airbnb employees will have completed the new and enhanced training. Airbnb customer service representatives are on the front lines of dealing with hosts from around the world; these employees will receive specialized anti-bias training by January 2017.

**One Million Instant Book Listings**

Instant Book allows certain listings to be booked immediately—without prior host approval of a specific guest. To achieve these goals, Airbnb will accelerate the use of Instant Book with a goal of one million listings bookable via Instant Book by January 2017.

Instant Book makes it easier for guests to be accepted by hosts on the platform if they meet some basic qualifications, and hosts can set preferences that serve the purpose of automatically filtering guests, including whether the listing is pet-friendly, suitable for events, or features particular amenities. More importantly, Instant Book reduces the potential for bias because hosts automatically accept guests who meet these objective custom settings they have put in place.

Airbnb has already worked to increase the number of Instant Book listings, which has more than doubled in the past year.

**Going Beyond Photos**

22

Some advocates have asked Airbnb to consider removing photographs from its guest profiles, noting that removing a person's picture and even using a pseudonym prevents a host from discriminating against a guest based on certain immutable characteristics. Creating these kinds of anonymous tools has helped people successfully apply for mortgages and employment opportunities, just to name a few examples.

However, profile photos are essential to Airbnb's overall mission of building a community and creating durable, lasting relationships between host and guests that continue long after a reservation has ended. Creating these kinds of relationships is far different from merely facilitating an anonymous transaction.

After thoroughly analyzing this issue, I came to believe that Airbnb guests should not be asked or required to hide behind curtains of anonymity when trying to find a place to stay. Technology can bring us together and technology shouldn't ask us to hide who we are. Instead, we should be implementing new, creative solutions to fight discrimination and promote understanding. I believe the various policy changes outlined in this report meet that goal.

Still, I believe there is room for improvement in the Airbnb platform on this issue. The reviews a host and guest have received, their social media presence, and other information regarding Airbnb community members are not always properly highlighted on the Airbnb platform. Research indicates that people base decisions on conspicuous and prominent information, and Airbnb has committed to making this information easier to access. By the end of 2016, Airbnb will modify the reservation request system to better feature objective information regarding trip details and—where available—reputation-enhancing data such as reviews and verified ID to reduce the potential for bias. As part of the process outlined above, Airbnb will also experiment with reducing the prominence of guest photos in the booking process.

These changes are rooted in research. Airbnb recently partnered with experts at Stanford University who found that reputation systems like review scores can significantly extend the trust between dissimilar users. Making review and other objective data more readily available could help overcome some people's inclination to only trust people who are like them. The initial study performed by the Stanford researchers examined a range of demographic features, but did not include race. Airbnb is currently working with the same researchers on a new study that will consider race as a factor.

**A Permanent, Full-Time Product Team to Fight Bias and Promote Diversity**

Airbnb has assembled a permanent, full-time team of engineers, data scientists, researchers and designers whose sole purpose is to advance belonging and inclusion and to root out bias. This team will perform tests with input from social science experts, examine algorithms, and make ongoing adjustments to the technical underpinnings of Airbnb's platform to achieve these ends.

I know of no other technology company that has created such a team as a permanent part of its structure. Just as teams of lawyers were assembled to fight discrimination in the mid-20th century, it is my hope that 21st-century engineers will do their part to help eliminate bias and set an example for other technology startups and companies in the sharing economy to do the same.

**A Diverse Workforce, A Diverse Community**

Airbnb realizes that a more diverse company is a stronger company. Airbnb wants to ensure its workforce is more diverse and has work to do to achieve this goal. Airbnb will:

1.  Create a new, comprehensive plan to recruit and retain a diverse workforce. Later in September, Airbnb will file a report indicating that approximately 9.64 percent of all its United States-based employees are from underrepresented populations. Airbnb is committed to ensuring that the percentage of employees from underrepresented populations in the U.S. increases to 11 percent by the end of 2017, and is taking a series of steps to help recruit more employees from underrepresented backgrounds. Airbnb will:

    a.  Implement the Diversity Rule, a new Airbnb policy that will mandate that all candidate pools for senior level positions at Airbnb include women and candidates from underrepresented backgrounds.
    b.  Substantially expand efforts to recruit new employees from Historically Black Colleges and Universities, schools with large Latino populations, and schools with large female populations in science and engineering.
    c.  Assure that all hiring managers and their team leaders be assessed, in part, on their efforts to diversify their teams.

2.  Expand efforts to bring economic opportunities to minority-owned business. Airbnb recognizes that its employees and business relationships outside the company inform how they think, operate, and solve problems, and they are committed to bringing more economic opportunities to minority communities and minority-owned businesses. Currently, one percent of Airbnb's total procurement spend goes to suppliers owned by underrepresented minorities, women, veterans, members of the LGBTQ community, and businesses in Historically Underutilized Business Zones. Airbnb will work to increase this figure to 10 percent of total procurement spend by 2019. To oversee this commitment, Airbnb will hire a Manager for Supplier Diversity. This newly created full-time position will be responsible for identifying opportunities where Airbnb can more actively engage with and support minority-owned and -operated businesses here in the United States.

3.  Encourage more minorities to host on Airbnb. Airbnb offers economic opportunities to every American, and the typical Airbnb host in the U.S. earns $5,900 per year. Minority communities in particular have benefitted from hosting. For example, the number of Airbnb guests grew 78 percent year-over-year in the 30 New York City zip codes with the largest percentage of black residents, compared to 50 percent city-wide. Airbnb will do more to encourage people in underserved communities to take advantage of the economic opportunities hosting provides. In the next several months, Airbnb will partner with community-based organizations like the National Urban League to encourage people to share their space and create trainings for hosts in minority communities. Initial trainings will take place in Springfield, Massachusetts; Washington, D.C.; Gary, Indiana; and Detroit. Airbnb will advertise in media outlets that have historically reached more people in communities of color, and continue to explore additional partnership and marketing opportunities that reach a diverse audience.

# Conclusion

Fighting discrimination and bias is difficult and while these policy, product, and operational changes are a strong step in the right direction, achieving the goals outlined in this report will require constant vigilance and ongoing work. I hope everyone who shares my commitment to fairness and equality holds Airbnb accountable, evaluates these measures, and shares their thoughts on how the company and community can continue to make travel fair for all.

# Appendix One:

## The Airbnb Nondiscrimination Policy

**Airbnb's Nondiscrimination Policy:**
**Our Commitment to Inclusion and Respect**

Airbnb is, at its core, an open community dedicated to bringing the world closer together by fostering meaningful, shared experiences among people from all parts of the world. Our community includes millions of people from virtually every country on the globe. It is an incredibly diverse community, drawing together individuals of different cultures, values, and norms.

The Airbnb community is committed to building a world where people from every background feel welcome and respected, no matter how far they have traveled from home. This commitment rests on two foundational principles that apply both to Airbnb's hosts and guests: inclusion and respect. Our shared commitment to these principles enables every member of our community to feel welcome on the Airbnb platform no matter who they are, where they come from, how they worship, or whom they love. Airbnb recognizes that some jurisdictions permit, or require, distinctions among individuals based on factors such as national origin, gender, marital status, or sexual orientation, and it does not require hosts to violate local laws or take actions that may subject them to legal liability. Airbnb will provide additional guidance and adjust this nondiscrimination policy to reflect such permissions and requirements in the jurisdictions where they exist.

While we do not believe that one company can mandate harmony among all people, we do believe that the Airbnb community can promote empathy and understanding across all cultures. We are all committed to doing everything we can to help eliminate all forms of unlawful bias, discrimination, and intolerance from our platform. We want to promote a culture within the Airbnb community— hosts, guests, and people just considering whether to use our platform—that goes above and beyond

mere compliance. To that end, all of us—Airbnb employees, hosts, and guests alike—agree to read and act in accordance with the following policy to strengthen our community and realize our mission of ensuring that everyone can belong, and feels welcome, anywhere.

- **Inclusion** — We welcome guests of all backgrounds with authentic hospitality and open minds. Joining Airbnb, as a host or guest, means becoming part of a community of inclusion. Bias, prejudice, racism, and hatred have no place on our platform or in our community. While hosts are required to follow all applicable laws that prohibit discrimination based on such factors as race, religion, national origin, and others listed below, we commit to do more than comply with the minimum requirements established by law.

- **Respect** — We are respectful of each other in our interactions and encounters. Airbnb appreciates that local laws and cultural norms vary around the world, and expects hosts and guests to abide by local laws and to engage with each other respectfully, even when views may not reflect their beliefs or upbringings. Airbnb's members bring to our community an incredible diversity of background experiences, beliefs, and customs. By connecting people from different backgrounds, Airbnb fosters greater understanding and appreciation for the common characteristics shared by all human beings and undermines prejudice rooted in misconception, misinformation, or misunderstanding.

**Specific Guidance for Hosts in the United States**

As a general matter, we will familiarize ourselves with all applicable federal, state, and local laws that apply to housing and places of public accommodation. Hosts should contact Airbnb customer service if they have any questions about their obligations to comply with this Airbnb Nondiscrimination Policy. Airbnb will release further discrimination policy guidance for jurisdictions outside the United States in the near future. Guided by these principles, our U.S. host community will follow these rules when considering potential guests and hosting guests:

**Race, Color, Ethnicity, National Origin, Religion, Sexual Orientation, Gender Identity, or Marital Status**

Airbnb hosts **may not**:

- Decline a guest based on race, color, ethnicity, national origin, religion, sexual orientation, gender identity, or marital status.

- Impose any different terms or conditions based on race, color, ethnicity, national origin, religion, sexual orientation, gender identity, or marital status.

- Post any listing or make any statement that discourages or indicates a preference for or against any guest on account of race, color, ethnicity, national origin, religion, sexual orientation, gender identity, or marital status.

**Gender**

Airbnb hosts **may not**:

- Decline to rent to a guest based on gender unless the host shares living spaces (for example, bathroom, kitchen, or common areas) with the guest.

- Impose any different terms or conditions based on gender unless the host shares living spaces with the guest.

- Post any listing or make any statement that discourages or indicates a preference for or against any guest on account of gender, unless the host shares living spaces with the guest.

Airbnb hosts **may:**

- Make a unit available to guests of the host's gender and not the other, where the host shares living spaces with the guest.

**Disability**

Airbnb hosts **may not:**

- Decline a guest based on any actual or perceived disability.

- Impose any different terms or conditions based on the fact that the guest has a disability.

- Substitute their own judgment about whether a unit meets the needs of a guest with a disability for that of the prospective guest.

- Inquire about the existence or severity of a guest's disability, or the means used to accommodate any disability. If, however, a potential guest raises his or her disability, a host may, and should, discuss with the potential guest whether the listing meets the potential guest's needs.

- Prohibit or limit the use of mobility devices.

- Charge more in rent or other fees for guests with disabilities.

- Post any listing or make any statement that discourages or indicates a preference for or against any guest on account of the fact that the guest has a disability.

- Refuse to communicate with guests through accessible means that are available, including relay operators (for people with hearing impairments) and email (for people with vision impairments using screen readers).

- Refuse to provide reasonable accommodations, including flexibility when guests with disabilities request modest changes in your house rules, such as bringing an assistance animal that is necessary because of the disability, or using an available parking space near the unit. When a guest requests such an accommodation, the host and the guest should engage in a dialogue to explore mutually agreeable ways to ensure the unit meets the guest's needs.

Airbnb hosts **may:**

- Provide factually accurate information about the unit's accessibility features (or lack of them), allowing for guests with disabilities to assess for themselves whether the unit is appropriate to their individual needs.

**Personal Preferences**

Airbnb hosts **may:**

- Except as noted above, Airbnb hosts may decline to rent based on factors that are not prohibited by law. For example, except where prohibited by law, Airbnb hosts may decline to rent guests with pets, or to guests who smoke.

- Require guests to respect restrictions on foods consumed in the listing (e.g., a host who maintains a Kosher or vegetarian kitchen may require guests to respect those restrictions).

- Nothing in this policy prevents a host from turning down a guest on the basis of a characteristic that is not protected under the civil rights laws or closely associated with a protected class. For example, an Airbnb host may turn down a guest who wants to smoke in a unit, or place limits on the number of guests in a unit.

When guests are turned down. Hosts should keep in mind that no one likes to be turned down. While a host may have, and articulate, lawful and legitimate reasons for turning down a potential guest, it may cause that member of our community to feel unwelcome or excluded. Hosts should make every effort to be welcoming to guests of all backgrounds. Hosts who demonstrate a pattern of rejecting guests from a protected class (even while articulating legitimate reasons), undermine the strength of our community by making potential guests feel unwelcome, and Airbnb may suspend hosts who have demonstrated such a pattern from the Airbnb platform.

**What happens when a host does not comply with our policies in this area?**

If a particular listing contains language contrary to this nondiscrimination policy, the host will be asked to remove the language and affirm his or her understanding and intent to comply with this policy and its underlying principles. Airbnb may also, in its discretion, take steps up to and including suspending the host from the Airbnb platform.

If the host improperly rejects guests on the basis of protected class, or uses language demonstrating that his or her actions were motivated by factors prohibited by this policy, Airbnb will take steps to enforce this policy, up to and including suspending the host from the platform.

As the Airbnb community grows, we will continue to ensure that Airbnb's policies and practices align with our most important goal: To ensure that guests and hosts feel welcome and respected in all of their interactions using the Airbnb platform. The public, our community, and we ourselves, expect no less than this.

**EXHIBIT G**



# EXHIBIT H

⌂ (//www.airbnb.com)    **community (https://community.airbnb.com/t5/Community-Center/ct-p/community-center)**

Sign In (/plugins/common/feature/oauth2sso/sso_login_redirect?referer=https%3A%2F%2Fcommunity.airbnb.com%2Ft5%2FHosts%2Fwhere-is-the-quot-Permit-Tax-ID-quot-field%2Ftd-p%2F24592)

Discuss ⌄    Discover ⌄    Meet Ups 🗓 (//airbnb.com/meetups)

Community Center (https://community.airbnb.com/t5/Community-Center/ct-p/community-center)
›  All Discussion Rooms (https://community.airbnb.com/t5/All-Discussion-Rooms/ct-p/host)
  ›  Hosts (https://community.airbnb.com/t5/Hosts/bd-p/listing-and-reservations)

Options ▾

# where is the "Permit / Tax ID" field?



**Andy**
Level 1 in  San Francisco, CA
January

I'm a host in San Francisco and I've just received my Short-Term Rental registration number, which I'm required to post on my listing page. I'd like to add it to the "Permit / Tax ID" field in the "Prices" section as seen on this listing:

https://www.airbnb.com/rooms/937842?checkin=02%2F05%2F2016&checkout=02%2F07%2F2016&guests=2&s=_jxX9w...
(https://www.airbnb.com/rooms/937842?checkin=02%2F05%2F2016&checkout=02%2F07%2F2016&guests=2&s=_jxX9w3v)

However, when I click "edit listing" I cannot find this field in the "Pricing" section, the "Terms" section, or any of the other dozen sections I have the ability to edit.  This isn't the first time I've been completely baffled by mis-mappings between the host form entry and management UI and the actual live site listing UI.  Obviously the 2005 notion of WYSIWIG editing hasn't quite made its way into the Airbnb Product and UXD teams.

Any suggestions for where this "Permit / Tax ID" field is hiding or how to activate it so that I may populate it?  Thanks in advance.

-Andy

ity.airbnb.com/t5/kudos/messagepage/board-id/listing-and-reservations/message-id/6362/tab/all-users)

dosable-gid/24592?t.ac=board-id/listing-and-reservations/thread-id/6362&t.cp=kudos/contributions/tabletcontributionspage)

| Join the conversation (/t5/forums/replypage/board-id/listing-and-reservations/message-id/24592) |

## 13 Replies



**Andy**
Level 1 in  San Francisco, CA
January

## Related Tags

hosting (https://community.airbnb.com/t5/tag/hosting/tg-p/board-id/listing-and-reservations)

host (https://community.airbnb.com/t5/tag/host/tg-p/board-id/listing-and-reservations)

reviews (https://community.airbnb.com/t5/tag/reviews/tg-p/board-id/listing-and-reservations)

cancellation (https://community.airbnb.com/t5/tag/cancellation/tg-p/board-id/listing-and-reservations)

guests (https://community.airbnb.com/t5/tag/guests/tg-p/board-id/listing-and-reservations)

Community Guide (https://community.airbnb.com/t5/tag/Community%20Guide/tg-p/board-id/listing-and-reservations)

refund (https://community.airbnb.com/t5/tag/refund/tg-p/board-id/listing-and-reservations)

bookings (https://community.airbnb.com/t5/tag/bookings/tg-p/board-id/listing-and-reservations)

hosts (https://community.airbnb.com/t5/tag/hosts/tg-p/board-id/listing-and-reservations)

Calendar (https://community.airbnb.com/t5/tag/Calendar/tg-p/board-id/listing-and-reservations)

Search for anything...

additionally: due to Airbnb's overzealous number obfuscation system, it is literally not possible to include the short-term rental registration number in the body of the description, since this is how it renders on the site:

SAN FRANCISCO SHORT-TERM RESIDENTIAL RENTAL REGISTRATION NUMBER: STR-(PHONE NUMBER HIDDEN)

I am required by law to display this number so I either need (a) a field where I can enter the number or (b) a method for overriding Airbnb's inane text obfuscation system.

ity.airbnb.com/t5/kudos/messagepage/board-id/listing-and-reservations/message-id/6363/tab/all-users)

dosable-gid/24597?t ac=board-id/listing-and-reservations/thread-id/6362&t cp=kudos/contributions/tapletcontributionspage)

ions/message-id/6363)



**Monica**
Level 10 in  Ormstown, Canada
January

I have the same problem. I have a license number that I cannot show. On my flipkey site it is shown right under the property details.

ity.airbnb.com/t5/kudos/messagepage/board-id/listing-and-reservations/message-id/6364/tab/all-users)

dosable-gid/24617?t ac=board-id/listing-and-reservations/thread-id/6362&t cp=kudos/contributions/tapletcontributionspage)

ions/message-id/6364)



**James**
Level 10 in  San Francisco, CA
April - last edited April

I just tried entering my registration number yet again and if I omit the four leading zeros I can post it at the top of the section "The Space".

ty.airbnb.com/t5/kudos/messagepage/board-id/listing-and-reservations/message-id/16856/tab/all-users)

dosable-gid/62687?t ac=board-id/listing-and-reservations/thread-id/6362&t cp=kudos/contributions/tapletcontributionspage)

ions/message-id/16856)



**Brian**
Level 1 in  San Francisco, CA
April

I found the same problem, after search forever to find the field and
entering it in the box, it's redacted by Airbnb's overzealous anti-
fraud technology. Eek - I can't believe this problem has been going
on so long.

ty.airbnb.com/t5/kudos/messagepage/board-id/listing-and-reservations/message-id/21504/tab/all-users)

dosable-gid/78748?t ac=board-id/listing-and-reservations/thread-id/6362&t cp/kudos/contributions/tapletcontributionspage)

ions/message-id/21504)



**Andy**
Level 1 in  San Francisco, CA
January

I got a response from an Airbnb person via their facebook page: the
"Permit / Tax ID" field is managed in the "Location" section.  Really,
"Location"?  So this means that "Prices" portion of the front-end is fed
from (at least) three sections in the CMS: "Pricing", "Terms", and
"Location".  Beyond the misleading labeling of the CMS sections and
the data they contain, it also doesn't seem like the CMS and front-end
site teams are in sync at all, so these data management acrobatics and
research projects are forced upon users.  Get it together Airbnb!
Competition will come a-knockin' if you subject users to a rickety
platform for too long...

0

dosable-gid/24657?t ac=board-id/listing-and-reservations/thread-id/6362&t cp=kudos/contributions/tapletcontributionspage)

ions/message-id/6372)



**Monica**
Level 10 in  Ormstown, Canada
January

I just checked out the "Location" tab on my listing. There is no
space to put in my license number. All that is mentioned there is
that a host must comply with local laws. That's it.

0

dosable-gid/24695?t ac=board-id/listing-and-reservations/thread-id/6362&t cp=kudos/contributions/tapletcontributionspage)

ions/message-id/6385)



**Lisa**
Level 10 in  London, United Kingdom
January

@Andy (https://community.airbnb.com/t5/user/viewprofilepage/user
-id/13188) Why don't you post a screenshot of the number along with
your photos? That way it can't be blocked and you're fulfilling your
local duty.

Case 3:19-cv-02615-JD   Document 58-1   Filed 09/19/16   Page 79 of 81

o

dosable-gid/24753?t ac=board-id/listing-and-reservations/thread-id/6362&t cp=kudos/contributions/tapletcontributionspage)

ions/message-id/6404)



**Andy**
Level 1 in San Francisco, CA
January

@Lisa (https://community.airbnb.com/t5/user/viewprofilepage/us er-id/2369) that's a great idea. After saturating my social network with this question this afternoon I did eventually figure out how to edit the "Permit / Tax ID" field (for me it was in the "Location" section, same page as the map but below the fold and out of sight), so I think I have myself covered. It sounds like that "Permit / Tax ID" field isn't in the same place when @Monica (https://community.airbnb.com/t5/user/viewprofi lepage/user-id/3565) edits her host listing, maybe due to regional differences (I guess information in the "Location" section would vary from place to place - though you'd think a section called "Location" would deal with, ya know, LOCATION - not "Location + Legal compliance").

But a screen shot with the id displayed seems like a great workaround for folks who can't find a data field to enter their legal registration info into.

Obviously Airbnb is pretty keen to prevent the direct exchange of phone numbers, website URLs, email addresses and such via host listings, so I'm sure IN GENERAL I'm sure they do what they can to prevent numbers/addresses/etc from being posted in photos... but I suspect they wouldn't aggressively remove photos of *compliance codes*. But who knows, maybe they have bots that indiscriminately remove photos that display numbers. Would be worth a shot if there were no other option.

Thousands of Airbnb hosts must be dealing with this issue in cities all over the world. I'm really surprised there isn't a more straight-forward, generic workflow that guides hosts thru legal compliance and data entry of required registration info. Maybe the SF STR registration codes are especially tricky because they are 7 digits and resemble local phone numbers?

All in all, way too much user effort to do something basic (and legally mandatory). But hey, no ever said Airbnb was the iPhone when it came to intuitive usability.

o

dosable-gid/24807?t ac=board-id/listing-and-reservations/thread-id/6362&t cp=kudos/contributions/tapletcontributionspage)

ions/message-id/6416)



Dan
Level 2 in  San Francisco, CA
February

I just got my permit # and found this post after searching and
searching and searching my listing. However, I don't see any
option in the "Location" section to enter the permit #. I've scrolled
all the way to the bottom of the section and it's simply not there.
Any ideas?

ity.airbnb.com/t5/kudos/messagepage/board-id/listing-and-reservations/message-id/8645/tab/all-users)

dosable-gid/32218?t ac=board-id/listing-and-reservations/thread-id/6362&t cp=kudos/contributions/taplcontributionspage)

ions/message-id/8645)

‹   1

2 (https://community.airbnb.com/t5/Hosts/where-is-the-quot-Permit-Tax-ID-quot-
field/td-p/24592/page/2)

▶ (https://community.airbnb.com/t5/Hosts/where-is-the-quot-Permit-Tax-ID-quot-
field/td-p/24592/page/2)

**Company**

About
(https://www.airbnb.com/a
bout/about-us)
Careers
(https://www.airbnb.com/ca
reers)
Press
(https://www.airbnb.com/pr
ess/news)
Blog
(http://blog.airbnb.com/?
_ga=1.220247130.31180926
5.1444224063)
Help
(https://www.airbnb.com/h
elp)
Policies
(https://www.airbnb.com/h
elp/topic/251/cancellations-
--refunds)
Disaster Response
(https://www.airbnb.com/di
saster-response)
Terms & Privacy
(https://www.airbnb.com/te
rms)

**Discover**

Trust & Safety
(https://www.airbnb.com/tr
ust)
Invite Friends
(https://www.airbnb.com/in
vite?r=6)
Gift Cards
(https://www.airbnb.com/gi
ft)
Airbnb Picks
(https://www.airbnb.com/wi
shlists/airbnb_picks)
Mobile
(https://www.airbnb.com/m
obile)
Support NYC
(https://www.airbnbaction.c
om)
Business Travel
(https://www.airbnb.com/b
usiness/traveler?ref=ft)
Site Map
(https://www.airbnb.com/sit
emaps)

**Hosting**

Why Host
(https://www.airbnb.com/h
ost)
Hospitality
(https://www.airbnb.com/h
ospitality)
Responsible Hosting
(https://www.airbnb.com/h
elp/responsible-hosting)
Home Safety
(https://www.airbnb.com/h
ome-safety)

**Join Us On**

f
(http
s://w
ww.f
aceb
ook.
com/
airbn
b)

g+
(http
s://p
lus.g
oogl
e.co
m/+a
irbnb
)

(http
s://t
witte
r.co
m/ai
rbnb)

in
(http
s://w
ww.li
nked
in.co
m/co
mpa
ny/ai
rbnb)

(http
s://w
ww.
pinte
rest.
com/
airbn
b/)

(http
://w
ww.y
outu
be.c
om/a
irbnb
)

(http
s://w
ww.i
nsta
gram
.com
/airb
nb)

© Airbnb, Inc.