# EXHIBIT C

# CITY AND COUNTY OF SAN FRANCISCO
## BOARD OF SUPERVISORS
### BUDGET AND LEGISLATIVE ANALYST

1390 Market Street, Suite 1150, San Francisco, CA 94102
(415) 552-9292    FAX (415) 252-0461

## Policy Analysis Report

To:      Supervisor Campos
From:    Budget and Legislative Analyst's Office
Date:    May 13, 2015
Re:      Analysis of the impact of short-term
         rentals on housing

## Summary of Requested Action

Your office requested that the Budget and Legislative Analyst conduct an analysis on how short-term rentals affect the housing market in San Francisco, and how these effects might change given different limitations on the number of allowed nights housing units can be rented on a short-term basis.  You also requested an overview of the Planning Department's short-term rental enforcement efforts and how they might be made more effective along with an assessment of how additional data on the short-term rental market might enhance their enforcement mandate.

*For further information about this report, contact Fred Brousseau at the Budget and Legislative Analyst's Office.*

## Executive Summary

- Short-term rentals in recent years have become a new form of visitor lodging in San Francisco and throughout the world. While an informal market may have existed in the past, hosts can now make a spare room or an entire apartment or house available to potential visitors through websites such as Airbnb, Homeaway, Flipkey and others.

- Unlike a hotel or bed and breakfast inn, making one's personal residential space available for short-term rentals can be a low-cost and flexible undertaking for a host. It can also substitute for having a roommate for hosts who would otherwise need to share their space to cover their rent or mortgage.

- Guests can select from a variety of housing options and have the experience of staying in a home in a neighborhood not traditionally geared to tourism. The host can earn income by renting their space for as few or as many nights as they wish and that the market will bear. The platform companies have different arrangements but generally earn fees when bookings occur and/or when listings are posted by hosts.

- Though short-term rentals (defined as 30 days or fewer) were illegal in San Francisco until February 2015, between 5,249 and 6,113 of Airbnb listings in San Francisco were identified between November 2013 and February 2015 in Airbnb website webscrapes conducted by three individuals and made publically available. Comparable information for other hosting

platform companies was not available and is not included in the estimates prepared for this report, understating the estimated impacts reported.

- While specific locations are not disclosed, neighborhood locations can be identified from the Airbnb webscrapes. There are listings in almost all neighborhoods in San Francisco but concentrations of listings were found in the Inner Mission, Haight-Ashbury/Western Addition, Castro/Eureka Valley and Russian Hill/Polk Gulch.

- Numerous studies and assertions about the benefits and costs of the short-term rental market have been made. On the positive side, claims have been made that the short-term rental market increases tourism and its economic benefits, provides additional income for hosts, particularly those who would not otherwise rent out their housing unit or rooms, and benefits neighborhoods that tourists traditionally do not visit.

- On the negative side, some assert that short-term rentals take away already scarce housing for long-term rentals, may encourage tenant evictions if a landlord concludes that they can earn more from short-term rentals than from a long-term tenant, violates local zoning and other ordinances and negatively affects the quality of life in residential areas.

- To assess the impact of the 6,113 Airbnb listings identified as of December 2014 on the housing market in San Francisco, the Budget and Legislative Analyst developed a model to estimate bookings for those listings and to classify hosts as either casual or commercial.

- Casual hosts are defined by the Budget and Legislative Analyst as those who occasionally make their residences available for short-term rentals for supplemental income. For example, hosts who rent their entire unit on a short-term basis when they are away for a weekend, on vacation or otherwise travelling and would not otherwise rent the unit on a long-term basis are classified as casual. In the case of renting a room in their residences, casual hosts would not usually need or choose to have a roommate. Casual hosts are assumed not to be affecting the housing market since they would continue to occupy their housing unit in the absence of the short-term rental market.

- Commercial hosts for entire units are defined by the Budget and Legislative Analyst as those who probably do not live or could not live in their short-term rental unit and therefore rent it out as a means of generating income. For commercial hosts renting out rooms on a short-term basis, the motivation would be to cover rent or mortgage payments that would otherwise require having a roommate. The next best uses of the housing units for such hosts in the absence of the short-term rental market would be living in the unit themselves, placing the unit on the long-term rental market, or getting roommates. Commercial hosts are thus assumed to be removing housing units that would otherwise be available for the long-term rental market.

- The Budget and Legislative Analyst prepared estimates of the impact of short-term rentals on San Francisco's housing market using various assumptions and calculations about the number of bookings per listing and the threshold number of booked nights that distinguish casual and commercial Airbnb hosts. Three scenarios were developed with variations in assumptions, resulting in the distribution of host classifications shown in Exhibit A. The medium pact scenario, referred to as the primary scenario and presented in the main body

of this analysis, applied a threshold of 59 nights or more for commercial hosts of entire units. For private and shared rooms, the threshold was 89 or more booked nights.

| Exhibit A: Number of Hosts by Type under 3 BLA Scenarios | | | |
|---|---|---|---|
| Host Type | Lower Impact Scenario | Medium Impact Scenario *(primary scenario used in this report)* | Higher Impact Scenario |
| Number of Casual Hosts | 4,517 | 4,191 | 3,107 |
| Number of Commercial Hosts | 1,596 | 1,922 | 3,006 |
| Total | 6,113 | 6,113 | 6,113 |

- Assessing only the impact of commercial hosts that rent entire housing units for short-term rentals, the Budget and Legislative Analyst estimates that between 925 and 1,960 units citywide have been removed from the housing market from just Airbnb listings. At between 0.4 and 0.8 percent, this number of units is a small percentage of the 244,012 housing units that comprised the rental market in 2013 (the latest number available from the U.S. Census Bureau's American Community Survey). However, when compared to the 8,438 units reported as vacant by the American Community Survey in 2013, the percentage is estimated to be between 11.0 and 23.2 percent, as follows.

| Exhibit B: Estimated Number of Commercial Entire Unit Listings as % of Vacant Units Citywide | | | |
|---|---|---|---|
| | Lower Impact Scenario | Medium Impact *(primary scenario used in this report)* | Higher Impact Scenario |
| Number of Commercial Entire Unit Airbnb Listings, 2014 | 925 | 1,251 | 1,960 |
| Percent of 8,438 vacant units, 2013 | 11.0% | 14.8% | 23.2% |

Sources:   American Community Survey 2013, Budget and Legislative Analyst Utilization Model

- The impact of short-term rentals on the housing market varies by neighborhood. When adding the number of entire unit commercial listings to the number of vacant units in each neighborhood as of 2013, and calculating the percentage of total units potentially for rent, the impacts are highest in the Inner Mission, the Haight-Ashbury/Western Addition, the Castro/Eureka Valley, and Potrero Hill/South Beach, as follows. The primary scenario assumptions were used for these estimates. On the low side, the impact in nine neighborhoods was under 5 percent.

| Exhibit C: Primary Scenario: Impact on Vacant For Rent Housing of Commercial Short-term Rentals for Entire Housing Unit, by Neighborhood | | | | | | |
|---|---|---|---|---|---|---|
| Zip Code | Neighborhood | Rental Market Size (2013) | Vacancy For Rent (2013) | Number of Commercial Entire Unit Listings | Total Potential Units for Rent | Airbnb Commercial Unit Listings as % of Total Potential for Rent |
| 94117 | Haight-Ashbury/Western Addition | 14,686 | 260 | 122 | 382 | 31.9% |
| 94110 | Inner Mission | 19,194 | 483 | 199 | 682 | 29.2% |
| 94107 | Potrero Hill/South Beach | 9,121 | 246 | 85 | 331 | 25.7% |
| 94114 | Castro/Eureka Valley | 9,921 | 358 | 117 | 475 | 24.6% |
| Source Webscrape of Airbnb website prepared by Murray Cox, December 2014; Budget and Legislative Analyst Utilization Model, American Community Survey 2013 | | | | | | |

- The Budget and Legislative Analyst's analysis of commercial host earnings from the short-term rental market compared to 2013 median gross rent earned for their neighborhoods found that, on average, hosts earned more in the short-term rental market than they would in the long-term rental market as of December 2014. Applying the hosts' December rates to the full year, an estimated 508 listings would have earned more than the 2014 median market rental rate of $3,750 per month. There were another approximately 200 listings generating slightly less than $3,750 per month but could have exceeded the median market rate with higher rates charged at peak months of the year. Some hosts probably earn less than the market rent but may not be offering housing comparable to what commands the median market rate.

- A number of the neighborhoods with the most commercial hosts also had high numbers of evictions in 2014 according to the City's Rent Board data. Exhibit D presents number of commercial hosts and number of evictions for the five neighborhoods with the highest number of evictions. While there are many reasons for evictions, and evictions for the purpose of conversion into a short-term rental is not tracked by the Rent Board, some landlords could be motivated to evict a tenant for the financial benefits of entering the short-term rental market.

| | Exhibit D: Neighborhoods with Most 2014 Commercial Hosts Compared to Evictions | | | | |
|---|---|---|---|---|---|
| Zip Code | Neighborhood | Number of Commercial hosts | Number of Evictions | Neighborhood Evictions, as % of Total Evictions in San Francisco | Neighborhood Evictions, Ranked |
| 94110 | Inner Mission | 315 | 323 | 12% | 1st |
| 94117 | Haight-Ashbury/Western Addition | 193 | 212 | 8% | 3rd |
| 94114 | Castro/Eureka Valley | 188 | 130 | 5% | 10th |
| 94109 | Russian Hill/Polk Gulch | 130 | 269 | 10% | 2nd |
| 94107 | Potrero Hill/South Beach | 126 | 51 | 2% | 19th |

Source: Webscrape of Airbnb website prepared by Murray Cox, December 2014; Budget and Legislative Analyst Utilization Model; San Francisco Rent Board

- Enforcement of the City's laws pertaining to short-term rentals that went in to effect in February 2015 has been hampered by the lack of information about the location and number of bookings per listing. Since short-term rentals operate in private residences and cannot be publically viewed and platform companies do not disclose addresses or booking information about their hosts, the City has limited information for enforcement.

- Hosts are required to pay hotel taxes for every booking and register with the City's Planning Department. The Treasurer and Tax Collector reports that hotel taxes are being paid by short-term rental hosts but cannot disclose information about the total number of hosts with business licenses. The Planning Department reports that, as of May 1, 2015, only 579 hosts had applied for now required registration and 282 certificates have been issues. Given the 6,113 listings identified for just Airbnb in December 2014, compliance with the registration requirement has been low.

## Policy Options

**The Board of Supervisors should consider the following actions:**

1. Enact legislation requiring hosting platforms to provide host address information and booking information on a quarterly basis for enforcement purposes.

2. Enact legislation requiring hosting platforms to only list units and hosts that are registered with the City.

3. Enact legislation limiting the number of un-hosted nights allowed per year.

4. Amend the Planning Code to allow the Planning Department to levy fines on platforms that list unregistered hosts.

*Project staff: Fred Brousseau, Julian Metcalf and Mina Yu.*

# Background

### Short-term Rental Market

The short-term rental market has three key players: the host, the guest, and the rental platform. The host is the property owner, lease holder, or a third party management company who supplies entire apartments, private rooms, or shared rooms. The guests rent out the apartments or rooms, and the rental platform facilitates the exchange between the hosts and guests.

Some municipalities, including the City and County of San Francisco, limit the number of days a short-term rental can be rented out and prohibit using residences solely for commercial purposes. Short-term rentals may provide a close substitute to hotel rooms or may offer a new type of lodging product by providing additional amenities such as full kitchens, easy access to different neighborhoods, and a more local and familiar experience of an area.

In San Francisco and in other cities, Airbnb is the predominant rental platform in the short-term rental market and generates revenue by taking a fee from both the host and guest for each booking completed (a pay-per-booking model). Other rental platforms such as HomeAway and FlipKey will offer a pay-per-booking option and also a subscription model, which charges hosts for advertising rentals.

### Airbnb

This report focuses on Airbnb due to its predominance in the short-term rental market and the availability of public data on its activities. Airbnb originated in 2008. Airbnb has since expanded to over 34,000 cities and 190 countries and has over 1 million listings worldwide.[1] As of April 2014, Airbnb has raised nearly $800 million from investments firms including Andreessen Horowitz, Sequoia Capital, T. Rowe Price, and SherpaVentures. Airbnb has been valued at $20 billion,[2] which is higher than major hotel chains such as Hyatt Hotels Corporation ($8.4 billion).[3]

The Airbnb website allows for three types of rentals: 1) entire homes where the guest has access to the entire unit and the host is generally not present, 2) private rooms where the host is often present in the home, and 3) shared rooms, where hosts or others guests may sleep in the same room.

As detailed further below, using publically available webscrapes of Airbnb's San Francisco website, the Budget and Legislative Analyst identified 6,113 total listings in San Francisco from December 2014, consisting of entire units, private rooms and shared rooms. Details about these listings and their impacts on the housing market are provided below.

---

[1] Airbnb. "About Us." *About*. Airbnb. Website. https://www.Airbnb.com/about/about-us. Accessed March 23, 2015
[2] Saitto, Serena. "Airbnb Said to Be Raising Funding at $20 Billion Valuation." Bloomberg Business. Bloomberg, February 28, 2015. Website. April 27, 2015. http://www.bloomberg.com/news/articles/2015-03-01/Airbnb-said-to-be-raising-funding-at-20-billion-valuation
[3] Samaan, Roy. LAANE. "Airbnb, Rising Rent, and the Housing Crisis in Los Angeles." March 2015

*Budget and Legislative Analyst*

**Report estimates are Conservative**

The Airbnb listings are only part of the short-term rental market so all conclusions and estimated short-term rental impacts presented in this report understate the full short-term rental market by an unknown amount although Airbnb is considered to have the largest number of short-term rental listings by many analysts. Neither company nor other public data was available for the other short-term rental platforms.

Besides excluding estimates of part of the short-term rental market, estimates in this report are conservative because housing stock and vacancy data was obtained from the American Community Survey conducted by the U.S. Census Bureau. The latest data from that source was from 2013 and based on five year averages ending that year.

**Three Scenarios of Housing Impact were Developed for this Report**

Since no single source of data was available to identify the exact number of short-term rental listings and bookings in San Francisco, estimates were prepared using different assumptions about bookings and the thresholds that distinguish casual from "commercial" short-term rental hosts. Details about the three scenarios are explained below. While all show an impact on the rental housing market, particularly in certain neighborhoods, the impacts vary from lower to medium to higher. For ease of reading, the medium impact scenario, referred to as the primary scenario, is presented in the main body of the text; the other two scenarios are presented as alternative scenarios at the end of the report. While all of the scenarios have strengths and limitations, the primary scenario is considered to be the most reasonable, with the most realistic assumptions by the Budget and Legislative Analyst.

**Current Regulation in San Francisco**

In the fall of 2014, San Francisco legalized short-term rentals. Previously illegal, the new law allowed permanent residents -- a person who occupies a unit for at least 60 consecutive days with the intent to make it their home -- to offer short-term rentals. There are some caveats: Hosts are required to register with the City's Planning Department; they must pay the City's hotel tax; un-hosted rentals, which are usually entire homes, are limited to 90 days per year; and each listing is required to carry liability insurance.

Short-term rentals are subject to the same 14 percent transient occupancy tax that hotels in the City pay. The Treasurer and Tax Collector of the City and County of San Francisco issued a ruling in 2012 that the City's Transient Occupancy Tax applied to short-term rental hosts and website companies. Airbnb has publicly stated that they have paid back taxes owed to the City and County, but the Treasurer is unable to confirm this due to taxpayer confidentiality laws. Airbnb reports that it has been collecting and remitting transient occupancy taxes on behalf of its hosts in San Francisco and remitting them monthly to the City. In a 2014 letter to its hosts in the City, Airbnb stated it is remitting "nearly $1 million" per month.

## Positive Impacts and Claims Pertaining to Short-term Rentals

### Strong Tourism Demand

Short-term rentals may provide many benefits to the City and its residents. Beyond the tax revenue that Airbnb reports, and the Treasurer and Tax Collector confirms, that it routinely collects and remits to the City, some studies report that short-term rentals can contribute to tourism, bringing additional customers to local businesses. In some cases, hosting may help individuals afford housing cost and other expenses.

Based on a study by the San Francisco Travel Association[4], short-term rentals accounted for an estimated 1.9 percent of all overnight tourists stays in the City in 2014. While, this is a relatively small proportion, it is significant when considering the City received an estimated 16.9 million visitors in 2013[5]. Applying the 2014 rate to the 2013 number of tourists means that 321,100 stayed in short-term rentals that year.

The current hotel market in the City is reported to be one of the strongest in the country, with an occupancy rate of 84.1 percent in 2013[6], well above the national rate of 62.2 percent.[7] With the demand for hotel accommodations so strong, short-term rentals may present a unique option to accommodate tourist demand, especially during peak tourist seasons and large events. To this point, the San Francisco Travel Association recently partnered with Airbnb to be a provider of accommodations that the Association can sell to conferences as blocks for large events.[8]

The theory that short-term rentals contribute to increased tourism, rather than simply replace hotel stays outright, is supported by a 2014 study conducted by researchers at Boston University. The Boston University study analyzed short-term rentals across the state of Texas. The study found that every "1% increase in Airbnb listings in Texas results in a 0.05 percent decrease in quarterly hotel revenues." It also concluded that this loss to hotels and replacement mainly occurred on less expensive, lower-end hotels.[9] Assuming the same ratio applies to San Francisco, with its currently booming, often heavily booked hotel market, a potential loss of 0.05 percent would be exceeded by the average 2.0 percent year-over-year growth[10] or non-existent given the strong tourism demand. However, in the future if the market is declining, the substitution of short-term rentals compared to hotels

---

[4] San Francisco Travel Association: Visitor Industry Economic Impact Summary, 2014
[5] San Francisco Travel Association
[6] San Francisco Center for Economic Development: Hotel Occupancy Rate and Other Features (2013), updated April 2014.
[7] American Hotel & Lodging Association, 2013 At-a-Glance Statistical Figures
[8] San Francisco Travel Association: Partners
[9] Boston University School of Management, "The Rise of the Sharing Economy: Estimating the Impact of Airbnb on the Hotel Industry" 2013, Boston University School of Management Research Paper Series No. 2013-16
[10] San Francisco Travel Association: Average growth of Room Night Demand from 2011 to 2014

*Budget and Legislative Analyst*

might be more noticeable. To determine the extent of the potential impact on San Francisco hotels a more robust study and access to additional data would be necessary.

**Short-term Rentals May Increase Tourism Spending**

Assuming the Boston University study results for Texas that the availability of short-term rentals results in a net increase in tourists is similarly applicable to San Francisco, increased visitors to the City should result in additional spending at local businesses. A study funded by Airbnb[11] concludes that in 2012 Airbnb guests generated "approximately $56 million in local spending and supported 430 jobs in San Francisco." The study also suggests that tourist spending by Airbnb guests is distributed to less visited neighborhoods across the City. However, there is limited data on the extent to which Airbnb guests spend time in their host neighborhood vs. traditional tourist neighborhoods and the study did not assess the neighborhood impact when short-term guests replace long-term residents.

**Short-term Rentals May Provide New Supplemental Income for Some Hosts**

Many supporters of short-term rentals have stated that their hosting business allows them to afford the cost of living in the City and to pay various expenses. Based on the Budget and Legislative Analyst's assessment of available data on income earned by Airbnb hosts, this seems to be true in some case. Still, there is a distinction to be made between two types of hosts assumed for this analysis: casual hosts who rent out entire units and rooms on an occasional basis and commercial hosts who rent out their rooms or entire units more frequently to maximize earnings and achieve other business objectives.

Casual hosts are defined for this analysis as those who may on occasion share a room with a guest or rent a private room or entire home when they are away but they would not choose otherwise to be in the business of renting out their space on a long-term basis. Available data shows that the income earned in these scenarios could reasonably be considered supplemental but does not equal what could be earned with more frequent bookings. In contrast, commercial hosts may substitute their rooms and entire home that may otherwise be available on the long-term market with short-term rentals either to earn more than could be earned through long-term rentals or for other reasons.

In addition to the Budget and Legislative Analyst's assessment, the scenario of the casual host is supported by two recent studies. The first, a survey of 344 hosts concluded in a draft report for Airbnb that 56 percent of hosts report using income from rentals listed on Airbnb to pay for part of their rent or mortgage.[12] The second study, by Rosen Consulting Group in 2013, surveyed users of Airbnb and

---

[11] Airbnb.com "AIRBNB ECONOMIC IMPACT" http://blog.Airbnb.com/economic-impact-Airbnb/#san-francisco, accessed March 25, 2015

[12] HR&A Advisors, unpublished report for Airbnb on the economic impact assessment of Airbnb rental activities in San Francisco and New York City, October 2013. Some details are available from the (1)official press release from Airbnb.com, (2) article discussing results on Forbes.com, and (3) HR&A Advisor's summary on their client portfolio webpage.

found that 42 percent report using short-term rental income to supplement living expenses.[13] Both studies were commissioned by Airbnb, but the survey results seem reasonable. The remaining 44 percent of hosts from the 2012 study and the 58 percent from the 2013 study are assumedly not supplementing living expenses with their rental revenue but are treating it as a steady source of income.

The Budget and Legislative Analyst prepared estimates of the number of casual and commercial Airbnb hosts as of 2014 under three scenarios for this analysis using different assumptions about the threshold number of bookings that distinguish casual and commercial hosts and about the number of bookings per listing. One of the three scenarios, which will be referred to as the primary scenario in this report, is the one the Budget and Legislative Analyst concludes is the most reasonable and is presented in the main body of this report. The results of the two other scenarios are presented in the Alternate Scenarios section at the end of this report.

For the primary scenario, the Budget and Legislative Analyst classified 69 percent of all hosts, or 4,191 of the 6,113 hosts identified, as casual. This higher than the 42 to 56 percent of hosts identified in the two studies cited above as hosts who use their earnings to supplement living expenses or help pay their rent or mortgage. The remaining 31 percent of hosts, or 1,922 of the 6,113 hosts are assumed to be operating their short-term rentals as a business and may be generating income above the amount they could earn on the long-term rental market and/or that otherwise suits their business and personal objectives such as not having long-term tenants covered by rent control and rent stabilization.

## Negative Impacts and Claims Pertaining to Short-term Rentals

### Short-Term Rentals Decrease Available Housing in San Francisco
Short-term rentals may exacerbate the housing shortage in San Francisco by offering a more lucrative alternative or a more flexible living arrangement to listing a unit on the long-term rental market.

With the three estimates of the number of commercial users by listing type, the Budget and Legislative Analyst estimates that commercial hosts of 1,251 entire homes or apartments, 631 private rooms and 40 shared rooms may generate higher income through Airbnb than from the long-term rental market, which is shown in Tables 6 and 7 below.  Since these hosts can earn an estimated level of revenue that is above what they could earn on the long-term market, they have an incentive to remove their units from traditional long-term rental opportunities. Some hosts may also be attracted to participating in the short-term rental market in order to maintain a more flexible living arrangement.  For example, a host may not wish to have a roommate or long-term tenants on a rent-stabilized lease. The ease of participation in the short-term offers these hosts an alternative to participation in the traditional long-term rental market.

---

[13]  Rosen Consulting Group, *Short-Term Rentals and Impact on the Apartment Market*. 2013

At 0.3 percent, the estimated 1,251 entire units being rented out by commercial Airbnb hosts is relatively small compared to the entire 376,083 units of housing in San Francisco, but larger when compared to the number of units available for rent at any one time, which was reported to be 8,438 in 2013 by the American Community Survey conducted by the U.S. Census Bureau. From this perspective, entire homes listed by commercial hosts take away an estimated 14.8 percent of the total rental housing available for rent Citywide, and private and shared rooms that might otherwise be occupied by roommates take even more units off the rental market. The impact on the rental stock in certain neighborhoods is higher, as detailed below.

Hosts operating casually are not assumed to take units off of the housing market since it is assumed that they occupy the unit themselves and only rent out only sporadically such as during their own vacations and trips away.

**Short-Term Rentals May Encourage Tenant Evictions**
Approximately 71.9 percent of San Francisco's rental stock is rent-stabilized, which typically results in rents below market rate. Housing market rental rates in San Francisco have been increasing significantly over the past few years so that for some landlords that may already be inclined to evict their tenants to capture current full market value rents, an additional incentive exists due to the higher revenue that could be generated through short-term renting. The San Francisco Rent Board reports that notices of eviction increased from 2,039 to 2,789, or by 37 percent, between 2011 and 2014. The Rent Board does not track what happens to units after evictions occur so it cannot be readily determined how many evictions resulted in housing units converted to short-term rental use. The Rent Board tracks filing of eviction notices only, though these are generally strong indicators of subsequent evictions. The Board does not systematically track successful evictions.

**Many Short-Term Rentals May Violate Local Ordinances**
In the fall of 2014, the Board of Supervisors legalized un-hosted short-term rentals (i.e., entire units) under 90 days, on the condition that hosts register with the Planning Department and apply for business licenses with Treasurer & Tax Collector. However, hosts have been slow to register; as of April 2015 455 hosts have registered. Given that seven publically available webscrapes report the number of listings on just the Airbnb platform as between 4,865 to 6,113 the rate of registration to date suggests that the majority of the current hosts are violating the required registration requirement.

**Short-Term Rentals May Introduce Neighborhood Safety Risks and Decline in Quality of Life**
The Planning Department has received noise complaints, concerns about parking, and other quality of life complaints from residents due to units suspected to be short-term rentals. These impacts seem plausible, but the extent and magnitude of these impacts have not been measured.

## Housing Stock Impacts

To determine the potential impact of short-term rentals on San Francisco's housing available for long-term rentals, the approach for this analysis was to first distinguish between hosts who rent out their homes or rooms in their home on an occasional, or casual, basis such as hosts who rent out their entire units when they are away on vacation, a business trip or away for a weekend. For private room rentals, an example of a casual host would be one who occasionally rents out rooms for supplemental income and perhaps for the experience of meeting people from elsewhere, but does not otherwise need or want a full-time roommate.

Hosts who own or rent homes for the express purpose of renting on the short-term rental market and, for the most part, do not live in the unit themselves or who regularly rent out rooms in their homes in lieu of having a roommate to cover rent and other expenses were classified as commercial hosts.

The Budget and Legislative Analyst concludes that commercial hosts affect the Citywide and, to varying degrees, neighborhood supply of housing available for the long-term rental market. Without commercial short-term rentals, the use of the housing units would assumedly be the owners living in the unit themselves or renting the unit out on a long-term basis. Hosts who rent out rooms on a more frequent short-term basis and who need the income to cover rent and other living expenses would assumedly turn to getting long-term roommates if not for short-term rentals.

While data is not publically available from the short-term rental platform companies on the frequency of bookings per listing, the Budget and Legislative Analyst assembled data to estimate the number of bookings per listing. Data on listings, neighborhoods, and host type (entire units, private rooms, shared rooms) were obtained and analyzed from several publically available webscrapes of the Airbnb website to create three scenarios based on three sets of assumptions about the number of bookings per listing and the number of bookings that distinguishes casual and commercial hosts.

Though neither the short-term rental platform companies nor any of the available webscrapes provide information on the frequency of bookings for individual listings, the Budget and Legislative Analyst used a multiple of the number of reviews per listing to estimate the number of bookings, or frequency of rental use of each listing, to categorize all listing hosts as either casual or commercial.

Since no single source of data was available to identify the exact number of short-term rental listings and bookings in San Francisco, estimates were prepared using different assumptions about bookings and thresholds distinguishing casual from "commercial" short-term rental hosts. All three scenarios show an impact on the rental housing market, particularly in certain neighborhoods, ranging from lower to medium to higher impact. The scenarios are summarized as follows:

**Lower impact scenario:** assumes casual hosts are those renting their unit 90 nights or fewer per year, commercial hosts rent out their units more than 90 nights per year, and the number of reviews for each listing represents 72 percent of total bookings for the listing.

**Medium impact scenario** (*referred to as primary scenario in this report*): assumes casual hosts are those renting their unit 58 nights or fewer per year, commercial hosts rent out their units more than 58 nights per year, and the number of reviews for each listing represents 72 percent of total bookings for the listing.

**Higher impact scenario:** assumes casual hosts are those renting their unit 58 nights or fewer per year, commercial hosts rent out their units more than 58 nights per year and the number of reviews for each listing represents 30.5 percent of total bookings for the listing (resulting in a higher number of bookings per listing than the other two scenarios).

As an example of the differences between the three scenarios, the Budget and Legislative Analyst classified Airbnb hosts as follows under the three scenarios:

|  | BLA Scenario | | |
| --- | --- | --- | --- |
|  | **Lower Impact** | **Medium Impact** *(primary scenario used in this report)* | **Higher Impact** |
| Number of Casual Hosts | 4,517 | 4,191 | 3,107 |
| Number of Commercial Hosts | 1,596 | 1,922 | 3,006 |
| Total | 6,113 | 6,113 | 6,113 |

Casual hosts are assumed for the most part to be operating their short-term rentals to earn supplemental income or for other non-business reasons such as meeting travelers. Commercial hosts are assumed for the most part to be operating their short-term rentals as a business and may be generating income above the amount they could earn on the long-term rental market and/or otherwise fulfilling their business and personal objectives such as not having long-term tenants covered by rent control and rent stabilization.

As another example of differences between the three scenarios, in 2013, the American Community Survey estimated a 5-year average of 8,438 units as Vacant and For Rent in San Francisco, or 3.5 percent of the 244,012 units defined as the rental market at that time.[14] Based on the Budget and Legislative Analyst's model

---

[14] The American Community Survey (ACS) is conducted annually by the U.S. Census Bureau. Compared to the relatively comprehensive 10-year Census, the ACS is a "mandatory ongoing statistical survey that samples a small percentage of the population every year." The ACS selects approximately 1-in-480 addresses to mail 3.5 million questionnaires annually. While this is a significant number of individuals and addresses surveyed, it still relies on statistical assumptions, which result in a margin of error for every ACS estimate. The ACS Rental Vacancy figures

*Budget and Legislative Analyst*

used to prepare estimated impacts and the 5-year average number of units Vacant For Rent in 2013 reported by the American Community Survey, commercial hosts renting out entire units would have reduced the San Francisco rental stock by between 11 and 23.2 percent, in accordance with the three scenarios' assumptions, as follows:

| | Lower Impact | Medium Impact (primary scenario used in this report) | Higher Impact |
|---|---|---|---|
| Number of Commercial Entire Unit Listings, 2014 | 925 | 1,251 | 1,960 |
| Percent of 8,438 vacant units, 2013 | 11.0% | 14.8% | 23.2% |

Sources:  American Community Survey 2013, Budget and Legislative Analyst Utilization Model

For ease of reading, the primary scenario only is presented in the following main body of the text; the lower and higher impact scenarios are presented as alternative scenarios at the end of the report. While all three scenarios have strengths and limitations, the primary scenario is considered to be the most reasonable, with the most realistic assumptions, by the Budget and Legislative Analyst. The results of the two other scenarios are presented in the Alternate Scenarios section at the end of this report.

Table 1 summarizes the Budget and Legislative Analyst's classification of short-term rental hosts for Airbnb using only primary scenario assumptions. As shown, the total number of housing units listed in 2014 was 6,113, of which 4,191, or 69 percent, were classified by the Budget and Legislative Analyst as casual, and the other 1,922 units, or 31 percent, were classified as commercial. The threshold number of days to distinguish casual and commercial hosts is shown for each type of host for the primary scenario. Commercial hosts are those that book their space for more than 58 days for entire units and more than 88 days for private or shared rooms. Those amounts are the average number of booked nights reported for each host type in an unpublished report prepared for Airbnb and obtained by the Budget and Legislative Analyst.[15]

---

include all units listed for rent but currently not occupied and all units that are rented but have yet to be occupied by the incoming tenant. The total number of units that are vacant but have incoming tenants is expected to be small, but does somewhat inflate the size of the available rental units listed on the market.
[15] HR&A, "Airbnb Economic Impacts in San Francisco and its Neighborhoods," November 2012

*Budget and Legislative Analyst*

| Table 1: Primary Scenario: Estimated Number of Short-term Rental Housing Units in San Francisco, by Type of Host, 2014 | | | |
|---|---|---|---|
| Type of Host/Listing | Threshold Number of Days Unit Rented | Estimated Number of Units as of December 2014 | Percentage of Total Units |
| Casual: Entire unit | 58 days or less | 2,400 | 39% |
| Casual: Private room | 88 days or less | 1,565 | 26% |
| Casual: shared room | 88 days or less | 226 | 4% |
| *Total casual:* | | *4,191* | *69%* |
| Commercial: Entire unit | over 58 days | 1,251 | 20% |
| Commercial: Private room | over 88 days | 631 | 10% |
| Commercial: Shared room | over 88 days | 40 | 1% |
| *Total commercial:* | | *1,922* | *31%* |
| TOTAL UNITS | | 6,113 | 100% |

Source: Webscrape prepared by Murray Cox, December 2014; Budget and Legislative Analyst Utilization Model

To determine the impact of the commercial hosts on the rental market, the Budget and Legislative Analyst relied on the U.S. Census Bureau's American Community Survey data from 2013 which reports total number of housing units in the San Francisco rental market and total number of vacant housing units available for rent, by neighborhood.  This data, the most recent available from the American Community Survey, may overstate the number of units available currently since the published data is from 2013 and based on a five year average for the years leading up to 2013.

Table 2 summarizes the data sources used for the analysis. Further details and sources and methods are provided below.

| | Total Housing Units in San Francisco Rental Market (2013) | Vacant Housing Units for Rent in San Francisco, by Neighborhood (2013) | Airbnb Listings in San Francisco, by Neighborhood (2014) | Number of Reviews per Listing | Multiple: Number of Bookings per Listing Derived from Number of Reviews per Listing |
|---|---|---|---|---|---|
| **Variable** | | | | | |
| **Source** | American Community Survey, U.S. Census Bureau | American Community Survey, U.S. Census Bureau | 2014 Webscrape of Airbnb website | 2014 Webscrape of Airbnb website | Statement by Airbnb Co-Founder and CEO [16] (72 percent, used for Lower & Medium Impact scenarios)

New York State Attorney General's Subpoenaed Airbnb Data for New York City (30.5 percent, used for Higher Impact scenario)[17] |
| **Purpose** | To identify total units in rental market | To identify rental vacancy rate for San Francisco and by neighborhood | To identify number of housing units being used by Airbnb | To apply to Multiple explained in next column | To apply to number of reviews per listing to determine frequency of bookings/listing |

**Table 2: Information Sources Used for Analysis**

**Data Sources**

This report considers the impacts of short-term rentals on housing availability in San Francisco, and data from the American Community Survey, Zillow, Trulia, the San Francisco Rent Board, various webscrapes of the Airbnb website, and other reports on the short-term rental market such as those produced by and for the City's Planning Department, Airbnb press releases and public statements, and our own internal review of Airbnb.com were used.

The Budget and Legislative Analyst's Office sent a request for anonymized listing and booking data to Airbnb in April 2015 but the company did not respond. Therefore, the Budget and Legislative Analyst Office utilized 7 webscrapes of the Airbnb website and cross-referenced this information with actual Airbnb data obtained through subpoena and reported by the New York State Attorney General's Office in

---

[16]Chesky, Brian. September 7, 2012. "What percent of Airbnb hosts leave reviews for their guests?" Retrieved on May 6, 2015 from: http://www.quora.com/What-percent-of-Airbnb-hosts-leave-reviews-for-their-guests
[17] This rate was used to calculate a high estimate of the number of units removed from the long-term market by neighborhood, as shown in the Alternate Scenario section below.

Memo to Supervisor Campos
May 13, 2015

2014, a report prepared for Airbnb[18] and Airbnb's press releases and public statements.

**Source of Webscrape data**
The Budget and Legislative Analyst's Office reviewed seven webscrapes of the Airbnb website prepared by three technology professionals. Webscrapes extract and compile data from the public-facing websites and allow for analysis that would otherwise not be feasible or practical to conduct using a standard browser. All seven of the webscrapes reviewed show a consistency over time in the number of Airbnb listings and in rental rates. The December 2014 webscrape prepared by Murray Cox was used by the Budget and Legislative Analyst for this analysis as this dataset provided the most comprehensive collection of data. Summary information from each of the seven webscrapes is provided in the Appendix to this report.

The webscrapes used were prepared by the following three individuals. Tom Slee, who works in the software industry, writes about technology and politics, is active in the open data and sharing economy communities, and is based in Waterloo, Ontario. Murray Cox is a community activist based in New York City who utilizes his technology skills for various non-profits and community groups. He has a degree in computer science from the University of Sydney. Gus Dolan collaborates with the Anti-Eviction Mapping Project.

Webscrapes are subject to limitations: there may be duplicate or inaccurate listings, and webscrape authors may run the scrapes several times to reduce error. Because of the consistency of the information in the webscrapes reviewed, the Budget and Legislative Analyst concluded that they were reliable sources of information for this analysis.

---

[18] New York State Attorney General, "Airbnb in the City." Office of the Attorney General of the State of New York's Research Department and Internet Bureau. October 2014

*Budget and Legislative Analyst*

Memo to Supervisor Campos
May 13, 2015

| Table 3: Number of San Francisco Airbnb Listings, by Listing Type December 2014 | | | |
|---|---|---|---|
| **Number of Entire Unit Listings** | **Number of Private Room Listings** | **Number of Shared Room Listings** | **Total Number of Listings** |
| 3,651 | 2,196 | 266 | 6,113 |

Source: Webscrape of Airbnb website prepared by Murray Cox, December 2014

The Budget and Legislative Analyst conducted a review and sampling of Airbnb's current San Francisco listings to confirm summary statistics of the webscrapes. Average prices were checked by listing type for each webscrape against the website's reported averages. Table 4 below shows the average prices from the webscrape used for this analysis. See the Appendix for more detail about how the webscrapes were used for this analysis.

| Table 4: Average San Francisco Airbnb Prices, by Listing Type December 2014 | | | |
|---|---|---|---|
| **Average Price of Entire Unit Listings** | **Average Price of Private Room Listings** | **Average Price of Shared Room Listings** | **Average Price of All Listings** |
| $239 | $115 | $72 | $239 |
| Source: Webscrape of Airbnb website prepared by Murray Cox, December 2014 | | | |

**Limitations of data**

The number of bookings is key to understanding the impact of the short-term rental market on housing in San Francisco. Hosts have the option to unlist or deactivate listings, but it is unclear whether listings expire; thus, units that are not currently being booked may still be listed. Data from the webscrapes do not provide information on bookings. However, the Budget and Legislative Analyst utilized the number of reviews left on each listing to estimate the booking frequency, or utilization rate, in booked nights per year for each listing. See the Appendix for detail on our methodology.

Airbnb and other platforms obscure the location of a host's unit on their website so it is not possible to determine exact locations. Neighborhoods are identified for each listing, although inconsistently and without clear definition. To help determine neighborhood locations for listings, zip codes were pulled from some of the webscrapes. The neighborhood locations used in our analysis are expected to approximate to within 0.6 miles of their true location.

**Review Data Key to Estimating Utilization**

Because data from the webscrapes do not provide information on the number of bookings, two estimates of bookings were prepared: 1) Airbnb's public statement that 72 percent of guests leave reviews was applied to all listings with reviews to

*Budget and Legislative Analyst*

determine the total number of bookings per listing (i.e., assuming that the number of reviews per listing represented 72 percent of all bookings for that listing), and 2) a second, lower review rate of 30.5 percent was applied based on the number of reviews per listing reported from a webscrape of New York City Airbnb listings and compared to the number of bookings for the same time period in New York City as reported by the New York State Attorney General in subpoenaed Airbnb booking data. That report showed a total of 497,322 bookings from January 1, 2010 through June 2, 2014. When compared with the webscrape results showing a review count of 151,623 from January 1, 2010 through June 2, 2014, the rate of apparent reviews to bookings was determined to be 30.5 percent.

The apparent review ratio of 30.5 percent may not represent the actual rate that users leave reviews. Some sources suggested that Airbnb alters the number of reviews on their website, and may remove older reviews over time. If true, this would explain the difference between the apparent review rate and Airbnb statements from 2012 that 72 percent of guests leave reviews. Both the apparent review ratio and Airbnb's stated ratio are all well above common ratios assumed for the e-commerce and other online industries, which have been estimated to range between one[19] to nine percent, but the Airbnb business model appears to be more dependent on reviews than some other businesses .[20] [21]

The 72 percent review rate was used for the primary scenario estimates presented in this report. The 30.5 percent review rate was used for the higher impact alternate scenario presented in this report.

---

[19]  Arthur, Charles. "What is the 1% rule?" theguardian.com July 19, 2006. Web. April 30, 2015. http://www.theguardian.com/technology/2006/jul/20/guardianweeklytechnologysection2http://nautil.us/issue/12/feedback/one-percenters-control-online-reviews

[20] Ford, Mat. "The Pareto Principle and the 1% Rule of Internet Culture. Mattyford.com. June 4, 2014. Web. 30 Apil, 2015. http://mattyford.com/blog/2014/6/5/the-pareto-principle-and-the-1-rule-of-internet-culture

[21] "What Percentage of People Write Reviews?"  http://reviewreputation.com/what-percentage-of-people-writes-reviews/

**Many Types of Hosts**

As discussed above, for purposes of this analysis, the Budget and Legislative Analyst categorized hosts into one of two groups: casual hosts and commercial hosts depending on the number of nights their unit was booked. For entire units rented in the primary scenario for this analysis, the threshold for commercial hosts was 59 booked nights or more. Casual hosts for entire units were those with 58 or fewer booked nights. For private and shared rooms, the threshold was 88 or fewer booked nights for casual hosts and 89 or more booked nights for commercial hosts.

Casual hosts are defined for this analysis as those who list units on an ad hoc basis to make supplemental income.  A casual host might be a host who lists their unit for rent a few weekends throughout the year or while on an out-of-town trip. Casual hosting is assumed to have little or no impact on the long-term rental market.

Commercial hosts with more than 58 booked nights per year for an entire home or 88 nights or more for private or shared room listings are renting out a room for over 7 days per month or a whole unit for almost 5 days a month. Commercial entire unit hosts would need to be out of their residences to rent them out for approximately two months or more per year. Commercial hosting is assumed by the Budget and Legislative Analyst to reduce the number of units or rooms available for long-term rent. A commercial host is one that practices short-term renting as a business instead of listing a unit on the long-term rental market.

The Budget and Legislative Analyst assumes that there are exceptions to the casual and commercial classifications above. There are likely hosts who travel or stay elsewhere more than 59 days a year, rent out their entire primary residence unit while they are gone and therefore are not taking a housing unit away from the long-term rental market. Similarly, there are likely hosts who rent entire units for 58 days or less though they do not live in the unit, but would otherwise make it available to the long-term market.

Using the data from the December 2014 San Francisco Airbnb webscrape, the Budget and Legislative Analyst created a utilization model for the number of nights per year a listing is expected to be booked based on the number of reviews for each listing. For the primary scenario presented in this report, the following data was used: the 72 percent review to bookings ratio, 5.1 average nights of stay for Airbnb guests as reported by SF Travel, and the length of time from the host join date to the last review date. To determine the number of bookings per month for each listing, total bookings were spread over the amount of time since the host joined the site since that data was available from the 2014 webscrape. The detailed methodology for calculating this utilization rate is found in the Appendix.

Based on the utilization model and the thresholds described above to distinguish between casual and commercial hosts, Figure 5 below shows the distribution of the 6,113 Airbnb listings from the December 2014 webscrape across San Francisco by type of host under the primary scenario assumptions. As presented in Table 1

*Budget and Legislative Analyst*

above, the primary scenario assumes 4,191 casual hosts and 1,922 commercial hosts for a total of 6,113.

**Figure 5: Distribution of Casual and Commercial Hosts in San Francisco December 2014**



Source: Webscrape of Airbnb website prepared by Murray Cox, December 2014; Budget and Legislative Analyst Utilization Model

**Commercial Hosts Expected to Have Greater Impact on Housing Availability**

At 68.6 percent, the 4,191 hosts classified as casual is slightly more than two thirds of all 6,113 listings. Casual hosts are not expected to reduce the rental stock due to the infrequency of and the motivations for their hosting. As shown Table 6 below, casual hosts are expected to earn significantly less than median gross rent for their neighborhoods on the short-term rental market based on the number of nights their unit is booked as estimated by our utilization model and the price a host charges per night.

| Table 6: Differences between Short-term vs Long-term Monthly Revenue Generated by Casual Hosts for Entire Units, 2014 | | | | |
|---|---|---|---|---|
| Zip Code | Neighborhood | Average Monthly Revenue for Entire Unit, Casual Host | Median Gross Rent, by Neighborhood (2013) | Monthly Earnings Above/(Loss Below) Long-term Rent |
| 94102 | Tenderloin/Union Square/Hayes Valley | $211 | $840 | ($629) |
| 94103 | SOMA | $216 | $922 | ($706) |
| 94104 | Financial District | $159 | $673 | ($514) |
| 94105 | Rincon Hill | $258 | $2,000+ | ($1,742) |
| 94107 | Potrero Hill/South Beach | $240 | $2,000+ | ($1,760) |
| 94108 | Chinatown | $289 | $1,019 | ($730) |
| 94109 | Russian Hill/Polk Gulch | $255 | $1,379 | ($1,124) |
| 94110 | Inner Mission | $260 | $1,459 | ($1,199) |
| 94111 | Telegraph Hill/Waterfront | $204 | 2,000+ | ($1,796) |
| 94112 | Ingleside/Excelsior | $189 | $1,398 | ($1,209) |
| 94114 | Castro/Eureka Valley | $329 | $1,771 | ($1,442) |
| 94115 | Western Addition | $328 | $1,563 | ($1,235) |
| 94116 | Parkside | $208 | $1,639 | ($1,431) |
| 94117 | Haight-Ashbury/Western Addition | $262 | $1,732 | ($1,470) |
| 94118 | Inner Richmond | $300 | $1,621 | ($1,321) |
| 94121 | Outer Richmond | $247 | $1,512 | ($1,265) |
| 94122 | Sunset | $195 | $1,663 | ($1,468) |
| 94123 | Marina/Cow Hollow | $278 | $1,838 | ($1,560) |
| 94124 | Bayview/Hunters Point | $127 | $892 | ($765) |

| | | | | |
|---|---|---|---|---|
| **Table 6: Differences between Short-term vs Long-term Monthly Revenue Generated by Casual Hosts for Entire Units, 2014 (cont'd)** | | | | |
| 94127 | Miraloma/Sunnyside | $294 | $2,000+ | ($1,706) |
| 94129 | Presidio | $39 | no data | |
| 94130 | Treasure Island | $178 | $1,582 | ($1,404) |
| 94131 | Twin Peaks/Glen Park | $318 | $1,728 | ($1,410) |
| 94132 | Lake Merced | $104 | $1,797 | ($1,693) |
| 94133 | North Beach | $316 | $1,274 | ($958) |
| 94134 | Visitacion Valley/Portola | $240 | $1,101 | ($861) |
| 94158 | Mission Bay | $174 | $2,000+ | ($1,826) |
| City-wide Average | | $260 | $1,516 | ($1,740) |

Source: Webscrape of Airbnb website prepared by  Murray Cox, December 2014; Budget and
Legislative Analyst Utilization Model; American Community Survey 2013 median gross rents

However, the estimated average monthly revenue from a commercial host for
entire units exceeds the expected long-term rental rates per month. The table
below shows that there is a financial incentive to list a unit on the short-term
rental market, as it can generate revenues above median rents for each
neighborhood.

*Budget and Legislative Analyst*

Memo to Supervisor Campos
May 13, 2015

| | | Average Monthly Revenue for Entire Unit, Commercial Host | Median Gross Rent by Neighborhood (2013) | Monthly Earnings Above/(Loss Below) Long-term Rent |
|---|---|---|---|---|
| **Table 7: Differences between Short-term vs Long-term Monthly Revenue Generated by Commercial Hosts for Entire Units, 2014** | | | | |
| Zip Code | Neighborhood | | | |
| 94102 | Tenderloin/Union Square/Hayes Valley | $2,264 | $840 | $1,424 |
| 94103 | SOMA | $2,708 | $922 | $1,786 |
| 94104 | Financial District | $2,412 | $673 | $1,739 |
| 94105 | Rincon Hill | $2,644 | $2,000+ | $644 |
| 94107 | Potrero Hill/South Beach | $2,400 | $2,000+ | $400 |
| 94108 | Chinatown | $2,952 | $1,019 | $1,933 |
| 94109 | Russian Hill/Polk Gulch | $2,382 | $1,379 | $1,003 |
| 94110 | Inner Mission | $2,356 | $1,459 | $897 |
| 94111 | Telegraph Hill/Waterfront | $2,351 | 2,000+ | $351 |
| 94112 | Ingleside/Excelsior | $1,784 | $1,398 | $386 |
| 94114 | Castro/Eureka Valley | $2,703 | $1,771 | $932 |
| 94115 | Western Addition | $2,438 | $1,563 | $875 |
| 94116 | Parkside | $1,834 | $1,639 | $195 |
| 94117 | Haight-Ashbury/Western Addition | $2,910 | $1,732 | $1,178 |
| 94118 | Inner Richmond | $2,050 | $1,621 | $429 |
| 94121 | Outer Richmond | $1,977 | $1,512 | $465 |
| 94122 | Sunset | $2,074 | $1,663 | $411 |
| 94123 | Marina/Cow Hollow | $2,723 | $1,838 | $885 |
| 94124 | Bayview/Hunters Point | $1,721 | $892 | $829 |
| 94127 | Miraloma/Sunnyside | $2,030 | $2,000+ | $30 |
| 94130 | Treasure Island | $1,572 | $1,582 | ($10) |
| 94131 | Twin Peaks/Glen Park | $2,263 | $1,728 | $535 |
| 94132 | Lake Merced | $2,083 | $1,797 | $286 |
| 94133 | North Beach | $2,826 | $1,274 | $1,552 |
| 94134 | Visitacion Valley/Portola | $2,006 | $1,101 | $905 |
| 94158 | Mission Bay | $2,779 | $2,000+ | $779 |
| City-wide Average | | $2,440 | $ 1,516 | $440 |

Source: Webscrape of Airbnb website prepared by Murray Cox, December 2014; Budget and Legislative Analyst Utilization Model; American Community Survey 2013 median gross rents

Commercial hosts are expected to have a larger impact on the housing market. Entire units listed by commercial hosts would reduce the number of long-term rental units available, while private and shared rooms would reduce the number of rooms available for long-term rent. Entire units make up the majority of commercial units listed at 1,251 homes or apartments.

*Budget and Legislative Analyst*

In 2013, the American Community Survey estimated a 5-year average of 8,438 units as Vacant For Rent in San Francisco, or 3.5 percent of the 244,012 units defined as the rental market at that time by the Census Bureau.[22] Based on the model developed for this analysis and the 5-year average Vacant For Rent in 2013 reported by the American Community Survey, the 1,922 commercial hosts renting entire units for over 58 days a year would reduce the San Francisco rental stock by an amount equal to 14.8 percent of the 8,438 units Vacant For Rent Citywide in San Francisco under the primary scenario assumptions. The range of this impact is between 11.0 and 23.2 percent based on the lowest to highest impact scenario assumptions. Rentals for private and shared rooms would reduce the available rental stock even further.

While commercial short-term rental hosts appear to be beating the median rents across the City in the data we examined, the Budget and Legislative Analyst also compared short-term rental revenues to the median $3,750 rental market rate in 2014.[23] Comparing data to this market rate, there were a total of 508 units in December 2014 beating the market rate—286 entire rooms, and 222 private rooms.

There were also about 200 units that generated just slightly less revenue than the median market rate. For example, a commercial entire home in the Castro which earned an average of approximately $330 per night, and was booked an estimated 134 nights per year earned about $3,690 per month, or slightly less than the 2014 City-wide median rent of $3,750. However, if the unit was booked just three more nights in the year or charged higher rates at other times of year, the short-term rental listing would be more profitable than the long-term market rates. Thus, the short-term rental market can offer similar financial compensation with an added flexibility in living arrangements over the long-term rental market.

The data from December 2014 shows that over two-thirds of the hosts could have potentially earned more by listing their units in the long-term rental market if their unit could have commanded the then median market rate of $3,750.[24] However, other factors affecting this calculation include:

---

[22] The American Community Survey (ACS) is conducted annually by the U.S. Census Bureau. Compared to the relatively comprehensive 10-year Census, the ACS is a "mandatory ongoing statistical survey that samples a small percentage of the population every year." The ACS selects approximately 1-in-480 addresses to mail 3.5 million questionnaires annually. While this is a significant number of individuals and addresses surveyed, it still relies on statistical assumptions, which result in a margin of error for every ACS estimate. The ACS Rental Vacancy figures include all units listed for rent but currently not occupied and all units that are rented but have yet to be occupied by the incoming tenant. The total number of units that are vacant but have incoming tenants is expected to be small, but does somewhat inflate the size of the available rental units listed on the market.

[24] Zillow.com, San Francisco Home Prices & Values. Accessed on May 10, 2015 at http://www.zillow.com/san-francisco-ca/home-values/

[24] Zillow.com, San Francisco Home Prices & Values. Accessed on May 10, 2015 at http://www.zillow.com/san-francisco-ca/home-values/

- The calculations above are based on short-term rental rates charged in December 2014. Hosts may have charged higher rates at other times of year such as summer and thus their total annual income could be higher than the projected amounts based on December rates.

- Some short-term hosts could be renting units with market values below the median market rate so they could still be beating the market value for their particular unit even if their earnings or less than the total market median amount.

- Some of the short-term rental housing stock may not match the amenities of the median market rate housing stock and therefore it may not be possible to earn median market rent through long-term rentals compared to landlords with newer apartments and/or more amenities.

- Some commercial short-term rental hosts may not be marketing their units effectively to maximize rentals.

- Short-term rental and hotel competition may prevent some commercial short-term hosts from charging rates to earn more than a long-term rental would generate.

- Some commercial hosts may be satisfied earning more than they had in the long-term rental market though less than the median market rental rate as they may prefer the flexibility of short-term rentals and may not wish to rent their unit(s) on a long-term basis under City rent control laws.

Some commercial hosts may be in the hospitality business and not interested in entering the long term rental market.

### Commercial Short-term Rentals by Neighborhood
Table 8 below shows the rental market size, vacancy for rent, and the estimates of commercial listings on Airbnb by neighborhood zip code under the primary scenario. The same results for the lower and higher impact scenarios are presented at the end of the report in the Alternative Scenarios section.

| Zip Code | Neighborhood | Rental Market Size (2013) | Vacancy For Rent (2013) | Number of Commercial Entire Unit Listings | Total Potential Units for Rent | AirBnb Commercial Unit Listings as % of Total Potential Units |
|---|---|---|---|---|---|---|
| colspan=7: Table 8: Primary Scenario: Impact on Vacant For Rent Housing of Commercial Short-term Rentals for Entire Housing Unit, by Neighborhood |
| 94158 | Mission Bay | 2,273 | 0 | 2 | 2 | 100.0% |
| 94127 | Miraloma/Sunnyside | 1,614 | 24 | 19 | 43 | 44.2% |
| 94117 | Haight-Ashbury/ Western Addition | 14,686 | 260 | 122 | 382 | 31.9% |
| 94110 | Inner Mission | 19,194 | 483 | 199 | 682 | 29.2% |
| 94114 | Castro/Eureka Valley | 9,921 | 358 | 117 | 475 | 24.6% |
| 94107 | Potrero Hill/South Beach | 9,121 | 246 | 85 | 331 | 25.7% |
| 94131 | Twin Peaks/Glen Park | 6,723 | 181 | 45 | 226 | 19.9% |
| 94105 | Rincon Hill | 2,239 | 60 | 18 | 78 | 23.1% |
| 94122 | Sunset | 12,780 | 202 | 60 | 262 | 22.9% |
| 94118 | Inner Richmond | 12,665 | 194 | 40 | 234 | 17.1% |
| 94121 | Outer Richmond | 11,117 | 192 | 43 | 235 | 18.3% |
| 94115 | Western Addition | 15,041 | 305 | 52 | 357 | 14.6% |
| 94123 | Marina/Cow Hollow | 11,211 | 495 | 84 | 579 | 14.5% |
| 94133 | North Beach | 12,270 | 349 | 59 | 408 | 14.5% |
| 94112 | Ingleside/Excelsior | 8,686 | 175 | 28 | 203 | 13.8% |
| 94111 | Telegraph Hill/ Waterfront | 1,892 | 35 | 2 | 37 | 5.4% |
| 94116 | Parkside | 5,931 | 205 | 22 | 227 | 9.7% |
| 94109 | Russian Hill/Polk Gulch | 30,551 | 1,099 | 89 | 1188 | 7.5% |
| 94103 | SOMA | 11,460 | 899 | 71 | 970 | 7.3% |
| 94108 | Chinatown | 7,697 | 377 | 24 | 401 | 6.0% |
| 94104 | Financial District | 259 | 52 | 2 | 54 | 3.7% |
| 94134 | Visitacion Valley/Portola | 5,067 | 112 | 6 | 118 | 5.1% |
| 94102 | Tenderloin/Union Square/Hayes Valley | 16,644 | 1360 | 54 | 1414 | 3.8% |
| 94124 | Bayview/Hunters Pt | 5,932 | 146 | 4 | 150 | 2.7% |
| 94132 | Lake Merced | 6,793 | 356 | 4 | 360 | 1.1% |
| 94129 | Presidio | 1,385 | 159 | 0 | 159 | 0.0% |
| 94130 | Treasure Island | 860 | 114 | 0 | 114 | 0.0% |
| TOTAL | | 244,012 | 8,438 | 1,251 | 9,689 | 12.9% |

Source: Webscrape of Airbnb website prepared by  Murray Cox, December 2014; Budget and Legislative Analyst Utilization Model; American Community Survey 2013

*Budget and Legislative Analyst*

**Private Room Commercial Hosts**

No historical data on roommate market was available, but an average number of bedrooms by neighborhood was calculated based on American Community Survey data. We multiplied the number of Vacant For Rent units by the Average Number of Rooms by zip code to get the number of Vacant Rooms For Rent. Based on 2013 American Community Survey data, 12,884 rooms were available for rent in San Francisco in 2013.

In addition to the number of entire units presented above, 631 commercial private rooms and 40 commercial shared rooms were listed on the Airbnb webscrape from December 2014. The number of shared rooms were divided by 2 to estimate the number of rooms these commercial shared rooms listings accounted for, and we estimate that 651 commercial rooms were listed in December 2014.

Table 9 below shows the range of commercial room listings and impacts by neighborhoods.

| Zip Code | Neighborhood | Room Rental Market Size (2013) | Vacancy For Rent (2013) | Number of Commercial Room Listings | Total Potential Rooms for Rent | Airbnb Commercial Room Listings as % of Total Potential Units |
|---|---|---|---|---|---|---|
|  | **Table 9: Primary Scenario: Impact on Vacant For Rent Housing of Commercial Short-term Rentals for Private Rooms, by Neighborhood** |
| 94130 | Treasure Island | No data | 0 | 4 | 4 | **100%** |
| 94158 | Mission Bay | 2,705 | 0 | 1 | 1 | **100%** |
| 94127 | Miraloma/Sunnyside | 7,659 | 71 | 12 | 83 | **14%** |
| 94117 | Haight-Ashbury/Western Addition | 19,568 | 471 | 71 | 542 | **13%** |
| 94110 | Inner Mission | 29,276 | 940 | 114 | 1,054 | **11%** |
| 94107 | Potrero Hill/South Beach | 14,829 | 388 | 40 | 428 | **9%** |
| 94114 | Castro/Eureka Valley | 17,880 | 696 | 71 | 767 | **9%** |
| 94105 | Rincon Hill | 4,651 | 89 | 8 | 97 | **8%** |
| 94112 | Ingleside/Excelsior | 23,498 | 446 | 39 | 485 | **8%** |
| 94118 | Inner Richmond | 18,649 | 409 | 33 | 442 | **7%** |
| 94131 | Twin Peaks/Glen Park | 13,787 | 385 | 21 | 406 | **5%** |
| 94111 | Telegraph Hill/Waterfront | 2,643 | 46 | 3 | 49 | **5%** |
| 94115 | Western Addition | 18,968 | 488 | 27 | 515 | **5%** |
| 94122 | Sunset | 23,459 | 454 | 25 | 479 | **5%** |
| 94124 | Bayview/Hunters Point | 11,096 | 372 | 19 | 391 | **5%** |
| 94133 | North Beach | 14,987 | 520 | 24 | 544 | **4%** |
| 94121 | Outer Richmond | 18,837 | 414 | 16 | 430 | **4%** |
| 94103 | SOMA | 14,322 | 1,072 | 38 | 1,110 | **3%** |
| 94109 | Russian Hill/Polk Gulch | 36,850 | 1,235 | 39 | 1,274 | **3%** |
| 94104 | Financial District | 275 | 32 | 1 | 33 | **3%** |
| 94134 | Visitacion Valley/Portola | 12,088 | 294 | 6 | 300 | **2%** |
| 94116 | Parkside | 16,194 | 539 | 10 | 549 | **2%** |
| 94123 | Marina/Cow Hollow | 15,349 | 785 | 14 | 799 | **2%** |
| 94108 | Chinatown | 8,554 | 378 | 7 | 385 | **2%** |
| 94102 | Tenderloin/Union Square/Hayes Valley | 18,713 | 1,111 | 10 | 1,121 | **1%** |
| 94132 | Lake Merced | 11,227 | 819 | 3 | 822 | **0%** |
| 94129 | Presidio | 1,216 | 431 | 0 | 431 | **0%** |
| | TOTAL | 377,280 | 12,885 | 651 | 13,536 | **4.8%** |

Source: Webscrape of Airbnb website prepared by  Murray Cox, December 2014; Budget and Legislative Analyst Utilization Model; American Community Survey 2013

**Neighborhoods**

The table below shows the five neighborhoods with the highest number of commercial Airbnb listings.

| Table 10: Neighborhoods with Most Commercial Hosts | | | | | |
|---|---|---|---|---|---|
| Zip code | Neighborhood | Entire Unit | Private Room | Shared Room | TOTAL |
| 94110 | Inner Mission | 199 | 112 | 4 | 315 |
| 94117 | Haight-Ashbury/Western Addition | 122 | 70 | 1 | 193 |
| 94114 | Castro/Eureka Valley | 117 | 70 | 1 | 188 |
| 94109 | Russian Hill/Polk Gulch | 89 | 37 | 4 | 130 |
| 94103 | SOMA | 71 | 34 | 8 | 113 |

Source: Webscrape of Airbnb website prepared by  Murray Cox, December 2014; Budget and Legislative Analyst Utilization Model

**Evictions**

Table 11 below shows that the neighborhoods with the highest number of listings also have the highest number of evictions. While the use of housing units after evictions cannot be determined from Rent Board data, landlords in neighborhoods that are popular areas for short-term rentals may have financial incentives to remove existing tenants.

About 71.9 percent of San Francisco's rental stock is rent-stabilized. Housing market rate prices in San Francisco have been increasing significantly over the past few years, and landlords, already encouraged to capture the full market value on the long-term rental market, may be further encouraged by the higher revenue that could be generated through short-term renting. The San Francisco Rent Board provided data which showed that evictions have increased by 37 percent from 2011 through 2014.

In 2014 there were 2,789 evictions. The table below compares the five neighborhoods with the most Airbnb listings to the eviction rates.

| Table 11: Neighborhoods with Most 2014 Commercial Hosts Compared to Evictions | | | | | |
|---|---|---|---|---|---|
| Zip code | Neighborhood | Number of Commercial hosts | Number of Evictions | Neighborhood Evictions, as % of Total Evictions in San Francisco | Neighborhood Evictions, Ranked |
| 94110 | Inner Mission | 315 | 323 | 12% | 1st |
| 94117 | Haight-Ashbury/Western Addition | 193 | 212 | 8% | 3rd |
| 94114 | Castro/Eureka Valley | 188 | 130 | 5% | 10th |
| 94109 | Russian Hill/Polk Gulch | 130 | 269 | 10% | 2nd |
| 94107 | Potrero Hill/South Beach | 126 | 51 | 2% | 19th |

Source: Webscrape of Airbnb website prepared by Murray Cox, December 2014; Budget and Legislative Analyst Utilization Model; San Francisco Rent Board

As shown in the table above, the Inner Mission, Russian Hill, and Haight-Ashbury had the top three highest eviction rates in 2014 and are also the amongst the top five neighborhoods with highest commercial entire unit and private room Airbnb listings.

**Impact of Night Limits**

If followed, the various proposed legislation could result in significantly different hosting outcomes for all types of rooms. The estimates in Table 12 below are based on the December 2014 Airbnb webscrape. This webscrape showed 3,651 entire homes, 2,196 private homes, and 266 shared rooms, for a total of 6,113 listings.

Given current booking rates, if regulation that caps the number of un-hosted nights only at 90 nights, were followed, the number of entire homes listed would decrease to 3,115, or by 15 percent. Private and shared rooms would remain unchanged as the current legislation does not restrict hosted nights.

If the number of days for hosted and unhosted nights were capped at 120 nights, the total number of units expected to be listed on Airbnb would decrease from 6,113 to 5,706, or by 7 percent. If the number of nights were capped at 90 nights, the total number would decrease to 5,168 or by 15 percent. If the number of nights were capped at 60 nights, the total number would decrease to 4,471 or by 27 percent.

The table considers the financial incentives a commercial user would incorporate into their decision to host a short-term rental or a long-term rental based on American Community Survey 2013 rental rates by zip code. All casual users are

*Budget and Legislative Analyst*

expected to remain in the short-term rental market, and only modify their behavior to abide by the caps. A commercial user would compare the expected monthly revenues from participating in the short-term rental market based on the cap to the monthly rate on the long-term market.

| Table 12: Number of Listings in Primary Scenario, by Policy Limits | | | | | |
|---|---|---|---|---|---|
| | Current scenario | Current Scenario if Fully Enforced Regulation (Max 90 un-hosted nights) | 120 Night Max on All Unit Types | 90 Night Max on All Unit Types | 60 Night Max on All Unit Types |
| **Entire Units Remaining** | 3,651 | 3,115 | 3,390 | 3,115 | 2,634 |
| **Private Rooms Remaining** | 2,196 | 2,196 | 2,060 | 1,803 | 1,602 |
| **Shared Rooms Remaining** | 266 | 266 | 256 | 250 | 235 |
| **TOTAL** | **6,113** | **5,577** | **5,706** | **5,168** | **4,471** |

Source: Webscrape of Airbnb website prepared by Murray Cox, December 2014; Budget and Legislative Analyst Utilization Model

Table 13 below shows the corresponding number of units that are estimated to exit the short-term rental market and may be available for long-term rent under the various policy proposals and assuming effective enforcement.

| Table 13: Number of Listings that Exit the Short-term Rental Market | | | | |
|---|---|---|---|---|
| | Current Scenario if Fully Enforced Regulation | 120 Night Max on All Unit Types | 90 Night Max on All Unit Types | 60 Night Max on All Unit Types |
| Entire unit | 536 | 261 | 536 | 1,017 |
| Private room | 0 | 136 | 393 | 594 |
| Shared room | 0 | 10 | 16 | 31 |
| Total | **536** | **407** | **945** | **1,642** |

Source: Webscrape of Airbnb website prepared by Murray Cox, December 2014; Budget and Legislative Analyst Utilization Model; American Community Survey 2013 median gross rents

**If Regulations Are Fully Enforced Many Commercial Hosts Will Switch to Long-term Rentals**

The analysis suggests if regulations are followed at almost all levels then many commercial hosts will no longer find their operations economically feasible compared to the traditional long-term rental market. This is because with limitations on the number of nights that can be rented annually hosts would make more money renting continuously on the long-term market, particularly for entire units. Some amount of commercial hosts would remain because they have relatively high prices that allow them to maintain operations despite any annual limits on the number of nights per year. Other commercial hosts might raise their prices in response to any limitations, which would keep their unit off the long-term market. However, this group would likely be small since there market limits on how much guests are willing to pay per night.

**Commercial Hosts Might Be Replaced by Additional Casual Hosts**

The primary group of hosts that remain are the casual hosts. This is because they are less sensitive to revenue lost from capping the number of nights per year. Most aren't hosting at or above the various maximums modeled already and only a small percentage would lose revenue in any of the models.[25] As a side business, casual hosts aren't in the business of commercial lodging and unlike commercial hosts they haven't invested money on additional property to run a short-term rental business.

If demand from guests remains high, the bookings currently filled by commercial hosts are expected to be replaced by additional casual hosts. This would continue to deliver the many benefits of short-term rentals to the City and would replace much of the transient occupancy tax revenue that commercial host activity is currently providing.

# Current Enforcement

The current regulations allow some limited commercial activity of short-term rentals in residential properties. Despite this change, the new laws have added few tools for the City to enforce short-term rentals. The primary challenge remains that short-term rentals are businesses that operate in private residences and it is difficult to know what is happening behind closed walls. Companies such as Airbnb have been unwilling to share booking information with the City and others such as VRBO don't facilitate individual transactions and don't have aggregate booking data available. Without booking information the City is unable to sufficiently enforce current regulations that limit the number of nights per year in some types of units.

---

[25] An estimated #X of casual hosts are currently offering private rooms and shared rooms that are booked for an estimated 61 to 88 nights per year. Under the 60 maximum scenario these casual hosts would lose some revenue because their maximum number of nights would be reduced to 60.

**Limitations of Complaint-based System**

Prior to the current regulations enacted in November 2014 that took effect in February 2015, all residential short-term rentals that weren't zoned and permitted as hotels, motels and bed and breakfasts were out of compliance - essentially over 5,000 businesses were operating in the City illegally. Even now that some host's rental activity is permitted, the City's is unable to sufficiently enforce regulations current regulations.

Enforcement is currently reliant on a traditional land use enforcement framework, where complaints trigger investigations. Upon receiving complaints, often from neighbors, violators are cited and asked to appear before an administrative hearing. Alleged violators are given 30 days to come into compliance prior to the hearing. Following the hearing and temporarily suspending business operations, many hosts reportedly return to renting their property short-term. This leaves only limited enforcement options for the City, and a challenge to essentially monitor and document alleged business activities occurring behind closed doors.

**Framework Effective for Other Land Use Violations**

This complaint-based enforcement framework has historically been effective for other land use violations. This is because most unpermitted commercial land use activities, such as un-approved retail or industrial activities and non-compliant building types were easy to identify and relatively visible to the public. In contrast, the operations of short-term rentals are obscured by vague internet listings and activities that occur within the walls of private residences.

**Short-term Rentals Require New Information**

Without knowledge of what is occurring within short-term rentals it is nearly impossible to enforce limits on the number of nights that are booked. This information could come from the platforms or, when platforms don't record booking transactions, it could come from the hosts themselves. Access to booking information would allow the Planning Department to better identify violators and substantiate the extent of their violations. This type of data sharing requires a stronger partnership with platforms and hosts to work with the City to ensure compliant hosts are allowed to operate and noncompliant hosts are penalized. If a partnership can't be established, regulations requiring the sharing of data could be considered.

**City and State Options**

To address these enforcement needs the Board of Supervisors could pass additional legislation requiring that platforms and hosts share booking data that allows the Planning Department to better enforce existing regulation. At the state level, Senator Mike McGuire of Healdsburg introduced state Senate Bill 593. The bill would provide a uniform framework across the state for municipalities to receive booking information on a quarterly basis and hold platforms accountable when their listings violate local laws. The bill would allow municipalities to levy fines against platforms that do not provide data or knowingly list units that violate local regulations.

*Budget and Legislative Analyst*

**Privacy Concerns**

In any case, booking data does contain a degree of private information on hosts' activities. Despite its sensitivity, the data is important as it is the only way to monitor the business operations that hosts and platforms are conducting. Currently, the Planning Department maintains its registration information on a database separate and secured from other information systems in the department. It also anonymizes all host information that the public could potentially access. The same level of protections could be applied to booking data they receive from hosts and platforms. Importantly, information on the guests staying in short-term rentals is not needed for enforcement and the City would not need to receive private guest information.

Personal privacy protection for hosts remains important, but hosting is a business activity and a choice hosts make to transform a residential space into a commercial lodging. Like most other businesses and industries, some level of regulatory oversight is required. If handled with confidentiality and hosts' personal privacy in mind, then asking hosts and platforms to provide information on their bookings would be in line with other types of business oversight.

**Rate of Registration is Low**

Beyond the current enforcement limitations, very few hosts have applied to register their units with the Planning Department, as shown in Figure 14 below. As of May 1, 2015, only 579 hosts have applied. This is a small volume of the total amount of hosts estimated in the City, or 9.5 percent of the 6,113 estimated Airbnb listings as of December 2014, and even a smaller percentage if hosts that use other platforms besides Airbnb are considered. The incoming pipeline for hosts seems small too, with only 550 hosts having applied for business licenses with the Treasurer and Tax Collector since April 30, 2015. However, an unknown amount of hosts may have applied for business permits previously, but the Treasurer and Tax Collector did not track licenses for short-term rentals until recently.

| Figure 14: Low Rate of Registration Compared to Total Estimated Units | | | | | | | |
|---|---|---|---|---|---|---|---|
| Estimated total number of listings in 2014 | Applied for Business License prior to February 2015 | Applied for Business License after February 2015 | Short-term Rental Applications Submitted to the Planning Department for Review | Certificates Issued | Incomplete Applications | Applications Under Review | Applications Awaiting Review |
| 6,113 | Unknown [26] | 550 | 579 | 282 | 77 | 50 | 170 |
| | Unknown | 9.0% of total listings | 9.4% of total listings | 48.7% of applications | 13.3% of applications | 8.6% of applications | 29.4% of applications |
| | As of April 30, 2015 | | As of May 1, 2015 | | | | |

Sources: Budget and Legislative Analyst Utilization Model, San Francisco Treasurer and Tax Collector, and San Francisco Planning Department

The low rate of applications implies that hosts have limited incentive to apply, don't know about the current regulations or have faced challenges in the application process. Our analysis shows there are an estimated 1,922 hosts operating at a commercial level and 536 renting their entire house for over the current 90 day un-hosted maximum. These hosts might choose not to register in order to avoid any unnecessary attention on their operations. However, even if all hosts applied, the Planning Department would have a very limited capacity to monitor compliance with current regulations without additional information on host's bookings.

**Require Verification of Hosts by Platforms**
Finally, increased registration and compliance with regulations could be encouraged if platforms only listed hosts with verified registration with the City. This again could be accomplished through stronger partnerships with platforms or in lieu of cooperation, regulations requiring platforms to verify the legality of units they list should be considered.

## Alternative Scenarios

As discussed, the Budget and Legislative Analyst prepared two other scenarios in addition to the primary scenario presented above to estimate the impact of short-term rentals on the housing market. One of the two alternative scenarios presents a lower impact on the long-term rental market than the primary scenario used and the other presents a higher impact.

The key differences in assumptions used to prepare these alternative scenarios were as follows. For the lower impact scenario, a threshold of 90 booking nights

---

[26] Treasure & Tax Collector did not track business licenses specific to short-term rentals prior to February 2015.

was used to distinguish casual and commercial hosts rather than the 58 used in the primary and higher impact scenarios. This resulted in a smaller number of hosts being classified as commercial and reduced the number of housing units removed from the long-term rental market through short-term rentals. For the higher impact scenario, a 32 percent rate of reviews per booking was used rather than the 70 percent used in the primary and lower impact scenarios. This resulted in more bookings per listing being assumed and thus increased the number of hosts classified as commercial and impacting the long-term rental housing market. The results are presented in the following tables.

| Table 15: Higher Impact Scenario: Estimate of Short-term Rental Housing Units in San Francisco, by Type of Host, 2014 | | | |
|---|---|---|---|
| Type of Host/Listing | Threshold Number of Days Unit Rented | Est'd # of Units as of December 2014 | Percentage of Total Units |
| Casual: Entire unit | 58 days or under | 1,690 | 28% |
| Casual: Private room | 88 days or under | 1,233 | 20% |
| Casual: shared room | 88 days or under | 184 | 3% |
| Total casual: | | 3,107 | 51% |
| Commercial: Entire unit | over 58 days | 1,960 | 32% |
| Commercial: Private room | over 88 days | 963 | 16% |
| Commercial: Shared room | over 88 days | 82 | 1% |
| Total commercial: | | 3,006 | 49% |
| TOTAL UNITS | | 6,113 | 100% |

Source: Webscrape of Airbnb website prepared by Murray Cox, December 2014; Budget and Legislative Analyst Utilization Model

| Table 16: Lower Impact Scenario: Estimate of Short-term Rental Housing Units in San Francisco, by Type of Host, 2014 | | | |
|---|---|---|---|
| Type of Host/Listing | Threshold Number of Days Unit Rented | Est'd # of Units as of December 2014 | Percentage of Total Units |
| Casual: Entire unit | 90 days or under | 2,726 | 45% |
| Casual: Private room | 88 days or under | 1,565 | 26% |
| Casual: shared room | 88 days or under | 226 | 4% |
| Total casual: | | 4,517 | 74% |
| Commercial: Entire unit | over 90 days | 925 | 15% |
| Commercial: Private room | over 88 days | 631 | 10% |
| Commercial: Shared room | over 88 days | 40 | 1% |
| Total commercial: | | 1,596 | 26% |
| TOTAL UNITS | | 6,113 | 100% |

Source: Webscrape of Airbnb website prepared by Murray Cox, December 2014; Budget and Legislative Analyst Utilization Model

*Budget and Legislative Analyst*

Impacts of the two alternative scenarios on long-term housing by neighborhood
are presented in Tables 17 and 18. As can be seen, the lower and higher impact
scenarios also show impacts on housing available for long-term rentals.

| Zip Code | Neighborhood | Rental Market Size (2013) | Vacant For Rent (2013) | Number of Commercial Unit Listings (Low~ High) | Total Potential Units for Rent (Low ~ High) | Airbnb Commercial Unit Listings as % of Total Potential Units(Low ~ High) |
|---|---|---|---|---|---|---|
| | **Table 17: Impacts on Vacant For Rent Housing of Commercial Short-term Rentals for Entire Housing Unit, by Neighborhood  (Low ~ High Estimates)** | | | | | |
| 94158 | Mission Bay | 2,273 | 0 | 1 ~ 4 | 1 ~ 4 | 100% |
| 94127 | Miraloma/Sunnyside | 1,614 | 24 | 14 ~ 23 | 38 ~ 47 | 37% ~ 49% |
| 94117 | Haight-Ashbury/Western Addition | 14,686 | 260 | 94 ~ 193 | 354 ~ 453 | 27% ~ 43% |
| 94110 | Inner Mission | 19,194 | 483 | 144 ~ 321 | 627 ~ 804 | 23% ~ 40% |
| 94114 | Castro/Eureka Valley | 9,921 | 358 | 91 ~ 196 | 449 ~ 554 | 20% ~ 35% |
| 94107 | Potrero Hill/South Beach | 9,121 | 246 | 62 ~ 117 | 308 ~ 363 | 20% ~ 32% |
| 94131 | Twin Peaks/Glen Park | 6,723 | 181 | 31 ~ 81 | 212 ~ 262 | 15% ~ 31% |
| 94105 | Rincon Hill | 2,239 | 60 | 12 ~ 26 | 72 ~ 86 | 17% ~ 30% |
| 94122 | Sunset | 12,780 | 202 | 49 ~ 80 | 251 ~ 282 | 20% ~ 28% |
| 94118 | Inner Richmond | 12,665 | 194 | 30 ~ 71 | 224 ~ 265 | 13% ~ 27% |
| 94121 | Outer Richmond | 11,117 | 192 | 31 ~ 58 | 223 ~ 250 | 14% ~ 23% |
| 94133 | North Beach | 12,270 | 349 | 43 ~ 92 | 392 ~ 441 | 11% ~ 21% |
| 94123 | Marina/Cow Hollow | 11,211 | 495 | 60 ~ 130 | 555 ~ 625 | 11% ~ 21% |
| 94115 | Western Addition | 15,041 | 305 | 33 ~ 79 | 338 ~ 384 | 10% ~ 21% |
| 94112 | Ingleside/Excelsior | 8,686 | 175 | 20 ~ 45 | 195 ~ 220 | 10% ~ 20% |
| 94116 | Parkside | 5,931 | 205 | 15 ~ 31 | 220 ~ 236 | 7% ~ 13% |
| 94111 | Telegraph Hill/Waterfront | 1,892 | 35 | 2 ~ 5 | 37 ~ 40 | 5% ~ 13% |
| 94109 | Russian Hill/Polk Gulch | 30,551 | 1099 | 66 ~ 151 | 1165 ~ 1250 | 6% ~ 12% |
| 94103 | SOMA | 11,460 | 899 | 57 ~ 105 | 956 ~ 1004 | 6% ~ 10% |
| 94108 | Chinatown | 7,697 | 377 | 17 ~ 36 | 394 ~ 413 | 4% ~ 9% |
| 94134 | Visitacion Valley/Portola | 5,067 | 112 | 6 ~ 9 | 118 ~ 121 | 5% ~ 7% |
| 94104 | Financial District | 259 | 52 | 2 ~ 4 | 54 ~ 56 | 4% ~ 7% |
| 94102 | Tenderloin/Union Square/Hayes Valley | 16,644 | 1360 | 39 ~ 88 | 1399 ~ 1448 | 3% ~ 6% |
| 94124 | Bayview/Hunters Point | 5,932 | 146 | 3 ~ 9 | 149 ~ 155 | 2% ~ 6% |
| 94132 | Lake Merced | 6,793 | 356 | 3 ~ 6 | 359 ~ 362 | 1% ~ 2% |
| 94129 | Presidio | 1,385 | 159 | ~ | 159 ~ 159 | 0% |
| 94130 | Treasure Island | 860 | 114 | ~ | 114 ~ 114 | 0% |
| TOTAL | | 244,012 | 8,438 | 925 ~ 1,960 | 9,363 ~ 10,398 | 9.9% ~ 18.9% |

Source: Webscrape of Airbnb website prepared by Murray Cox, December 2014; Budget and Legislative Analyst Utilization Model; American Community Survey 2013

| Zip Code | Neighborhood | Rental Market Size (2013) | Vacancy For Rent (2013) | Number of Commercial Room Listings (Low ~ High) | Total Potential Rooms for Rent (Low ~ High) | Airbnb Commercial Room Listings as % of Total Potential Units (Low ~ High) |
|---|---|---|---|---|---|---|
| 94130 | Treasure Island | No data | 0 | 4 ~ 5 | 4 ~ 5 | 100% |
| 94158 | Mission Bay | 2,705 | 0 | 1 ~ 2 | 1 ~ 2 | 100% |
| 94127 | Miraloma/Sunnyside | 7,659 | 71 | 12 ~ 22 | 83 ~ 93 | 14% ~ 24% |
| 94117 | Haight-Ashbury/Western Adtn. | 19,568 | 471 | 71 ~ 98 | 542 ~ 569 | 13% ~ 17% |
| 94110 | Inner Mission | 29,276 | 940 | 114 ~ 179 | 1,054 ~ 1,119 | 11% ~ 16% |
| 94107 | Potrero Hill/South Beach | 14,829 | 388 | 40 ~ 58 | 428 ~ 446 | 9% ~ 13% |
| 94114 | Castro/Eureka Valley | 17,880 | 696 | 71 ~ 102 | 767 ~ 798 | 9% ~ 13% |
| 94112 | Ingleside/Excelsior | 23,498 | 446 | 39 ~ 54 | 485 ~ 500 | 8% ~ 11% |
| 94111 | Telegraph Hill/Waterfront | 2,643 | 46 | 3 ~ 6 | 49 ~ 52 | 5% ~ 11% |
| 94105 | Rincon Hill | 4,651 | 89 | 8 ~ 10 | 97 ~ 99 | 8% ~ 10% |
| 94118 | Inner Richmond | 18,649 | 409 | 33 ~ 45 | 442 ~ 454 | 7% ~ 10% |
| 94131 | Twin Peaks/Glen Park | 13,787 | 385 | 21 ~ 38 | 406 ~ 423 | 5% ~ 9% |
| 94115 | Western Addition | 18,968 | 488 | 27 ~ 46 | 515 ~ 534 | 5% ~ 9% |
| 94122 | Sunset | 23,459 | 454 | 25 ~ 35 | 479 ~ 489 | 5% ~ 7% |
| 94133 | North Beach | 14,987 | 520 | 24 ~ 39 | 544 ~ 559 | 4% ~ 7% |
| 94103 | SOMA | 14,322 | 1,072 | 38 ~ 69 | 1,110 ~ 1,141 | 3% ~ 6% |
| 94121 | Outer Richmond | 18,837 | 414 | 16 ~ 25 | 430 ~ 439 | 4% ~ 6% |
| 94124 | Bayview/Hunters Point | 11,096 | 372 | 19 ~ 22 | 391 ~ 394 | 5% |
| 94109 | Russian Hill/Polk Gulch | 36,850 | 1,235 | 39 ~ 64 | 1,274 ~ 1,299 | 3% ~ 5% |
| 94134 | Visitacion Valley/Portola | 12,088 | 294 | 6 ~ 10 | 300 ~ 304 | 2% ~ 3% |

Table 18: Impacts on Vacant For Rent Housing of Commercial Short-term Rentals for Private Rooms, by Neighborhood (Low ~ High Estimates)

| | Table 18: Impacts on Vacant For Rent Housing of Commercial Short-term Rentals for Private Rooms, by Neighborhood (Low ~ High Estimates) (cont'd) | | | | | |
|---|---|---|---|---|---|---|
| 94104 | Financial District | 275 | 32 | 1 ~ 1 | 33 ~ 33 | 3% |
| 94123 | Marina/Cow Hollow | 15,349 | 785 | 14 ~ 24 | 799 ~ 809 | 2% ~ 3% |
| 94116 | Parkside | 16,194 | 539 | 10 ~ 16 | 549 ~ 555 | 2% ~ 3% |
| 94108 | Chinatown | 8,554 | 378 | 7 ~ 10 | 385 ~ 388 | 2% ~ 3% |
| 94102 | Tenderloin/Union Sq./Hayes Vly | 18,713 | 1,111 | 10 ~ 20 | 1,121 ~ 1,131 | 1% ~ 2% |
| 94132 | Lake Merced | 11,227 | 819 | 3 ~ 7 | 822 ~ 826 | 0% ~ 1% |
| 94129 | Presidio | 1,216 | 431 | 0 ~ 0 | 431 ~ 431 | 0% |
| TOTAL | | 377,280 | 12,885 | 651 ~ 1,004 | 13,536 ~ 13,888 | 5 % ~ 7% |

Source: Webscrape of Airbnb website prepared by  Murray Cox, December 2014; Budget and Legislative Analyst Utilization Model; American Community Survey 2013

## Policy Options

**The Board of Supervisors should consider the following actions:**

1. Enact legislation requiring hosting platforms to provide host address information and booking information on a quarterly basis for enforcement purposes.

2. Enact legislation requiring hosting platforms to only list units and hosts that are registered with the City.

3. Enact legislation limiting the number of un-hosted nights allowed per year.

4. Amend the Planning Code to allow the Planning Department to levy fines on platforms that list unregistered hosts.

*Budget and Legislative Analyst*

# Appendix: Methodology

<u>Airbnb Listing Counts, Distributions, and Prices</u>

**Webscrape Total Counts**

The Budget and Legislative Analyst's Office reviewed 7 webscrapes of the Airbnb website prepared by three technology professionals. Webscrapes extract and compile data from the public-facing websites and allow for analysis that would otherwise not be feasible or practical to conduct using a standard browser. All seven of the webscrapes reviews show a consistency over time in the number of Airbnb listings and in rates reported by the different webscrapers. The December 2014 webscrape prepared by Murray Cox was used by the Budget and Legislative Analyst for this analysis as this dataset provided the most comprehensive collection of data. Summary information from each of the seven webscrapes is provided in the Appendix to this report.

The webscrapes used were prepared by the following three individuals. Tom Slee, who works in the software industry, writes about technology and politics, is active in the open data and sharing economy communities, and is based in Waterloo, Ontario. Murray Cox is a community activist based in New York City who utilizes his technology skills for various non-profits and community groups. He has a degree in computer science from the University of Sydney. Gus Dolan collaborates with the Anti-Eviction Mapping Project.

Webscrapes are subject to limitations: there may be duplicate or inaccurate listings, and webscrape authors may run the scrapes several times to reduce error. Because of the consistency of the information in the webscrapes reviewed, the Budget and Legislative Analyst concluded that they were reliable sources of information for this analysis.

The table below shows the frequency distribution of types of listing by each of the 7 webscrape.

| | **Appendix Table 1: Number of Airbnb Listings, by Type** | | | |
|---|---|---|---|---|
| | **Number of Entire Unit Listings** | **Number of Private Room Listings** | **Number of Shared Room Listings** | **Total Number of Listings** |
| **November 2013** | 3,533 | 1,917 | 235 | 5,685 |
| **May 2014** | 2,991 | 1,733 | 192 | 4,916 |
| **August 2014** | 3,001 | 1,691 | 173 | 4,865 |
| **December 2014** | 3,651 | 2,196 | 266 | 6,113 |
| **December 2014** | 3,329 | 1,938 | 235 | 5,502 |
| **February 2015** | 3,176 | 1,844 | 229 | 5,249 |
| **February 2015** | 2,988 | 2,101 | | 5,089 |

Source: Webscrapes prepared by: November 2013, May 2014, August 2014, December 2014 and February 2015: Tom Slee; December 2014: Murray Cox; February 2015: Gus Dolan.

The Budget and Legislative Analyst conducted a review and sampling of Airbnb's current listings to confirm summary statistics of the webscrapes. Average prices were checked by listing type for each webscrape against the website's reported averages. While variations appear from the different webscrapes, the table below also shows consistent relationships in the prices of the different types of rentals.

| Appendix Table 2: Number of Listings | | | | |
|---|---|---|---|---|
| | Number of Entire Unit Listings | Number of Private Room Listings | Number of Shared Room Listings | Total Number of Listings |
| November 2013 Tom Slee | 3,533 | 1,917 | 235 | **5,685** |
| May 2014 Tom Slee | 2,991 | 1,733 | 192 | **4,916** |
| August 2014 Tom Slee | 3,001 | 1,691 | 173 | **4,865** |
| December 2014 Murray Cox | 3,651 | 2,196 | 266 | **6,113** |
| December 2014 Tom Slee | 3,329 | 1,938 | 235 | **5,502** |
| February 2015 Tom Slee | 3,176 | 1,844 | 229 | **5,249** |
| February 2015 Gus Dolan | 2,988 | 2,101 | | **5,089** |

Source: Webscrapes prepared by: November 2013, May 2014, August 2014, December 2014 and February 2015: Tom Slee; December 2014: Murray Cox; February 2015: Gus Dolan; Budget and Legislative Analyst review of Airbnb.com in April 2015

**Percentage Distribution of Listings by Type**

HR&A reported a percentage distribution by Airbnb listing type in 2012 which was described to be based on actual Airbnb data. The table below compares the distribution by webscrapes to the distribution reported by HR&A. We determined the frequency distribution by listing type for each and calculated the percentage of total listings report for each of the webscrapes. We also calculated the percentage distribution based on our review in April 2015 of the website. We compared the distribution by listing type for the webscrapes and our review to the HR&A distribution, as a check on the webscrapes. We found the percentage distributions to be similar.

| Appendix Table 3: Percent Distribution of Listings by Type | | | |
|---|---|---|---|
| | % Entire Unit Listing | % Private Room Listing | % Shared Room Listing |
| HR&A 2012 | 63% | 35% | 2% |
| November 2013 Tom Slee | 62% | 34% | 4% |
| May 2014 Tom Slee | 61% | 35% | 4% |
| August 2014 Tom Slee | 62% | 35% | 4% |
| December 2014 Murray Cox | 60% | 36% | 4% |
| December 2014 Tom Slee | 61% | 35% | 4% |
| February 2015 Tom Slee | 61% | 35% | 4% |
| February 2015 Gus Dolan | 59% | 41% | 0% |
| April 2015 Airbnb Website | 54% | 38% | 9% |

Source: Webscrapes prepared by: November 2013, May 2014, August 2014, December 2014 and February 2015: Tom Slee; December 2014: Murray Cox; February 2015: Gus Dolan; HR&A report 2012; Budget and Legislative Analyst review of Airbnb.com April 2015

**Price Check by Types**

We checked the average prices by listing type for each webscrape against the website's reported averages. The New York Attorney General's report in 2014 shows seasonality in the usage of Airbnb, which would affect prices based on demand for Airbnb units. The table below reflects the seasonality, showing higher prices in May, November, and December, and lower ones in April.

| Appendix Table 4: Average Prices by Listing Type | | | | |
|---|---|---|---|---|
| | **Average Price of Entire Unit Listings** | **Average Price of Private Room Listings** | **Average Price of Shared Room Listings** | **Average Price of All Listings** |
| **November 2013 Tom Slee** | $240 | $111 | $73 | $190 |
| **May 2014 Tom Slee** | $254 | $132 | $87 | $204 |
| **August 2014 Tom Slee** | $281 | $134 | $94 | $224 |
| **December 2014 Murray Cox** | $239 | $115 | $72 | $239 |
| **December 2014 Tom Slee** | no data | no data | no data | no data |
| **February 2015 Tom Slee** | $322 | $153 | $105 | $253 |
| **February 2015 Gus Dolan** | $249 | $113 | | $193 |
| **April 2015 Airbnb Website** | $232 | $115 | $71 | $173 |

Source: Source: Webscrapes prepared by: November 2013, May 2014, August 2014, December 2014 and February 2015: Tom Slee; December 2014: Murray Cox; February 2015: Gus Dolan; Budget and Legislative Analyst review of Airbnb.com April 2015

**Price Check by Sampling**

In order to gather further confidence in the price data from the webscrapes, we collected data internally to check prices reported in the webscrapes. We pulled samples of sizes to obtain a 95 percent confidence level + / - 10 for select neighborhoods. We used the distribution by type to collect samples for each type from three zip codes.

| Appendix Table 5: Sampling by Neighborhood | | |
|---|---|---|
| Zip Code | Total Number of Listings from Airbnb Website | Sample for 95% Confidence Interval |
| 94110 | 1,000 | 183 |
| 94109 | 741 | 120 |
| 94103 | 738 | 121 |

Based on the total populations listed by zip code on Airbnb, we selected samples of the sizes found in the table above. We manually went through the website and collected information to check prices and the length of time host is active for our utilization model.

The sampled data was first used to compare the median prices by listing type for each webscrape to our samples. The data showed variations due to seasonality, but showed similarities.

| Appendix Table 6: Median Prices of Listings | | | |
|---|---|---|---|
| | **Median Price of Entire Unit Listings** | **Median Price of Private Room Listings** | **Median Price of Shared Room Listings** |
| **November 2013 Tom Slee** | $193 | $99 | $54 |
| **May 2014 Tom Slee** | $201 | $111 | $62 |
| **August 2014 Tom Slee** | $214 | $118 | $79 |
| **December 2014 Murray Cox** | $190 | $105 | $60 |
| **December 2014 Tom Slee** | no data | no data | no data |
| **February 2015 Tom Slee** | $249 | $141 | $83 |
| **February 2015 Gus Dolan** | $195 | $100 | |
| **April 2015 Airbnb Website** | $182 | $110 | $60 |

Source: Source: Webscrapes prepared by: November 2013, May 2014, August 2014, December 2014 and February 2015: Tom Slee; December 2014: Murray Cox; February 2015: Gus Dolan; Budget and Legislative Analyst review of Airbnb.com April 2015

Our samples were also used to check the prices of one of the key webscrapes we utilized in our analysis, the December 2014 Murray Cox webscrape. This webscrape provided a more comprehensive database with locations and dates of activity recorded more thoroughly than the other webscrapes. The table below compares the median reported prices from the December 2014 Murray Cox webscrape and our sample data. These numbers show similarities in the data.

*Budget and Legislative Analyst*

| Appendix Table 7: Median Prices of Listings for Sampled Neighborhoods | | | Median Price of Entire Unit Listings | Median Price of Private Room Listings | Median Price of Shared Room Listings |
|---|---|---|---|---|---|
| **April 2015 Airbnb Website** | | **94103** | $199 | $113 | $65 |
| | | **94109** | $195 | $107 | $159 |
| | | **94110** | $174 | $100 | $53 |
| **December 2014 Murray Cox Webscrape** | | **94103** | $185 | $115 | $59 |
| | | **94109** | $193 | $120 | $74 |
| | | **94110** | $180 | $100 | $59 |

Source: Webscrape of Airbnb website prepared by Murray Cox, December 2014; Budget and Legislative Analyst review of Airbnb.com April 2015

<u>Model to Estimate Utilization Rate (Days per Year)</u>

Our model to estimate utilization rate in days per year required several preliminary calculations.

**Apparent review rate**

Total # reviews / Total # bookings = Review rate                    **(1)**

Airbnb stated that the rate of reviews was 72 percent in 2012. However, data on New York City's apparent reviews and bookings show a rate of 30.5 percent. The New York Attorney General's report on Airbnb released in October 2014 shows a total of 497,322 bookings from January 1, 2010 through June 2, 2014. Data pulled from Murray Cox's InsideAirbnb.com showed reviews of 151,623 from January 1, 2010 through June 2, 2014, which is an apparent review rate of 30.5 percent.

We interpret this 30.5% of reviews as the apparent review ratio, in that the number of visible reviews to the number of actual bookings remains a reliable variable assuming

that Airbnb behaves similarly with the San Francisco market in its activities around reviews.

We used both ratios in our calculations. The 30.5 percent apparent review ratio estimated a higher number of bookings to apparent reviews, and the 72 percent review ratio estimated a lower number of bookings to reviews.

**# Days listing active**

Date of host join - Date of first review = # Days listing active                          **(2)**

The dates a listing is active was calculated by subtracting the date of the host joining from the date of last review. Airbnb has been noted to remove older reviews and alter the review displays.

**# Reviews per average booked nights**

(# Reviews for a listing / Review rate) * Average # nights for a listing = Estimated # nights booked for a listing                          **(3)**

We divided the number of reviews visible on the site by the review rate to get the estimated number of bookings (see (1)), and multiplied this by the average number of nights per stay of 5.1 as reported by SF Travel. This gives us an estimate of the number of nights the Airbnb listing is occupied.

**Utilization rate over lifetime of listing**

Estimated # nights booked for a listing / # Days listing active = Utilization rate over lifetime of listing **(4)**

We divide the estimated number of nights booked for a listing (3) by the dates a listing is active (2), to determine the utilization rate over the lifetime of a listing.

**Utilization rate model**

Utilization rate over lifetime of listing * 365 days = # Days a listing is booked out of the year **(5a)**

We multiple the utilization rate in (4) by 365 days in a year to obtain an estimate of the number of days a listing is booked out of the year. This is our utilization rate.

To put it all together, our model to estimate utilization rate (days per year) is as follows:

( [ (# Reviews for a listing / Review rate) * Average # of nights for a listing ] / # Days listing active ) * 365 days = # Days a listing is booked out of the year **(5b)**

**Estimated revenue**

Price per night * # Days a listing is booked out of the year = Estimated revenue per listing per year **(6a)**

Estimated revenue per listing per year / 12 = Estimated revenue per listing per month **(6b)**

The webscrapes provided listing prices per night. We multiplied this by the number of days a listing is booked out of the year to get an estimate of the revenue per year. We divided the estimated revenue per year by 12 to get an estimated revenue per month.

Number of Rentals Available "for rent" by Neighborhood

The American Community Survey is conducted annually by the U.S. Census Bureau. Compared to the relatively comprehensive 10-year Census, the American Community Survey is a "mandatory ongoing statistical survey that samples a small percentage of the population every year." The American Community Survey selects approximately 1-in-480 addresses to mail 3.5 million questionnaires annually. While this is a significant number of individuals and addresses surveyed, it still relies on statistical assumptions, which result in a margin of error for every American

*Budget and Legislative Analyst*

Community Survey estimate. The American Community Survey Rental Vacancy figures include all units listed for rent but currently not occupied and all units that are rented but have yet to be occupied by the incoming tenant. The total number of units that are vacant but have incoming tenants is expected to be small, but does somewhat inflate the size of the available rental units listed on the market.

Another survey challenge of the American Community Survey is that field representatives are only deployed to review addresses which did not reply by mail, internet or phone. As such, there are no field representatives present to independently assess the units reported by mail, internet or phone. If a survey respondent has any reason to falsely report or not report a vacant unit these false responses are then included in the data. Despite these shortcomings, the American Community Survey vacancy data was the most reliable, comprehensive, and up-to-date data source identified by the Budget and Legislative Analyst.

<u>Size of Rental Market by Neighborhood</u>

The American Community Survey includes an estimate of Rental Vacancy Rates, and the rental market size by neighborhood was backed out of the 5-year estimate of the Rental Vacancy Rate. The American Community Survey summary of definitions defines the Rental Vacancy Rate as "The rental vacancy rate is the proportion of the rental inventory that is vacant "for rent." It is computed by dividing the number of vacant units "for rent" by the sum of the renter-occupied units, vacant units that are "for rent," and vacant units that have been rented but not yet occupied, and then multiplying by 100. This measure is rounded to the nearest tenth."

American Community Survey estimates vacant units "for rent," renter-occupied units, and rented but not yet occupied units. There three were added to find the size of the rental market. This was checked against the American Community Survey's estimate of the overall housing stock and subtracting out the home ownership rate for the city to get the size of the rental market.

<u>Rental Unit and Room Prices</u>

Gross rents reported by the American Community Survey were used for 2013 rents. Zillow median rental prices by zip code over 2014 were used for market rate comparisons.

| Appendix Table 8: Rents by Neighborhood | | | |
|---|---|---|---|
| Zip Code | Neighborhood | Median Rent (2013) | Room Rental Price (2013) |
| 94102 | Tenderloin/Union Square/Hayes Valley | $2,326.51 | $840 |
| 94103 | SOMA | $3,460.00 | $922 |
| 94104 | Financial District | $2,709.00 | $673 |
| 94105 | Rincon Hill | $2,984.33 | $2,000+ |
| 94107 | Potrero Hill/South Beach | $2,677.14 | $2,000+ |
| 94108 | Chinatown | $3,107.21 | $1,019 |
| 94109 | Russian Hill/Polk Gulch | $2,745.13 | $1,379 |
| 94110 | Inner Mission | $2,606.35 | $1,459 |
| 94111 | Telegraph Hill/Waterfront | $7,051.04 | 2,000+ |
| 94112 | Ingleside/Excelsior | $2,404.98 | $1,398 |
| 94114 | Castro/Eureka Valley | $3,140.04 | $1,771 |
| 94115 | Western Addition | $2,648.82 | $1,563 |
| 94116 | Parkside | $2,060.63 | $1,639 |
| 94117 | Haight-Ashbury/Western Addition | $3,420.32 | $1,732 |
| 94118 | Inner Richmond | $2,305.93 | $1,621 |
| 94121 | Outer Richmond | $2,024.53 | $1,512 |
| 94122 | Sunset | $2,242.05 | $1,663 |
| 94123 | Marina/Cow Hollow | $2,836.71 | $1,838 |
| 94124 | Bayview/Hunters Point | $2,025.66 | $892 |
| 94127 | Miraloma/Sunnyside | $2,439.37 | $2,000+ |
| 94130 | Presidio | - | $1,582 |
| 94131 | Twin Peaks/Glen Park | $2,469.24 | $1,728 |
| 94132 | Lake Merced | $2,786.42 | $1,797 |
| 94133 | North Beach | $3,288.60 | $1,274 |
| 94134 | Visitacion Valley/Portola | $2,486.89 | $1,101 |
| 94158 | Mission Bay | $3,235.72 | $2,000+ |

Source: American Community Survey 2013

| Appendix Table 9: Market Rates by Neighborhood | | | | |
|---|---|---|---|---|
| Zip Code | Neighborhood | Market Rental Rate (2014) | Average Number of Bedrooms (2013) | Room Market Rental Price (2014) |
| 94102 | Tenderloin/Union Square/Hayes Valley | $3,512 | 0.82 | **$4,300** |
| 94103 | SOMA | $3,670 | 1.19 | **$3,079** |
| 94104 | Financial District | $3,940 | 0.62 | **$6,336** |
| 94105 | Rincon Hill | $4,265 | 1.48 | **$2,887** |
| 94107 | Potrero Hill/South Beach | $3,819 | 1.58 | **$2,419** |
| 94108 | Chinatown | $3,412 | 1 | **$3,405** |
| 94109 | Russian Hill/Polk Gulch | $3,600 | 1.12 | **$3,205** |
| 94110 | Inner Mission | $3,782 | 1.95 | **$1,943** |
| 94111 | Telegraph Hill/Waterfront | $3,815 | 1.31 | **$2,905** |
| 94112 | Ingleside/Excelsior | $2,763 | 2.55 | **$1,083** |
| 94114 | Castro/Eureka Valley | $4,331 | 1.94 | **$2,228** |
| 94115 | Western Addition | $3,594 | 1.6 | **$2,248** |
| 94116 | Parkside | $3,314 | 2.63 | **$1,261** |
| 94117 | Haight-Ashbury/Western Addition | $3,751 | 1.81 | **$2,071** |
| 94118 | Inner Richmond | $3,750 | 2.11 | **$1,781** |
| 94121 | Outer Richmond | $3,087 | 2.16 | **$1,432** |
| 94122 | Sunset | $3,065 | 2.25 | **$1,363** |
| 94123 | Marina/Cow Hollow | $4,021 | 1.56 | **$2,535** |
| 94124 | Bayview/Hunters Point | $2,375 | 2.54 | **$933** |
| 94127 | Miraloma/Sunnyside | $4,140 | 2.98 | **$1,391** |
| 94129 | Presidio | $3,344 | 2.71 | **$1,234** |
| 94131 | Twin Peaks/Glen Park | $3,574 | 2.13 | **$1,679** |
| 94132 | Lake Merced | $2,911 | 2.3 | **$1,265** |
| 94133 | North Beach | $4,068 | 1.49 | **$2,731** |
| 94134 | Visitacion Valley/Portola | $2,836 | 2.62 | **$1,081** |
| 94158 | Mission Bay | $3,887 | 1.36 | **$2,853** |

Source: American Community Survey 2013, Zillow.com


Eviction rates

The San Francisco Rent Board provided data on the number of eviction notices filed. The Rent Board does not track the purpose of evictions systematically and does not follow up on outcomes of notices filed, but stated that the notices filed are a reliable indicator of the number of actual evictions.

**EXHIBIT D**

AMENDED IN BOARD
7/14/2015

FILE NO. 150363                                    ORDINANCE NO. 130-15

[Administrative Code – Short-Term Residential Rentals]

**Ordinance amending the Administrative Code to revise the Residential Unit Conversion Ordinance to:** ~~limit short-term rental of a Residential Unit to no more than 120 days per calendar year~~**; revise the definition of Interested Parties who may enforce the provisions of Chapter 41A through a private right of action to include Permanent Residents residing within 100 feet of the Residential Unit; create an additional private right of action under certain circumstances**<u>; change the administrative hearing process from mandatory to at the request of any party found in violation of this Chapter; require hosts to submit quarterly reports to the Planning Department;</u> **and direct the Mayor to create an Office of Short-Term Residential Rental Administration and Enforcement staffed by the Planning Department and other departments as needed; and affirming the Planning Department's determination under the California Environmental Quality Act.**

NOTE:   **Unchanged Code text and uncodified text** are in plain Arial font.
**Additions to Codes** are in *single-underline italics Times New Roman font*.
**Deletions to Codes** are in *s̶t̶r̶i̶k̶e̶t̶h̶r̶o̶u̶g̶h̶ ̶i̶t̶a̶l̶i̶c̶s̶ ̶T̶i̶m̶e̶s̶ ̶N̶e̶w̶ ̶R̶o̶m̶a̶n̶ ̶f̶o̶n̶t̶*.
**Board amendment additions** are in <u>double-underlined Arial font</u>.
**Board amendment deletions** are in ~~strikethrough Arial font~~.
**Asterisks (\*   \*   \*   \*)** indicate the omission of unchanged Code subsections or parts of tables.

Be it ordained by the People of the City and County of San Francisco:

Section 1. Environmental Findings. The Planning Department has determined that the actions contemplated in this ordinance comply with the California Environmental Quality Act (California Public Resources Code Sections 21000 et seq.).  Said determination is on file with

Mayor Lee; Supervisor Farrell
**BOARD OF SUPERVISORS**                                             Page 1

1   the Clerk of the Board of Supervisors in File No. 150363 and is incorporated herein by

2   reference. The Board affirms this determination.

3

4          Section 2.  The Administrative Code is hereby amended by revising Sections 41A.4,

5   41A.5, 41A. 6, adding a new Section 41A.7, and renumbering existing Section 41A.7 as

6   41A.8, to read as follows:

7

8          **SEC. 41A.4.  DEFINITIONS.**

9          Whenever used in this Chapter 41A, the following words and phrases shall have the

10  definitions provided in this Section:

11          * * * *

12          **Director.** The Director of the Planning Department*, or his or her designee*.

13          * * * *

14          **Interested Party.** A Permanent Resident of the building in which the Tourist or

15  Transient Use is alleged to occur, any homeowner association associated with the Residential

16  Unit in which the Tourist or Transient Use is alleged to occur, the Owner of the Residential

17  Unit in which the Tourist or Transient Use is alleged to occur, *a Permanent Resident or Owner of*

18  *a property within 100 feet of the property containing the Residential Unit in which the Tourist or*

19  *Transient Use is alleged to occur,* the City and County of San Francisco, or any non-profit

20  organization exempt from taxation pursuant to Title 26, Section 501 of the United States

21  Code, which has the preservation or improvement of housing as a stated purpose in its

22  articles of incorporation or bylaws.

23          * * * *

24          **Short-Term Residential Rental.**  A Tourist or Transient Use where all of the following

25  conditions are met:

(a)  the Residential Unit is offered for Tourist or Transient Use by the Permanent Resident of the Residential Unit;

(b)  the Permanent Resident is a natural person;

(c)  the Permanent Resident has registered the Residential Unit and maintains good standing on the Department's Short-Term Residential Rental Registry; and

(d)  the Residential Unit: is not subject to the Inclusionary Affordable Housing Program set forth in Planning Code Section 415et seq.; is not a residential hotel unit subject to the provisions of Chapter 41, unless such unit has been issued a Permit to Convert under Section 41.12; is not otherwise a designated as a below market rate or income-restricted Residential Unit under City, state, or federal law; has not been the subject of an eviction pursuant to the Ellis Act and Administrative Code Section 37.9(a)(13) within the five year period prior to applying for the Registry if such eviction occurred after November 1, 2014; and no other requirement of federal or state law, this Municipal Code, or any other applicable law or regulation prohibits the permanent resident from subleasing, renting, or otherwise allowing Short-Term Residential Rental of the Residential Unit.

**Short-Term Residential Rental Registry or Registry.** A database of information maintained by the Department that includes information regarding Permanent Residents who are permitted to offer Residential Units for Short-Term Residential Rental. Only one Permanent Resident per Residential Unit may be included on the Registry at any given time. The Registry shall be available for public review to the extent required by law, except that, to the extent permitted by law, the Department shall redact any Permanent Resident names *and street and unit numbers* from the records available for public review.

* * * *

**SEC. 41A.5.  UNLAWFUL CONVERSION; REMEDIES.**

1       (a) **Unlawful Actions.** Except as set forth in subsection 41A.5(g), it shall be unlawful

2   for

3          (1) any Owner to offer a Residential Unit for rent for Tourist or Transient Use;

4          (2) any Owner to offer a Residential Unit for rent to a Business Entity that will

5   allow the use of a Residential Unit for Tourist or Transient Use; or

6          (3) any Business Entity to allow the use of a Residential Unit for Tourist or

7   Transient Use.

8       (b) **Records Required.** The Owner and Business Entity, if any, shall retain and make

9   available to the Department records to demonstrate compliance with this Chapter 41A upon

10   written request as provided herein. ~~Any Permanent Resident offering his or her Primary Residence~~

11   ~~as a Short-Term Residential Rental shall retain and make available to the Department records to~~

12   ~~demonstrate compliance with this Chapter 41A, including but not limited to records demonstrating~~

13   ~~Primary Residency, the number of days per calendar year he or she has occupied the Residential Unit,~~

14   ~~and the number of days per calendar year, with dates and duration of each stay, the Residential Unit~~

15   ~~has been rented for Short-Term Residential Rental Use.~~

16       (c) **Determination of Violation.** Upon the filing of a written Complaint that an Owner

17   or Business Entity has engaged in an alleged unlawful Conversion or that a Hosting Platform

18   is not complying with the requirements of subsection (g)(4)(A), the Director shall take

19   reasonable steps necessary to determine the validity of the Complaint. The Director may

20   independently determine whether an Owner or Business Entity may be renting a Residential

21   Unit for Tourist or Transient Use in violation of this Chapter 41A or whether a Hosting Platform

22   has failed to comply with the requirements of subsection (g)(4)(A). To determine if there is a

23   violation of this Chapter 41A, the Director may initiate an investigation of the subject property

24   or Hosting Platform's allegedly unlawful activities. This investigation may include, but is not

25   limited to, an inspection of the subject property and/or a request for any pertinent information

from the Owner, Business Entity, or Hosting Platform, such as leases, business records, or other documents. The Director shall have discretion to determine whether there is a potential violation of this Chapter 41A ~~and whether to conduct an administrative review hearing as set forth below~~. Notwithstanding any other provision of this Chapter 41A, any alleged violation related to failure to comply with the requirements of the Business and Tax Regulations Code shall be enforced by the Treasurer/Tax Collector under the provisions of that Code.

   (d)  **Civil Action.**

   *(1)  The City may institute civil proceedings for injunctive and monetary relief, including civil penalties, against an Owner, Business Entity, or Hosting Platform for violations of this Chapter 41A under any circumstances, without regard to whether a Complaint has been filed or the Director has made a determination of a violation* ~~through an administrative review hearing as set forth in this Chapter 41A~~.

   *(2)*       ***Private Rights of Action.***

   *(A)*  Following the filing of a Complaint and the final determination of a violation by the Director, ~~through an administrative review hearing~~ *~~as set forth in this Chapter 41A, the City may institute civil proceedings for injunctive and monetary relief against a Hosting Platform for violation of subsection (g)(4)(A) or the City or~~* any ~~other~~ Interested Party may institute civil proceedings for injunctive and monetary relief against an Owner or Business Entity.

   *(B)  An Interested Party who is a Permanent Resident of the building in which the Tourist or Transient Use is alleged to occur, is a Permanent Resident of a property within 100 feet of the property containing the Residential Unit in which the Tourist or Transient Use is alleged to occur, or is a homeowner association associated with the Residential Unit in which the Tourist or Transient Use is alleged to occur may institute a civil action for injunctive and monetary relief against an Owner or Business Entity if:*

   *(i)  The Interested Party has filed a Complaint with the Department;*

Mayor Lee; Supervisor Farrell
**BOARD OF SUPERVISORS**

*(ii)  The Director has not made a written determination pursuant to subsection 41A.6(a) that there is no violation of this Chapter 41A or basis for an investigation for an unlawful activity;*

*(iii)  An administrative hearing officer has not issued a final determination pursuant to subsection 41A.6(~~bc~~) regarding the Complaint within ~~105~~135 days of the filing of the Complaint with the Department;*

*(iv)  After such ~~105~~135-day period has passed, the Interested Party has provided 30 days' written notice to the Department and the City Attorney's Office of its intent to initiate civil proceedings; and*

*(v)  The City has not initiated civil proceedings by the end of that 30-day notice period.*

*Under this subsection 41A.5(d)(2)(B), the prevailing party shall be entitled to the costs of suit, including reasonable attorneys' fees, pursuant to an order of the Court.*

*(3)  ~~In addition,~~* **Civil Penalties.**  *If the City is the prevailing party in any civil action under this subsection (d):* an Owner or Business Entity in violation of this Chapter *41A* or a Hosting Platform in violation of subsection (g)(4)(A) may be liable for civil penalties of not more than $1,000 per day for the period of the unlawful activity. *Interested Parties other than the City may not seek or obtain civil penalties.*

*(4)  **Attorneys' Fees and Costs.**  *If the City or *any other* ~~the~~ Interested Party is the prevailing party, the City or the Interested Party shall be entitled to the costs of enforcing this Chapter 41A, including reasonable attorneys' fees, pursuant to an order of the Court.

*(5)*  Any monetary award obtained by the City and County of San Francisco in such a civil action shall be deposited in the Department to be used for enforcement of Chapter 41A. The Department, through the use of these funds, shall reimburse City departments and

1   agencies, including the City Attorney's Office, for all costs and fees incurred in the

2   enforcement of this Chapter 41A.

3       (e)   **Criminal Penalties.** Any Owner or Business Entity who rents a Residential Unit

4   for Tourist or Transient Use in violation of this Chapter 41A without correcting or remedying

5   the violation as provided for in subsection 41A.6(b)(7)(c)(6) shall be guilty of a misdemeanor.

6   Any person convicted of a misdemeanor hereunder shall be punishable by a fine of not more

7   than $1,000 or by imprisonment in the County Jail for a period of not more than six months, or

8   by both. Each Residential Unit rented for Tourist or Transient Use shall constitute a separate

9   offense.

10       * * * *

11       (g)   **Exception for Short-Term Residential Rental.**

12         (1)   Notwithstanding the restrictions set forth in this Section 41A.5, a Permanent

13   Resident may offer his or her Primary Residence as a Short-Term Residential Rental if:

14         (A)   The Permanent Resident occupies the Residential Unit for no less

15   than 275 days out of the calendar year in which the Residential Unit is rented as a Short-Term

16   Residential Rental or, if the Permanent Resident has not rented or owned the Residential Unit

17   for the full preceding calendar year, for no less than 75% of the days he or she has owned or

18   rented the Residential Unit The Residential Unit is rented for Tourist or Transient Use for no

19   more than 120 days during any calendar year;

20         (B)   The Permanent Resident maintains records for two years

21   demonstrating compliance with this Chapter 41A, including but not limited to information

22   demonstrating Primary Residency, the number of days per calendar year he or she has

23   occupied the Residential Unit, the number of days per calendar year the Residential Unit has

24   been rented as a Short-Term Residential Rental, and compliance with the insurance

25

1   requirement in Subsection (D). These records shall be made available to the Department

2   upon request;

3          * * * *

4             (3)  **Short-Term Residential Rental Registry Applications, Fee, and**

5   **Reporting Requirement.**

6                   (A)  **Application.**  Registration shall be for a two-year term, which may be

7   renewed by the Permanent Resident by filing a completed renewal application. Initial and

8   renewal applications shall be in a form prescribed by the Department. The Department shall

9   determine, in its sole discretion, the completeness of an application. Upon receipt of a

10  complete initial application, the Department shall send mailed notice to the owner of record of

11  the Residential Unit, informing the owner that an application to the Registry for the unit has

12  been received. If the Residential Unit is in a RH-1(D) zoning district, the <u>following additional</u>

13  <u>requirements shall apply: the</u> Department shall also send mailed notice to any directly

14  associated homeowner association that has previously requested such notice <u>and to any</u>

15  <u>owners and occupants within 300 feet of the property</u>.; the Department shall hold the

16  <u>application for 45 days after sending such notice; and the Department shall review and</u>

17  <u>consider any information submitted by any such homeowner association, neighboring owner</u>

18  <u>or occupant, or member of the public regarding the eligibility of the permanent resident and/or</u>

19  <u>the residential unit for listing on the Registry received during the 45-day hold period.</u>

20        Both the initial application and any renewal application shall contain information

21  sufficient to show that the Residential Unit is the Primary Residence of the applicant, that the

22  applicant is the unit's Permanent Resident, and that the applicant has the required insurance

23  coverage and business registration certificate. In addition to the information set forth here, the

24  Department may require any other additional information necessary to show the Permanent

25  Resident's compliance with this Chapter 41A. Primary Residency shall be established by

showing the Residential Unit is listed as the applicant's residence on at least two of the following: motor vehicle registration; driver's license; voter registration; tax documents showing the Residential Unit as the Permanent Resident's Primary Residence for home owner's tax exemption purposes; or utility bill. A renewal application shall contain sufficient information to show that the applicant is the Permanent Resident and has occupied the unit for at least 275 days of each of the two preceding calendar years. Upon the Department's determination that an application is complete, the unit shall be entered into the Short-Term Residential Rental Registry and assigned an individual registration number.

* * * *

(C) **Reporting Requirement.**  To maintain good standing on the Registry, the Permanent Resident shall submit a quarterly report to the Department beginning on January 1, 2016, and on January 1, April 1, July 1, and October 1 of each year thereafter, regarding the number of days the Residential Unit or any portion thereof has been rented as a Short-Term Residential Rental since either initial registration or the last report, whichever is more recent, and any additional information the Department may require to demonstrate compliance with this Chapter 41A.

(4) **Requirements for Hosting Platforms.**

(A) **Notice to Users of Hosting Platform.** All Hosting Platforms shall provide the following information in a notice to any user listing a Residential Unit located within the City and County of San Francisco through the Hosting Platform's service. The notice shall be provided prior to the user listing the Residential Unit and shall include the following information: that Administrative Code Chapters 37 and 41A regulate Short-Term Rental of Residential Units; the requirements for Permanent Residency and registration of the unit with the Department; and the transient occupancy tax obligations to the City.

1        (B)  A Hosting Platform shall comply with the requirements of the

2   Business and Tax Regulations Code by, among any other applicable requirements, collecting

3   and remitting all required Transient Occupancy Taxes, and this provision shall not relieve a

4   Hosting Platform of liability related to an occupant's, resident's, Business Entity's, or Owner's

5   failure to comply with the requirements of the Business and Tax Regulations Code. A Hosting

6   Platform shall maintain a record demonstrating that the taxes have been remitted to the Tax

7   Collector and shall make this record available to the Tax Collector upon request.

8        (C)  Any violation of a Hosting Platform's responsibilities under

9   subsection (g)(~~5~~4)(A) shall subject the Hosting Platform to the administrative penalties and

10  enforcement provisions of this Chapter _41A_, including but not limited to payment of civil

11  penalties of up to $1,000 per day for the period of the failure to comply, with the exception that

12  any violation related to failure to comply with the requirements of the Business and Tax

13  Regulations Code shall be enforced by the Treasurer/Tax Collector under that Code.

14        * * * *

15  SEC. 41A.6.  <u>ADMINISTRATIVE ENFORCEMENT</u> PROCEDURES ~~FOR~~

16  ~~DETERMINING ADMINISTRATIVE PENALTIES~~.

17     (a)  <u>Determination and</u> Notice of ~~Complaint~~<u>Violation</u>.

18        <u>_(1)_</u> ~~Within 30 days of the filing of a Complaint and upon~~ <u>After</u> the Director~~'s~~

19  ~~independent finding~~ <u>has determined</u> that ~~there may be~~ a violation of this Chapter _41A_ <u>exists</u>,

20  the Director shall notify the <u>responsible</u> Owner<u>, Business Entity, or Hosting Platform of the</u>

21  <u>determination of violation</u> by certified mail <u>and shall post the notice of violation in a</u>

22  <u>conspicuous location on, or if access to the property is not available in a conspicuous location</u>

23  <u>as close as practicable to, the building or property where the Residential Unit is located</u> ~~that~~

24  ~~the Owner's Residential Unit is the subject of an investigation for an unlawful use and provide~~

25  ~~the date, time, and place of an administrative review hearing in which the Owner can respond~~

1   to the Complaint. *If the Director finds there is no violation of this Chapter or basis for an*

2   *investigation for an unlawful activity, the Director shall so inform the complainant within 30 days of*

3   *the filing of the Complaint.*

4   *(2)* If the Complaint concerns the failure of a Hosting Platform to comply with the

5   requirements of subsection 41A.5 (g)(4)(A), within 30 days of the filing of the Complaint and

6   upon the Director's independent finding that there may be a violation of this Chapter, the

7   Director shall notify the Hosting Platform by certified mail that the Hosting Platform is the

8   subject of an investigation for failure to comply with the requirements of that subsection and

9   provide the date, time, and place of an administrative review hearing in which the Hosting

10   Platform can respond to the Complaint.

11   *(3)* Once a Complaint has been filed or once the Director has made a

12   determination of violation in the absence of a Complaint, *the Department shall include*

13   *information regarding the Complaint* or violation, *including whether the Complaint is pending or*

14   *resolved and, if resolved, any final determination, on the Department's website.*

15   *(4*3) **Contents of Notice.** The notice shall cite to this Chapter 41A and describe

16   the violation(s) with specificity. The notice of violation shall: state that the responsible party

17   shall immediately correct all violations; and assess any applicable administrative penalties as

18   set forth in Subsection 41A.6(d)(1). The notice of violation shall also inform the responsible

19   party of the right to request a Director's hearing under Subsection 41A.6(b) to appeal the

20   determination of violation and any assessed administrative penalties.

21   *(5*4) *If the Director finds there is no violation of this Chapter or basis for an*

22   *investigation for an unlawful activity, the Director shall so inform the complainant within* 30*60 days of*

23   *the filing of* the any *Complaint.*

24   (b)  **Request for Hearing.** Within 30 days of the notice of violation, the responsible

25   party may request a Director's hearing to appeal the determination of violation and any

assessed administrative penalties. The Director shall send a notice of the date, hour, and place of the hearing to the responsible party at the address specified in the request for hearing and to any member of the public who has expressed an interest in the matter.

(c) **Administrative Review Hearings.** In the event the Director determines that an administrative review hearing shall be conducted, tThe Director may designate a member of Department staff to act in his or her place as the hearing officer. The Director's appointed hearing officer will shall hold an administrative review hearing within 45 days of the Director's finding that there may be a violation of this Chapter 41A request for hearing to review all information provided by the Interested Party, members of the public, City staff, and the Owner, Business Entity, or Hosting Platform for the investigation, and the hearing officer shall thereafter make a determination whether the Owner, Business Entity, or Hosting Platform has violated this Chapter 41A.

(1) For hearings regarding alleged unlawful conversions, notice of the hearing shall be conspicuously posted on the building that is the subject of the hearing. The Director shall appoint a hearing officer to conduct the hearing.

(2) **Pre-hearing Submission.** No less than ten days prior to the administrative review hearing, parties to the hearing shall submit written information to the Director including, but not limited to, the issues to be determined by the hearing officer and the evidence to be offered at the hearing. Such information shall be forwarded to the hearing officer prior to the hearing along with any information compiled by the Director.

(32) **Hearing Procedure.** If more than one hearing is requested for Residential Units located in the same building at or about the same time, the Director shall consolidate all of the hearings into one hearing. The hearing shall be recorded. Any party to the hearing may at his or her own expense cause the hearing to be recorded by a certified court reporter. Parties may be represented by counsel and shall have the right to cross-examine witnesses.

All testimony shall be given under oath. Written decisions and findings shall be rendered by the hearing officer within 30 days of the hearing. Copies of the findings and decision shall be served upon the parties by certified mail. A notice that a copy of the findings and decision is available for inspection between the hours of 9:00 a.m. and 5:00 p.m. Monday through Friday shall be posted by the Owner or the Director in the building in the same location in which the notice of the administrative review hearing was posted.

(43)   **Failure to Appear.** In the event the Owner, authorized Hosting Platform representative, or an interested party fails to appear at the hearing, the hearing officer may nevertheless make a determination based on the evidence in the record and files at the time of the hearing, and issue a written decision and findings.

(54)   **Finality of the Hearing Officer's Decision and Judicial Review.** The decision of the hearing officer shall be final. Within 20 days after service of the hearing officer's decision, any party may seek judicial review of the hearing officer's decision.

(65)   **Hearing Officer Decision and Collection of Penalties.** Upon the Hhearing Officer's decision, or if no hearing is requested upon the expiration of the appeal period, the Director may proceed to collect the penalties and costs pursuant to the lien procedures set forth in Subsection 41A.6(de), consistent with the Hhearing Oofficer's decision or the determination of violation if no hearing is requested.

(76)   **Remedy of Violation.** If the Hhearing Oofficer determines that a violation has occurred, the Hhearing Oofficer's Ddecision shall:

(A)   Specify a reasonable period of time during which the Owner, Business Entity, or Hosting Platform must correct or otherwise remedy the violation;

(B)   Detail the amount of any administrative penalties the Owner or Hosting Platform shall be required to pay as set forth in Subsection 41A.6(ed); and,

(C)  For violations by Owners, state that if the violation is not corrected or otherwise remedied within this period, the Department shall remove or prohibit the registration of the Residential Unit from the Short-Term Residential Registry for one year even if the Residential Unit otherwise meets the requirements for Short-Term Residential Rental.

(8̶7̲)  If the H̶hearing O̶officer determines that no violation has occurred, the determination is final.

(c̶d̲)  ~~Imposition of~~Administrative Penalties for Violations and Enforcement Costs.

(1)  **Administrative Penalties.** ~~If the Hearing Officer determines that a violation has occurred, an a~~Administrative penalt̲y̶ie̲s shall be assessed as follows:

(A)  f̶For the initial violation, not more than four times the standard hourly administrative rate of $121.00 for each unlawfully converted unit, or for each identified failure of a Hosting Platform to comply with the requirements of subsection *41A.5*(g)(4)*(A)*, per day from the notice of ~~Complaint~~violation until such time as the unlawful activity terminates;

(B)  f̶For the second violation by the same Owner(s), Business Entity, or Hosting Platform, not more than eight times the standard hourly administrative rate of $121.00 for each unlawfully converted unit, or for each identified failure of a Hosting Platform to comply with the requirements of subsection *41A.5* (g)(4)*(A)*, per day from the day the unlawful activity commenced until such time as the unlawful activity terminates; and

(C)  f̶For the third and any subsequent violation by the same Owner(s), Business Entity, or Hosting Platform, not more than twelve times the standard hourly administrative rate of $121.00 for each unlawfully converted unit or for each identified failure of a Hosting Platform to comply with the requirements of subsection *41A.5* (g)(4)*(A)* per day from the day the unlawful activity commenced until such time as the unlawful activity terminates.

(2)   **Prohibition on Registration and Listing Unit(s) on Any Housing Platform.** In the event of multiple violations, the Department shall remove the Residential Unit(s) from the Registry for one year and include the Residential Unit(s) on a list maintained by the Department of Residential Units that may not be listed on any Hosting Platform until compliance. Any Owner or Business Entity who continues to list a Residential Unit in violation of this sSection shall be liable for additional administrative penalties and civil penalties of up to $1,000 per day of unlawful inclusion.

(de)   **Notice of Violation and Imposition of Penalties.** The Director shall notify the Owner or Hosting Platform by certified mail of the violation and that administrative penalties shall be imposed pursuant to this Chapter 41A. The notice shall state the time of the existence of the violation and the resulting imposition of penalties. Payment of the administrative penalties and enforcement costs shall be made within 30 days of the certified mailed notice to the Owner or Hosting Platform. If the administrative penalties and enforcement costs are not paid, the Director shall refer the matter to the Treasurer/Tax Collector and/or initiate lien procedures to secure the amount of the penalties and costs against the real property that is subject to this Chapter, under Article XX of Chapter 10 of the Administrative Code to make the penalty, plus accrued interest, a lien against the real property regulated under this Chapter. Except for the release of the lien recording fee authorized by Administrative Code Section 10.237, all sums collected by the Tax Collector pursuant to this ordinance shall be deposited as set forth in subsection (ef) below.

(ef)   **Deposit of Penalties.** Any fees and penalties collected pursuant to this Chapter 41A shall be deposited in the Department, which shall reimburse City departments and agencies, including the City Attorney's Office, for all costs and fees incurred in the enforcement of this Chapter 41A.

1      **SEC. 41A.7.** *OFFICE OF SHORT-TERM RESIDENTIAL RENTAL ADMINISTRATION*

2 *AND ENFORCEMENT.*

3      *The Mayor shall establish an Office of Short-Term Residential Rental Administration and*

4 *Enforcement, which shall provide a single location to receive and process applications for the Registry*

5 and Complaints regarding violations of this Chapter 41A. ~~and which~~ This office *shall be staffed*

6 *by the Department* and other departments as appropriate, with participation from *the Department*

7 *of Building Inspection,* ~~and~~ *the* Treasurer/*Tax Collector's Office,* and other departments *as needed,*

8 *to process applications for the Registry and enforce the requirements of this Chapter 41A in a timely*

9 *and efficient manner. It is the intent of this Board in directing the establishment of this office to*

10 *streamline both the process of administering the Registry and enforcing the requirements of this*

11 *Chapter 41A to protect residential housing from unlawful conversion to Tourist or Transient Use.*

12      *SEC. 41A.8* **CONSTRUCTION.**

13      (a)  Nothing in this Chapter 41A may be construed to supersede any other lawfully

14 enacted ordinance of the City and County of San Francisco.

15      (b)  Clauses of this Chapter 41A are declared to be severable and if any provision or

16 clause of this ~~c~~Chapter 41A or the application thereof is held to be unconstitutional or to be

17 otherwise invalid by any court of competent jurisdiction, such invalidity shall not affect other

18 provisions of this Chapter 41A.

19

20      Section 3.  Effective Date.  This ordinance shall become effective 30 days after

21 enactment.  Enactment occurs when the Mayor signs the ordinance, the Mayor returns the

22 ordinance unsigned or does not sign the ordinance within ten days of receiving it, or the Board

23 of Supervisors overrides the Mayor's veto of the ordinance.

24

25

Section 4.  Scope of Ordinance.  In enacting this ordinance, the Board of Supervisors intends to amend only those words, phrases, paragraphs, subsections, sections, articles, numbers, punctuation marks, charts, diagrams, or any other constituent parts of the Municipal Code that are explicitly shown in this ordinance as additions, deletions, Board amendment additions, and Board amendment deletions in accordance with the "Note" that appears under the official title of the ordinance.

APPROVED AS TO FORM:
DENNIS J. HERRERA, City Attorney

By: _____
    MARLENA BYRNE
    Deputy City Attorney

n:\legana\as2015\1500635\01031020.doc



**City and County of San Francisco**

**Tails**

**Ordinance**

City Hall
1 Dr. Carlton B. Goodlett Place
San Francisco, CA  94102-4689

**File Number:**   150363                    **Date Passed:**   July 21, 2015

Ordinance amending the Administrative Code to revise the Residential Unit Conversion Ordinance to: revise the definition of interested parties who may enforce the provisions of Chapter 41A, through a private right of action to include permanent residents residing within 100 feet of the residential unit; create an additional private right of action under certain circumstances; change the administrative hearing process from mandatory to at the request of any party found in violation of this Chapter; create an Office of Short-Term Residential Rental Administration and Enforcement staffed by the Planning Department, Department of Building Inspection, and Tax Collector's Office; and affirming the Planning Department's determination under the California Environmental Quality Act.

May 18, 2015 Land Use and Transportation Committee - AMENDED, AN AMENDMENT OF THE WHOLE BEARING SAME TITLE

May 18, 2015 Land Use and Transportation Committee - REFERRED WITHOUT RECOMMENDATION AS AMENDED

June 09, 2015 Board of Supervisors - CONTINUED ON FIRST READING
      Ayes: 7 - Breed, Christensen, Cohen, Farrell, Tang, Wiener and Yee
      Noes: 4 - Avalos, Campos, Kim and Mar

July 14, 2015 Board of Supervisors - AMENDED, AN AMENDMENT OF THE WHOLE BEARING NEW TITLE
      Ayes: 11 - Avalos, Breed, Campos, Christensen, Cohen, Farrell, Kim, Mar, Tang, Wiener and Yee

July 14, 2015 Board of Supervisors - NOT AMENDED, AN AMENDMENT OF THE WHOLE BEARING SAME TITLE
      Ayes: 5 - Avalos, Campos, Kim, Mar and Yee
      Noes: 6 - Breed, Christensen, Cohen, Farrell, Tang and Wiener

July 14, 2015 Board of Supervisors - AMENDED, AN AMENDMENT OF THE WHOLE BEARING SAME TITLE
      Ayes: 11 - Avalos, Breed, Campos, Christensen, Cohen, Farrell, Kim, Mar, Tang, Wiener and Yee

July 14, 2015 Board of Supervisors - DUPLICATED AS AMENDED

July 14, 2015 Board of Supervisors - AMENDED, AN AMENDMENT OF THE WHOLE BEARING NEW TITLE
      Ayes: 6 - Breed, Christensen, Cohen, Farrell, Tang and Wiener
      Noes: 5 - Avalos, Campos, Kim, Mar and Yee

July 14, 2015 Board of Supervisors - PASSED ON FIRST READING AS AMENDED
      Ayes: 6 - Breed, Christensen, Cohen, Farrell, Tang and Wiener

Noes: 5 - Avalos, Campos, Kim, Mar and Yee

July 21, 2015 Board of Supervisors - FINALLY PASSED
Ayes: 6 - Breed, Christensen, Cohen, Farrell, Tang and Wiener
Noes: 4 - Avalos, Kim, Mar and Yee
Excused: 1 - Campos

File No. 150363

**I hereby certify that the foregoing
Ordinance was FINALLY PASSED on
7/21/2015 by the Board of Supervisors of
the City and County of San Francisco.**

_[signature]_

**Angela Calvillo
Clerk of the Board**

_[signature]_

**Mayor**

_7/30/15_

**Date Approved**

**EXHIBIT E**

TRIM LINE 



# REGISTERED SHORT-TERM RESIDENTIAL RENTAL CERTIFICATE

**OFFICE OF SHORT-TERM RENTALS**

**Registration Number:** **STR-XXXXXXX (sample cert.)**

**Certificate Holder:** John Example

**Issue Date:** 09/14/2016          **Expiration Date:** 09/13/2018

**Address:** 1650 Mission Street #400

**Contact:**
**(415) 575–9179 or shorttermrentals@sfgov.org**

Possession of a San Francisco Short-Term Rental Registration Certificate certifies that the registration certificate holder has agreed to comply with the terms of the San Francisco Short-Term Residential Rental Ordinance (San Francisco Administrative Code Section 41A).  This ordinance *does not require* an initial inspection of the unit by the City for potential Building, Housing, Fire, or other Code violations. However, any living spaces within the unit that have not been previously permitted by the Department of Building Inspection are not eligible for short-term rental.

The issuance of this certificate does not constitute a change of use of the property or override any lease agreements, homeowner's association bylaws, Covenants, Conditions & Restrictions (CC&Rs), or any other agreement, law, or regulations that prohibit subletting or use of your unit as a short-term residential rental.

**DISPLAY CONSPICUOUSLY AT RESIDENTIAL UNIT FOR WHICH ISSUED**          **THIS CERTIFICATE IS NON-TRANSFERRABLE**

 TRIM LINE