1   JONATHAN H. BLAVIN (State Bar No. 230269)
    jonathan.blavin@mto.com
2   ELLEN M. RICHMOND (State Bar No. 277266)
    ellen.richmond@mto.com
3   JOSHUA PATASHNIK (State Bar No. 295120)
    josh.patashnik@mto.com
4   MUNGER, TOLLES & OLSON LLP
    560 Mission Street, Twenty-Seventh Floor
5   San Francisco, CA  94105-4000
    Telephone:     (415) 512-4000
6   Facsimile:     (415) 512-4077

7   Attorneys for Plaintiff Airbnb, Inc.

8   JAMES C. GRANT (*pro hac vice*)
    jamesgrant@dwt.com
9   AMBIKA K. DORAN (*pro hac vice*)
    ambikadoran@dwt.com
10  DAVIS WRIGHT TREMAINE LLP
    1201 Third Avenue, Suite 2200
11  Seattle, Washington  98101
    Telephone:  (206) 757-8136
12  Facsimile:  (206) 757-7136

13  Attorneys for Plaintiff HomeAway.com, Inc.

14  *[Additional counsel listed on next page]*

15                  UNITED STATES DISTRICT COURT

16                NORTHERN DISTRICT OF CALIFORNIA

17                    SAN FRANCISCO DIVISION

18

19
    AIRBNB, INC. and HOMEAWAY.COM,          Case No. 3:16-cv-03615-JD
20  INC.,
                                            **PLAINTIFFS' REPLY IN SUPPORT**
21              Plaintiffs,                 **OF JOINT MOTION FOR**
                                            **PRELIMINARY INJUNCTION**
22         vs.
                                            Judge:        Hon. James Donato
23  CITY AND COUNTY OF SAN                  Courtroom:    11
    FRANCISCO,                              Time:         Oct. 6, 2016 at 10:00 am
24
                Defendant.
25

26

27

28

---

REPLY ISO MOTION FOR PRELIMINARY INJUNCTION

1    *Additional counsel:*

2    JOHN W. SPIEGEL (State Bar No. 78935)
     john.spiegel@mto.com
3    MUNGER, TOLLES & OLSON LLP
     355 South Grand Avenue, Thirty-Fifth Floor
4    Los Angeles, California 90071-1560
     Telephone:     (213) 683-9100
5    Facsimile:     (213) 687-3702

6    Attorneys for Plaintiff Airbnb, Inc.

7    THOMAS R. BURKE (CA State Bar No. 141930)
     thomasburke@dwt.com
8    SANJAY M. NANGIA (CA State Bar No. 264986)
     sanjaynangia@dwt.com
9    DAVIS WRIGHT TREMAINE LLP
     505 Montgomery Street, Suite 800
10   San Francisco, California  94111
     Telephone:     (415) 276-6500
11   Facsimile:     (415) 276-6599

12   Attorneys for Plaintiff HomeAway.com, Inc.

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**TABLE OF CONTENTS**

**Page**

I.       INTRODUCTION ........................................................................................................... 1

II.      ARGUMENT ................................................................................................................. 2

    A.       The Ordinance Violates and Is Preempted By the CDA ............................................ 2

        1.       The Ordinance Attacks Publication and Transaction Services and Would Directly Undermine the CDA's Promotion of E-Commerce .............. 2

        2.       The Ordinance Regulates Fees Received for Publishing Conduct .................. 5

        3.       The Ordinance Requires Platforms to Review and Screen Content ................ 6

        4.       Courts Reject Efforts to Evade Section 230 Immunity .................................... 7

        5.       The Authority the City Cites Is Inapposite ..................................................... 8

    B.       The Ordinance Violates the First Amendment ......................................................... 10

        1.       The Ordinance Must Satisfy Heightened Scrutiny ........................................ 10

        2.       The Ordinance Fails Heightened Scrutiny ..................................................... 12

        3.       The Ordinance Is Invalid Because It Has No Scienter Element .................... 13

    C.       The Other Preliminary Injunction Factors Favor an Injunction ............................... 14

    D.       The Court Should Not Require an Injunction Bond .................................................. 15

III.     CONCLUSION ............................................................................................................. 15

1

**TABLE OF AUTHORITIES**

2

<u>Page</u>

3

**Federal Cases**

4

*Anthony v. Yahoo Inc.*,
  421 F. Supp. 2d 1257 (N.D. Cal. 2006) ...................................................................9

5

6

*Baca v. Moreno Valley Unified Sch. Dist.*,
  936 F. Supp. 719 (C.D. Cal. 1996)..........................................................................15

7

8

*Backpage.com, LLC v. Cooper*,
  939 F. Supp. 2d 805 (M.D. Tenn. 2013) ..............................................................5, 14

9

*Backpage.com, LLC v. Hoffman*,
  2013 WL 4502097 (D.N.J. Aug. 20, 2013)...............................................................5

10

11

*Backpage.com, LLC v. McKenna*,
  881 F. Supp. 2d 1262 (W.D. Wash. 2012) ...........................................................5, 11

12

*Barnes v. Yahoo!, Inc.*,
  570 F.3d 1096 (9th Cir. 2009).........................................................................2, 6, 9

13

14

*Bartnicki v. Vopper*,
  200 F.3d 109 (3d Cir. 1999), aff'd, 532 U.S. 514 (2001) ..........................................11

15

16

*Batzel. v. Smith*,
  333 F.3d 1018 (9th Cir. 2003).........................................................................4, 7, 8

17

*Braun v. Soldier of Fortune Magazine, Inc.*,
  968 F.2d 1110 (11th Cir. 1992) .............................................................................11

18

19

*Central Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n*,
  447 U.S. 557 (1980) ...........................................................................................12

20

21

*City of Chicago v. Stubhub!, Inc.*,
  624 F.3d 363 (7th Cir. 2010)................................................................................10

22

*CTIA-The Wireless Ass'n v. City of Berkeley*,
  158 F. Supp. 3d 897 (N.D. Cal. 2016) ...................................................................12

23

24

*Doe v. Harris*,
  772 F.3d 563 (9th Cir. 2014)................................................................................11

25

*Doe v. Internet Brands, Inc.*,
  824 F.3d 846 (9th Cir. 2016)..................................................................................9

26

27

*Doe v. MySpace, Inc.*,
  528 F.3d 413 (5th Cir. 2008)...............................................................................3, 7

28

*Fair Hous. Council of San Fernando Valley v. Roommates.com, LLC*,
    521 F.3d 1157 (9th Cir. 2008) ........................................................................................ 2

*Fields v. Twitter, Inc.*,
    2016 WL 4205687 (N.D. Cal. Aug. 10, 2016) .......................................................... 6, 7, 9

*Flytenow, Inc. v. FAA*,
    808 F.3d 882 (D.C. Cir. 2015) ...................................................................................... 12

*Goddard v. Google, Inc.*,
    2008 WL 5245490 (N.D. Cal. Dec. 17, 2008) ........................................................ 3, 6, 7

*Goddard v. Google, Inc.*,
    640 F. Supp. 2d 1193 (N.D. Cal. 2009) ......................................................................... 9

*Green v. AOL*,
    318 F.3d 465 (3d Cir. 2003) ........................................................................................... 6

*Inman v. Technicolor USA, Inc.*,
    2011 WL 5829024 (W.D. Pa. Nov. 18, 2011) ................................................................ 3

*Jane Doe No. 1 v. Backpage.com, LLC*,
    817 F.3d 12 (1st Cir. 2016) .................................................................................. 2, 5, 7, 10

*Johnson v. Couturier*,
    572 F.3d 1067 (9th Cir. 2009) ..................................................................................... 15

*Kimzey v. Yelp! Inc.*,
    __F.3d__, 2016 WL 4729492 (9th Cir. Sept. 12, 2016) ............................................. 7, 8

*Levitt v. Yelp! Inc.*,
    2011 WL 5079526 (N.D. Cal. Oct. 26, 2011), aff'd, 765 F.3d 1123 (9th Cir.
    2014) ................................................................................................................................ 6

*Meyer v. Grant*,
    486 U.S. 414 (1988) ...................................................................................................... 10

*Minneapolis Star & Tribune Co. v. Minn. Comm'r of Revenue*,
    460 U.S. 575 (1983) ...................................................................................................... 11

*National Meat Ass'n v. Harris*,
    132 S. Ct. 965 (2012) ...................................................................................................... 8

*News & Sun-Sentinel Co. v. Bd. of Cnty. Comm'rs*,
    693 F. Supp. 1066 (S.D. Fla. 1987) ............................................................................. 11

*Nunes v. Twitter*,
    2016 WL 3660526 (N.D. Cal. July 1, 2016) ................................................................ 10

*Optinrealbig.com, LLC v. Ironport Sys., Inc.*,
    323 F. Supp. 2d 1037 (N.D. Cal. 2004) ...................................................................7

*Perfect 10, Inc. v. CCBill LLC*,
    488 F.3d 1102 (9th Cir. 2007) .........................................................................2, 9

*Pittsburgh Press Co. v. Pittsburgh Comm'n on Human Relations*,
    413 U.S. 376 (1973) .........................................................................................12

*Planned Parenthood of Idaho, Inc. v. Wasden*,
    376 F.3d 908 (9th Cir. 2004) ...........................................................................14

*Reed v. Town of Gilbert*,
    135 S. Ct. 2218 (2015) .....................................................................................12

*Retail Digital Network, LLC v. Applesmith*,
    810 F.3d 638 (9th Cir. 2016) ...........................................................................12

*Senate Permanent Subcommittee v. Ferrer*,
    ___ F. Supp. 3d. ___, 2016 WL 4179289 (D.D.C. Aug. 5, 2016) ..................12

*Simon & Schuster, Inc. v. Members of N.Y. St. Crime Victims Bd.*,
    502 U.S. 105 (1991) .........................................................................................10

*Sorrell v. IMS Health Inc.*,
    564 U.S. 552 (2011) ...................................................................................10, 12

*Thompson v. W. States Med. Ctr.*,
    535 U.S. 357 (2002) .........................................................................................13

*United States v. Stevens*,
    559 U.S. 460 (2010) .........................................................................................14

*United States v. Williams*,
    553 U.S. 285 (2008) .........................................................................................12

*United States v. X-Citement Video*,
    513 U.S. 64 (1994) ...........................................................................................14

*Universal Commc'n Sys., Inc. v. Lycos, Inc.*,
    478 F.3d 413 (1st Cir. 2007) .............................................................................5

*Valle Del Sol Inc. v. Whiting*,
    709 F.3d 808 (9th Cir. 2013) ...........................................................................13

*Village of Schaumburg v. Citizens for a Better Env't*,
    444 U.S. 620 (1980) .........................................................................................10

*Wos v. E.M.A. ex rel. Johnson*,
    133 S. Ct. 1391 (2013) .......................................................................................8

**STATE CASES**

*Gentry v. eBay, Inc.*,
   99 Cal. App. 4th 816 (2002)...................................................................................4

*Hill v. StubHub, Inc.*,
   727 S.E.2d 550 (N.C. App. 2012) .......................................................................3, 4

*Stoner v. eBay Inc.*,
   2000 WL 1705637 (Cal. Super. Ct. Nov. 1, 2000) ............................................3, 4, 6

**FEDERAL STATUTES**

18 U.S.C. § 2702(c)......................................................................................................13

18 U.S.C. § 2703(d) .....................................................................................................13

47 U.S.C. § 230(c).........................................................................................................15

47 U.S.C. § 230(e)(3)......................................................................................................3

**STATE STATUTES**

California Penal Code § 653h .........................................................................................4

## I.   <u>INTRODUCTION</u>

The City admits that it amended the Original Ordinance to avoid Plaintiffs' lawsuit and that the CDA "protect[s] Hosting Platforms from liability based on publishing" unregistered short-term rental listings.  Opp. 8-9.   The City also admits the purpose of the Ordinance is the same as the original law—to hold platforms accountable for short-term rentals the City seeks to block.  In other words, the City acknowledges it has tried to draft around the CDA and the First Amendment to do what it concedes is otherwise impermissible.  The law does not permit such gamesmanship.

The City's core argument is that the Ordinance does not regulate online publishing or speech; it merely regulates conduct.  Platforms can publish "whatever listings they choose," the City says, and are liable only if they allow users to book or pay for listings the City deems illegal.  Opp. 5.  The City argues this is permissible because it purports to segregate the services provided by platforms into the "distinct functions" of (1) publishing third-party listings and (2) providing services for users to book and rent properties that are listed.  *Id.* at 8.  No case has ever accepted such an obvious attempt to evade Section 230, and the City does not cite one.

Under the CDA, courts repeatedly have held websites immune from laws that impose any liability *stemming from* the publication of user content, including attempts to hold websites responsible for third-party transactions that occur through their sites.  The City does not meaningfully distinguish this authority.  Under the City's approach, a state could prohibit websites like eBay or Amazon from providing payment processing services for third-party sales of products, and this would be permissible so long as it does not expressly ban listings.  But such transaction services are part and parcel of websites' publisher functions.  The City's unprecedented theory would force websites to review thousands, if not millions of listings, directly contravening one of the CDA's central purposes to protect and foster e-commerce.

For similar reasons, the City's arguments misapprehend First Amendment law.  Again, the City argues that if the Ordinance (in its view) does not directly ban speech, it does not implicate the First Amendment.  The Supreme Court has long rejected such arguments—laws that burden or chill speech (like the Ordinance) are just as offensive to the First Amendment as outright bans.  A law that effectively compels publishers to review content to avoid liability violates the First Amendment.

The City cannot rely on a fiction that it is not seeking to regulate publishing activities or speech by instead regulating conduct that is solely based on and would not occur except for the publication of listings.  For these reasons, and those below, the Court should grant the Motion.

II.   **ARGUMENT**

    A.    **The Ordinance Violates and Is Preempted By the CDA**

Distilled down, the City's argument is that it can segregate the services offered by Hosting Platforms into "distinct functions" of (1) providing a forum for third parties to post listings, and (2) providing Booking Services.  Opp. 8.  "The City does not dispute that Hosting Platforms act as publishers of third-party content" protected by the CDA "when they post listings" for unregistered rentals.  *Id.* at 8-9.  But if platforms receive compensation for their services when bookings occur, the City asserts it can punish and effectively ban such services for any listings it deems unlawful because it contends the sites then are not acting as publishers.  *Id.* at 11 (asserting that the "source of potential liability" is the "Hosting Platforms' affirmative acts outside of their role as publisher").

The City cites no case holding that a state may evade Section 230 and impose liability on websites if they receive fees for transactions between third parties using their services.  The City also offers no authority for its assertion that services offered by websites to enable sales of products or services between users can be divorced from publishing third-party content and providing a forum for users to connect, which is the heart of the services such websites provide.  That the City offers no authority is not surprising, as its theory is contrary to the extensive law interpreting Section 230 and would severely undermine the statute's purpose to protect e-commerce.

    1.    **The Ordinance Attacks Publication and Transaction Services and Would Directly Undermine the CDA's Promotion of E-Commerce**

Section 230's "'broad immunity'"[1] applies not just to defamation or other claims targeting

---

[1] The City claims the Ninth Circuit has "applied the CDA significantly more narrowly" than other courts.  Opp. 6.  This is groundless.  The Ninth Circuit repeatedly has emphasized the CDA's "broad grant of webhost immunity."  *Fair Hous. Council of San Fernando Valley v. Roommates.com, LLC*, 521 F.3d 1157, 1180 (9th Cir. 2008) (en banc); *Perfect 10, Inc. v. CCBill LLC*, 488 F.3d 1102, 1118 (9th Cir. 2007) (same).  Relying on *Barnes v. Yahoo!, Inc.*, 570 F.3d 1096 (9th Cir. 2009), the First Circuit recently held that this "broad construction accorded to section 230 as a whole has resulted in a capacious conception of what it means to treat a website operator as the publisher or speaker" under the CDA.  *Jane Doe No. 1 v. Backpage.com, LLC,* 817 F.3d 12, 19 (1st Cir. 2016).

content on its face, but "to '*all claims stemming from* [a website's] publication of information created by third parties.'" *Goddard v. Google, Inc.,* 2008 WL 5245490, at *2 (N.D. Cal. Dec. 17, 2008) (quoting *Doe v. MySpace, Inc.*, 528 F.3d 413, 418 (5th Cir. 2008)) (emphasis in original).  As shown before, the CDA protects online marketplaces for allowing users to list and offer products or services *as well as* for liability for online transactions.  Such transactions derive from and are intertwined with websites' role as publishers—"sales made by a third party are considered information for purposes of the CDA," as they are "facilitated by communication for which" the site "may not be held liable under the CDA." *Inman v. Technicolor USA, Inc*., 2011 WL 5829024, at *7 (W.D. Pa. Nov. 18, 2011); *see Hill v. StubHub, Inc.*, 727 S.E.2d 550, 563 (N.C. App. 2012); *Stoner v. eBay Inc.*, 2000 WL 1705637, at *2-3 (Cal. Super. Ct. Nov. 1, 2000); Mot. 12-14 & n.14.

As the case law makes clear, the services Plaintiffs provide to hosts and guests to book rental transactions with each other are components of their overall services in publishing listings and providing forums for third parties to connect.  Plaintiffs provide booking and payment services only for listings that appear on their sites; they do not offer such services generically or separate from the listings they publish.  These services—and the charges for the services—are no different from those offered by countless other websites that provide forums for third-party transactions.  StubHub and eBay, for example, offer payment-processing services for third-party ticket and product sales.

The City's effort to parse platforms' publishing functions is difficult to understand, if not unintelligible.  The City admits that under the CDA, "you cannot hold a website liable *for the underlying third-party transaction* because it provides some broker services" or "allow[s] the third party transactions to occur."  Opp. 12, 13 (emphasis in original).  Still, it argues, this "says nothing about whether" the City could "pass a law prohibiting the website from offering those services in connection with illegal sales." *Id*.  But this is exactly what Section 230 proscribes.  States cannot pass laws imposing liability on websites based on third-party content.  47 U.S.C. § 230(e)(3).

Courts have rejected similar efforts to divorce a website's publisher functions from its alleged "participation" in unlawful third-party transactions.  For example, the court in *Hill* held StubHub immune from liability under a state law prohibiting ticket scalping and limiting ticket broker fees.  Although the plaintiffs claimed they challenged only StubHub's "business model,"

including that it "handl[ed] the mechanics required to complete the transaction" and charged a fee

for such services, the court held Section 230 preempted the claims.  727 S.E.2d at 562.  Similarly,

the court in *Stoner* rejected an attempt to "hold eBay responsible" for third-party sales of bootleg

recordings on its site, alleging that it violated California Penal Code § 653h, which prohibits

"caus[ing] the sale or resale" of contraband recordings, *id*. § 653h(d).  The plaintiff characterized his

claims as challenging eBay's "active participa[tion] in the sale of auctioned goods and services,"

including by offering "payment services, for which additional fees are charged."  2000 WL 1705637,

at *2.  In *Gentry v. eBay, Inc.*, 99 Cal. App. 4th 816 (2002), the court rejected claims seeking to hold

eBay liable under state law for not providing a certificate of authenticity for autographed sports

collectibles.  Here too, the plaintiffs alleged they were challenging eBay for its "independent duty

under the statute," not as a publisher, but the court rejected the claims because they would

"ultimately … trea[t] it as the publisher."  *Id*. at 831-33.

Contrary to the City's view, there is no difference between "allowing" transactions—which

the City admits is protected—and offering "services" that are part and parcel of such transactions—

which the City claims it may criminalize without running afoul of Section 230.  Under the City's

logic, it could pass a law penalizing StubHub or eBay for allowing third parties to complete sales of

tickets or products through their websites (and charging for their services) if the City decides to

treat the sales as unlawful.  Then, as here, it could say it is not seeking to prohibit online *publishing*,

it is only seeking to punish the websites supposedly for acting as "direct market participant[s]."[2]

Opp. 13.  Yet saying that Hosting Platforms can publish whatever third-party listings for

transactions they want, but those transactions can never occur—or, if they do, will expose the

platforms to criminal liability—is a meaningless distinction without a difference.  The case law

does not permit such a transparent attempt to evade the broad immunity of the CDA, and if adopted,

the City's approach would undermine one of its key purposes—"to promote the development of

e-commerce."  *Batzel v. Smith,* 333 F.3d 1018, 1027 (9th Cir. 2003); *see Stoner*, 2000 WL 1705637,

---

[2] In any event, Hosting Platforms are not parties to the transactions between guests and hosts; they
provide listing and associated booking and payment services to users.  Owen Decl. ¶¶ 3-7 & Ex. 1 at
3; Furlong Decl. ¶¶ 3-4 & Ex. B at 2; Ordinance § 41A.4 (platforms provide Booking Services for
"transaction[s] between an Owner or Business Entity and a prospective tourist or transient user").

1   at *3 ("principal objective" of CDA "is to encourage commerce over the Internet by ensuring that

2   [sites] are not held responsible for how third parties use their services").

3          Finally, the City's assertion that this case is somehow different because the City as a

4   "government entity" seeks to directly regulate online transactions (Opp. 13) is directly contrary to

5   the law under Section 230.  Courts repeatedly have rejected the City's suggestion that if states pass

6   laws specifically prohibiting protected publisher activity that somehow evades the reach of the CDA.

7   In the *Backpage.com* cases, the states of Washington, Tennessee and New Jersey enacted laws

8   requiring websites to screen escort ads to ensure they were not illegal, and courts in all three states

9   held Section 230 preempted the laws because they were "directly aimed at online service providers"

10  and "would encourage websites either to restrict speech" or "undermine[] Congress's goal of self-

11  policing."  *Backpage.com, LLC v. McKenna*, 881 F. Supp. 2d 1262, 1274 (W.D. Wash. 2012); *see*

12  *also Backpage.com, LLC v. Cooper*, 939 F. Supp. 2d 805, 824-25 (M.D. Tenn. 2013);

13  *Backpage.com, LLC v. Hoffman*, 2013 WL 4502097, at *5-7 (D.N.J. Aug. 20, 2013).

14                **2.     The Ordinance Regulates Fees Received for Publishing Conduct**

15         As Plaintiffs demonstrated, the CDA prohibits imposing liability on websites for charges to

16  third parties, and, in many instances Plaintiffs' fees for bookings between users through their

17  websites *is* the compensation they receive for publishing listings and providing a forum.  *See* Mot.

18  4-5; 14-16.  Here again, the City admits that the CDA "prohibits regulation or imposition of liability

19  based on a website's receipt of funds for its publishing activities."  Opp. 14.  The City suggests,

20  however, that it can draft around the CDA here as well—stating that "Hosting Platforms are free to

21  charge a fee for posting a listing (even a listing for an unregistered unit) on their websites," but

22  cannot "collect a fee for providing booking services for an unregistered unit."  *Id.*

23         Again, the CDA does not permit efforts to separate websites' publishing functions from the

24  fees charged for their services.  Moreover, no court has ever held that Section 230 allows state

25  authorities to dictate how websites charge for their services—yet the City argues that it can direct

26  that websites can charge fees for online users to post listings but cannot charge for users to complete

27  transactions.  The CDA also precludes the City from regulating or imposing liability based on the

28  "construct and operation" of websites.  *Universal Commc'n Sys., Inc. v. Lycos, Inc.*, 478 F.3d 413,

422 (1st Cir. 2007). The City fails to rebut Plaintiffs' showing that the Ordinance attacks Hosting Platforms' operation and structure, including their decisions as to the best manner to allow third-party content to flourish (such as the absence of upfront fees for listings). *See* Mot. 19-20 n.10; Owen Decl. ¶¶ 8-9; Furlong Decl. ¶ 4. The City's approach would undermine Congress's intent to encourage websites to devise and offer new models to users. According to the City, it can freeze the functionality offered by platforms to be nothing more than the equivalent of online classified ads, while prohibiting them from providing transaction services to users. The CDA bars this.[3]

### 3. The Ordinance Requires Platforms to Review and Screen Content

The City admits the Ordinance requires Hosting Platforms to review listings. Opp. 14 ("it is true" that "Platforms may, at some point, have to determine if a unit is lawfully registered"). Yet it claims Section 230 does not apply because a platform need not "remove or alter" listings—it just may not provide Booking Services. *Id.* at 15. *Any* requirement, however, to monitor or review content triggers the CDA. *See* Mot. 18; *Barnes*, 570 F.3d at 1102 ("publication involves reviewing" content); *Green v. AOL*, 318 F.3d 465, 471 (3d Cir. 2003) ("decisions relating to the monitoring" of "content" are "quintessentially related to a publisher's role"). The City's contrary view has no legal basis. *See Stoner,* 2000 WL 1705637, at *3 ("Congress intended to remove any legal obligation of interactive computer service providers to attempt to *identify* or *monitor the sale of such products*") (emphasis added); *Fields v. Twitter, Inc.,* 2016 WL 4205687, at *5, 8 (N.D. Cal. Aug. 10, 2016) (claim allegedly based on provision of Twitter accounts, not the "contents" of or "failure to remove tweets," "effectively require[d]" monitoring in violation of CDA).

Moreover, the City does not dispute that the law, in practice, would require platforms to pre-screen listings and remove unverified listings, given the delays and confusion caused by listings guests could not book immediately (to allow time for the verification step) or at all (if the listing cannot be verified as registered). Mot. 19; Owen Decl. ¶¶ 23-26; Furlong Decl. ¶¶ 13-14. In

---

[3] The City's repeated references to Airbnb's purported valuation and alleged profits are both speculative, and at any rate, irrelevant. Under the CDA, the "fact that a website elicits online content for profit is immaterial." *Goddard,* 2008 WL 5245490, at *3; *see also Levitt v. Yelp! Inc.*, 2011 WL 5079526, at *8 (N.D. Cal. Oct. 26, 2011), *aff'd,* 765 F.3d 1123 (9th Cir. 2014) (rejecting "intent-based exception" to CDA immunity including, e.g., website's "financial considerations").

analyzing preemption, the Court must examine how the law operates in fact, not how the City characterizes it.  *See infra* at 8.  Here, the law would in fact impermissibly require platforms to monitor, and effectively screen and remove, listings, spending substantial resources and significantly modifying their websites.  Mot. 19; Owen Decl. ¶¶ 17, 19-20, 23-26; Furlong Decl. ¶¶ 13-14.[4]

### 4.    Courts Reject Efforts to Evade Section 230 Immunity

The City is not the first to try to evade the CDA by claiming it regulates non-publisher functions.  *See MySpace,* 528 F.3d at 419 (rejecting effort to recast claim as involving non-publisher conduct as "artful pleading" and "disingenuous"); *Goddard*, 2008 WL 5245490, at *4 ("[C]ourts repeatedly have rejected attempts to recharacterize claims" to "avoid § 230's bar on 'treat[ing] [a website] as a 'publisher''").  As the Ninth Circuit recently held, courts reject "artful skirting of the CDA's safe harbor provision" because it "cannot be the case that the CDA and its purpose of promoting the 'free exchange of information and ideas over the Internet' could be so casually eviscerated."  *Kimzey v. Yelp! Inc.*, __F.3d__, 2016 WL 4729492, at *2, 4 (9th Cir. Sept. 12, 2016).

Thus, just as the City claims it regulates platforms' "affirmative acts outside their role as publisher" (Opp. 11), in *Jane Doe No. 1 v. Backpage.com, LLC*, which the City ignores, the plaintiffs challenged a website's "'affirmative course of conduct'" allegedly "amount[ing] to participation in sex trafficking," including the site's "acceptance of anonymous payments" and "lack of phone number verification" for ads.  817 F.3d at 20.  The First Circuit rejected the description of such features as "distinct from the exercise of the 'traditional publishing or editorial functions,'" as they were "part and parcel of the overall design and operation of the website" and thus were protected "editorial choices."  *Id*. at 20-21; *see also Fields*, 2016 WL 4205687, at *5, 7 (following *Jane Doe*, applying CDA and rejecting claims "not based on 'the contents of tweets, the issuing of tweets, or the failure to remove tweets,'" but "provision of Twitter accounts to ISIS").

---

[4] The City asks why the CDA protects Booking Services, whereas under "a law prohibiting travel agents from receiving a fee for booking clients into a hotel that lacked a proper certificate of occupancy," a travel agent would not be protected.  Opp. 9.  As the City notes, travel agents are not online marketplaces or "publishers."  *Id.*  "[A]ny analogy between activities in the bricks and mortar (traditional, non-Internet) world and the Internet world will fail because Congress has distinguished the activities of the two."  *Optinrealbig.com, LLC v. Ironport Sys., Inc.,* 323 F. Supp. 2d 1037, 1045 (N.D. Cal. 2004) (citing *Batzel*, 333 F.3d at 1020 (laws "apply differently in cyberspace")).

The Supreme Court, too, has rejected efforts to avoid preemption through wordplay.  "Pre-emption is not a matter of semantics.  A State may not evade the pre-emptive force of federal law by resorting to creative statutory interpretation or description at odds with *the statute's intended operation and effect*."  *Wos v. E.M.A. ex rel. Johnson*, 133 S. Ct. 1391, 1398 (2013) (emphasis added).  If it could, this "would make a mockery" of preemption.  *Id.*  The Court must evaluate "what the state law in fact does, not how the litigant might choose to describe it."  *Id.*  In *National Meat Ass'n v. Harris*, 132 S. Ct. 965 (2012), for example, the Court held that a federal law barring state "[r]equirements … with respect to [slaughterhouse] premises, facilities and operations" preempted a California law prohibiting slaughterhouses from selling meat from certain animals for human consumption.  *Id.* at 969-70.  California claimed its law did not regulate slaughterhouse activities but the type of meat that could be sold after butchering.  *Id.* at 972-73.  The Court rejected this argument; otherwise, "any State could impose any regulation on slaughterhouses just by framing it as a ban on the sale of meat produced in whatever way the State disapproved."  *Id.*

So, too, here.  The City indisputably intended the operation and effect of the Ordinance to be the same as the original one—to "hold[] the hosting platforms accountable" for user listings.  Blavin Decl., Ex. J at 1; *see id.*, Ex. C at 1 (Supervisor Campos: the amendments made "very few set of modest revisions," and "intent" remains same); Mot. 6-9.  The Court should reject this attempt to "casually eviscerate[]" CDA immunity, *Kimzey*, 2016 WL 4729492, at *2, 4, and undermine a key purpose of the law, "to promote the development of e-commerce," *Batzel*, 333 F.3d at 1027.

### 5.      The Authority the City Cites Is Inapposite

The City cites no case to support its theory and instead focuses on a few cases that have denied websites Section 230 immunity (Opp. 6-11) on grounds that are irrelevant here.

For example, this case concerns the treatment of Hosting Platforms as "publishers or speakers" of user content, *not* whether platforms develop third-party content—indeed, the City acknowledges that third-party hosts, not platforms, are the content providers (*id.* at 8).  Yet two of the cases the City relies on (*see id.* at 7-10) discuss exactly that.  In *Roommates*, the Ninth Circuit partially denied immunity to a website that *required* subscribers to identify their sex, sexual orientation, and family status, and to indicate such preferred characteristics in potential roommates,

"as a condition of using its services," because those actions rendered it "an information content provider" for CDA purposes.  488 F.3d at 1164.[5]  Similarly, the court in *Anthony v. Yahoo Inc.,* 421 F. Supp. 2d 1257 (N.D. Cal. 2006), found the CDA inapplicable because the plaintiff "allege[d] that Yahoo! *creates* false profiles," making it "an 'information content provider' itself."  *Id*. at 1262-63.

Nor does this case concern an attempt to impose liability on a website based on an independent duty it has undertaken.  Thus, cases like *Barnes* (*see* Opp. 7) are also distinguishable. "Read as broadly as possible, *Barnes* stands for the proposition that when a party engages in conduct giving rise to an independent and enforceable contractual obligation, that party may be 'h[eld] ... liable [not] as a publisher or speaker of third-party content, but rather as a counter-party to a contract, as a promisor who has breached.'"  *Goddard*, 640 F. Supp. 2d at 1199 (quoting *Barnes*, 570 F.3d at 1107).  The City does not claim Hosting Platforms made, much less breached, any promise, with respect to third-party content.  *Id*. at 1200-01 (*Barnes* inapplicable where "there is no allegation that Google ever promised Plaintiff or anyone else, in any form or manner, that it would" remove content); *Fields*, 2016 WL 4205687, at *7 (*Barnes* inapplicable where plaintiffs "assert no theory based on contract liability and allege no promise made or breached by Twitter").

*Doe v. Internet Brands, Inc.*, 824 F.3d 846 (9th Cir. 2016), is similarly inapposite.  There, the plaintiff sought "to hold Internet Brands liable for failing to warn her about information it obtained from an outside source about how third parties targeted and lured victims through" its website.  *Id*. at 851.  The plaintiff did "not claim to have been lured by any posting that Internet Brands failed to remove" and the site was "not alleged to have learned of the predators' activity from any monitoring of postings on the website, nor [was] its failure to monitor postings at issue."  *Id*.  Thus, the duty to warn "would not require [it] to remove any user content or otherwise affect how it publishes or monitors such content."  *Id*.  In contrast, the Ordinance indisputably requires Hosting Platforms to monitor, verify, and effectively screen and block, third-party content.  *See* Mot. 16-20; *supra* at 6-7; *see also Fields*, 2016 WL 4205687, at *7-8 (unlike *Internet Brands*, plaintiffs' claims would

---

[5] *Roommates* "turned entirely on the website's decision to *force* subscribers to divulge the protected characteristics and discriminatory preferences,'" and thus "carved out only a narrow exception" to CDA immunity.  *Goddard v. Google, Inc.*, 640 F. Supp. 2d 1193, 1198-99 (N.D. Cal. 2009).

1   "significantly affect Twitter's monitoring and publication of third-party content").[6]

2        Finally, the City emphasizes its policy objectives.  But "Congress did not sound an uncertain

3   trumpet when it enacted the CDA, and it chose to grant broad protections to internet publishers."

4   *Jane Doe*, 817 F.3d at 29.  If the alleged harms the City has "identified are deemed to outweigh" the

5   "values that drive the CDA, the remedy is through legislation, not through litigation."  *Id.*

6        **B.**     **The Ordinance Violates the First Amendment**

7        **1.**     **The Ordinance Must Satisfy Heightened Scrutiny**

8        As Plaintiffs explained (Mot. 20-22), because the Ordinance imposes a content-based

9   restriction on speech, it is subject to heightened scrutiny under the First Amendment.  The City

10   argues *no* scrutiny is warranted because the Ordinance targets conduct, not speech, and the speech,

11   if any, is not protected by the First Amendment.  The City is wrong.

12        The City claims the First Amendment does not apply because the Ordinance imposes liability

13   only if a platform "collects a fee" for providing "booking services for an illegal transaction."  Opp.

14   16.  Not so.  The First Amendment unquestionably applies even if a speaker receives payment.  Mot.

15   22; *see Simon & Schuster, Inc. v. Members of N.Y. St. Crime Victims Bd.*, 502 U.S. 105, 118 (1991).

16        Nor can the City evade the First Amendment by creating an artificial distinction between

17   fees for "Booking Services" and fees for publication of rental listings.[7]  Free speech protections

18   apply when conduct is "intertwined with" speech, *Village of Schaumburg v. Citizens for a Better*

19   *Env't*, 444 U.S. 620, 632 (1980); the regulation "reduc[es] the total quantum of speech," *Meyer v.*

20   *Grant*, 486 U.S. 414, 423 (1988); or the regulation "in its practical operation … imposes a burden

21   based on the content of speech," *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 567 (2011).  Put

---

22   [6] Similarly, in *Nunes v. Twitter*, 2016 WL 3660526 (N.D. Cal. July 1, 2016), the court rejected the

23   CDA's application to a TCPA claim alleging Twitter sent unwanted text messages, as the claim did

24   "not depend on the content of any tweet, or on any assertion that Twitter is required to sift through
content to make sure the content is not bad."  *Id.* at *8.  The Ordinance requires platforms to do
exactly that.  *See* Mot. 16-20; *supra* at 6-7.  In *City of Chicago v. Stubhub!, Inc.*, 624 F.3d 363 (7th

25   Cir. 2010), the court refused to apply the CDA to an ordinance requiring sales agents to collect a tax
on all ticket resales; the tax had "nothing to do with the content of any speech (the City's tax is the

26   same whether the theater is performing 'South Pacific' or 'Hair')," and the effort to collect taxes did
"not depend on who 'publishes' any information or is a 'speaker.'"  *Id.* at 365.  But here, the portion

27   of the Ordinance that Plaintiffs challenge depends entirely on the content of third-party speech.

28   [7] In fact, Plaintiffs' fees *do* fund their publication of listings.  Owen Decl. ¶¶ 8-9; Furlong Decl. ¶ 4.

differently, "although it may be possible to find some kernel of conduct in almost *every* act of expression, such kernel of conduct does not take … speech … outside the protection of the First Amendment." *Bartnicki v. Vopper*, 200 F.3d 109, 120 (3d Cir. 1999), *aff'd*, 532 U.S. 514 (2001). This is particularly so given that the Ordinance has "the inevitable effect of singling out those engaged in expressive activity." *Doe v. Harris*, 772 F.3d 563, 573-74 (9th Cir. 2014); *see also Minneapolis Star & Tribune Co. v. Minn. Comm'r of Revenue*, 460 U.S. 575, 581-82 (1983) (tax on buying ink invalid where targeted at protected speakers). The City has clearly "singl[ed] out" platforms, which publish listings and as the City admits are "usually" websites. Ordinance § 41A.4.

The City next argues the First Amendment does not apply because the Ordinance only burdens "illegal and misleading speech." Opp. 18-19. As applied to Hosting Platforms, this argument is wrong. "The *third-party publication* of offers to engage in illegal transactions does not fall within 'well-defined and narrowly limited classes of speech' that fall outside of First Amendment protection." *McKenna*, 881 F. Supp. 2d at 1281 (emphasis added). This is because it often is not possible for a publisher to determine from the face of an ad whether it proposes a lawful transaction. *See Braun v. Soldier of Fortune Magazine, Inc.*, 968 F.2d 1110, 1117-18 (11th Cir. 1992) (First Amendment scrutiny required unless "the ad on its face" is unlawful); *News & Sun-Sentinel Co. v. Bd. of Cnty. Comm'rs*, 693 F. Supp. 1066, 1072 (S.D. Fla. 1987) (government "must bear the cost of distinguishing" lawful from unlawful ads). Thus, platforms' publication of allegedly unlawful listings is not *per se* unprotected.

Moreover, the Ordinance burdens a significant amount of *legal* speech. Some short-term rentals are permissible. Platforms must spend significant time and resources to verify that each property is "lawfully registered." And as Plaintiffs showed—and the City does not dispute—the practical effect of the Ordinance will be that they must screen and remove listings, including lawful ones. *See* Mot. 19, 29; Owen Decl. ¶¶ 19, 23-25; Furlong Decl. ¶¶ 13-14.

The cases the City relies on (Opp. 19) are inapposite: they involve ads that were unlawful *on their face*, or the regulation of direct sellers (rather than third-party publishers), or both. *See Pittsburgh Press Co. v. Pittsburgh Comm'n on Human Relations*, 413 U.S. 376, 388 (1973) (newspaper itself separated job listings into "male" and "female" categories, rendering ads "overtly

discriminatory"); *Flytenow, Inc. v. FAA*, 808 F.3d 882, 894 (D.C. Cir. 2015) ("pilots advertising their services" on plaintiff's website, not the site itself, faced liability); *United States v. Williams*, 553 U.S. 285, 297 (2008) (defendant himself offered to sell child pornography).[8]

### 2.    The Ordinance Fails Heightened Scrutiny

The City argues that if the Ordinance is subject to First Amendment scrutiny, it nonetheless survives.  But here again, the City misunderstands and misapplies the law.

As Plaintiffs noted (Mot. 22), content-based laws are "presumptively unconstitutional."  The City disputes this by arguing that *Reed v. Town of Gilbert*, 135 S. Ct. 2218 (2015), did not involve commercial speech.  Opp. 20.  But as the Supreme Court noted in *Sorrell*, it is "all but dispositive to conclude that a law is content-based" and "[t]he outcome is the same whether a special commercial speech inquiry or a stricter form of judicial scrutiny is applied."  564 U.S. at 571.  The City also claims the Ordinance is subject to intermediate scrutiny under *Central Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n*, 447 U.S. 557 (1980).  Opp. 20.  But "*Sorrell* modified the *Central Hudson* test."  *Retail Digital Network, LLC v. Applesmith*, 810 F.3d 638, 648 (9th Cir. 2016).  Under *Sorrell*, "the government bears a heavier burden of showing that the challenged law 'is drawn to achieve [the government's substantial] interest.'"  *Id.*; *accord CTIA-The Wireless Ass'n v. City of Berkeley*, 158 F. Supp. 3d 897, 900-01 (N.D. Cal. 2016) (*Sorrell* requires "more than intermediate scrutiny").

Under any standard, the Ordinance cannot survive First Amendment scrutiny.  As the City admits, it can and does enforce its short-term rental laws directly against hosts.  The City asserts this is insufficient because it "cannot ascertain [from] public information" hosts' names, addresses, or registration statuses.  Opp. 21.  This not only contradicts the City's own representations that it *can* police short-term rentals, but also provides no basis for the broad-based speech restrictions in the Ordinance, which would effectively impose policing and enforcement obligations on websites.

First, the City has admitted it can "identify San Francisco short-term rental hosts who are out of compliance" and is "taking many steps to improve enforcement."  Blavin Decl., Ex. G at 21.  In

---

[8] The City also cites *Senate Permanent Subcommittee v. Ferrer*, ___ F. Supp. 3d ___, 2016 WL 4179289 (D.D.C. Aug. 5, 2016), but that case is even further afield:  it involved a defendant's alleged failure to fully "search for responsive documents[]" after receiving a subpoena.  *Id.* at *11.

1   fact, as of this month, the City has assessed about *$1 million* in fines against non-compliant hosts.

2   Supp. Blavin Decl., Ex. A at 2.  The sharp increase in fines—$300,000 in the last seven months,

3   Blavin Decl., Ex. G at 21—may well be attributable to the fact the OSTR only became fully staffed

4   in December 2015, a move the City anticipated would aid enforcement.  *Id.*[9]

5          Second, even if the City feels its *existing* short-term rental regulations need revision to

6   enhance enforcement, it could take other steps short of restricting speech.  As Plaintiffs noted (Mot.

7   23), the City can encourage compliance by simplifying the registration process because the current

8   scheme, as the City admits, "might deter or confuse otherwise compliant short-term rental hosts."

9   Blavin Decl., Ex. G at 26.  The City can increase compliance with short-term rental laws through

10  education campaigns, as it also concedes.  Indeed, it attributes an "uptick in registration applications

11  between November 2015 and March 2016" partly to the City's own notification efforts.  Opp. 4 n.2.

12         Third, if the City believes it needs additional information about hosts with allegedly unlawful

13  listings, it may obtain the information by way of a lawful subpoena or court order.  *See* Ordinance

14  § 41A.7(b)(2) (granting OSTR subpoena power); 18 U.S.C. §§ 2702(c), 2703(d) (Stored

15  Communications Act).

16         Thus, the City has multiple avenues to enforce its laws without restricting speech.  Although

17  it may be more "convenient" or politically palatable to target platforms instead of hosts, *Thompson*

18  *v. W. States Med. Ctr.*, 535 U.S. 357, 373 (2002), this is insufficient, for the City may restrict speech

19  only as a "last resort," *Valle Del Sol Inc. v. Whiting*, 709 F.3d 808, 826 (9th Cir. 2013).[10]

20                    **3.       The Ordinance Is Invalid Because It Has No Scienter Element**

21         The City does not dispute that when the government imposes penalties on publishers for the

22  dissemination of information, it cannot do so without proof of scienter, and that the Ordinance

23  contains no such requirement.  The City's arguments that the law is nonetheless valid are meritless.

24  ---

[9] The City claims Airbnb "affirmatively frustrated" enforcement by "eliminating the field allowing

25  hosts to post their registration numbers."  Opp. 22.  But Airbnb expressly informs hosts to include
    permit numbers on their listings and the specific field where to do so.  *See* Owen Decl. ¶ 13 & Ex. 3

26  ("In the 'Other Things to Note' field, type in your permit number …. The format is: STR-xxxxxxx").

27  [10] The City attempts to distinguish *Thompson*, *Valle Del Sol*, and the other cases Plaintiffs cited on
    the basis that they concern speech, not conduct.  Opp. 22-23.  But this is just a reprise of Plaintiffs'

28  (meritless) argument that First Amendment scrutiny is not required at all.  *Supra* at 10-12.

First, the City argues Plaintiffs' claims are "premature" because they have not shown they "face[] a reasonable risk of prosecution … without actual knowledge of the host's booking status." Opp. 24.  But undisputedly, the City intends to enforce the law, and Plaintiffs do not generally know whether a listing is lawful, *see* Owen Decl. ¶¶ 17, 19, Furlong Decl. ¶ 13, so enforcement will have that effect.  Regardless, courts routinely decide pre-enforcement challenges to speech restrictions that lack a scienter element.  *See, e.g.*, *Cooper*, 939 F. Supp. 2d at 818.

Second, the City suggests banning fees for Booking Services is akin to banning "sex payment[s]" accepted by a pimp engaged in underage sex trafficking—and that a ruling in Plaintiffs' favor here would prohibit "criminalizing online pimping of underage sex trafficking."  Opp. 25.  This sensational analogy is absurd.  The government can outlaw short-term rentals, just as it may ban underage sex trafficking.  But the First Amendment prohibits the government, absent proof of scienter, from punishing a *platform* that hosts speech simply because some speakers may misuse it, whether to promote allegedly unlawful rentals or prostitution.

Finally, the City claims the Court can "impute" a scienter requirement into the Ordinance. Opp. 25.  But a court "may not … 'rewrite' [a] statute to save it, and any narrowing construction of a state statute adopted by a federal court must be a 'reasonable and readily apparent' gloss on the language."  *Planned Parenthood of Idaho, Inc. v. Wasden*, 376 F.3d 908, 925 (9th Cir. 2004).[11]

The absence of scienter is compounded by the vagueness of the phrases "lawfully" registered and "at the time it is rented."  Mot. 26.  The City says "lawfully registered" means "registered" (rendering "lawfully" superfluous) and at "the time [it] is rented" means at "the time [it is booked]."  Guy Decl. ¶¶ 12-13.  But courts do "not uphold an unconstitutional statute merely because the Government promise[s] to use it responsibly."  *United States v. Stevens*, 559 U.S. 460, 480 (2010).

### C.   The Other Preliminary Injunction Factors Favor an Injunction

Absent an injunction, Plaintiffs will suffer irreparable harm, and the balance of equities and

---

[11] The City's reliance on *United States v. X-Citement Video* is inapposite: the statute there made it illegal to "knowingly transport[] … any visual depiction, if ... the producing of such visual depiction involves the use of a minor engaging in sexually explicit conduct," and the Court held Congress intended to apply "knowingly" not only to the act of transporting but also to the age of the person depicted.  513 U.S. 64, 75-78 (1994).  In contrast, the Ordinance contains no knowledge element.

1    public interest favor an injunction.  As Plaintiffs explained (Mot. 27-28), the loss of First

2    Amendment freedoms and threat of prosecution under a preempted law constitute irreparable harm.

3    The City does not dispute this.  Irreparable harm also exists due to the disruption to Plaintiffs'

4    businesses.  Mot. 28-29.  The City does not dispute this either, except to say Plaintiffs could just

5    comply with the Ordinance.  Opp. 26.[12]  But as Plaintiffs explained (Mot. 28-29), this would force

6    them to restructure their websites and incur significant costs, entail substantial delays in the booking

7    process, and effectively require the screening and removal of thousands of third-party listings

8    (including listings for lawful rentals), risking customer goodwill.  This is irreparable harm.

9         The City also pays scant attention to the balance of equities and public interest, arguing that

10   the Ordinance serves important government interests.  Opp. 27-28.  But again, it is in the public

11   interest to enforce the Constitution—here, the First Amendment and the Supremacy Clause.  Mot.

12   29-30.  The City fails to rebut this or explain why its interests trump the Constitution.

13        **D.**    **The Court Should Not Require an Injunction Bond**

14        The City argues that if the Court grants the Motion, it must order Plaintiffs to post a bond.

15   Opp. 28-29.  But "'Rule 65(c) invests the district court with discretion as to the amount of security

16   required, *if any*.'"  *Johnson v. Couturier*, 572 F.3d 1067, 1086 (9th Cir. 2009) (emphasis in

17   original).  And courts generally do not require bonds for injunctions based on constitutional claims,

18   especially when, as here, Plaintiffs have shown a high likelihood of success on the merits.  *See Baca*

19   *v. Moreno Valley Unified Sch. Dist.*, 936 F. Supp. 719, 738 (C.D. Cal. 1996).  Nor do courts require

20   bonds where, as here, the defendant will suffer no damages.  *See id.*

21   **III.**    **CONCLUSION**

22        For these reasons and those discussed in the Motion, the Court should grant the injunction.

23
24   [12] The City focuses on Airbnb's nondiscrimination policy to suggest it could remind hosts about San
     Francisco law and verify listings.  Opp. 26-27.  But Plaintiffs already require hosts to comply with

25   local laws (Mot. 4), and the nondiscrimination policy, while important, does not require Airbnb to
     screen every listing.  In addition, this is a platform-wide initiative that implements the company's

26   own standards on its users around the world.  The argument that Airbnb therefore can and should
     implement the City's local regulations—and by implication, the specific laws of the thousands of
     cities in which it operates—is not only inapposite, it underscores precisely the kind of burdens that

27   Congress sought to prevent with the CDA.  Further, the City's claim Airbnb's voluntary step to fight
     discrimination justifies holding it responsible for third-party listings flies in the face of the CDA's

28   protection for voluntary "Good Samaritan" efforts by websites to self-regulate.  47 U.S.C. § 230(c).

DATED:  September 26, 2016

MUNGER, TOLLES & OLSON LLP
    JOHN W. SPIEGEL
    JONATHAN H. BLAVIN
    ELLEN M. RICHMOND
    JOSHUA PATASHNIK

By:  */s/ Jonathan H. Blavin*
    JONATHAN H. BLAVIN
Attorneys for Plaintiff Airbnb, Inc.

DATED:  September 26, 2016

DAVIS WRIGHT TREMAINE LLP
    JAMES C. GRANT
    AMBIKA K. DORAN

By:  */s/ James C. Grant*
    JAMES C. GRANT
Attorneys for Plaintiff HomeAway.com, Inc.

## **FILER'S ATTESTATION**

I, Jonathan H. Blavin, am the ECF user whose identification and password are being used to file this Reply In Support of Joint Motion for Preliminary Injunction.  Pursuant to Civil Local Rule 5-1(i)(3), I hereby attest that the other above-named signatory concurs in this filing.