UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| AIRBNB, INC., et al.,<br><br>　　　　　Plaintiffs,<br><br>　　v.<br><br>CITY AND COUNTY OF SAN FRANCISCO,<br><br>　　　　　Defendant. | Case No. 3:16-cv-03615-JD<br><br>**ORDER RE PRELIMINARY INJUNCTION**<br><br>Re: Dkt. No. 50 |

Plaintiffs Airbnb, Inc. ("Airbnb") and HomeAway, Inc. ("HomeAway") seek a preliminary injunction barring enforcement of a City and County of San Francisco ordinance that makes it a misdemeanor to provide booking services for unregistered rental units. The parties agreed that an evidentiary hearing was not necessary and the Court took oral argument on the motion on October 6, 2016. The injunction is denied on the primary grounds urged by plaintiffs, but further proceedings are warranted on an issue relating to fair enforcement.

**BACKGROUND**

This case arises out of San Francisco's effort to regulate aspects of the "sharing economy" for accommodation rentals. Airbnb is a San Francisco-based company that operates an Internet website through which "guests" can connect with "hosts" to enter into agreements to rent accommodations on a short- or long-term basis. Dkt. No. 50 at 3; Dkt. No. 52 ¶¶ 1, 2. Airbnb does not own, manage or operate any of the host properties, and is not a party to the rental agreements. Dkt. No. 50 at 3; Dkt. No. 52 ¶ 4. It does not charge an upfront fee for hosts to post a listing on its website, and does not run banner ads or other forms of advertising next to the listings. Dkt. No. 52 ¶ 9; Dkt. No. 72 at 18:5-6. Airbnb makes money by charging hosts and guests a service fee that is a percentage based on the cost of the rental. Dkt. No. 52 ¶ 8. Airbnb has been

1   phenomenally successful nationally and internationally since its inception in 2008.  HomeAway
2   also features an Internet website that operates in part on the same business model.  Dkt. No. 72 at
3   4:11-14.

4     An important feature of plaintiffs' websites is that content for the rental listings is driven
5   entirely by hosts.  Dkt. No. 52 ¶ 7; Dkt. No. 72 at 18:13-15.  The posting process is automated and
6   requires the host to fill in some required fields, but plaintiffs do not verify, review or edit the
7   information provided by the host, and do not contribute content of their own to the listing.  Dkt.
8   No. 52 ¶ 7; Dkt. No. 72 at 17:2-25.

9     The ordinance plaintiffs challenge is San Francisco's most recent approach to regulating
10  short-term rentals.  Between 1981 and 2014, San Francisco effectively banned "tourist or
11  transient" rentals out of concerns over losing affordable permanent housing stock.  Dkt. No. 57
12  at 2.  In 2015, San Francisco changed course and enacted Ordinance 218-14, which lifted the ban
13  and provides "an exception for permanent residents to the prohibition on short-term residential
14  rentals under certain conditions."  *Id.*  One of the main conditions is that a host register a residence
15  with San Francisco before making it available as a short-term rental.  *Id.*; Dkt. No. 60-1 Exh. A.
16  Registration requires proof of liability insurance and compliance with municipal codes, usage
17  reporting, tax payments and other conditions.  Dkt. No. 49 ¶¶ 30, 31.  San Francisco also enacted
18  Ordinance 130-15 to create the Office of Short-Term Residential Rental Administration and
19  Enforcement ("OSTR"), which administers the registration and other requirements.  Dkt. No. 57
20  at 3; Dkt. No. 60 ¶ 6.

21    Taken together, these ordinances broke new ground in San Francisco by legalizing short-
22  term rentals of properties that are registered with the OSTR.  Plaintiffs do not challenge Ordinance
23  218-14 or Ordinance 130-15 in any way, and they agree that a residential unit must be lawfully
24  registered before being rented on a short-term basis.  Dkt. No. 72 at 14:21-15:1; *see generally* Dkt.
25  Nos. 50, 64.

26    According to San Francisco, compliance with the registration requirement has been spotty.
27  Dkt. No. 57 at 4.  As of November 2015, for example, San Francisco had received only 1,082
28  short-term rental registration applications while Airbnb listed 5,378 unique short-term rental hosts

2

1   in San Francisco, which points to a registration rate of just 20% even without including
2   HomeAway and other similar services. *Id.*; Dkt. No. 51-7 at 14. By March 2016, the ratio was
3   1,647 registered out of 7,046 listed -- a registration rate of approximately 25%. Dkt. No. 57 at 4;
4   Dkt. No. 51-7 at 14. In April 2016, San Francisco's Budget and Legislative Analyst's Office
5   reported that enforcement of the registration requirement was "hampered by the City's lack of
6   information" because short-term rentals "operate in private residences without any commercial
7   signage posted" and because hosting platforms "do not disclose addresses or booking information
8   about their hosts." Dkt. No. 51-7 at 7.

9   In an apparent response to this situation, San Francisco enacted Ordinance 104-16 (the
10  "Original Ordinance"), which amended Chapter 41A of the Administrative Code. Dkt. No. 51-1.
11  As San Francisco acknowledges, this ordinance directly touched upon content posted on the
12  Internet by imposing requirements designed to prevent the publication of listings for rentals that
13  were not lawfully registered. Dkt. No. 57 at 4. In effect, this ordinance would have required
14  companies like plaintiffs to actively monitor and verify content provided by third-party hosts
15  before publication, at the peril of being held criminally and civilly liable if a listing for an
16  unregistered unit was published on their websites. *See* Dkt. No. 51-1 at 3-5.

17  Promptly after the Original Ordinance was enacted in June 2016, Airbnb filed this lawsuit
18  and moved for a preliminary injunction. Dkt. Nos. 1, 3. HomeAway was granted leave to
19  intervene as a plaintiff. Dkt. No. 35. But as the Court prepared to launch the injunction
20  proceedings, San Francisco requested a stay to allow the Board of Supervisors to consider
21  proposed amendments that might "significantly alter plaintiffs' obligations under San Francisco
22  law." Dkt. No. 31-1; Dkt. No. 36.

23  On August 2, 2016, the Board of Supervisors passed Ordinance 178-16 (the "Ordinance"),
24  which is the law at issue in this lawsuit. Dkt. No. 57 at 4-5; Dkt. No. 58-1 Exh. C. Although
25  styled as an amendment of the Original Ordinance, the Ordinance is significantly different from its
26  predecessor and in practical measure amounts to a new law. Of particular import here, it abandons
27  any requirements or restrictions on the publication of a rental listing. *Compare* Dkt. No. 51-1 at 4
28  *with* Dkt. No. 50-2 at 3-4. The Ordinance makes it a misdemeanor to collect a fee for providing

booking services for the rental of an unregistered unit.  Dkt. No. 50-2 at 3-4.  It became law without the Mayor's signature on August 11, 2016.  Dkt. No. 40 at 1.

The operative terms and definitions of the Ordinance are critical to the resolution of the injunction motion, and deserve close attention.  As an initial matter, the Ordinance defines a "Booking Service" in pertinent part as "any reservation and/or payment service provided by a person or entity that facilitates a short-term rental transaction between an Owner . . . and a prospective tourist or transient user . . . for which the person or entity collects or receives . . . a fee in connection with the reservation and/or payment services."  Dkt. No. 50-2 at 2.  It defines a "Hosting Platform" as a "person or entity that participates in the short-term rental business by providing, and collecting or receiving a fee for, Booking Services."  *Id.*  The Ordinance expressly states that a Hosting Platform includes more than just "an online platform" and encompasses non-Internet based services as well.  *Id.*  Drawing these elements together, the Ordinance permits a Hosting Platform to "provide, and collect a fee for, Booking Services in connection with short-term rentals for Residential Units located in the City and County of San Francisco only when those Residential Units are lawfully registered on the Short Term Residential Rental Registry" at the time of rental.  *Id.* at 3-4.  The OSTR interprets "lawfully registered" to mean that a host has obtained a registration number from the OSTR.  Dkt. No. 60 ¶ 12.  A violation constitutes a misdemeanor punishable by a fine of up to $1,000 and imprisonment for up to six months.  Dkt. No. 50-2 at 2-3.  The Ordinance also imposes reporting and other requirements, but the Booking Service terms and provisions are at the heart of plaintiffs' lawsuit.

On August 17, 2016, San Francisco filed a "Notice of Completion of Amendment Process" and took the position that the litigation should proceed.  Dkt. No. 40.  At a status conference on August 22, 2016, San Francisco agreed to stay enforcement of the Ordinance pending the Court's disposition of plaintiffs' renewed preliminary injunction motion.  Dkt. No. 44.  Plaintiffs jointly filed the renewed motion on September 6, 2016.  Dkt. No. 50.

Plaintiffs challenge the Ordinance on three main grounds:  (1) "preemption" under the Communications Decency Act, 47 U.S.C. § 230 ("CDA"); (2) content-based speech restriction

1  under the First Amendment to the United States Constitution; and (3) imposition of criminal strict
2  liability.  *See generally* Dkt. Nos. 49, 50.

## DISCUSSION

### I. Preliminary Injunction Standards

A "preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011) (quoting *Winter*, 555 U.S. at 20). Our circuit applies a "sliding scale" approach in which "the elements of the preliminary injunction test are balanced, so that a stronger showing of one element may offset a weaker showing of another." *Id.*; *see also Arc of California v. Douglas*, 757 F.3d 975, 983 (9th Cir. 2014). But "at an irreducible minimum," the party seeking an injunction "must demonstrate a fair chance of success on the merits, or questions serious enough to require litigation." *Pimentel v. Dreyfus*, 670 F.3d 1096, 1105-06 (9th Cir. 2012) (internal quotation omitted).

### II. Likelihood of Success on the Merits

#### A. CDA Section 230(c)

Plaintiffs' lead argument is that the Ordinance is preempted by the CDA. Dkt. No. 50 at 10. Section 230(c)(1) of the CDA states that "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." The CDA includes an express preemption clause, which provides that "[n]o cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section." 47 U.S.C. § 230(e)(3).

Our circuit holds that Section 230(c)(1) precludes liability for claims involving "(1) a provider or user of an interactive computer service (2) whom a plaintiff seeks to treat, under a state law cause of action, as a publisher or speaker (3) of information provided by another information content provider." *Doe v. Internet Brands, Inc.*, 824 F.3d 846, 850 (9th Cir. 2016) (internal

5

quotation omitted). There is no dispute in this case that plaintiffs provide an interactive computer service or that the information in their rental listings comes directly and exclusively from third-party users. Consequently, plaintiffs' Section 230 challenge turns on whether the Ordinance "inherently requires the court to treat" them as "the 'publisher or speaker' of content provided by another." *Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1102 (9th Cir. 2009).

Plaintiffs' argument is straightforward. In their view, the threat of a criminal penalty for providing and receiving a fee for Booking Services for an unregistered unit requires that they actively monitor and police listings by third parties to verify registration. Plaintiffs contend that is tantamount to treating them as a publisher because it involves the traditional publication functions of "reviewing, editing, and deciding whether to publish or to withdraw from publication third-party content." *Id.*; *see also Fair Housing Council of San Fernando Valley v. Roommates.com, LLC*, 521 F.3d 1157, 1170-71 (9th Cir. 2008) (en banc) (any activity "that can be boiled down to deciding whether to exclude material that third parties seek to post online is perforce immune under section 230").

But the Ordinance does not threaten the liability plaintiffs fear. As the text and plain meaning of the Ordinance demonstrate, it in no way treats plaintiffs as the publishers or speakers of the rental listings provided by hosts. It does not regulate what can or cannot be said or posted in the listings. It creates no obligation on plaintiffs' part to monitor, edit, withdraw or block the content supplied by hosts. To the contrary, as San Francisco has emphasized in its briefs and at oral argument, plaintiffs are perfectly free to publish any listing they get from a host and to collect fees for doing so -- whether the unit is lawfully registered or not -- without threat of prosecution or penalty under the Ordinance. Dkt. No. 57 at 9; Dkt. No. 72 at 25:20-24. The Ordinance holds plaintiffs liable only for their own conduct, namely for providing, and collecting a fee for, Booking Services in connection with an unregistered unit. Dkt. No. 50-2 at 3; Dkt. No. 57 at 9. This regulation of plaintiffs' own conduct "does not depend on who 'publishes' any information or who is a 'speaker.'" *City of Chicago, Ill. v. Stubhub!, Inc.*, 624 F.3d 363, 366 (7th Cir. 2010) (rejecting Section 230(c) challenge to municipal tax on Internet auction sites).

1 Plaintiffs recognize that the Ordinance is not, on its face, directed to content or speech. Dkt. No. 72 at 8:25-9:11. In an effort to surmount that hurdle, plaintiffs reel off a long list of federal and state cases that have broadly applied Section 230(c). Dkt. No. 50 at 10-18. While it is certainly true that these cases found preemption, they are all readily distinguishable from the facts here. The cases plaintiffs rely on involved claims and regulations that would have imposed liability on the service provider as a publisher or speaker of content supplied by a third party. In *Backpage.com, LLC v. McKenna*, 881 F. Supp. 2d 1262, 1266-68 (W.D. Wash. 2012), for example, the plaintiff was "the second largest online advertising service" in the country, and challenged a Washington state law that made it a felony offense to display content advertising or offering the sexual abuse of a minor. In that circumstance, where the crime expressly consisted of an act of publication, the court had no trouble finding preemption because the state law would necessarily hold Backpage.com liable for publishing advertising content supplied by third parties. *Id.* at 1273. The same result was reached in *Goddard v. Google*, No. C 08-2738 JF (PVT), 2008 WL 5245490 (N.D. Cal. Dec. 17, 2008). The plaintiff there sought to hold Google liable for injuries from "clicking on web-based advertisements" hosted by Google. *Id.* at *1. The court found that "[p]laintiff claims in essence that she was harmed because Google hosted certain online content" and that her claims "would effectively hold Google liable for its publication of third-party content in contravention of § 230." *Id.* at *5. In *Doe v. Backpage.com, LLC*, 817 F.3d 12, 16 (1st Cir. 2016), victims of child sex trafficking sought to hold Backpage.com liable because its "rules and processes governing the content of advertisements are designed to encourage sex trafficking." The First Circuit found that these claims "[w]ithout exception" encompassed Backpage's editorial and publication "decisions about how to treat postings" by third parties, and were therefore precluded. *Id.* at 21-22. In addition, the First Circuit appears to take a more expansive view of Section 230(c) preemption than the Ninth Circuit. And in another case plaintiffs cite involving Backpage.com, the law at issue expressly criminalized the sale of or the offer to sell an advertisement for commercial sexual abuse of a minor. *Backpage.com, LLC v. Cooper*, 939 F. Supp. 2d 805, 816-17 (M.D. Tenn. 2013).

Plaintiffs' other case citations are inapposite for the same reason -- they all turned on facts showing that the service provider would necessarily be held liable as the publisher or speaker of online content provided by another. Much more germane, and of course controlling, are the Ninth Circuit's recent decisions denying preemption under Section 230(c). These cases acknowledge Congress's goals in Section 230(c) "to promote the free exchange of information and ideas over the Internet and to encourage voluntary monitoring for offensive or obscene material," and to preserve the "vibrant and competitive free market" for interactive computer services. *Barnes*, 570 F.3d at 1099-1100 (internal quotation omitted). But they also hold, contrary to plaintiffs' position, that Section 230(c) does not provide limitless immunity for online activity or conduct related to it. Congress enacted Section 230 primarily "to protect websites against the evil of liability for failure to remove offensive content." *Roommates.com*, 521 F.3d at 1174. Section 230(c) does not create "a general immunity from liability deriving from third-party content." *Barnes*, 570 F.3d at 1100; *see also City of Chicago*, 624 F.3d at 366 (same). "To 'provid[e] immunity every time a website uses data initially obtained from third parties would eviscerate [the statute].'" *Barnes*, 570 F.3d at 1100 (quoting *Roommates.com*, 521 F.3d at 1171)(brackets in original).

The correct test, then, is not whether a challenged activity merely bears some connection to online content. It is whether a regulation or claim "inherently requires the court to treat" the "interactive computer service" as a publisher or speaker of information provided by another. *Barnes*, 570 F.3d at 1102. Applying this test, our circuit has denied preemption when a regulation or claim does not turn on holding an Internet service liable for posting or failing to remove content provided by a third party. *Internet Brands*, 824 F.3d at 851 (denying preemption of duty to warn relating to defendant's online practices); *see also Barnes*, 570 F.3d at 1107 (denying preemption of promissory estoppel claim relating to online postings because "Barnes does not seek to hold Yahoo liable as a publisher or speaker of third-party content, but rather as the counter-party to a contract"). So too here, where the challenged Ordinance regulates plaintiffs' own conduct as Booking Service providers and cares not a whit about what is or is not featured on their websites.

Plaintiffs' other main CDA argument draws on a preemption decision far removed from the CDA and Section 230(c). Plaintiffs argue that a 2012 Supreme Court opinion, *National Meat*

8

*Association v. Harris*, 132 S.Ct. 965 (2012), sets a general rule that a preemption analysis must assess the "practical effect" of the challenged ordinance and how it "operates in fact" to determine whether it runs afoul of a bar. Dkt. No. 64 at 8; Dkt. No. 72 at 8:4-12.  In that case, the Supreme Court struck down a California state law that imposed criminal penalties on slaughterhouses for selling products from nonambulatory animals for human consumption. *National Meat*, 132 S.Ct. at 975.  It held that the Federal Meat Inspection Act ("FMIA") broadly preempts state laws that purport to impose any additional or different standards on slaughterhouse facilities or operations, including the handling of nonambulatory animals. *Id.* at 970-71.  The federal statute did not explicitly refer to sales activities, and proponents of the California law tried to avoid preemption by saying it regulated only those practices. *Id.* at 972.  But the Court disagreed.  It held that the "inevitable effect" of the sales ban "is to make sure that slaughterhouses remove nonambulatory pigs" from their operations. *Id.*  Allowing that to stand would "make a mockery of the FMIA preemption provision." *Id.* at 972-73.

Plaintiffs argue that this same reasoning applies here.  While they acknowledge that the Ordinance does not on its face treat them as publishers or speakers of third party content, Dkt. No. 72 at 8:25-9:11, they insist that it will have the practical effect of compelling them to monitor listings and remove postings for unregistered rentals. Dkt. No. 64 at 11; Dkt. No. 72 at 14:6-16.  They point to the sequence of events leading up to the Ordinance as suggestive evidence. Dkt. No. 50 at 6-7.  The Original Ordinance would have treated plaintiffs as liable for content provided by users; San Francisco withdrew that law essentially as a concession that it would not survive review under Section 230(c). *Id.*  The current Ordinance, in plaintiffs' view, is designed to achieve the same impermissible end through indirect means. Dkt. No. 50 at 19; Dkt. No. 64 at 1.

This argument is not well taken.  As an initial matter, plaintiffs raised *National Meat* for the first time in a reply brief, and a case can be made that the Court should decline to consider it for that reason alone. *United States v. Romm*, 455 F.3d 990, 997 (9th Cir. 2006); *FT Travel -- New York, LLC v. Your Travel Center, Inc.*, 112 F. Supp. 3d 1063, 1079 (C.D. Cal. 2015).  The Court addresses it anyway for the sake of completeness and because the risk that plaintiffs have unfairly sandbagged San Francisco is not substantial.

9

Plaintiffs' problem is that they have failed to submit evidence showing that the Ordinance will in fact inevitably or perforce require them to monitor, remove or do anything at all to the content that hosts post. Airbnb says the Ordinance will make screening listings for registration status "very likely" but stops short of saying that it would be a necessity. Dkt. No. 52 ¶ 25. Plaintiffs might indeed voluntarily choose to screen listings, and the facts show that Airbnb already reviews and "discretionarily removes listings" for other reasons. *Id.* ¶ 14. But the Ordinance does not compel that result. It may be equally likely that plaintiffs will consider other measures unrelated to editing user content, such as posting a notice to users that they can provide Booking Services in San Francisco only for units that are lawfully registered and verified as such. *See Internet Brands*, 824 F.3d at 851 (approving warning notice on website). Or they may consider charging fees for publishing listings, rather than for facilitating transactions -- a measure San Francisco concedes is lawful. *See* Dkt. No. 57 at 14 ("Under the Ordinance, Hosting Platforms are free to charge a fee for posting a listing (even a listing for an unregistered unit) on their websites."). The record before the Court simply does not support a finding that the Ordinance will inevitably or necessarily treat plaintiffs as publishers or speakers of user content, or force them to edit or remove postings.

Plaintiffs also slight the fact that preemption under the FMIA is different from and potentially much broader than under Section 230(c). *Compare* CDA, 47 U.S.C. § 230(e)(3) ("No cause of action may be brought and no liability may be imposed under any State or local law that is *inconsistent* with this section.") (emphasis added) *with* FMIA, 21 U.S.C. § 678 (barring a state from imposing requirements "in addition to, or different than . . . requirements within the scope" of the FMIA -- even if the requirements do not conflict). It is the scope of Section 230(c) that governs here, and the Ninth Circuit has expressly cautioned against applying it "beyond its narrow language and its purpose." *Internet Brands*, 824 F.3d at 853. Requirements that might have an incidental ripple effect on Internet postings are not barred under the CDA. "Congress has not provided an all purpose get-out-of-jail-free card for businesses that publish user content on the internet" even when a claim "might have a marginal chilling effect on internet publishing businesses." *Id.*

Other factors also counsel against plaintiffs' reading of *National Meat*. Cases that have construed *National Meat* in contexts outside the FMIA have limited it to its particular facts. The Second Circuit, for example, declined to apply it to find preemption of a New York state law regulating the sale of certain tobacco products. *See U.S. Smokeless Tobacco Mfg. Co. LLC v. City of New York*, 708 F.3d 428, 434 (2d Cir. 2013). The circuit held that "it does not follow that every sales ban . . . should be regarded as a backdoor" attempt to regulate conduct upstream from the actual sale of goods or services. *Id.* In addition, the broad reading of *National Meat* that plaintiffs urge would give them a windfall over potential competitors. The Ordinance is intended to apply to all hosting services, whether online or not. Dkt. No. 50-2 at 2. Plaintiffs' backdoor argument under Section 230(c) would carve out favorable treatment for themselves, as online companies, that booking service providers not based on the Internet would not enjoy. *See Roommates.com*, 521 F.3d at 1164 n.15 (CDA immunity should not be applied to "give online businesses an unfair advantage over their real-world counterparts").

Plaintiffs have not demonstrated a likelihood of success or a serious question on preemption under Section 230(c). Consequently, an injunction is denied on that ground.

## B. First Amendment

Plaintiffs also challenge the Ordinance under the First Amendment. Plaintiffs say the Ordinance triggers First Amendment scrutiny because its practical effect will be to burden speech, and that it is subject to "heightened" scrutiny because it restricts particular content, namely advertisements for unlawfully registered rentals. Dkt. No. 50 at 20-22; Dkt. No. 72 at 18:22-25. These contentions are unavailing.

The initial inquiry under the First Amendment is whether the Ordinance primarily targets speech or speakers, or is better construed as an economic regulation. "[R]estrictions on protected expression are distinct from restrictions on economic activity or, more generally, on nonexpressive conduct," and "the First Amendment does not prevent restrictions directed at commerce or conduct from imposing incidental burdens on speech." *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 567 (2011). Consequently, as our circuit has held, the "threshold question is whether conduct with a 'significant expressive element' drew the legal remedy or the ordinance has the inevitable effect

11

of 'singling out those engaged in expressive activity.'" *Int'l Franchise Ass'n, Inc. v. City of Seattle*, 803 F.3d 389, 408 (9th Cir. 2015) (quoting *Arcara v. Cloud Books, Inc.*, 478 U.S. 697, 706-07 (1986)).

Plaintiffs have not demonstrated that the Ordinance meets either of these threshold conditions. A Booking Service as defined and targeted by the Ordinance is a business transaction to secure a rental, not conduct with a significant expressive element. *See Int'l Franchise Ass'n*, 803 F.3d at 408 ("decision of a franchisor and a franchisee to form a business relationship and their resulting business activities" not expressive conduct). The Ordinance also does not single out those engaged in expressive activity "such as newspapers or advocacy organizations." *Id.* No specific speaker is targeted for disparate or unfavorable treatment under the Ordinance. Although the Ordinance does note that Hosting Platforms are "usually" online platforms, the law is not limited to entities operating on the Internet. Dkt. No. 50-2 at 2. And plaintiffs have not established that the Ordinance was "motivated by a desire to suppress speech." *Int'l Franchise Ass'n*, 803 F.3d at 409. The legislative record plaintiffs present indicates that the Ordinance was adopted to help enforce compliance with the registration requirement by ensuring that "hosting platforms do business with law-abiding hosts." *See, e.g.*, Dkt. No. 51-3 at 1 (legislative remarks of Supervisor Campos). In light of these factors, the Court finds that the Ordinance is directed at specific business transactions and practices, and "not to any message the businesses express." *Int'l Franchise Ass'n*, 803 F.3d at 409.

Plaintiffs contend that two Supreme Court cases require a different outcome: *Sorrell*, 564 U.S. at 564, which struck down a Vermont statute that restricted the sale, disclosure and use of pharmacy records revealing doctors' drug prescribing practices so that "recipient speakers" such as pharmaceutical companies could not receive or "use the information for marketing"; and *Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.*, 502 U.S. 105 (1991), which invalidated a New York statute, the "Son of Sam" law, that would have restricted a criminal's right to profit from literary or other works based on the crime. But neither case leads to the result plaintiffs seek. The Vermont law in *Sorrell* on its face "disfavor[ed] marketing, that is, speech with a particular content," and "[m]ore than that, . . . disfavor[ed] specific speakers, namely

1   pharmaceutical manufacturers." 564 U.S. at 564. Consequently, the Supreme Court found that
2   those were "content- and speaker-based" restrictions that did not withstand First Amendment
3   scrutiny. *Id.* at 563-80. The New York law in *Simon & Schuster* was also a "content-based
4   statute" because it singled out income derived from classically "expressive activity" (*e.g.*, books,
5   movies, magazine articles, or other "expression[s] of [an] accused or convicted person's thoughts,
6   feelings, opinions or emotions" about the crime), and was directed only at "works with a specified
7   content" (*i.e.*, relating to the "reenactment of [the] crime"). 502 U.S. at 110, 116. These core First
8   Amendment concerns are not implicated by the Ordinance here.

9   Plaintiffs' other citations are similarly inapposite. *Reed v. Town of Gilbert, Arizona*, 135
10  S. Ct. 2218 (2015), for example, invalidated under the First Amendment a municipal code that
11  imposed disparate restrictions on the display of outdoor signs based on the speech content of the
12  signs. Signs expressing "political" messages or directing passersby to religious, charitable or
13  other non-profit organization events were subjected to different and more burdensome regulations
14  than other signs. *Id.* at 2224-25. The Court invalidated this "Sign Code" under strict scrutiny
15  precisely because it improperly imposed "content-based restrictions on speech." *Id.* at 2231-32.
16  Similarly, the Supreme Court in *Bigelow v. Virginia*, 421 U.S. 809 (1975), struck down a Virginia
17  law that "made it a misdemeanor, by the sale or circulation of any publication, to encourage or
18  prompt the procuring of an abortion." *Id.* at 811. And, as previously discussed, *McKenna*, 881 F.
19  Supp. 2d at 1268, addressed a Washington law that made it a felony to publish, disseminate, or
20  display advertisements for a commercial sex act "that includes the depiction of a minor." The
21  common denominator in these and the other cases plaintiffs have proffered is that they involved
22  laws that plainly targeted and disfavored specific speech content or speakers. The law in this case
23  stands apart as one that targets nonexpressive commercial conduct rather than speech content.

24  Plaintiffs' fallback position is that the Ordinance is a restriction on speech in the "disguise"
25  of a conduct regulation. Dkt. No. 50 at 21; Dkt. No. 64 at 10-11. But this argument is little more
26  than an expression of the widely recognized condition that speech and conduct fall on a
27  continuum, and a law that affects one will often affect the other. "Every civil and criminal remedy
28  imposes some conceivable burden on First Amendment protected activities." *Arcara*, 478 U.S. at

706 (citing as an example that "a thief who is sent to prison might complain that his First Amendment right to speak in public places has been infringed because of the confinement"); s*ee also Barnes*, 501 U.S. at 570 ("It is possible to find some kernel of expression in almost every activity a person undertakes -- for example, walking down the street or meeting one's friends at a shopping mall -- but such a kernel is not sufficient to bring the activity within the protection of the First Amendment."). It does not follow, then, that every sanction under a law is subject to First Amendment scrutiny "simply because each particular remedy will have some effect on the First Amendment activities of those subject to sanction." *Arcara*, 478 U.S. at 706. Unlike the cases plaintiffs cite, the Ordinance here enacts "restrictions directed at commerce or conduct," namely the booking of rentals for unregistered units. *Sorrell*, 564 U.S. at 567. To the limited extent the Ordinance might be said to affect speech, the impact or burden is purely incidental. *Id.* Because the Ordinance "was not motivated by a desire to suppress speech, the conduct at issue is not . . . expression, and the ordinance does not have the effect of targeting expressive activity," *Int'l Franchise Ass'n*, 803 F.3d at 409, the First Amendment is "not implicated" at all. *Arcara*, 478 U.S. at 707.

This is enough to end plaintiffs' First Amendment challenge, but even if the Ordinance is reviewed as a restriction on commercial speech, it survives scrutiny. To the extent the Ordinance can be said to affect speech at all, it involves speech that "does no more than propose a commercial transaction" and consequently is "commercial speech." *Lone Star Security and Video, Inc. v. City of Los Angeles*, 827 F.3d 1192, 1198 n.3 (9th Cir. 2016) (internal quotation omitted). Plaintiffs agree with this approach. Dkt. No. 50 at 21.

As a preliminary matter to the commercial speech discussion, the parties dispute the appropriate level of scrutiny. Our circuit recently resolved this issue by reaffirming after publication of *Reed* and *Sorrell* that commercial speech, even if content-based, need only withstand intermediate scrutiny under *Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n of New York*, 447 U.S. 557, 564 (1980). *See Lone Star*, 827 F.3d at 1198 n.3. In any event, the level of scrutiny does not drive the First Amendment analysis here. Our circuit applies a four-part test from *Central Hudson* to decide commercial speech challenges, and the "threshold

14

requirement" is that the speech must be related to lawful activity. *Valle Del Sol Inc. v. Whiting*, 709 F.3d 808, 816 (9th Cir. 2013) ("we first evaluate whether the affected speech is misleading or related to unlawful activity."). If it is, the commercial speech at issue is not protected by the First Amendment and no further analysis is required. *Id.* at 820-21.

*Central Hudson*'s legality requirement has "traditionally focused on the content of the affected speech -- i.e., whether the speech proposes an illegal transaction." *Valle Del Sol*, 709 F.3d at 821. This is so because the Supreme Court has consistently held that speech proposing an illegal transaction is excluded from First Amendment protection. *See United States v. Williams*, 553 U.S. 285, 297 (2008); *Pittsburgh Press Co. v. Pittsburgh Comm'n on Human Relations,* 413 U.S. 376, 388-89 (1973) ("Any First Amendment interest which might be served by advertising an ordinary commercial proposal and which might arguably outweigh the governmental interest supporting the regulation is altogether absent when the commercial activity itself is illegal and the restriction on advertising is incidental to a valid limitation on economic activity."). Consequently, the determinative question is "whether 'the transactions proposed in the forbidden [communication] are themselves illegal in any way.'" *Valle Del Sol*, 709 F.3d at 821 (quoting *Va. State Bd. of Pharm. v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 772 (1976)). If they are, the speech is unprotected and the government may freely regulate it. *Fla. Bar v. Went For It, Inc.*, 515 U.S. 618, 623-24 (1995); *Washington Mercantile Ass'n v. Williams*, 733 F.2d 687, 691 (9th Cir. 1984) (affirming state ban on advertisements for drug paraphernalia when sale of paraphernalia is illegal).

These well-established principles forestall plaintiffs' argument. As plaintiffs expressly agree, it is illegal in San Francisco to rent a unit that is not lawfully registered. Dkt. No. 72 at 14:21-15:1. They cannot seek, then, to set aside on First Amendment grounds an ordinance that they contend would restrict their ability to communicate offers to rent unregistered units. Plaintiffs' reply arguments do not point to a different outcome. For example, plaintiffs quote *McKenna*, 881 F. Supp. 2d at 1281, for the proposition that "[t]he third-party publication of offers to engage in illegal transactions does not fall within 'well-defined and narrowly limited classes of speech' that fall outside of First Amendment protection." Dkt. No. 64 at 11. But in *Pittsburgh*

15

*Press*, the Supreme Court expressly stated that "[w]e have no doubt that a newspaper constitutionally could be forbidden to publish a want ad proposing a sale of narcotics or soliciting prostitutes." 413 U.S. at 388. Plaintiffs also contend that "First Amendment scrutiny [is] required unless 'the ad on its face' is unlawful." Dkt. No. 64 at 11 (quoting *Braun v. Soldier of Fortune Magazine, Inc.*, 968 F.2d 1110, 1117-18 (11th Cir. 1992)). But *Braun* does not stand for that proposition. In that case, the Eleventh Circuit held that as a matter of state tort law, it was appropriate to impose liability only if an advertisement "on its face" would have alerted the publisher of the proposed illegality. 968 F.2d at 1118. As a matter of First Amendment law, however, the court confirmed that "[i]t is well-settled that the First Amendment does not protect commercial speech 'related to illegal activity,' and, thus, there is no constitutional interest in publishing personal service ads that solicit criminal activity." *Id.* at 1117 (citations omitted).

Plaintiffs also make a cursory argument in their reply brief that the Ordinance offends the First Amendment because it requires Hosting Platforms to file a monthly declaration of compliance with the Ordinance and to keep records of facilitated transactions. Dkt. No. 50 at 21. This is unpersuasive. The filing and records requirements relate solely to business transactions. They do not regulate or restrict any speech (*e.g.*, there is no requirement that Hosting Platforms keep records of listings they publish) or any speaker based on the content or views expressed, and so do not trigger any First Amendment concerns.

Plaintiffs have not demonstrated a likelihood of success or a serious question under the First Amendment. Consequently, an injunction is denied on that ground.

### C. Imposition of Criminal Strict Liability

Plaintiffs' final attack on the Ordinance is that it purportedly imposes criminal liability without proof of scienter. Dkt. No. 50 at 25-26. In plaintiffs' view, the imposition of strict liability for the dissemination of information is impermissible even when the content is unprotected under the First Amendment. *Id.* While several points can be made in response, this challenge does not require extended discussion. San Francisco has expressly accepted the imputation of a scienter requirement "[b]ecause scienter is commonly understood to be an element of criminal liability." Dkt. No. 57 at 25. And nothing in the record before the Court shows a

legislative intent on San Francisco's part to dispense with *mens rea* as an element. *See Staples v. United States*, 511 U.S. 600, 605-06 (1994). The Court will construe the Ordinance as requiring scienter, and San Francisco will be held to that interpretation.

Plaintiffs also contend the Ordinance is fatally ambiguous. Dkt. No. 50 at 26-27. They say, for example, that "lawfully registered" is unclear because registration involves a "multitude" of requirements ranging from insurance to tax reports. *Id.* And that "at the time it is rented" is unclear because it does not specify clearly enough the moment in time that is covered. *Id.* at 27. But San Francisco again has solved plaintiffs' concerns by declaring that "lawfully registered" means the host has a registration certificate, and that "at the time it is rented" means when the booking transaction occurs. Dkt. No. 60 ¶¶ 12-13. Those constructions also bind San Francisco and are enough at this stage to alleviate the concern that the Ordinance might fail "to give adequate notice to people of ordinary intelligence concerning the conduct it prescribes" or invite "arbitrary and discriminatory enforcement." *United States v. Doremus*, 888 F.2d 630, 634 (9th Cir. 1989) (citing *Schwartzmiller v. Gardner*, 752 F.2d 1341, 1345 (9th Cir.1984)). Plaintiffs are certainly free to raise these arguments in more concrete terms if enforcement proceedings implicate them in the future.

### III. Further Proceedings

The CDA, the First Amendment, and scienter are the three main grounds on which plaintiffs moved for an injunction. They have not demonstrated the "irreducible minimum" of a likelihood of success on the merits of these arguments or questions serious enough to require litigation, and so the injunction is properly denied without consideration of the other *Winter* factors. *Pimentel*, 670 F.3d at 1111.

Plaintiffs have, however, arguably raised another possible ground for an injunction. Liability and penalties under the Ordinance turn on whether a rental is lawfully registered, but as plaintiffs point out, and San Francisco forthrightly concedes, OSTR currently does not have in place a procedure or mechanism for prompt and effective registration verification. At most, San Francisco mentions several possibilities along with the representation that OSTR "is willing to engage with Hosting Platforms as partners to develop a mechanism." Dkt. No. 60 ¶ 11.

Plaintiffs have understandably expressed concerns about the lack of a functional verification system while they face potential criminal sanctions under the Ordinance. The issue came up at oral argument and was referenced in the briefs, but the Court has not yet had the benefit of a full discussion of the merits. Consequently, the Court defers determination of whether a preliminary injunction should issue on this ground pending submission of supplemental briefs by the parties. A status conference is set for **Thursday, November 17, 2016, at 10:00 a.m.** The parties should be prepared to set a briefing schedule and should try to work out a joint proposal before the conference. If plaintiffs would prefer not to pursue this issue, they should advise the Court promptly.

The Court anticipates that San Francisco will continue to abide by the stay of enforcement of the Ordinance until this question is resolved.

**IT IS SO ORDERED.**

Dated: November 8, 2016

JAMES DONATO
United States District Judge